UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

| | | |
|---|---|---|
| RICHARD MUNCH, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>SPROUT SOCIAL, INC., et al.,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No.  1:24-cv-03867<br><br>Judge Lindsay C. Jenkins<br><br>CLASS ACTION |
| CITY OF HOLLYWOOD POLICE OFFICERS' RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>SPROUT SOCIAL, INC., et al.,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No.  1:24-cv-05582<br><br>Judge John Robert Blakey<br><br>CLASS ACTION |

MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR CONSOLIDATION OF RELATED ACTIONS, APPOINTMENT AS LEAD PLAINTIFF, AND APPROVAL OF LEAD PLAINTIFF'S SELECTION OF LEAD COUNSEL

4875-7346-6575.v1

**TABLE OF CONTENTS**

**Page**

I.  INTRODUCTION ......................................................................................................1

II. FACTUAL BACKGROUND ......................................................................................2

III. ARGUMENT ............................................................................................................5

      A.    The Related Actions Should Be Consolidated.........................................................5

      B.    The Michigan Pension Funds Should Be Appointed Lead Plaintiff.......................6

            1.    The Michigan Pension Funds' Motion Is Timely .......................................6

            2.    The Michigan Pension Funds Have the Largest Financial Interest in the Relief Sought by the Class....................................................................7

            3.    The Michigan Pension Funds Satisfy the Rule 23 Typicality and Adequacy Requirements ...........................................................................7

      C.    The Court Should Approve the Michigan Pension Funds' Selection of Counsel .................................................................................................................9

IV. CONCLUSION........................................................................................................10

4875-7346-6575.v1

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Flynn v. Exelon Corp.*,
No. 1:19-cv-08209 (N.D. Ill. July 21, 2020) ...............................................................9

*In re Cardinal Health, Inc. Sec. Litig.*,
No. 2:04-cv-00575-ALM (S.D. Ohio) .......................................................................10

*In re Enron Corp. Sec.*,
No. 4:01-cv-03624 (S.D. Tex.) ..................................................................................10

*In re GoHealth, Inc. Sec. Litig.*,
No. 1:20-cv-05593 (N.D. Ill. Dec. 10, 2020) ..............................................................9

*In re HealthSouth Corp. Sec. Litig.*,
No. 2:03-cv-01500-KOB-TMP (N.D. Ala.) ...............................................................10

*In re Neopharm, Inc. Sec. Litig.*,
225 F.R.D. 563 (N.D. Ill. 2004) ..................................................................................8

*In re Qwest Commc'ns Int'l, Inc. Sec. Litig.*,
No. 1:01-cv-01451-REB-KLM (D. Colo.) .................................................................10

*In re UnitedHealth Grp. Inc. Sec. Litig.*,
No. 0:06-cv-01691-JMR-FLN (D. Minn.) ..................................................................10

*Lawrence E. Jaffe Pension Plan v. Household Int'l, Inc.*,
No. 1:02-cv-05893 (N.D. Ill.) .................................................................................9, 10

*Mortimer v. Diplomat Pharmacy Inc.*,
2019 WL 3252221 (N.D. Ill. July 19, 2019).................................................................7

*Silverman v. Motorola, Inc.*,
2012 WL 1597388 (N.D. Ill. May 7, 2012), *aff'd*, 739 F.3d 956 (7th Cir. 2013) ...................10

*Sokolow v. LJM Funds Mgmt., Ltd.*,
2018 WL 3141814 (N.D. Ill. June 26, 2018) ...............................................................8

4875-7346-6575.v1

**Page**

## STATUTES, RULES, AND REGULATIONS

15 U.S.C.

§78u-4(a)(1) ................................................................................................6

§78u-4(a)(3)(A) ............................................................................................6

§78u-4(a)(3)(A)(i) ........................................................................................6

§78u-4(a)(3)(B)(i) .........................................................................................1

§78u-4(a)(3)(B)(ii) .....................................................................................1, 5

§78u-4(a)(3)(B)(iii) ....................................................................................1, 6

§78u-4(a)(3)(B)(iii)(I)(cc) ............................................................................7

§78u-4 (a)(3)(B)(v) ............................................................................. *passim*

4875-7346-6575.v1

## I.  INTRODUCTION

Two related securities class action lawsuits brought on behalf of purchasers of Sprout Social, Inc. ("Sprout Social" or the "Company") securities are pending in this district.[1]  The Private Securities Litigation Reform Act of 1995 ("PSLRA") requires district courts to resolve consolidation before appointing a lead plaintiff in securities cases.  *See* 15 U.S.C. §78u-4(a)(3)(B)(ii).  Here, the Related Actions should be consolidated because they are based on the same core set of facts and assert identical claims against identical defendants on behalf of a proposed class of investors that purchased Sprout Social securities during overlapping time periods alleging the same violations of the federal securities laws.  *See* Fed. R. Civ. P. 42(a); §III.A., *infra*.

As soon as practicable after consolidating the Related Actions, the Court "shall appoint the most adequate plaintiff as lead plaintiff for the consolidated actions." 15 U.S.C. §78u-4(a)(3)(B)(ii). The lead plaintiff is the "member or members of the purported plaintiff class that the court determines to be most capable of adequately representing the interests of class members." 15 U.S.C. §78u-4(a)(3)(B)(i).  Here, the Michigan Laborers' Pension Fund and City of Warren Police and Fire Retirement System and Health Benefits Plan VEBA Trust (collectively, the "Michigan Pension Funds") should be appointed lead plaintiff because they filed a timely motion, have a significant financial interest in the outcome of this litigation, and will typically and adequately represent the class's interests.  *See* 15 U.S.C. §78u-4(a)(3)(B)(iii).  In addition, the Michigan Pension Funds' selection of Robbins Geller Rudman & Dowd LLP to serve as lead counsel is reasonable and should be approved.  *See* 15 U.S.C. §78u-4 (a)(3)(B)(v).

---

[1]  The Related Actions are *Munch v. Sprout Social, Inc.*, No. 1:24-cv-03867 (filed May 13, 2024) and *City of Hollywood Police Officers' Ret. Sys. v. Sprout Social, Inc.*, No. 1:24-cv-05582 (filed July 2, 2024). Unless otherwise noted, all emphasis is added and citations are omitted.

4875-7346-6575.v1

## II. FACTUAL BACKGROUND

Sprout Social is a Chicago-based software company which develops and operates a web-based social media management platform. The Company's software offers a centralized platform for customers to manage social media outreach, including integrated tools for social engagement, publishing, reporting, and analytics. The Company generates revenue primarily from subscriptions to its social media management platform under a software-as-a-service model. The Company's stock trades on the NASDAQ under the ticker SPT.

The *Hollywood* complaint alleges that, leading up to the Class Period, Sprout Social began to change its business mix, targeting larger customers for annual contracts. For example, on May 5, 2021, the Company noted the shift to a "50-50 split between month-to-month and annual contracts[,]" with defendants expecting to "see that widening over the longer term." *Hollywood* Action, ECF 1 at ¶3. The *Hollywood* complaint continues, alleging that throughout the Class Period, defendants touted "continued momentum in the midmarket and enterprise and our ability to kind of go upmarket," as it transitioned to larger customers that would sign annual contracts. *Id.* at ¶4. In making this transition, defendants highlighted the Company's "unique go-to-market strategy" and that "execution from the sales organization has been really strong." *Id.* Indeed, when asked on February 22, 2022 if there were any impediments to "landing larger customer deals[,]" defendant Justyn Howard, the Company's co-founder and current Chief Executive Officer emphasized that "we're well equipped for the deals that are out there. . . . So there's not anything that we would look to and put on the board as deficiencies[.]" *Id.* During the same call, Company President defendant Ryan Barretto assured investors that Sprout Social's deals with these larger customers were "still running at a sales cycle that runs between 30 to 45 days on average." *Id.* at ¶5. Defendants repeatedly assured investors that Sprout Social was "keeping the sales cycles moving quickly" while

- 2 -

the Company changed the mix of its customer base, and that the larger customers "land with similar costs and similar sales cycles as the rest of our customer base." *Id.*

Unbeknownst to investors, however, the *Hollywood* complaint alleges that Sprout Social did not have the structural ability to sell its software to enterprise customers and thus could not execute on its purported go to-market strategies for enterprise customers. Further, and as was only revealed to investors at the end of the Class Period, the Company had seen "lengthening of [its] sales cycles as the composition of the customer base and the prospect base [had] chang[ed]" and had seen "longer-type sales cycles, [requests for proposals ("RFPs")], for example, from larger companies that are going to be back-end loaded." *Hollywood* Action, ECF 1 at ¶6.

The *Hollywood* complaint alleges that after the markets closed on August 3, 2023, Sprout Social lowered its full-year revenue and non-GAAP operating income guidance and announced it had acquired Tagger Media, Inc., a leading influencer marketing and social intelligence platform used by enterprise customers, for $140 million – a purchase price analysts thought to be "steep." In a conference call that day, defendants disclosed that Sprout Social acquired Tagger because the Company lacked the ability to provide influencer marketing even though "influencer [marketing was] a customer requirement showing up in more than half of our enterprise conversations." *Hollywood* Action, ECF 1 at ¶7. Thus, defendants admitted that, despite years of promoting Sprout Social's ability to land larger enterprise clients, the Company could not even address a critical need required by the majority of its target market.

Indeed, analysts at Cantor Fitzgerald wrote that the acquisition "further complicates the story, as there is a lot of noise surrounding [Sprout Social's] customer count and go-to-market strategy." *Hollywood* Action, ECF 1 at ¶8. Accordingly, the analysts could not "overlook the opportunity cost associated with a $140m purchase price for a company that is projecting ~$6m of revenue in 2023E [estimated ("E")] and ~$15m in revenue for 2024E" as Sprout Social "is likely to pay more in

- 3 -

interest expense in 2024E [$6-8m] than the revenue that Tagger is going to generate in 2023E (~$6m)." *Id.* Piper Sandler analysts explained that, given the acquisition, the "biggest outstanding question is on the enterprise pipeline in the back half" of the year. *Id.* Analysts at CG Capital Markets similarly queried whether Sprout Social was "making an acquisition to mask deteriorating growth." *Id.* The market agreed with the analysts, as the next trading day, Sprout Social's stock price fell 12.3%. However, the Company continued to misrepresent its ability and success in shifting its customer mix to larger, mid-market and enterprise customers.

For example, during the Company's Investor Day conference on September 27, 2023, in response to an analyst question as to whether Sprout Social had the ability to serve both its large and smaller customer base, defendant Barretto explained that the Company "felt really great about the capacity that we had in places like mid-market and enterprise and places like solution engineering that support the enterprise and places like customer success that we're supporting some of our larger customers." *Hollywood* Action, ECF 1 at ¶10. Then, during an earnings call held on February 20, 2024, in response to a similar question about Sprout Social's ability to sell to enterprise clients, defendant Barretto again explained that "a lot of that transition was happening through '23" and that the Company previously accomplished the "redeployment of our resources towards those sophisticated customers in the core." *Id.*

Then, on May 2, 2024, after the market closed, Sprout Social disclosed that it had missed its revenue guidance for the first fiscal quarter of 2024 and issued a $20 million downward revision to Sprout Social's fiscal 2024 results because Sprout Social had "underestimated the magnitude of enterprise seasonality" and had endured "self-induc[ed] sales execution headwinds." *Hollywood* Action, ECF 1 at ¶62. Defendant Barretto disclosed that the Company "made several important strategic decisions heading into Q1" that included "building new vertical sales teams, accelerating promotions in our midmarket and enterprise teams, adjusting our account coverage model and

- 4 -

prioritizing Tagger enablement for all of our customer-facing teams." *Id.* at ¶63. Despite having pursued, purportedly successfully, the move "upmarket" for years, and in contrast to the Company's prior statements, defendants finally revealed "we are definitely seeing lengthening of our sales cycles, as the composition of our customer base . . . is changing." *Id.* at ¶65.

Analysts were incredulous. For example, Cantor Fitzgerald reminded investors that the Company "announced its move to go up-market" long before 2024, and "thus the execution issues it is now facing, which are a result of its [go-to-market] strategy, should have been apparent much earlier than today." *Hollywood* Action, ECF 1 at ¶67. Analysts at Jefferies were "puzzl[ed] [with] the disconnect between the actions that were taken at the beginning of the year[], the subsequent issuance of full[-]year guidance on 2/21, and now a material guide down." *Id.*

On this news, the price of Sprout Social stock plunged over 40%, wiping out a substantial amount of shareholder value.

## III. ARGUMENT

### A. The Related Actions Should Be Consolidated

The PSLRA provides that "[i]f more than one action on behalf of a class asserting substantially the same claim or claims arising under this chapter has been filed," the court shall not appoint a lead plaintiff until "after the decision on the motion to consolidate is rendered." 15 U.S.C. §78u-4(a)(3)(B)(ii). Under Rule 42(a), consolidation is appropriate when actions "involve a common question of law or fact." Fed. R. Civ. P. 42(a). The Related Actions present nearly identical factual and legal issues, allege the same claims on behalf of overlapping classes of Sprout Social investors, and name the same four defendants. Because the Related Actions clearly arise out of the same facts and circumstances, the same discovery will be relevant to all lawsuits. Thus, consolidation is appropriate here.

4875-7346-6575.v1

B.      **The Michigan Pension Funds Should Be Appointed Lead Plaintiff**

The PSLRA establishes the procedure for the appointment of a lead plaintiff in "each private action arising under [the 1934 Act] that is brought as a plaintiff class action pursuant to the Federal Rules of Civil Procedure." 15 U.S.C. §78u-4(a)(1). First, "[n]ot later than 20 days" after the complaint is filed, a notice must be published "in a widely circulated national business-oriented publication or wire service" advising members of the purported plaintiff class "of the pendency of the action, the claims asserted therein, and the purported class period" and that "not later than 60 days after the date on which the notice is published, any member of the purported class may move the court to serve as lead plaintiff." 15 U.S.C. §78u-4(a)(3)(A)(i). The statutory notice in this case was published on May 13, 2024 via *Business Wire*. Motion, Ex. A.

Next, the PSLRA provides that the Court shall adopt a presumption that the most adequate plaintiff is the person that:

(aa) has either filed the complaint or made a motion in response to a notice . . . ;

(bb) in the determination of the court, has the largest financial interest in the relief sought by the class; and

(cc) otherwise satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure.

15 U.S.C. §78u-4(a)(3)(B)(iii). The Michigan Pension Funds meet these requirements and should therefore be appointed Lead Plaintiff.

1.      **The Michigan Pension Funds' Motion Is Timely**

The May 13th statutory notice published in this case advised purported class members of the pendency of the action, the claims asserted, the proposed class period, and the right to move the Court to be appointed as lead plaintiff within 60 days, or by July 12, 2024. *See* Motion, Ex. A; 15 U.S.C. §78u-4(a)(3)(A). Because the Michigan Pension Funds' motion was timely filed, they are eligible for appointment as lead plaintiff.

- 6 -

**2.**        **The Michigan Pension Funds Have the Largest Financial
Interest in the Relief Sought by the Class**

As evidenced by their Certifications and the accompanying loss chart, the Michigan Pension

Funds have a significant financial interest stemming from the purchase of 13,836 shares of Sprout

Social stock during the Class Period, resulting in approximately $370,216 in losses as a result of

defendants' alleged misconduct. *See* Motion, Exs. B, C. To the best of their counsel's knowledge,

there are no other plaintiffs with a larger financial interest. Therefore, the Michigan Pension Funds

satisfy the PSLRA's prerequisite of having the largest financial interest.

**3.**        **The Michigan Pension Funds Satisfy the Rule 23 Typicality
and Adequacy Requirements**

In addition to possessing a significant financial interest, a lead plaintiff must also "otherwise

satisf[y] the requirements of Rule 23 of the Federal Rules of Civil Procedure." 15 U.S.C. §78u-

4(a)(3)(B)(iii)(I)(cc). Rule 23 requires that "the claims or defenses of the representative parties are

typical of the claims or defenses of the class; and [that] the representative parties will fairly and

adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(3)-(4). Only two of the Rule 23

requirements pertain to the lead plaintiff motion: typicality and adequacy. *Mortimer v. Diplomat

Pharmacy Inc.*, 2019 WL 3252221, at *4 (N.D. Ill. July 19, 2019). "'[A] plaintiff's claims are

typical if they "arise[ ] from the same event or practice or course of conduct that gives rise to the

claims of other class members and his or her claims are based on the same legal theory."'" *Id.* "'A

lead plaintiff meets the adequacy requirement if (1) its claims are not antagonistic or in conflict with

those of the class; (2) it has sufficient interest in the outcome of the case to ensure vigorous

advocacy; and (3) it is represented by competent, experienced counsel who be able to prosecute the

litigation vigorously.'" *Id.*

Here, the Michigan Pension Funds' claims are typical of – if not identical to – the claims of

the class as a whole. Like the purported class members, the Michigan Pension Funds: (1) purchased

- 7 -

Sprout Social stock during the Class Period; (2) were adversely affected by defendants' allegedly false and misleading statements and omissions; and (3) suffered damages thereby. In other words, the Michigan Pension Funds' claims arise from the same alleged misconduct and are based on the same legal theory as the claims of other class members. The Michigan Pension Funds' substantial stake in the outcome of the case indicates that they have the requisite incentive to vigorously represent the class's claims. Moreover, the Michigan Pension Funds are the paradigmatic lead plaintiff under the PSLRA because they are sophisticated institutional investors with a substantial financial interest in the resolution of the action. *See* H.R. Conf. Rep. No. 104-369, at 34 (1995), *reprinted in* 1995 U.S.C.C.A.N. 730, 733; S. Rep. No. 104-98, at 6 (1995), *reprinted in* 1995 U.S.C.C.A.N. 679, 685; *see also In re Neopharm, Inc. Sec. Litig.*, 225 F.R.D. 563, 567 (N.D. Ill. 2004) ("Congress 'anticipated and intended' large institutional investors to oversee securities cases."); *Sokolow v. LJM Funds Mgmt., Ltd.*, 2018 WL 3141814, at *5 (N.D. Ill. June 26, 2018) (finding that the PSLRA indicates a "'presumption that institutional investors be appointed lead plaintiff'").

Further, each member of the Michigan Pension Funds has significant experience serving in a fiduciary capacity and supervising the work of outside counsel. As set forth in greater detail in the Joint Declaration submitted herewith (*see* Motion, Ex. D), the Michigan Pension Funds understand the obligations of a lead plaintiff to absent class members under the PSLRA, and are willing and able to undertake the responsibilities of lead plaintiff in this litigation to ensure vigorous and efficient prosecution. The Michigan Pension Funds' collaboration in this litigation follows from their roles as fiduciaries to their respective members and their shared goals and interests in protecting and maximizing pension fund assets. Moreover, before seeking a role as lead plaintiff, representatives from the Michigan Pension Funds participated in a conference call to discuss, among other things, the merits of the claims, as well as their common goals and strategy for the joint prosecution of this

- 8 -

4875-7346-6575.v1

Action. *See* Motion, Ex. D at ¶¶ 5-6. Thus, the Michigan Pension Funds have the incentive and commitment to vigorously prosecute this action in a cohesive and coordinated fashion, and the ability to supervise and monitor counsel.

Finally, as further detailed below, the Michigan Pension Funds retained qualified and experienced proposed lead counsel to vigorously prosecute the case on behalf of the class.

Because the Michigan Pension Funds filed a timely motion, have a large financial interest in the relief sought by the class, and demonstrated their typicality and adequacy, the Court should adopt the presumption that they are the "most adequate plaintiff."

### C. The Court Should Approve the Michigan Pension Funds' Selection of Counsel

The PSLRA vests authority in the lead plaintiff to select and retain lead counsel, subject to this Court's approval. *See* 15 U.S.C. §78u-4(a)(3)(B)(v). Here, the Michigan Pension Funds have selected Robbins Geller to serve as lead counsel for the proposed class.

Robbins Geller possesses the experience and resources necessary to successfully prosecute this large and complex action for the benefit of the class. With more than 200 attorneys in offices nationwide, including within this District, Robbins Geller possesses substantial experience in complex securities litigation.[2] Courts in this District and throughout the nation have noted Robbins Geller's reputation for excellence, resulting in the appointment of Robbins Geller to lead roles in hundreds of securities class actions and other complex litigations. *See, e.g.*, *In re GoHealth, Inc. Sec. Litig.*, No. 1:20-cv-05593, ECF 61 (N.D. Ill. Dec. 10, 2020) (Coleman, J.) (appointing Robbins Geller attorneys as lead counsel in securities class action case); *Flynn v. Exelon Corp.*, No. 1:19-cv-08209, ECF 64 (N.D. Ill. July 21, 2020) (same). For example, in *Lawrence E. Jaffe Pension Plan v.*

---

[2] For a detailed description of Robbins Geller's track record, resources, and attorneys, please see https://www.rgrdlaw.com. A hard copy of the Firm's resume is available upon the Court's request, if preferred.

- 9 -

*Household Int'l, Inc.*, No. 1:02-cv-05893 (N.D. Ill.), Robbins Geller, as sole lead counsel, obtained a record-breaking settlement of $1.575 billion after 14 years of litigation, including a 6-week jury trial in 2009 that resulted in a securities fraud verdict in favor of the class. The settlement is the largest ever following a securities fraud class action trial, the largest securities fraud settlement in the Seventh Circuit, and the seventh-largest settlement ever in a post-PSLRA securities fraud case. Judge Alonso, who presided over the action, stated that "[Robbins Geller] performed a very high-quality legal work in the context of a thorny case in which the state of the law has been and is in flux. They achieved an exceptionally significant recovery for the class. And the Court agrees . . . that it was, in fact, a spectacular result for the class." *Household*, No. 1:02-cv-05893, ECF 2261 at 65 (N.D. Ill. Oct. 20, 2016). Likewise, in *Silverman v. Motorola, Inc.*, 2012 WL 1597388, at *3 (N.D. Ill. May 7, 2012), *aff'd*, 739 F.3d 956 (7th Cir. 2013), Judge Amy J. St. Eve noted "[t]he representation that [Robbins Geller] provided to the class was significant, both in terms of quality and quantity." *Id.* Additionally, Robbins Geller has obtained the largest securities fraud class action recovery in the Fifth, Sixth, Eighth, Tenth, and Eleventh Circuits.[3]

As a result, the putative class's interests in this case will be well represented if the Court approves the Michigan Pension Funds' selection of Robbins Geller as Lead Counsel.

## IV. CONCLUSION

The Related Actions share common legal and factual questions and should be consolidated. In addition, the Michigan Pension Funds satisfy each of the PSLRA's requirements for appointment as lead plaintiff. As such, the Michigan Pension Funds respectfully request that the Court

---

[3] *See In re Enron Corp. Sec.*, No. 4:01-cv-03624 (S.D. Tex.) ($7.3 billion recovery is largest securities class action recovery in U.S. history and in the Fifth Circuit); *In re Cardinal Health, Inc. Sec. Litig.*, No. 2:04-cv-00575-ALM (S.D. Ohio) ($600 million recovery is the largest securities class action recovery in the Sixth Circuit); *In re UnitedHealth Grp. Inc. Sec. Litig.*, No. 0:06-cv-01691-JMR-FLN (D. Minn.) ($925 million recovery is the largest securities class action recovery in the Eighth Circuit); *In re Qwest Commc'ns Int'l, Inc. Sec. Litig.*, No. 1:01-cv-01451-REB-KLM (D. Colo.) ($445 million recovery is the largest securities class action recovery in the Tenth Circuit); *In re HealthSouth Corp. Sec. Litig.*, No. 2:03-cv-01500-KOB-TMP (N.D. Ala.) ($671 million recovery is the largest securities class action recovery in the Eleventh Circuit).

- 10 -

consolidate the Related Actions, appoint the Michigan Pension Funds as Lead Plaintiff, and approve their selection of Lead Counsel.

DATED: July 12, 2024

Respectfully submitted,

ROBBINS GELLER RUDMAN
 & DOWD LLP
DANIELLE S. MYERS (ILND-GB-5711)


s/ Danielle S. Myers
DANIELLE S. MYERS

655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
dmyers@rgrdlaw.com

ROBBINS GELLER RUDMAN
 & DOWD LLP (Firm No. 56028)
JAMES E. BARZ (IL Bar # 6255605)
FRANK A. RICHTER (IL Bar # 6310011)
200 South Wacker Drive, 31st Floor
Chicago, IL  60606
Telephone:  630/696-4107
jbarz@rgrdlaw.com
frichter@rgrdlaw.com

Proposed Lead Counsel for Proposed Lead Plaintiff

VANOVERBEKE, MICHAUD & TIMMONY, P.C.
THOMAS C. MICHAUD
79 Alfred Street
Detroit, MI  48201
Telephone:  313/578-1200
tmichaud@vmtlaw.com

WATKINS, PAWLICK, CALATI & PRIFTI, PC
LAUREN CRUMMEL
1423 E. Twelve Mile Road
Madison Heights, MI  48071
Telephone:  248/658-0797
lcrummel@wpcplaw.com

Additional Counsel

- 11 -