**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| RICHARD MUNCH, Individually and on Behalf of All Others Similarly Situated,<br><br>                        Plaintiff,<br><br>v.<br><br>SPROUT SOCIAL, INC., JUSTYN HOWARD, RYAN BARRETTO, and JOE DEL PRETO,<br><br>                        Defendants. | Case No.: 1:24-cv-03867<br><br>Hon. Jeffrey I. Cummings<br><br><u>CLASS ACTION</u><br><br>**CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**DEMAND FOR JURY TRIAL** |

## <u>TABLE OF CONTENTS</u>

Page

I.    PRELIMINARY STATEMENT ...................................................................................2

II.   JURISDICTION AND VENUE ...............................................................................9

III.  PARTIES ..................................................................................................................9

      A.    Lead Plaintiff ...............................................................................................9

      B.    Defendants ..................................................................................................10

IV.  OVERVIEW OF THE FRAUD...............................................................................12

      A.    Sprout's "Inbound" Business Model Was Designed For Small And Medium-Sized Customers Obtained Through Online Marketing And Free Trials...................................................................................................12

      B.    Defendants Proclaim To Investors That, In Order To Become More Profitable And Grow Sprout's Business, The Company Will Focus On Its Transition "Upmarket" And On Landing Larger Corporate "Enterprise" Customers ...............................................................................................14

      C.    Throughout the Class Period, Defendants Repeatedly Assured Investors That Sprout's Business Model Was Its "*Secret Sauce*" And A "*Huge Differentiator*" That Gave The Company A "*Significant Advantage*" In The Industry Precisely Because It Was Highly Effective For Large Enterprise Customers ...............................................................................16

      D.    Defendants Announce a Partnership With Salesforce That Will Supposedly Bring A Flood Of New Customers, And Continue To Assure Investors That Their Existing Product And Sales Model Can Deliver Sustained Growth...............................................................................................20

      E.    While Post-COVID Headwinds Negatively Impact The SaaS Industry, Defendants Assure Investors That Sprout's "Inbound, Product-Led" Model Remained A "*Secret Weapon*" And A "*Massive Differentiator*" In The Industry...............................................................................................22

      F.    Numerous High-Level Former Sprout Employees Confirm That, Contrary To Defendants' Repeated Representations, Sprout Never Had The Product, Strategy Or Infrastructure Needed To Capture Enterprise Clients ......................25

            1.    "*We Had No Business Competing In The Enterprise Space*": Sprout's Software Platform Lacked Several Fundamental And Essential Features Required By Large, Complex Enterprise Customers .................................................................................27

            2.    "A Total Sh*t Show": Former Sprout Employees Confirm That Sprout's Vaunted "Inbound" Sales Strategy Was "*Very Ineffective*" And "*Definitely Not Successful*" With Enterprise Clients .......................37

i

3. "*How The Hell Are We Going To Sell This*?": Former Employees Confirm That Sprout Could Not Raise Prices On Enterprise Clients Given Its Ineffective Sales Strategy And Inadequate Product ................ 41

4. Sprout Lacked Fundamental And Essential Sales Infrastructure Necessary To Successfully Compete In The Enterprise Space ............... 44

5. After A Short-Lived "Lifeline" From The Salesforce Partnership And A Failed Price Increase, Sprout Resorted To Rampant, Unsustainable Discounting And Other Machinations To Stave Off Its Growth Decline ........................................................................................ 47

G. The Truth Begins To Emerge ........................................................................... 50

1. After A Short-Seller Challenges Sprout's "Upmarket" Strategy And Salesforce Partnership, And A Disappointing Quarter Raises Questions, But Defendants Double Down On Their False Claims .......... 50

2. Sprout Reports Another Disappointing Quarter For Upmarket Growth, Reduces Its 2023 Guidance, And Announces An Expensive New Acquisition—An Influencer Marketing Platform— Admitting That It Had Previously Lacked This Critical Feature ............. 54

3. While Internally Scrambling To Stave Off An Impeding Growth Cliff, Defendants Continue To Falsely Assure Investors That Their Sales Strategy Was "*Built For The Very High-End Enterprise*" .............. 57

4. Despite the Resignations of Sprout's Chief Marketing Officer, Chief Revenue Officer, Chief Technology Officer, And Its CEO, Defendant Howard, Defendants Continue To Reassure Investors That Sprout's Sales Strategy And Products Are Successful In The Enterprise Space ................................................................................... 58

H. The Truth Is Fully Revealed When Defendants Stun The Market By Revealing That They Had To Completely "*Redraw[] Our Go-To-Market-Model*" Because Sprout's Product And Infrastructure Were "*Orders Of Magnitude*" Different Than What Was Necessary To Successfully Obtain Enterprise Clients .................................................................................................. 61

I. Post-Class Period Admissions Further Confirm That Defendants Made Materially False Statements To Investors During The Class Period ................... 68

J. Defendants Barretto And Howard Sold $63 Million Worth of Sprout Stock At Prices Inflated By Their Fraud ....................................................................... 69

V. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS .................................................................................................... 72

A. Sprout Social's September 22, 2021 Inaugural Investor Day ............................. 72

B. Q3 2021 Earnings Call and Barclays Global TMT Conference .......................... 75

C. January 12, 2022 Annual Needham Virtual Growth Conference ........................ 77

D.      Q4 2021 Earnings Call ...................................................................79

E.      June 2022 Investor Conferences ...................................................81

F.      August 2022 Investor Conferences ...............................................84

G.      Q3 2022 Earnings Call ..................................................................87

H.      December 7, 2022 Barclays Global Technology, Media and
        Telecommunications Conference ...................................................89

I.      Q4 2022 Earnings Call and March 20, 2023 Investor Call ..............90

J.      Q1 2023 Earnings Call ..................................................................94

K.      Sprout's Second Investor Day .......................................................95

L.      Q3 2023 Earnings Call ..................................................................97

M.      2023 Form 10-K Filed on February 23, 2024................................100

N.      March 6, 2024 KeyBanc Emerging Technology Summit ...............102

VI.     ADDITIONAL ALLEGATIONS OF SCIENTER ......................................104

VII.    LOSS CAUSATION............................................................................116

A.      May 2, 2023 Partial Corrective Disclosure ..................................116

B.      August 3, 2023 Partial Corrective Disclosure ..............................117

C.      May 2, 2024 Corrective Disclosure .............................................117

VIII.   PRESUMPTION OF RELIANCE ..........................................................119

IX.     INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND THE
        BESPEAKS CAUTION DOCTRINE .....................................................120

X.      CLASS ACTION ALLEGATIONS........................................................121

XI.     CLAIMS FOR RELIEF .......................................................................123

XII.    PRAYER FOR RELIEF .......................................................................127

XIII.   JURY DEMAND ...............................................................................128

Lead Plaintiff Employees' Retirement System of the City of Baltimore ("Baltimore Employees," "Lead Plaintiff" or "Plaintiff"), by and through the undersigned counsel, bring this securities class action against Sprout Social, Inc. ("Sprout Social," "Sprout," or the "Company"), Sprout's former Chief Executive Officer ("CEO"), Justyn Howard ("Howard"); President and CEO, Ryan Barretto ("Barretto"); Chief Financial Officer ("CFO"), Joe Del Preto ("Del Preto"); and Vice President of Investor Relations, Jason Rechel ("Rechel") (with Howard, Barretto, and Del Preto, the "Individual Defendants"; and collectively with Sprout, "Defendants"). Plaintiff brings this action under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), and U.S. Securities and Exchange Commission ("SEC") Rule 10b-5, 17 C.F.R. § 240.10b-5, on behalf of itself and all other persons and entities who purchased Sprout securities between September 22, 2021 and May 2, 2024, inclusive (the "Class Period"), and were damaged thereby (collectively, the "Class").

Plaintiff alleges the following upon personal knowledge as to itself and its own acts, and upon information and belief as to all other matters. Plaintiff's information and belief is based upon, among other things, Plaintiff's and its counsel's investigation, which includes, without limitation: (a) interviews with numerous, high-level former employees of Sprout and other companies; (b) public filings made by Sprout with the SEC; (c) press releases and other publications disseminated by Defendants and other parties; (d) shareholder communications, conference calls, news articles, and postings on Sprout's website concerning Defendants' public statements; and (e) other publicly available information concerning Sprout and the Individual Defendants.

Plaintiff's investigation is ongoing, and many of the relevant facts are known only by Defendants or are exclusively within their custody or control. Plaintiff believes that substantial additional evidentiary support exists for its allegations after a reasonable opportunity for discovery.

I.      PRELIMINARY STATEMENT

1.      Sprout Social offers a centralized, subscription-based platform for businesses to manage their social media marketing.  Prior to the Class Period, Sprout's business model focused on selling its services to small to medium sized businesses ("SMBs").  However, Sprout's business was not profitable, as SMBs had few employees, paid modest monthly subscription fees, required costly customer service resources, and often churned out of Sprout's services quickly. Accordingly, leading up to the Class Period, Sprout announced that it would shift its business strategy away from SMBs and to larger "upmarket" customers, which were "mid-market" and "enterprise" level corporate businesses that provided much higher revenue and profit margins.

2.      Throughout the Class Period, Defendants assured investors that Sprout's "upmarket" transition was on track and entirely successful, repeatedly touting that Sprout's social media management platform provided all the features and capabilities needed to serve large, complex corporate customers.  Indeed, Defendants emphasized to investors that Sprout was "***well equipped for the deals that are out there***," that there was "***not any functionality we don't have to win these larger deals***," and that "***when we go into these customers, we check all the boxes***."

3.      Significantly, Defendants repeatedly assured the market that Sprout had the sales strategy and infrastructure needed to easily make the transition to enterprise customers.  This was particularly important because, unlike its competitors, Sprout's "go-to-market strategy" ("GTM") did not rely on a traditional sales force but instead on a less costly, "inbound" and "product-led" sales model that relied on internet advertising to draw prospective customers to the Company's website or call center, at which point those customers would be offered a free 30-day trial of Sprout's service.  When analysts directly questioned Defendants whether this "inbound" strategy was effective for enterprise clients, Defendants unequivocally assured the market that Sprout's sales system was optimal for rapid and sustained enterprise growth.  Indeed, in every single one

2

of Sprout's investor calls, presentations, press releases and SEC filings during the Class Period, Defendants insisted that the Company's "inbound" sales model was a "***secret weapon for us in the enterprise [market]***," that Sprout's "***secret sauce is that we lead with the product and specifically with [free] trials***," and that this model was highly effective "***even [] for sophisticated customers in the mid-market and enterprise***." Defendants further emphasized that this inbound model ensured quick, efficient sales turnarounds with enterprise clients, touting that the strategy "***allowed us to land much larger customers faster because of this approach***" and that the Company was "***winning in the enterprise***," with sales cycles of just "***30 to 45 days on average.***" Defendants even went so far as to state that this was a "***massive differentiator***" in the marketplace and gave Sprout a "***significant advantage***" over its competitors because it ensured a reliable and steady stream of revenue.

4. Analysts credited Defendants' representations, lauding Sprout as a "category leader" whose "ability to leverage its product-led [go-to-market] engine market [was] a key differentiator," and concluding that the Company had "evolved to become the go-to social media management tool for not only [small businesses] ***but also larger enterprise customers***." Buoyed by Defendants' reassurances, Sprout's stock price rose as high as $144 per share after the start of the Class Period and remained trading at inflated levels throughout the Class Period. Defendants took full advantage of their fraud, with Defendants Barretto and Howard alone engaging in significant and suspiciously timed stock sales totaling more than ***one million shares*** for proceeds of ***nearly $63 million*** during the Class Period at substantially inflated prices.

5. Defendants' Class Period statements were utterly false and misleading. As no less than 14 former Sprout employees confirmed, the exact opposite was true: Sprout's product offerings and sales infrastructure were wholly inadequate to properly serve large, complex

enterprise organizations. Indeed, Sprout's product lacked numerous fundamental functions required by large corporate clients, including influencer marketing—a feature so essential that fully *half* of Sprout's prospective enterprise clients explicitly listed it as a critical requirement in their request for proposals ("RFPs"). As a former Sprout customer success manager explained, "*influencer marketing was huge and we were losing that battle with our competitors*." Further, Sprout's platform lacked numerous other critical features necessary to successfully sell the Company's services to large, complex corporations, including effective support and reporting for the large number of geographically dispersed users in a global organization, as well as full functionality and customer service in foreign languages. As a former Sprout account executive put it: "*[t]he infrastructure we had at Sprout was simply not as good as the competitors*." Furthermore, as former employees also confirmed, rather than being a "secret weapon in the enterprise [market]," Sprout's "inbound" sales model was so "*ineffective*" for larger clients that the Company "*had no business competing in the enterprise space*."

6.      The truth began to emerge in May 2023, when Defendants announced poor financial results for Q1 2023, including disappointing growth in upmarket clients, causing Sprout's stock price to decline by more than 20%. Nevertheless, Defendants staunchly denied that there were any issues with their strategy, claiming that Sprout's inbound sales model "*continue[d] to be the best weapon within [] the space*" due to the purported superiority of its products, and that the Company was "*not seeing any material change or difference*" in the enterprise space.

7.      However, mere months later, on August 3, 2023, Defendants stunned investors by disclosing another quarter of disappointing financial results for Q2 2023 and making clear that, notwithstanding their public statements to the contrary, Sprout lacked the "critical" influencer marketing capability that was required by enterprise clients. As a result, Sprout revealed that it

had been forced to pay a staggering $140 million—an amount equal to *half* its revenue in 2022—to acquire an influencer marketing platform called Tagger Media, Inc. ("Tagger"). Sprout's stock price declined by more than 12% on this news, and after seeing the market's reaction, Defendants stemmed that decline by continuing to misrepresent the Company's true state of affairs, claiming that Defendants were still able to "***land [enterprise] customers incredibly fast because of our trial model***" and that they had "***seen a lot of success with our enterprise team***" because Sprout's "***products are perfectly positioned for these enterprises***."

8. Notwithstanding Defendants' wholly positive public statements, internally Defendants' actions told a far different story—namely, that Sprout's services were grossly inadequate for enterprise customers, and that its purportedly "secret sauce" inbound sales model was an abject failure. Indeed, as Defendants would disclose at the end of the Class Period, by no later than October 2023, Defendants were forced to institute dramatic and wholesale "***major changes***" to Sprout's sales model precisely because they could not sell the Company's service to large clients. In Defendants' own words, they had to completely "***redraw[] our go-to-market model***" to build one suitable for enterprise clients, including making such substantial changes as "building vertical sales teams," "accelerating promotions in our mid-market and enterprise teams," "adjusting our account coverage model" and "prioritizing Tagger enablement for all our customer-facing teams." Remarkably, while Defendants ultimately conceded that these changes were made because Sprout's business had "***changed materially***," they not only failed to disclose them, but they told investors the exact opposite was true. On November 2, 2023, when Defendants were specifically asked whether they needed to make any "investments" or changes in Sprout's "overall go-to-market strategy" during its Q3 2023 earnings conference call, they unequivocally stated that

there were "***no major changes to call out***," the Company's "***go-to-market strategy is working***," and there were "***no surprises for all of you in the way that we grow our business***."

9.      The full truth did not emerge until May 2, 2024, when Defendants made a series of stunning disclosures that completely contradicted what they had been telling investors for years.

10.     First, only two months after reaffirming guidance and boasting to the market that they were likely to "exceed" their conservative forecast, Defendants reported extremely poor financial results for Q1 2024 and issued "significantly lower" full-year 2024 guidance.  Moreover, Defendants made clear that the abysmal results and guidance cut were due to the fact that Sprout's upmarket sales had fallen off a cliff, with Sprout reporting the lowest number of mid-market customer additions since 2019 and anemic enterprise additions of just 50 new customers—***one-third*** of the number of new enterprise clients that the Company reported in the prior quarter.

11.     Second, despite repeatedly assuring investors for nearly three years that Sprout's inbound sales model was the Company's purported "secret sauce" that supposedly gave it a "significant competitive advantage" in the enterprise space, Defendants now admitted that the exact opposite was true: Sprout's "completely inbound highly transactional model" was "***orders of magnitude different***" from what was necessary to successfully obtain enterprise-level business. As noted above, Defendants admitted that they had been forced to completely "***redraw[] our go-to-market model***" for enterprise clients, including making massive additional investments to properly build out "***our mid-market and enterprise teams***."  Furthermore, Defendants made clear that these were not recent developments, but that they had long been aware of these dramatic changes to their vaunted sales model and that they had outright lied to the market about them. Indeed, Defendants explicitly admitted that "***the decisions on all this happened in Q4 [2023]***"— *i.e.*, ***eight months earlier***, and at the same time that they were vehemently assuring investors that

"*our go-to-market strategy is working*" and that there were "*no major changes to call out*" and "*no surprises*" when it came to the success of that strategy in the enterprise space.

12.     Third, while Defendants had repeatedly claimed throughout the Class Period that Sprout's inbound sales model produced "faster sales cycles," with Company sales reps purportedly "clos[ing] mid-market and enterprise deals within 30 days," Defendants now attempted to claim that Sprout's disappointing sales were due to suddenly "longer-type sales cycles" from enterprise clients.  But analysts were having none of it, explicitly noting that this excuse directly contradicted Defendants' Class Period representations that "*Sprout ha[d] always had really quick close rates and short sales cycles*" *even in the enterprise space*, which Defendants had repeatedly touted as a "massive differentiator" in the industry and the "key" to Sprout's success.  Indeed, incredulous analysts further noted that this excuse did not make any sense given that Sprout had made its push to upmarket clients long ago, at the "*beginning [of] last year*," and therefore any "lengthening of the cycle" for enterprise clients would clearly have been apparent to Defendants long ago.

13.     Fourth, throughout the Class Period, Defendants had emphasized that the primary financial metric investors should use to value the Company was Annual Recurring Revenue ("ARR")—the revenue that Sprout's subscription-based business was in line to report over the next 12 months, which was particularly important given that enterprise clients enter into larger, longer-term contracts.  Significantly, Defendants explicitly highlighted ARR in each of Sprout's Class Period SEC filings—including in Sprout's Annual Report on Form 10-K filed *just weeks earlier*—as the "*key business metric*" that Defendants used to "*evaluate our business, measure our performance, identify trends, formulate financial projections and make strategic decisions*." However, Defendants now asserted that ARR was entirely meaningless, that investors should no longer rely on ARR to measure Sprout's performance, and that the Company would no longer

7

publicly report it moving forward.  Multiple analysts were again flabbergasted, noting that the decision "*raise[d] skepticism in the investment community*" as it "*stripp[ed] some visibility into what's occurring*" and "*[made] the business less transparent and opens up more questions*."

14.     Fifth, and significantly, Defendants made crystal clear that Sprout's poor performance and outlook were in no way, shape or form the product of external factors.  To the contrary, Defendants explicitly admitted that the Company's debacle was entirely "*self-induced*," with Sprout's newly appointed CEO, Defendant Barretto, tellingly acknowledging: "*I own this*."

15.     In response to Defendants' stunning disclosures, Sprout's stock price collapsed by 40%—or $19.33 in a single day—falling from a closing price of $48.15 per share on May 2, 2024, to a closing price of $28.82 per share on May 3, 2024, on extraordinary trading volume.

16.     Analysts excoriated management for their lack of credibility and pointedly noted that not only did the Company's disclosures contradict what Defendants had said during the Class Period, but that the upmarket transition had happened years prior—and it was thus inconceivable that Defendants did not know about these issues earlier.  Indeed, Cantor Fitzgerald commented that "*the execution issues [Sprout] is now facing, which are a result of its [go-to-market] strategy, should have been apparent much earlier than today*."  Jefferies likewise emphasized the "*puzzling . . . disconnect between the actions that were taken at the beginning of the year . . . and now a material guide down*."  KeyBanc likewise emphasized that "*management will have to earn back some credibility*" given their "poor execution and poor business modeling."

17.     In total, Defendants' fraud wiped out roughly $2 billion in shareholder value.  This action seeks redress on those shareholders' behalf.

## II.    JURISDICTION AND VENUE

18.    The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

19.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331, and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

20.    Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b), Section 27 of the Exchange Act (15 U.S.C. § 78aa(a)).  Sprout Social maintains its headquarters in this jurisdiction, and many of the acts and transactions alleged herein, including the dissemination of materially false and misleading statements, occurred in substantial part in this District.

21.    In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchanges.

## III.    PARTIES

### A.    Lead Plaintiff

22.    Lead Plaintiff Employees' Retirement System of the City of Baltimore is a public pension fund that provides retirement benefits to approximately 18,000 regular and permanent employees in the general administrative service of the City of Baltimore, Maryland and certain non-teacher employees of the Baltimore City Public School System. Baltimore Employees was established in 1926 and, as of June 2024, had approximately $2.2 billion in assets under management.  As reflected in its PSLRA certification (ECF No. 17-1), Baltimore Employees purchased Sprout Social securities during the Class Period and suffered damages as a result of the

federal securities laws violations and false and/or misleading statements and/or material omissions alleged herein.

**B.     Defendants**

23.     Defendant Sprout Social, Inc. is incorporated under the laws of Delaware with its principal executive offices located in Chicago, Illinois. Sprout Social's common stock trades on the Nasdaq Capital Market (the "NASDAQ") under the ticker symbol "SPT."

24.     Defendant Justyn Howard is the Company's co-founder and has served as Executive Chair of the Board since October 2024. He was CEO and Chairman of the Board from April 2010 to September 30, 2024. From April 2010 to December 2020, he also served as the Company's President.

25.     Defendant Ryan Barretto has served as CEO and a director of the Company since October 1, 2024. Barretto has also served as President since December 2020.  As part of this role, Barretto was responsible for Sprout's GTM operations and known for his involvement with the Company's GTM strategy. Prior to that he held the position of SVP of Global Sales since joining the Company in 2016. Prior to joining Sprout, Mr. Barretto was a VP of Global Sales for Pardot and Area VP, Commercial Sales at Salesforce.com.

26.     Defendant Joe Del Preto has served as the Company's CFO since July 2017.

27.     Defendant Jason Rechel was the Vice President of Investor Relations at Sprout, working at the Company since 2020, and in his role, "help[ed] build Sprout's investment engagement strategy."  Rechel departed from the Company in September 2024.  Prior to joining Sprout, he was Director of Equity Research at Oppenheimer & Co. Inc., Research Division. Prior to this, Mr. Rechel was employed as an Equity Analyst at Needham & Company, LLC, Research Division. He began his career as a Senior Analyst in capital markets at Ipreo.

28.     Defendants Howard, Barretto, Del Preto, and Rechel are collectively referred to herein as the "Individual Defendants."

29.     During the Class Period, the Individual Defendants, as senior executive officers and/or directors of Sprout Social, were privy to confidential, proprietary and material adverse non-public information concerning Sprout Social, its operations, finances, financial condition and present and future business prospects via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or board of directors meetings and committees thereof, and via reports and other information provided to them in connection therewith. Because of their possession of such information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being actively concealed from, the investing public.

30.     The Individual Defendants are liable as direct participants in the wrongs complained of herein. In addition, the Individual Defendants, by reason of their status as senior executive officers and/or directors, were "controlling persons" within the meaning of Section 20(a) of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein. Because of their positions of control, the Individual Defendants were able to and did, directly or indirectly, control the conduct of Sprout's business.

31.     The Individual Defendants, because of their positions with the Company, controlled and/or possessed the authority to control the contents of its reports, press releases and presentations to securities analysts, and through them, to the investing public. The Individual Defendants were provided with copies of the Company's reports and publicly disseminated documents alleged herein to be misleading, prior to or shortly after their issuance and had the ability and opportunity

to prevent their issuance or cause them to be corrected. Thus, the Individual Defendants had the opportunity to commit the fraudulent acts alleged herein.

32.     As senior executive officers and/or directors and as controlling persons of a publicly traded company whose securities were, and are, registered with the SEC pursuant to the Exchange Act, and were traded on the NASDAQ and governed by the federal securities laws, the Individual Defendants had a duty to disseminate promptly accurate and truthful information with respect to Sprout's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings, and present and future business prospects, to correct any previously issued statements that had become materially misleading or untrue, so the market price of Sprout's securities would be based on truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

## IV.    OVERVIEW OF THE FRAUD

### A.    Sprout's "Inbound" Business Model Was Designed For Small And Medium-Sized Customers Obtained Through Online Marketing And Free Trials

33.     Sprout offers a centralized platform for businesses to manage and track their social media marketing across various channels, including Facebook, Instagram, X (Twitter) and others. Sprout generates revenue from subscriptions under a software-as-a-service ("SaaS") model.

34.     In the years leading up to the Class Period, Sprout's business model was built primarily around targeting small and medium-sized business customers ("SMBs"), most of whom purchased Sprout's services through inexpensive, month-to-month subscriptions. Sprout's sales model (or "motion") relied on acquiring small business customers using an "inbound" sales process (also sometimes referred to as an "inbound motion")—meaning that Sprout used internet and social media advertising and marketing to get customers to visit Sprout's website or call its

call center, at which point those prospective customers would be offered a free trial of Sprout's platform. This was in contrast to a traditional "outbound" sales model, which relied on a costly sales force to actively seek out prospective customers.

35. Indeed, as Defendants emphasized in Sprout's Form 10-K filed with the SEC on February 23, 2022, "[o]ur go-to-market approach is **driven by the effectiveness and innovation of our platform** and unpaid customer demand. Our model is focused on a **product driven strategy, where potential customers are led to our website and sign up for a free trial of our products**." As Defendants made clear, "[t]his **approach allows us to cost-effectively drive strong lead generation, upgrade free trials to paying customers and achieve growth of our platform within organizations of all sizes**."

36. Sprout's investor conferences similarly highlighted that its "inbound" model was both highly effective and cost-efficient, with low customer acquisition costs and a short turnaround time (or "sales cycle") between the customer contacting Sprout and purchasing a subscription. Indeed, in the run-up to the Class Period, Defendants emphasized that their "inbound" sales model was the key to their success and a critical "competitive differentiator" for the Company. For example, in a January 12, 2021 investor call, Sprout's then-head of investor relations Defendant Rechel explained that with "the 30-day free trial model, we're predominantly inbound," which was "**a competitive differentiator** [] that allows us to go to market in a way that's different than anyone else in the market" and that "**has been a really nice advantage for us**." Similarly, in the Company's February 23, 2021 earnings call, Defendant Howard emphasized that the Company's inbound sales model was "a **driving force in the new business acquisition** in the top of the funnel."

**B.** **Defendants Proclaim To Investors That, In Order To Become More Profitable And Grow Sprout's Business, The Company Will Focus On Its Transition "Upmarket" And On Landing Larger Corporate "Enterprise" Customers**

37.     Because Sprout's business was subscription-based, its most critical financial metric was its Annual Recurring Revenue (ARR), which Sprout defined in its SEC filings as "the annualized revenue run-rate of subscription agreements from all customers as of the last date of the specified period."  With customers on varying subscription terms—including monthly, annual, and sometimes multi-year subscriptions—ARR afforded a way for the Company to smooth out the differences in contract terms so that it could give investors an estimate of annual revenue going forward.    For this reason, every one of Sprout's quarterly and annual filings until the end of the Class Period referred to ARR as the Company's "***key business metric***" that Defendants used to "evaluate our business, measure our performance, identify trends, formulate financial projections and make strategic decisions."   Indeed, in Sprout's investor calls during the Class Period, Defendants regularly instructed investors to "focus on the ARR that we're getting" as opposed to other metrics, explaining that "our focus is more on the ARR side of the business and just making sure we're getting quality customers versus just volume."

38.     While Sprout grew its business leading up to the Class Period, Sprout could not sustain its rapid growth by relying primarily on small business customers.  As a June 2021 Baird analyst report explained, "[o]f Sprout's 23,000 customers, only approximately 2,300 [i.e. 10% of customers] contribute more than $10k of ARR."  This was particularly a concern because SMBs were less likely to maintain their subscriptions long-term, as they were "more economically sensitive and represent a higher churn risk."  And while a COVID-fueled boom in social media marketing boosted Sprout's growth in 2020 and 2021, it became clear that the boom was ending.

39.     Moreover, Sprout needed to determine how to not just grow its business, but to grow profitably.  From the time of its IPO, Sprout experienced large annual net losses and was burning $15-20 million in cash per year.  As such, a Baird analyst noted, "[s]imilar to other newly IPO'd software companies, the [Sprout] team will have to prove its ability to scale profitable growth over the next 3-5 years."  But profitable growth with SMBs was difficult to achieve, as they tended to be unsophisticated and unfamiliar with platforms like Sprout's, and thus they demanded intensive support from Sprout personnel and often cost Sprout as much as or more than they were paying in subscription fees, rendering them unprofitable as customers.

40.     Thus, in order to continue to achieve sustainable and profitable growth, Sprout needed to move "upmarket"—*i.e.*, to target the larger mid-sized and "enterprise" businesses that would provide Sprout with higher (and longer-term) annual contract values ("ACV").  As a May 29, 2020 William Blair report explained, "midmarket and enterprise customers" tended to purchase "the entire [Sprout] platform up front," meaning not only the "core solution" that allowed for basic social media posting and scheduling but the "premium add-ons… [which] can be multiples of a per user subscription to the core solution." Accordingly, moving upmarket would give the market "confidence in [Sprout's] ability to continue exhibiting strong ACV growth" for years to come.

41.     To assure the market that Sprout's growth could be sustained long-term, Defendants repeatedly touted that both Sprout's "inbound" sales model—with its reliance on free trials—and Sprout's software product were more than sufficient for larger clients, and that Sprout's go-to-market strategy was already succeeding and would continue to succeed long term with "mid-market" and "enterprise" customers.[1]

---

[1] According to Sprout's SEC filings, "Mid-market" means organizations with 50 to 999 employees, and "Enterprise" means organizations with 1,000 or more employees.

**C. Throughout the Class Period, Defendants Repeatedly Assured Investors That Sprout's Business Model Was Its "*Secret Sauce*" And A "*Huge Differentiator*" That Gave The Company A "*Significant Advantage*" In The Industry Precisely Because It Was Highly Effective For Large Enterprise Customers**

42.     Throughout the Class Period, Defendants emphatically assured investors that Sprout's "inbound" sales model was just as effective with mid-sized and enterprise clients as it was with small business clients, and that Sprout's platform had all of the product features that these larger clients wanted and needed.  Indeed, Defendants repeatedly told investors that the Company's inbound sales model was a "***secret weapon for us in the enterprise [market]***," that Sprout's "***secret sauce is that we lead with the product and specifically with [free] trials***," and that this model was highly effective "***even [] for sophisticated customers in the mid-market and enterprise***."  Moreover, Defendants emphasized that the Company's "product-led" sales motion was highly effective with large clients precisely because Sprout's platform had everything those clients needed, *i.e.*, that Sprout was "***well equipped for the deals that are out there***," there was "***not any functionality we don't have to win these larger deals***," and "***when we go into these customers, we check all the boxes***."  As a result of their purportedly superior sales strategy and product, Defendants assured investors of their "outsized momentum in the mid-market and enterprise segments," the "steady drumbeat of upmarket expansion," and the "growth of our larger size deals." Defendants further emphasized that their inbound, trial-based model ensured quick, efficient sales turnarounds, with sales cycles of just "***30 to 45 days on average***"—giving Sprout a "***significant advantage***" in the marketplace and a "***massive differentiator***" versus its competitors.

43.     For example, on September 22, 2021—the first day of the Class Period—Sprout held its first ever Investor Day conference, during which Defendant Howard announced that the Company had achieved $200 million in ARR and 30,000 total customers.  Defendants insisted that Sprout's growth would be sustainable for years to come, that they expected the Company to "grow

at greater than 30% annual pace through at least 2025," and that this growth guidance was "only scratching the surface of the ultimate opportunity."

44. Significantly, Defendants insisted that the key to sustaining this growth was Sprout's move "upmarket," as the Company was increasingly focused on selling software to "mid-market" and "enterprise" customers. As part of its increasing focus on this "upmarket" growth with large clients, Sprout announced during the Investor Day call that it would begin disclosing a new category of customers every quarter: the total number of customers providing Sprout with more than $50,000 in ARR. This metric provided "a measure of our ability to scale with our largest customers and attract more sophisticated organizations" and "represent[ed] potential for future growth" given that "[o]ver time, our largest customers have constituted a greater share of our revenue." During the call, Defendant Del Preto explained, this "$50,000 customer cohort [wa]s the best representation of the next wave of customer ACV expansion beyond $10,000."

45. Throughout the Investor Day, analysts were keenly focused on whether Sprout could continue to grow with mid-market and enterprise clients long-term, whether they could do so profitably, and whether they needed to change their sales model or product to do it—for example, by incurring additional costs through a large, dedicated salesforce or an "evolution" in Sprout's sales strategy. In response, Defendants insisted not only that Sprout was highly effective in its upmarket push, but that nothing needed to change in its "inbound" model, and that this model even gave Sprout a significant competitive edge in the industry.

46. For example, Defendant Barretto emphasized that Sprout's "***secret sauce***" was its inbound sales motion, pursuant to which "we lead with the product and specifically with trials. ***And we do this even if for sophisticated customers in the mid-market and enterprise***." Barretto boasted that this "secret sauce" also allowed Sprout to secure large customers very quickly

compared to its competitors, and "enabled us to win customers in 30 to 45 days on average." Indeed, Defendants touted that Sprout's model was a "***huge differentiator***" and a "***significant advantage***" that was "***truly disruptive***" in the enterprise space precisely because the "***inbound engine is extremely powerful for enterprise***" as it allowed Sprout to "***move faster with a focus on speed to ROI by getting [large enterprise users'] hands on the keyboard***."  Further, Defendants insisted that the Company's trial-based system was highly cost-effective, offering "compelling unit economics" wherein the value received from a customer would be six times the customer acquisition costs.  Thus, Sprout's "inbound" sales model would continue to be the driver of its success with enterprise clients.

47.     Defendants' Investor Day messaging had its intended effect.  Analysts underscored that Sprout was one of the few companies in its space that were poised for growth.  For example, a September 22, 2021 Canaccord Genuity report called Sprout a "category leader" with "sustainable fundamental momentum" because of the Company's "***differentiated go-to-market model*** that leverages free trial and product led growth to fuel both new customer acquisition and expansion." Similarly, a September 22, 2021 Piper Sandler report raised its price target for Sprout and emphasized "the high point for investors and validation that the company's recent momentum [was] sustainable" was that the Company disclosed "annual revenue & ARR growth of >30% through at least CY25."  Barclays highlighted its "confiden[ce] on the sustainability of [Sprout's] growth trajectory" because of the "projected ***outsized growth in the upmarket segments***."

48.     Defendants made similar assurances on November 2, 2021, when they issued a press release announcing 46% revenue growth and 44% ARR growth in Q3 2021 "driven by accelerated momentum in our large-customer cohorts."  Defendant Howard reiterated on the earnings call held that day that Sprout's "really [] fantastic quarter" was due to the "***outsized***

*momentum in the mid-market and enterprise segments*"—which was now "approaching 70%" of Sprout's $204.6 million in ARR." During the call, analysts again raised questions about whether the Company could continue its rapid growth trajectory without shifting to more of an outbound sales strategy, such as "establishing direct sales teams" that would be "outbound-focused" to find larger customers. In response, Defendant Barretto again emphasized that, while Sprout had made some minor investments in outbound sales, "*not a lot has to change in our current [sales] motion*" because the Company's existing inbound model was not only effective in bringing in large clients, but was "very differentiated" and "disruptive," and gave Sprout a competitive edge due to Sprout's superior product and the much faster sales cycles the trial-model created. Accordingly, continued and sustained upmarket growth for Sprout was only a matter of "doubling down on those" efforts, rather than making any major changes to its sales strategy.

49. Similarly, at the Barclays Global TMT Conference held on December 7, 2021, in response to yet another analyst question about whether changes to Sprout's sales model were needed, Defendant Barretto again emphasized that the "inbound" model was "*really effective*" "*even in the enterprise space*," asserting that the Company was "*driv[ing] more inbound from more sophisticated customers and a higher level of executives*" through Sprout's premium products. Likewise, during a February 22, 2022 Q4 and FY 2021 earnings call, Defendants continued to insist that their "product-led" "inbound" sales motion was the driving force behind their growth and was a "*big competitive advantage*" that would sustain enterprise growth into the future. Indeed, Defendant Barretto again asserted that this free-trial-based inbound sales process led to quick turnarounds and short sales cycles—which, he again claimed, were just "*30 to 45 days on average*" even for large enterprise clients—quickly bringing more enterprise business into the

pipeline *every single month* because Sprout's products were so effective that enterprise clients "*d[idn't] want to lose [Sprout] after the 30-day trial" was over*.

50.     In addition to touting their sales process, Defendants also continued to insist that Sprout's product readily fulfilled all requirements needed by the largest clients and therefore fully supported the Company's push upmarket.  For example, during the Company's January 12, 2022 investor conference, Defendant Del Preto boasted that "one of the bigger drivers" that supported the upmarket progression was "[b]eing able to have a full suite of products" that specifically "*checked a lot of boxes with a lot of these enterprise clients*."  And during the February 22, 2022 earnings call, Howard similarly asserted that Sprout's platform was "*well equipped*" because it maintained all of the platform features needed for "*landing larger customer deals*."  Similarly, the Company's Form 10-K filed on February 23, 2022 confirmed that Sprout's "powerful platform" had all "the *robust capabilities needed by the most demanding enterprise users*."

**D.     Defendants Announce a Partnership With Salesforce That Will Supposedly Bring A Flood Of New Customers, And Continue To Assure Investors That Their Existing Product And Sales Model Can Deliver Sustained Growth**

51.     On March 7, 2022, Sprout announced a new partnership with Salesforce—a cloud-based software company that provides customer relations management, sales, marketing and other products—which would purportedly fuel Sprout's growth by flooding the Company with new customers.  Specifically, Salesforce was retiring its own social media management software called "Social Studio"—previously a competitor to Sprout's product—and would "sunset" the software over the following two plus years. Consequently, Salesforce would purportedly steer its existing clients—who were looking for a new social media management product—toward Sprout's platform.  However, Sprout would still have to win these former Salesforce clients' business as there was no requirement that those customers had to sign up with Sprout.

52.     Going forward from that announcement, Defendants repeatedly touted the Salesforce partnership as an engine of sustainable growth with enterprise customers and a source of likely thousands of new customers.  For example, during a June 7, 2022 William Blair investor conference, analysts asked how the Company was "planning to attack that Salesforce customer base to come over to Sprout."   In response, Defendant Barretto boasted that the Salesforce partnership presented a massive new trove of clients "***that are going to migrate over the next couple years***" to Sprout's platform, which would contribute to growth for years to come because of the Company's "***solution that's going to be the very best option for any Salesforce customer***." Barretto further stated that, because the sunset would take over two years, Sprout would have a pool of thousands of former Social Studio customers to draw from at least through 2024.

53.     Defendants also continued to emphasize the success of their upmarket growth strategy throughout the rest of 2022, reaffirming that both Sprout's product and its sales motion had everything needed for long-term, durable growth among large clients.  For example, during Sprout's June 7, 2022 investor conference, Defendant Barretto bragged that Sprout saw great "***traction winning customers in Fortune 10, the Fortune 100, and Fortune 500***" because its platform "***ha[d] a solution that perfectly aligned to most sophisticated companies in the world***." At an August 9, 2022 KeyBanc investor conference, Defendant Del Preto similarly explained that Sprout was able to "move upmarket" because its platform did not lack "any feature sets or [have] any [gaps] in our feature sets" for "enterprise" clients.  And during the Company's presentation at the Canaccord Genuity Annual Growth Conference on August 11, 2022, Del Preto affirmed that there was "***not any functionality we don't have to win these larger deals***" and that "***when we go into these customers, we check all the boxes***." Moreover, Del Preto reported that the Company's growth would continue as Sprout was "just really starting to resonate the platform, the ability to

reach some of these larger enterprise customers," and the "***quality of the funnel continues to increase***."

54.     Significantly, during the August 11, 2022 presentation, Defendants also emphasized to investors that, as Sprout purportedly moved upmarket and targeted enterprise and mid-market customers, it was ARR—the Company's "***key business metric***"—that investors should focus on, rather than the sheer number of customers the Company was adding.  As Defendant Del Preto explained: "***internally, our focus is more on the ARR side of the business and just making sure we're getting quality customers versus just volume***."

55.     Analysts continued to credit Defendants' statements.  For example, on October 10, 2022, Berenberg Capital issued a "Buy" rating for Sprout, specifically highlighting that Sprout had "evolved to become the ***go-to social media management tool for not only [small businesses] but also larger enterprise customers***."  Berenberg further noted that "ARR/customer growth" would be "accelerated" by Sprout's "successful conversion of Salesforce's 4k Social Studio customers, which have ACV of $10k-50k each"—significantly more value than Sprout's average customer.

**E.     While Post-COVID Headwinds Negatively Impact The SaaS Industry, Defendants Assure Investors That Sprout's "Inbound, Product-Led" Model Remained A "*Secret Weapon*" And A "*Massive Differentiator*" In The Industry**

56.      By late 2022, the COVID boom had begun to wane, with Sprout's SMB clients continuing to rapidly decline as they were increasingly hit with post-COVID headwinds.  As a result, Sprout found itself unable to acquire sufficient enterprise customers to offset the loss from its SMB clients.  In response to growing concern from the market that the Company's business would materially falter, Defendants implemented significant price increases across its entire client base, while assuring investors that Sprout's "inbound" sales model remained successful.

57.    Sprout announced on November 3, 2022 that it was increasing its prices across the board, which, according to Defendants, was part of Sprout's upmarket strategy and designed to move away from smaller customers by purportedly "aligning our pricing, product, go-to-market and customer success strategies around the most productive customers and potential customers"— *i.e.*, mid-market and enterprise clients.  To assure investors that this pricing change was prudent, particularly for enterprise clients, Defendant Howard boasted that Defendants had "***learned a great deal***" about these larger customers over the prior "***several years***," and that the Company could continue to acquire these enterprise clients "***with similar costs and similar sales cycles as the rest of our customer base***."  Thus, Howard emphasized to investors that "***we're still going to lea[d] with the same inbound, product-led motion that's made us so successful***."

58.    Nonetheless, with Sprout now entirely focused on upmarket clients, analysts again asked whether Sprout required "any changes around the go-to-market or sales motion, either with more outgoing sales hires or enterprise focused sales individuals."  In response, Defendant Barretto confirmed that Sprout's free-trial-driven sales model continued to be the key "***massive differentiator***" for the business, even with enterprise customers, explaining: "[O]ur customers ***continue to come in and trial the product and that continues to be a major differentiator for us even in the enterprise*** […] And so for us, ***we love that in the enterprise, massive differentiator***."  Defendants thus reiterated that upmarket growth would drive the Company's business into the future, stating that they were "***really confident about our ability to continue to hit the 30% [growth target] every year through 2025***."  And, importantly, Defendants again directed investors to focus on Sprout's "key" ARR metric in tracking the Company's upmarket growth, with Defendant Del Preto emphasizing that "the best way to think about it … is ***to focus on the ARR that we're getting from those customers***."

23

59.     Defendants again underscored these messages on February 21, 2023, when Sprout reported earnings for Q4 2022.  First, Defendant Howard emphasized Sprout's purported ongoing "***upmarket momentum***," citing "[e]xceptional new business strength in the enterprise and the early benefits of our pricing changes," which purportedly "delivered meaningful acceleration in our rate of [Annual Contract Value] growth."  Second, Defendants again boasted that new clients from the Salesforce partnership would fuel growth for at least the following two years, with Defendant Barretto stating that the Company "***continue[d] to see quite a bit of momentum***" from the partnership, that "***the [Salesforce] pipeline heading into this year is bigger than it had been ending the year***," and that there was "***plenty of upside***" in the partnership until at least 2025.

60.     Third, even as analysts continued to press Defendants on whether Sprout needed to change its sales strategy to sustain its upmarket growth, Defendants yet again emphasized that the "***same motion***" it had always used remained highly effective and in fact was the "***secret weapon***" in the enterprise space.  Specifically, a Canaccord analyst asked Defendant Barretto whether "the light touch trial-led go-to-market model resonate[s] as well at the high end of the market" and whether Defendants needed "***any refinement there as you focus more on the enterprise***?"  In response, Barretto again unequivocally stated that Sprout's "trial motion" was purportedly faster, cheaper and more effective with large enterprise clients than competitors, and thus was "***incredibly differentiated***" and a "***secret weapon for us in the enterprise***."  In no uncertain terms, Barretto assured investors: "***we know that it works really well for our enterprise customers***."

61.     Fourth, Defendants entirely dismissed any concerns that macroeconomic issues that had been impacting the rest of the SaaS industry due to post-COVID headwinds would impact Sprout's ARR or revenue or cause a "slower sales cycle," emphasizing that Sprout's free-trial based model was a "***huge strategic advantage***" that insulated the Company from macro slowdowns due

to its "shorter" sales cycles.   Specifically, during a March 20, 2023 interview, in response to an analyst question about the impact of a macroeconomic downturn, Defendant Rechel, averred that the Company's model "*allow[s] us to keep sales cycle shorter*" and to "*execute and control our own destiny from a sales execution perspective through economic cycles*."  Thus, in contrast with competitors' "outbounding and cold calling into accounts trying to create demand where there might not" be, Sprout had the "*huge strategic advantage*" of not having to do so and was thus "able to apply sales resources against warm leads."  As Rechel explained, "Sprout, *by putting our customers in the trial, is able to check all of those boxes, where in our market, particularly our competitors are not able to say those things or to be able to achieve those things. And that's a huge weapon for us on the new business side*."

62.   Finally, Defendant Del Preto yet again assured investors that they should not be concerned about whether price increases would cause Sprout to lose some customers, because ARR remained the critical metric of the Company's upmarket growth.  As Del Preto explained, "we're not really focused so much on the logo churn at Sprout.  *We're more focused on the ARR growth and retaining our highest quality customers.*"

   **F.   Numerous High-Level Former Sprout Employees Confirm That, Contrary To Defendants' Repeated Representations, Sprout Never Had The Product, Strategy Or Infrastructure Needed To Capture Enterprise Clients**

63.   Defendants' Class Period statements were wholly false and misleading.  As set forth below, a multitude of confidential witnesses confirmed that Sprout never had either a sufficiently robust product nor a sufficient sales process to back up their public representations to investors. These facts—many of which were later admitted by Defendants *themselves*—were confirmed in cross-corroborating and overwhelming detail by over 14 former employees of Sprout each of

whom had direct knowledge of the underlying facts.[2]  Significantly, among other things, they include individuals directly tasked with developing upmarket business for Sprout, onboarding enterprise customers, and analyzing Sprout's sales and new business generation.

64.     Indeed, these CWs confirmed that (i) Sprout's platform lacked numerous critical features and functionalities that were absolute requirements for many large corporate customers; (ii) enterprise clients were *not* purchasing Sprout's services based on free trials and required a much more intensive and prolonged sales process, requiring expensive investments in "vertical" sales teams to court corporate customers and much longer sales cycles; (iii) Sprout's partnership with Salesforce provided only a short-lived boost to Sprout's business that quickly petered out and only provided a muted increase in Sprout's revenue; and (iv) immediately after Sprout increased its prices at the end of 2022, Sprout's inbound sales pipeline began to dry up, as Sprout's main advantage over competitors in landing enterprise clients (being cheaper) disappeared.

65.     Significantly, these corroborating confidential witness accounts demonstrate that Sprout's most senior officers, including each of the Individual Defendants, were well aware throughout the Class Period that Sprout was plagued by these issues.  Indeed, as confirmed by numerous former Sprout employees, these issues were widely known and routinely discussed at Sprout, including by the Individual Defendants and other Sprout's executives, each of whom participated in regular meetings and closely monitored Sprout's sales and pipeline.

---

[2] Former Sprout employees (along with one additional industry source) are referred to herein as "confidential witness" or "CW #" and are all referenced herein in the masculine form to maintain their confidentiality.

1. "*We Had No Business Competing In The Enterprise Space*": Sprout's Software Platform Lacked Several Fundamental And Essential Features Required By Large, Complex Enterprise Customers

66. As multiple CWs overwhelmingly confirmed—in direct contrast to Defendants' Class Period representations that Sprout's "powerful platform" had all of the "robust capabilities needed by the most demanding enterprise users"—in truth, Defendants knew well before the start of the Class Period that Sprout's platform lacked multiple crucial components that were necessary to win large, sophisticated customers. As a former Customer Development Account Executive at Sprout, CW 1,[3] succinctly stated: "*[w]e had no business competing in the enterprise space. The infrastructure we had at Sprout was simply not as good as the competitor's like Sprinklr*."

67. *First*, former Sprout employees reported that, for the first nearly two years of the Class Period, despite their repeated representations there was "not any functionality we don't have to win these larger deals," in truth, the platform lacked a crucial component—influencer marketing. Influencer marketing is a social media marketing approach that uses endorsements and product mentions from influencers—i.e., individuals who have a dedicated social following and are viewed as experts within their niche. Over the past decade, influencer marketing has become a popular tool for connecting brands with their target customers and emerged as one of the most effective strategies for business growth. The popularity and effectiveness of influencer marketing led to a massive expansion in the market size of this industry, reaching a $13.8 billion valuation in 2021.[4]

---

[3] CW 1 served in various roles at Sprout from August 2014 until June 2022, including as a Customer Development Account Executive from November 2018 until June 2022. As a Customer Development Account Executive, CW 1 was responsible for managing a book of business that included clients at all levels from small to enterprise. CW 1 reported to Tony Ciolino, Senior Director, Global Revenue Strategy.

[4] From 2016 to 2024, the average annual growth rate of the influencer marketing industry was 40.5%. In the year before the start of the Class Period, the sector experienced immense growth driven by the COVID-19 pandemic, growing by more than 40% annually in 2021.

68.     As Defendants would admit in August 2023 (when it was forced to acquire influencer marketing platform Tagger at an exorbitant $140 million price, in an act of desperation), roughly half of Sprout's prospective enterprise clients had been demanding influencer marketing capabilities in their RFPs, yet Sprout lacked those very same capabilities for years. *See* §IV(G)(2), *infra.* As CW 2, a former Sprout Account Executive and Enterprise Business Development Representative who left the Company in September 2023,[5] recalled: "***Sprout didn't have the complexity level nor the influencers necessary to compete with companies like Sprinklr.***" He explained that Sprout was forced to acquire Tagger to provide the influencer marketing strategies Sprout did not previously possess.

69.     A former Sprout Customer Success Manager from April 2022 until December 2023, CW 3,[6] similarly confirmed that Sprout lacked influencer marketing capabilities, and that this substantially hindered Sprout's ability to win large accounts: "***influencer marketing was huge, and we were losing that battle with our competitors.***"  CW 4, another former Sprout Customer Success Manager,[7] confirmed that Sprout had to acquire Tagger to "meet influencer needs."  CW

---

[5] CW 2 served in various capacities at Sprout from September 2019 until September 2023, including as an Enterprise Business Development Representative from October 2020 until June 2022, a Senior Enterprise Business Development Representative from June 2022 until August 2022, and an Account Executive, SMB from August 2022 until September 2023.  CW 2 worked out of the Company's corporate headquarters in Chicago, Illinois.

[6] CW 3 served as a Manager, Customer Success for Sprout from April 2022 until he was laid off in December 2023.  He was responsible for managing mid-market accounts from April 2022 until January 2023, when he was transitioned to enterprise. CW 3 reported to Director of Customer Success, Christine Lawther ("Lawther") while working in Mid-Market, then reported to Senior Director of Enterprise Customer Success, Ali McAnaney ("McAnaney"). Lawther and McAnaney both reported to Senior Director Renewal Management Mark Schnake, and later to VP of Business Operations and Customer Success Claire Schlafly ("Schlafly").

[7] CW 4 served as a Strategic Services Consultant for Sprout from November 2018 until August 2019 and a Customer Success Manager from June 2021 until July 2022. During his first term, CW 4 was responsible for onboarding enterprise customers and training new users on the platform. During his second term, CW 4 was responsible for managing account renewals for mid-market

5,[8] a former Enterprise Account Executive at Sprout from July 2020 until January 2022, also confirmed that Sprout "certainly lacked" influencer capabilities.

70.     CW 1, who worked in a sales role at Sprout from August 2014 until June 2022, described Sprout's influencer marketing capabilities as "***extremely limited***" and "***not really functional to help clients***"—to the point that Sprout lacked the ability to even identify relevant influencers.  CW 1 said that what limited influencer information Sprout did provide was "***far-fetched and bullsh\*t like the rest of it***."  Illustrating the limitations of Sprout's influencer marketing capabilities, he stated that Sprout's listening tool would pick up, for example, that Taylor Swift tweeted about pizza, and therefore she was a good influencer for a brand like Pizza Hut.

71.     Strikingly, Defendants knew as early as 2019 that influencer marketing would be critical if Sprout wanted to compete for mid-market and enterprise customers.  Indeed, multiple CWs confirmed that, because Sprout lacked sufficient influencer capabilities, the Company's sales personnel were pressured to lie and exaggerate about them.  As CW 1 explained, influencer marketing was the "cutting-edge thing" in 2019, and, although Sprout's influencer capabilities were "***not really functional to help clients***" at the time, the sales teams were issued a directive from management to push Sprout's purported influencer capabilities to potential and existing customers.  He added: "[i]t was a sexy thing to advertise to potential or existing customers, but ***the reality is that Sprout had to go out and acquire Tagger because whatever we were doing in that listening realm was just not powerful enough***."  When asked about Defendants' representations to the market that there were "no gaps" in Sprout's feature sets that enterprise customers desired

customers and general relationship management.  CW 4 reported directly to Lawther, Director of Customer Success.

[8] CW 5 served as an Enterprise Account Executive at Sprout from July 2020 until January 2022.

and that the platform had no "deficiencies" in terms of features, CW 1 stated that those statements were completely "***bullsh\*t***" and "***not the truth***."

72. CW 4, a former Customer Success Manager for Sprout who was responsible for account renewals and managing customer relationships, similarly reported that "***Sprout had limitations with their analytical capability, and we lacked influencers***," and as a result, Sprout was "***making promises we couldn't keep***." CW 4 stated that customers would cancel their contracts when they learned Sprout could not deliver on the promised influencer marketing capabilities, and recalled losing one enterprise customer around spring 2022 because "***we didn't have influencer information nor location tagging ability***."

73. *Second*, multiple CWs described how Sprout's "social listening" capabilities—the process of analyzing online conversations about a brand or industry to learn more about the audience[9]—were surface-level and lacked the in-depth visualizations required to serve large, sophisticated clients. As an Account Executive dealing with customers directly, CW 1 recalled that Sprout's social listening tools were inadequate for enterprise customers because Sprout "***never had the full in-depth granular capabilities and metrics as the competition***." He explained that contrary to Defendants' public representations, Sprout's competitors offered a much more robust product: "***The reality, however, was that Sprinklr was so much more in depth***."

74. Two former Sprout Customer Success Managers, CW 3 and CW 4, confirmed that Sprout's social listening capabilities were not as robust as other competitor tools, and lacked capabilities customers desired. CW 3 described Sprout's geo-tagging and social listening capabilities as lagging competitors, and said Sprout received a lot of feedback that Sprout's

---

[9] Social listening involves monitoring social media channels for mentions of the brand or feedback from the audience. Social listening is a critical tool for identifying appropriate influencers for a company's brand and creating a successful influencer marketing strategy.

capabilities were not that great compared to other products. CW 4 described social listening as "*[t]he big thing in the market*," and detailed how Sprout's listening tool was missing crucial capabilities, including, for instance, the ability to "monitor LinkedIn."

75. Likewise, CW 2, a former Sprout Enterprise Business Development Representative, when asked whether Sprout was an "enterprise-grade product" stated that it was not, explaining that Sprout "*didn't compete well with other enterprise solutions like Sprinklr*" because "*the social listening tools Sprout had were lackluster.*" He explained that Sprout "lacked integrations with platforms like TikTok and YouTube," which limited the capabilities of its social listening tool, including the ability to "monitor and respond to issues." For example, he said an airline company would need to "monitor the entire web for complaints," and respond to those complaints, but "Sprout didn't have the social integration of their competitors to monitor social media" such as TikTok or YouTube. According to CW 2, the "[v]ast majority of enterprise customers" wanted a "robust social listening tool" and "went to competitors like Sprinklr or Khoros" for that functionality. A former Global Strategic Account Director at Sprinklr, CW 6,[10] similarly observed that Sprout's listening capabilities lagged competitors, explaining that Sprout's ability to "provide a customer 360° view of what's happening on social" was "very basic."

76. *Third*, confidential witnesses stated that Sprout lacked quality application program interfaces ("APIs")—functionality that allows social media networks to integrate with third-party apps[11]—that enterprise customers wanted. CW 1 stated that as a social media marketing platform,

---

[10] CW 6 served as a Global Strategic Account Director at Sprinklr from October 2021 until February 2024. In this role, he was responsible for sales, growth, and account management. CW 6 stated that he has researched the social media management space extensively, knows the space "very well," and has consulted on Sprout Social in the past.

[11] A social media API refers to a piece of code that allows social media networks to integrate with third-party apps and tools—such as social media management tools like Sprout. APIs connect

Sprout "would constantly want more information or more access to the API's because that would be of more benefit to the client or end user," but Sprout was missing API's that other platforms had would have helped with enterprise customers, especially when it came to Instagram and Facebook. Similarly, CW 7, a former Sprout Senior Sales Operations Analyst,[12] observed that "**Sprout's API's weren't robust**," and CW 2, who worked in Enterprise Development at Sprout for two years, stated that, "**[Sprout] had bad API**." CW 2 added that when demoing Sprout's platform, for the "majority of demonstrations" he had to tell the customer that Sprout lacked certain capabilities they wanted due to API limitations.

77. *Fourth*, multiple CWs reported that Sprout did not have the advanced social media analytics or reporting capabilities required to compete for mid-market and enterprise clients. For instance, CW 1, who was responsible for managing customer accounts at Sprout, stated that Sprout lagged behind competitors like Sprinklr in the enterprise space because Sprinklr could "provide more analytics on paid social capability" and had "more in-depth analytics with [] listening data." He explained that "Sprinklr had a better relationship with [platforms] like Instagram and Facebook" and could provide "more targeted and a longer tail of data," from those sources in their listening suite, including location-based insights, such as "specific towns or areas where people were talking about specific topics or influencers." According to CW 1, Sprout was also limited in

---

social media management tools with various social media accounts allowing them to create applications, integrate social media functionalities, and retrieve information from social media platforms. Social Media APIs dictate what features third-party tools can and can't provide and are crucial in data access and analysis.

[12] CW 7 served as a Sales Operations Analyst at Sprout from April 2021 until October 2022 and a Senior Sales Operations Analyst from October 2022 until November 2023. In these roles, CW 7 was responsible for sales operations pertaining to companies with fewer than 1,000 employees, setting quota analysis for sales representatives, monitoring market changes, and identifying challenges generating new business. CW 7 and his team were managed by Kimberly Fairchild, a Senior Director.

terms of "[t]he metrics that we were able to display to customers in order to show our return on investment." Sprinklr was "a legitimate enterprise social media software," and "*[Sprout] just didn't have those same capabilities*." He added, "people were looking for real Coke and we were Diet Coke. *We just didn't have the X factor to compete in the full enterprise space*."

78.     CW 4, who worked directly with customers to manage their needs, corroborated that "*Sprout Social did not have advanced analytics capabilities that these enterprise companies desired*," and, as a result, Sprout simply could not compete on product and had to resort to price undercutting to win business. Likewise, CW 2 reported that the issue he typically faced when trying to source leads as a Sprout Business Development Representative was enterprise customers "were married to complex well-built reporting solutions," like Sprinklr. He emphasized that Sprout "*needed more robust reporting and needed to monitor the web real time*" in order to compete for enterprise customers.

79.     CW 6 reported that Sprout's reporting and analytical capabilities were insufficient for enterprise customers, explaining: "when you want to look at analytics, you want to look at overall paid and own analytics, and [you] can't do that" with Sprout. He further noted that Sprout's platform did not provide "your ads' [return on investment] and your earned media value from maybe an influencer campaign and also your own reach and the [return on investment] of your organic campaigns." He added that these limitations may be "fine for companies where you have five people in the marketing department," but "[w]hen you have a multinational company" and "social leads in different countries" and "different product marketing teams that each will need to have access to a tool like that to get performance metrics and stuff like that, that kind of analytics, for example, *Sprout can't do that*."

80.     *Fifth*, CWs reported that Sprout's platform lacked the scalability necessary to support large globally diverse customers. For instance, CW 8, a former Sprout Sales Manager,[13] explained that, "***[w]e did not have as many capabilities, to be able to scale things for large customers like franchises with multiple locations***." He stated that, "[t]hat was difficult for us," explaining, "***[w]e lost out to Sprinklr, our largest enterprise competitor, frequently because of that***." CW 4, who was on Sprout's post-sales team, similarly stated that Sprout's platform had "more limited capabilities" and was "not as scalable as something like Sprinklr." He explained that for a "large organization trying to get a lot of user seats," using Sprout would be "chaotic."

81.     *Sixth,* multiple CWs stated that Sprout's platform lacked the multilingual operational capabilities necessary to be considered an enterprise grade tool, which caused Sprout to lose potential customers. For instance, CW 7, a former Sprout Senior Sales Operations Analyst, explained that Sprout only operated in four languages, including English, Brazilian Portuguese, and two other foreign languages. He stated that this was a problem because it meant if a large, global company wanted to operate in any other language, they could not use Sprout's platform. On top of that issue, CW 7 further explained that, even if a customer operated in one of the three foreign languages Sprout's platform did support, customer support for the platform was still only offered in English: "We would sell the product and tell companies you can operate the product in Portuguese, but when they had any issues or had to fix something anyone you called at Sprout for support only spoke English." CW 7 stated that this limitation was brought up numerous times to management during his tenure at Sprout. CW 1, who was responsible for upselling to Sprout's

---

[13] CW 8 served as a Sprout Sales Manager, Strategic Agency, from spring 2019 until March 2022. CW 8 sold into social media marketing agencies that had end customers ranging from SMB to enterprise businesses. Beginning in early 2021, CW 8 was a member of an agency team that catered to strategic and enterprise level agencies that had enterprise customers.

mid and enterprise customers, similarly stated that Sprout lacked the "language capabilities" other platforms such as Sprinklr had that were required to service a true global company.

82.     *Seventh,* according to CW 3, another big product feature missing from Sprout's platform that enterprise customers wanted was "customer care"—*i.e.*, the ability to manage social inquiries and respond to positive or negative sentiment directly through Sprout.  For instance, if a customer received an inquiry on Instagram, it could see the inquiry on Sprout—but in order to reply to that inquiry, the client had to use the Instagram platform.  He explained that multiple customers within the enterprise space had voiced their need for customer care and recalled telling customers it was on the roadmap for over one year, but the capability was not being added.

83.     CW 6, who was responsible for strategic alignment at Sprinklr, stated that, even by 2024, Sprout was not "***fully enterprise-grade***," explaining that "***[Sprout] doesn't necessarily have all the potential integrations, API, and so on that other tools may have to get into those large complex tech stacks***."  When asked whether Sprout's offerings were competitive with actual enterprise solutions, CW 6 unequivocally declared: "***the answer is no***."  He added: "***It's so rare that [Sprout has] won in our enterprise segment, and by rare, I mean I've never seen it happen***."[14]

84.     Former Sprout employees further recalled that it was readily apparent internally that Sprout's inability to deliver an "enterprise grade" product was hampering the Company's ability to move up-market and attract larger clients.  CW 1, who served as a Customer Development Account Executive at Sprout, said he could see that limitations in Sprout's products were affecting Sprout's ability to compete for upmarket clients because he was "on the ground

---

[14] In addition to not personally seeing Sprout in the market for enterprise customers, CW 6 further noted that his peers in the industry almost never mentioned competing against Sprout in the enterprise space and did not see Sprout as a "strong, scary competitor."

floor getting the information" first-hand of what customers "want[ed] more of." He added anyone reviewing Sprout and Sprinklr was going to go with Sprinklr: "***It was game-over, it was just a better tool all around***." CW 1 recalled that he frequently discussed with his manager how Sprout was losing deals to competitors due to product limitations, and said "***[t]here was an understanding that we were struggling or that we couldn't compete with Sprinklr on this, and for this reason, this customer is going to go with a different solution***."

85.     CW 1 confirmed that Sprout's product limitations and challenges with getting up-market customers were "definitely" reported up the chain, including to senior executives of Sprout. He explained that "***[w]e had [] team meetings and discussions a lot***" about Sprout's inability to move up-market, which were attended by executives, including Tony Ciolino, Dan Summers, and Claire Schlafly, and emphasized "***management definitely knew that it was an issue***."

86.     Moreover, Sprout's executives attended sales calls with potential new enterprise customers and heard first-hand the technical limitations of Sprout's platform for enterprise customers. CW 8, a former Sprout Sales Manager, Strategic Agency, recalled that his team needed "the support of the executives" to "sell into some enterprise accounts," and specifically recalled one sales call Barretto was on that did not close because Sprout lacked the technical capabilities that the customer needed. He added that Sprout's senior leadership "absolutely" had their fingers on the pulse of what was going on.

87.     CW 7, a former Sprout Senior Sales Operations Analyst tasked with identifying challenges with generating new business, explained that Sprout tracked contracts that were lost and the reasons they were lost, as at the conclusion of every deal, salespersons were required to report whether the "opportunity" was "won" or "lost." If an opportunity was reported as "lost,"

the (sometimes lengthy) reasons why the contract was lost was required to be detailed in Salesforce, and this information was available to anyone on Salesforce, including management.

88.     CW 4, who worked with renewals, stated that the same process was in place for tracking renewals—when a customer did not renew their contracts, his team included notes in Salesforce explaining why the customer did not renew.  CW 4 estimated that 50% of customers did not renew their contracts, and attributed the churn largely to the capabilities of the Sprout platform and customers choosing "a different solution or tool to help their business."

89.     CW 3, another former Customer Success Manager, described Sprout's "product features" as the "biggest challenge" to "getting larger customers" and confirmed that product limitations were known internally because the reasons why deals with potential new customers failed to close and customers failed to renew contracts were tracked in Salesforce.  CW 2, a former Sprout Senior Enterprise Business Development Representative, similarly reported that the biggest reason customers would not sign up for Sprout and "customers [were] not renewing," was product limitations and confirmed that those issues were raised to the C-Suite via Sprout's "product feedback channels in Slack" and Salesforce.

      **2.**      **"A Total Sh*t Show": Former Sprout Employees Confirm That Sprout's Vaunted "Inbound" Sales Strategy Was "*Very Ineffective*" And "*Definitely Not Successful*" With Enterprise Clients**

90.     Compounding Sprout's product limitations, the Company's inbound, trial-based go-to-market strategy was entirely insufficient to consistently land larger and more sophisticated customers.   Multiple high ranking former employees explained that—in direct contrast to Defendants' representations during the Class Period that Sprout's "inbound 30-day trial approach" was a "massive differentiator" for the Company and gave Sprout a "huge strategic advantage" in the industry—in truth, enterprise customers were not purchasing Sprout's services based on free trials, and required a significantly more intensive sales process than Defendants let on.

91.     For instance, CW 3, who worked on Sprout's post-sales team, first in mid-market from April 2022 until January 2023, then in enterprise from February 2023 until December 2023, stated that the Company's inbound, free-trial sales strategy was not successful with enterprise customers.   CW 3 repeatedly described Sprout's inbound strategy as "***very ineffective***," "***not something that was successful for enterprise***," and "***definitely not successful***" with enterprise clients—to the point that post-sales teams "actively [] fought against" this strategy for enterprise because it negatively impacted their performance and ability to meet targets.

92.     Other former employees corroborated CW 3's account.   For instance, CW 7, a former Senior Sales Operations Analyst at Sprout, confirmed that Sprout's inbound enterprise pipeline "***was rather weak***" and the free-trial sales model did not work for selling to larger customers because Fortune 500 companies did not use free trials.   CW 2, who worked in sales at Sprout from September 2019 until September 2023, confirmed the inbound model did not work for generating enterprise business, recounting that by January 2023, "[i]nbound leads fell off because we were no longer focused on SMB."

93.     As Sprout's 30-day free-trial program was not effective for enterprise clients, the strategic benefit Defendants repeatedly claimed its "differentiated" inbound model enabled—"faster sales cycles"—was not materializing.   In fact, the exact opposite was true: as Defendants would later admit (*see e.g.* ¶152, *infra*), Sprout was experiencing "longer sales cycle[s]" and "definitely seeing lengthening of our sales cycles."   In line with Defendants' admissions, multiple CWs reported that, throughout the Class Period, sales cycles for enterprise customers were multiple times longer than smaller customers.   For instance, CW 7 explained that only the SMB's could close contracts within the same month (i.e., less than 30 days); corporate sales would take 60-90 days; and "[e]nterprise contracts would take six months to a year to complete."

94.     CW 1, who dealt with existing clients at all levels from small to enterprise, confirmed in 2021 and 2022 sales cycles were "***100%***" getting longer as Sprout focused more on developing its enterprise business.  He explained that sales cycles for existing large customers were multiples longer than smaller clients, as it would take "two to three times longer" to close larger contracts.  Moreover, even enterprise accounts that did use the free trial did not close in 30 days.  CW 1 explained that "***it became a total shit show because you couldn't close these people in 30 days, you just needed longer time***."  CW 1 stated that "***[m]anagement was definitely aware***" of this issue, as he recalled that there was a ton of pressure coming from Defendant Barretto and the Company's VP of Sales, Dan Summers, to close those deals faster.  "They would inquire about certain deals, talk about putting people on performance improvement plans, things of that nature"—which drove many salespeople to leave the Company.

95.     CW 4, who was responsible for onboarding new enterprise customers and managing renewals for mid-market customers at Sprout, confirmed that sales cycles were always much longer for enterprise clients than the rest of Sprout's customer base due to a variety of factors, including complex internal approval processes, lengthy RFP processes, or the customer could be "stuck in a different contract" at the time.  He recalled salespeople who were trying to close deals with larger customers like Kraft Heinz or Dicks Sporting Goods discussing how those types of deals would take "multiple months" to close.  He emphasized: "***[e]nterprise contracts always took longer***."

96.     Another former Sprout Senior Account Executive, CW 9,[15] echoed CW 4's assertions, advising that "it could take up to three years to even get a meeting with the bigger

---

[15] CW 9 was a Sprout Senior Account Executive from April 2018 until July 2024.  He was part of the growth team and managed existing customers, including upselling to those clients.

accounts," and "*[i]t could take forever to close things*." One problem, he explained, is that enterprise customers in the pipeline were often already locked into long-term contracts. For instance, a customer he was trying to land could already "be in a five-year contract with Sprinklr."

97.     CW 10,[16] a former Sprout Business Development Representative for enterprise business, stated that enterprise deals typically took six months to a year to consummate because it would take months for enterprise customers to evaluate Sprout and negotiate terms and pricing and "[y]ou have like 10 different decisionmakers and three different organizations within a company that are all involved." CW 11,[17] a former Sprout Enterprise Account Executive, similarly advised that sales cycles were multiple times longer for Sprout's enterprise clients than SMB. He stated, "You're dealing with larger procurement processes and more red tape." Further, smaller companies tend to accept the terms of service posted on the website, while enterprise customers typically negotiate on the paperwork, such as setting caps or limits on liability, and might also go through RFP's and RFQ's, or requests for quotes. CW 12,[18] a former Sprout Strategic Enterprise Business Development Representative, corroborated that the enterprise sales cycle was significantly longer than SMB, by a factor of many months, because "[w]hen you're trying to sign up" large enterprises, such as, for example, "Best Buy, they have a lot of moving parts, there's a thousand things that go on."

---

[16] CW 10 served as Business Development Representative, Enterprise at Sprout from August 2021 until July 2023. In that role, CW 10 was responsible for cold calling and attempting to set up meetings with enterprise clients for the Company's enterprise account executives.

[17] CW 11 was an Enterprise Account Executive at Sprout from October 2021 until August 2022.

[18] CW 12 served as a Strategic Enterprise Business Development Representative at Sprout from March 2022 until October 2024. In this role, CW 12 was responsible for identifying outbound leads for the enterprise sales team.

### 3. "*How The Hell Are We Going To Sell This?*": Former Employees Confirm That Sprout Could Not Raise Prices On Enterprise Clients Given Its Ineffective Sales Strategy And Inadequate Product

98. CWs confirmed that it was clear internally Sprout's inbound strategy for generating enterprise business relied almost entirely on Sprout's low pricing, and that when Sprout increased prices at the end of 2022, those leads would inevitably dry up. For instance, CW 4, a former Sprout Customer Success Manager, stated: "Sprout did not generate Enterprise business, basically the Enterprise businesses would call into our call center for service," and explained that this occurred because other competitors, like Sprinklr, cost much more than Sprout. CW 11, a former Sprout Enterprise Account Executive, corroborated this account. CW 2 also confirmed Sprout's low pricing was the Company's primary competitive advantage in the enterprise market. CW 2 stated that in November of 2022, during an all hands meeting when a pricing change occurred "tripling the prices of the Sprout Standard, Professional, Advanced packages," he recalled that his team wondered: "*How the hell are we going to sell this?*"

99. Numerous CWs confirmed that immediately after Sprout increased prices at the end of 2022, Sprout's inbound sales pipeline began drying up. Indeed, CW 7 confirmed that Sprout's inbound pipeline began "drying up" towards the end of 2022, with a plummet in early 2023. CW 2, a former Sprout account executive, confirmed that by January 2023, sales were plummeting as a result of the price increases: "[w]e were trying to compete with companies like Sprinklr Social Media, but *we didn't have their capability and our prices were not competitive.*" CW 13, a Senior Enterprise Development Representative,[19] similarly noted that following the price hikes in

---

[19] CW 13 served in various capacities at Sprout from October 2019 until November 2023. He served as a Sales Development Representative at Sprout from October 2019 until November 2020, Enterprise Business Development Representative from November 2020 until February 2022, Senior Enterprise Business Development Representative from February 2022 until May 2022, and

November 2022, it became difficult to sell and there were no promotions or bonuses as "[p]eople were not performing because sales plummeted." As CW 13 summarized: "***It became the perfect storm of price increases causing lead decreases***."

100. CW 14, who worked in Enterprise Sales at Sprout from November 2018 through December 2023 and was responsible for landing new accounts,[20] confirmed that sales collapsed around the winter of 2022-2023 following Sprout's price increases. CW 14 estimated that at least 30% of contracts that were being negotiated in the pipeline never came to fruition due to the price increases, and 20-30% of existing customers terminated their contracts due to the price increases. CW 10 similarly recalled that following the price increases "there was a lot of churn and customers leaving," and said "Customer Success was struggling" as customers were gravitating toward Sprinklr or more affordable tools.

101. Management was well aware of the slumping sales, because, as CW 7 recalled, after the price increases were announced, "***leadership asked for an analysis of the effects of the price increases***." CW 7 further explained that his team was telling management in Q4 2022 that Sprout was losing SMB contracts, and that they were not going to be able to recoup the losses from the SMB contracts through enterprise or otherwise. He added that this deficiency was broadcast to the Company from November 2022 through May 2023—*i.e.*, at the same time that Defendants were publicly claiming that the exact opposite was true.

---

Account Executive, SMB from May 2022 until November 2023. CW 13 worked out of the Company's corporate headquarters in Chicago, Illinois.

[20] CW 14 worked in Enterprise Sales from November 2018 through December 2023. CW 14 worked from the Sprout HQ in Chicago, Illinois. In his last year of employment, CW 14 worked with Sales Directors focused on developing new contracts with new companies. CW 14 explained after he developed newly onboard contracts, they would be handed over to Account Representatives who would be responsible for maintaining the contract, responding to issues, and renewing the contracts.

102. Further, numerous confidential witnesses reported that, throughout the Class Period, Sprout's management had access to metrics the Company tracked that allowed them to evaluate the strength of the pipeline, Sprout's sales cycles, and future growth. For instance, CW 7, recalled that the entire sales organization, including executives, had access to sales information in Salesforce and was able to track the dwindling sales through the Salesforce database. CW 7 explained that from the time he started at Sprout in 2021, the Company tracked a number of metrics, including the number of users that had started the free trial, and stated that this information was logged and tracked by Sprout and placed into Salesforce by CRM (Customer Relations Management). He added that the entire sales team would log onto the Salesforce Dashboard on a daily basis to look for leads and see what was in the pipeline. He emphasized "[t]here was visibility into the health of the pipeline as long as people chose to look at it." CW 2 confirmed that Salesforce was used to track ARR and opportunities.

103. CW 1 similarly recounted that management had access to Salesforce and looked at what was happening in the pipeline "all the time." As CW 1 explained, Sprout's top executives were very involved in the sales pipeline: "They live inside of it. They know which reps have certain accounts. They're very involved. They are always on the Slack channel or on Microsoft teams – telling salespeople to 'pull us in where we can help to bring deals forward.'"

104. CW 14, who worked in enterprise sales developing new contracts, corroborated that Sprout's senior executives very closely monitored and tracked prospective and existing clients through Salesforce, and reported that if you weren't meeting your numbers, you were scrutinized and terminated. CW 14 said based on his interaction with Sprout's C-Suite executives, it was clear they were closely monitoring Salesforce on a daily basis. He added: "[t]he C-Suite were always tracking upcoming sales closely in order to forecast pending revenue."

105.    CW 9 similarly stated that Sprout's top management was very involved in the sales pipeline.  He advised that "[p]eople like Barretto certainly got reports and overviews," and could see the pipeline for each representative in Salesforce.  He added that Barretto would be all over it if you were working a huge deal.  "He was the – be in the trenches with you type."  CW 13 confirmed that the C-Suite, "like everyone else," was aware of the challenges the sales teams were facing and could see they were struggling simply by monitoring Salesforce.

### 4.    Sprout Lacked Fundamental And Essential Sales Infrastructure Necessary To Successfully Compete In The Enterprise Space

106.    Recognizing that Sprout's inbound trial-based sales strategy was ineffective with enterprise clients, the Company needed to pivot in order to sustain the high growth that it had been touting to the market.  To that end, in early 2023, the Company quietly began to put more pressure on the outbound channel of its business model.  However, CWs detailed a host of issues Sprout's sales teams faced executing outbound strategy.

107.    *First*, as Defendants would admit at the end of the Class Period, multiple CWs confirmed that Sprout did not have an "enterprise-grade team" capable of executing in an "enterprise environment" and completely lacked vertical sales teams.  CW 1 confirmed Sprout did not have vertical sales teams and emphasized that "having verticals, such as representatives who could focus on particular targets like pro sports or the hospitality industry and tailor their outreach, is a basic sales motion and ***something that should have happened as soon as the company started to go upmarket***."  CW 7 confirmed that "***[t]here was no large verticalization set up for our large team sellers***"; instead, Sprout had a "tiny, tiny vertical strategy" for enterprise, which was not at the scale necessary to capture enterprise business.  According to CW 7, sales representatives would complain that they had to learn about new industries to make sales and pushed for verticalization,

but Sprout did not even begin to have "serious" discussions about verticalization until shortly before he left in November 2023.

108.     CW 3, a former Sprout customer success manager, explained that in early 2023, Sprout restructured its entire go-to-market strategy to focus on the outbound channel.  As part of this restructuring, CW 3 said the inbound sales teams—who had previously been responsible for managing growth with existing business and handling inbound leads—were moved to outbound. According to CW 3, while the inbound sales teams still had inbound titles, they were told to focus their efforts on outbound sales rather than cultivating existing business.   Similarly, CW 7 explained, "[w]ith inbound leads drying up our teams started a project to transition from inbounding to outbounding."

109.     Consistent with that strategy, in Q2 2023, Sprout's management added outbounding as part of the Sales Representatives' "quota requirements" in SMB up though Mid/Corporate in North America.  Per the new quota system, CW 7 explained that, in addition to reaching their regular sales goals, the sales team was expected to close at least one or two outbound sales a month.

110.     *Second*, Sprout's sales force was not trained and lacked the capabilities, expertise and resources necessary to land larger, more complex enterprise customers.  Indeed, CW 7 stated that outbound sales "was a difficult skill to train in such a short time" and that by Q2 2023, there was "a good number of sales reps struggling to pick up on outbounding at the pace Sprout needed to be successful." He estimated that 25% of the team struggled and were not successful, emphasizing "Sprout was already struggling with people who weren't doing well selling, having an additional 25% struggling to sell outbound was significant."  He said sales representatives who could not meet their quotas would be placed on performance improvement plans, and if performance did not improve, they were terminated, causing a morale issue within the company.

111.    CW 3 recalled that when Sprout began to shift toward prioritizing outbound in late 2022 and early 2023, there was an "internal feeling of chaos" because outbound sales "hadn't been a focus before" and "people were uncomfortable and they weren't prepared for it." CW 3 stated that throughout spring 2023, Sprout's sales teams were unable to sell into the enterprise market, and "across the board everyone was struggling to hit their quotas." He added that the goals were ***not in "proportion to reality."*** CW 14 confirmed in spring 2023, "[p]eople were not hitting their numbers and there was a large drop-off of clients being signed."

112.    CW 2 similarly confirmed that he observed sales plummeting as early as January 2023, and said the situation was exacerbated by Sprout not being able to make the transition to enterprise sales and the Company was not prepared for the sales strategy shift.  He explained that not only did Sprout not have the product capabilities to compete with Sprinklr, but on the sales side, enterprise was not ready to sell, no training had been provided, and no guidance was put in place for selling to enterprise customers.  Further, as CW 2 explained, Business Development Representatives lacked the research tools necessary to identify companies to target.  CW 2 stated that by neglecting SMBs with price hikes and Sprout's sales strategy focusing on enterprise, there was no revenue stream to implement the outbound strategy.

113.    CW 12, a former Sprout Business Development Representative from March 2022 until October 2024, also corroborated that the sales staff was not trained to sell to large, sophisticated customers and not prepared for the transition to enterprise.   He explained that, for example, if BDRs who are responsible for finding leads, "don't know how to find [] leads, then the people that do know how to do their job within the enterprise space, such as Account Executives aren't going to be able to close."  CW 15, a former Sprout Business Development Representative,

who was responsible for developing enterprise accounts in the outbound pipeline,[21] corroborated these facts, confirming that Sprout's sales force was not equipped to sell its products and services upmarket to enterprises. CW 15 attributed the sales team's inability to break into those accounts to the lack of guidance in terms of messaging. He explained that "[w]e were given sequences" (i.e., "pre-generated messaging") but "[i]t didn't work." He described the marketing messaging as "very basic," "very simple," and "outdated."

114. *Third*, multiple CWs described how Sprout did not have the resources necessary to identify good outbound leads. For instance, CW 7 stated the problem with outbounding was Sprout "needed more and better BDR's" to assist the Sales Representatives. The BDR's responsibility was to identify potential customers through LinkedIn and other similar web sites, including applications Sprout paid for to gain information on digital customers, however, there were "definitely not enough BDR's to support the sales reps." CW 7 stated that heading into 2023, "[t]here weren't even enough BDR's to support the corporate teams I was working with." In Q2/Q3 2023, CW 7 said his team calculated Sprout needed three to four times as many BDR's as they had—during this time, CW 7 said there were only a total of 7-8 BDR's supporting all of North American sales, two of whom were new and one who was on leave.

### 5. After A Short-Lived "Lifeline" From The Salesforce Partnership And A Failed Price Increase, Sprout Resorted To Rampant, Unsustainable Discounting And Other Machinations To Stave Off Its Growth Decline

115. As Sprout's "inbound" sales strategy was not successful for enterprise customers, and as Sprout lacked a true "enterprise-grade" outbound sales system, Sprout resorted to temporary "lifelines" to temporarily prolong growth and stave off deceleration.

---

[21] CW 15 served as a Business Development Representative, Enterprise at Sprout from July 2021 until January 2024. CW 15 reported to Michael Worotikan (current Senior Manager, Sales Development) and Paige Dorfman (current Director, Business Development).

116.    *First*, Sprout relied on the Salesforce partnership to provide a short-term boost to sales, while dramatically overselling its longer-term benefits to the public.  CW 1 stated that as the quality of inbound leads diminished in late 2021 and early 2022 following the pandemic, Sprout entered into the Salesforce partnership as a "lifeline" to generate more enterprise leads.  However, he explained that the purported benefits were "nothing more than a talk track," reiterating that the goal of the partnership was to help make up for the slowdown in leads coming organically.  CW 1 explained that he has spoken to colleagues who are still at Sprout who reported, "***that [it] was a total flop***."  Salesforce customers had been using Social Studio for free as part of their Salesforce deal and many of them did not want to start paying for social media management.  CW 1 stated that "[i]t was just a ploy to say – we're partnered with Salesforce, and a way for Sprout to get access" to the customer list as reps had access to the names of people who were discontinuing with Social Studio.  However, CW 1 noted, "[t]here was an overwhelming sentiment that those customers didn't want to pay for Sprout Social."

117.    *Second,* Sprout boosted short term growth through extreme discounting.  As CW 4 explained, in order to compete against Sprinklr, Sprout often "manipulate[d] price points by offering discounts." He recalled that there were "crazy discounts" for enterprise customers when he was at Sprout between June 2021 and July 2022, that could be upwards of 90%.  He recalled one enterprise customer with approximately 900 users got a "94% discount on their plan." He said it was "an insane deal."  CW 5, who was an Enterprise Account Executive from July 2020 until January 2022, confirmed that Sprout employed discounting to boost enterprise sales.  He explained that "[t]here was discounting in the 20% range at the end of quarters," and "[t]he enterprise reps had agency to discount 20% all the time, but then at the end of quarters there would be flash periods where we could increase that to 40%."

118.     CW 1 advised that there were definitely some revenue manipulations at end of quarter to try to hit targets.  According to CW 1, this was done by pulling sales forward and offering discounts to do so, with sales teams telling customers things like, "my pricing is only approved for the end of the month, or I only have approval to do this today, if you sign today." CW 1 stated that "[t]here were no rules or structure with pricing.  You did whatever you had to do to get the deal done," and "[w]ith a good brand and a good logo, the account could be discounted up to 60% to get them in the door."  He added that sales reps basically had carte blanche on discounting: "They had something called the Agency Pricing Program which was *truly the wild wild west*, where you could make up your own pricing just to get agency business."

119.     CW 7 similarly reported that when Sprout realized sales were decreasing, discounts were used to generate sales.  CW 7 confirmed that some discounts Sprout used to generate customers were so steep that they required the permission of Defendant Barretto.

120.     *Third*, CW 14 recalled how Sprout's executive team doubled pricing across all offerings in November 2022, to inflate their sales forecast. As CW 14 explained, when Sprout doubled pricing, all the prospective customers in Salesforce doubled in value, even though the contracts had not been finalized and the clients/customers were not online running.  "The C-Suite thought the price increases would inflate our numbers and for a short time they did, but they were misleading because they were open deals that never materialized."

121.     As such, after Sprout raised prices at the end of 2022, its pipeline again dried up, and thus in early 2023, Sprout again resorted to extreme discounting to temporarily prop up growth and attract new customers without having to officially reverse its price increases.  Indeed, CW 2 stated that when prices tripled in late 2022, "there was no competing with our main competitors like Sprinklr," because Sprout lacked the product capabilities of its competitors, and "[w]e became

really desperate to close deals." He explained that by the middle of May 2023, Sprout was panicking as they saw conversion rates plummeting. He said "[t]here was a feeling of desperation," and direction came down from the C-Suite to offer enterprise customers with existing contracts 50-80% off of Sprout's pricing if they would break their contracts. As CW 2 recalled, management had told everyone to "[t]hrow any offer at the client to close the deal," so he "was giving insane 70% discounts" across the board.

122. Likewise, CW 13 stated that in and around February or March of 2023, he was told by his manager that they could offer discounts to compete with competitors. He stated that "[w]hen Sprout realized they weren't doing so great (with the price increases) *we started to discount like crazy*." CW 13 stated there was nothing officially announced, and the pricing structure was still as advertised, but unofficially he could offer a discount that would need to be approved by "leadership." He said they would offer up to 50% discounts to potential customers to generate revenue. CW 13 confirmed that any discounts would be reflected in the Salesforce database that management used to monitor sales.

### G. The Truth Begins To Emerge

#### 1. After A Short-Seller Challenges Sprout's "Upmarket" Strategy And Salesforce Partnership, And A Disappointing Quarter Raises Questions, But Defendants Double Down On Their False Claims

123. On April 4, 2023, a short seller writing under the moniker Akram's Razor issued a report that questioned Sprout's claims about its ability to successfully compete in the enterprise space and the Company's purportedly durable organic growth (the "Razor Report"). Specifically, casting doubt on Defendants' claims throughout the Class Period that there was "not any functionality [Sprout didn't] have to win these larger deals," the Razor Report stated that Sprout was struggling to land large corporate clients and to compete with its main competitor, Sprinklr. The Razor Report further opined that Sprout's growth was being artificially propped up by the

50

temporary influx of Salesforce customers—which would peak and decline far earlier than Defendants had promised—and by the Company's recent price increases.

124. Specifically, based on the author's calls with numerous major enterprise customers, Sprout was unable to compete for larger enterprise clients, as "Sprout was built to support SMBs as an off-the-shelf product, and its attempt to move upmarket [was] bumping into Sprinklr's superior offering," while Sprinklr, its competitor, was considered to be "the best-in-class player" by far. The report provided examples based on the author's calls with enterprise customers, who stated that Sprout's product "[l]acked collaborations tools and reporting they needed and didn't have enough ability to customize," while in fact being "just as expensive" as Sprinklr—particularly after Sprout's then recent price increases—due to the add-ons they were forced to purchase to meet their needs. The report claimed that Shopify had recently "decommissioned" Sprout because the Company's "[a]nalytics couldn't be trusted" and the "APIs would break constantly," requiring substantial manual effort and making things "more challenging." According to the report, Shopify had enlisted Sprout's services specifically for its analytics, and when those analytics did not work, "*it almost ended up being like a no-brainer decision as to why we wouldn't use it anymore*"— Sprout was "*just super, super unreliable*."

125. Further, the Razor Report asserted that, contrary to Defendants claims that the Salesforce partnership would fuel dramatic growth through at least 2024, in reality, Social Studio migrations were "much farther along than Sprout has disclosed or wants to admit" with very little of the opportunity remaining. Specifically, the report's author had determined, through research and interviews, that Social Studio's largest customers (such as Nestle, Novartis, and Johnson & Johnson) had begun migrating to other platforms as far back as May 2021, when Salesforce first stopped updating Social Studio—nearly a year before Sprout announced the Salesforce partnership

in March 2022. Thus, despite Defendants' boast that they had an "almost 100% win rate" with Social Studio customers, Sprout had in fact already failed to win most of the larger Social Studio customers because these customers had long ago migrated to other platforms—and they had not chosen Sprout because its product and platform were significantly inferior to that of Sprout's competitor Sprinklr. The report concluded that, as a result, the "bulk" of the remaining Social Studio boost would "land in Q4 2022 and Q1 2023," with Sprout hitting a "growth wall" soon thereafter, by the beginning of 2024. As the report stated, "***despite what Sprout might be claiming, we are far closer to the last innings of the [Social Studio] migration than the start—every source I have looked through points to this***."

126. As such, the Razor Report determined that while Salesforce's decision to sunset Social Studio had substantially "boosted [Sprout's] revenue growth in 2022" due to Sprout inheriting enterprise customers it would normally be unable to obtain, this boost was entirely temporary and was already nearly over. Meanwhile, "***without this boost, Sprout would have seen revenue growth decline to the high teens or lower***," as these customers had "***notably inflated ARR growth***" and "***obfuscated the organic realities of [Sprout's] business***." Rather than admit this reality, Sprout management had instead misleadingly capitalized on this temporary tailwind by "***play[ing] it up/mischaracterize[ing] it to investors as evidence of a sudden and successful strategic shift upmarket by them***." The report opined that "***[t]he fact that [Sprout] is still being modeled for 30% growth in 2024/2025 and [Defendants] have not walked this 2021 investor day framework back in this environment is absurd and definitely unsustainable***."

127. A few weeks later, on May 2, 2023, Sprout announced disappointing financial results for Q1 2023, and, particularly, disappointing growth among enterprise customers. Sprout added only $13.3 million in net new ARR during the quarter, the lowest net new ARR increase

since the start of the Class Period. Defendants also revealed that Sprout had added only 36 customers with ARR above $50,000 during Q1 2023, the lowest quarter of large customer adds in over two years. On this news, Sprout's share price dropped $9.79 per share over the following two trading days, or more than 20%, from a close of $48.32 on May 2, 2023 to $38.53 on May 4, 2023.

128. Significantly, however, Defendants now made a series of statements that contradicted the short seller's assertions and reassured investors that the poor results were a temporary blip on their path to upmarket growth. Indeed, Defendants **raised** their annual ARR guidance by 25 basis points, translating to "***greater than 33% [ARR growth] year over year***," and reiterated full year revenue growth guidance of 30%. When an analyst asked what factors gave Defendants "the most confidence" to raise the ARR outlook despite the poor Q1 results, Defendant Barretto responded: "***we're seeing just really great progress in our enterprise***" and "***really great progress from a competitive standpoint in terms of the execution from the sales team***."

129. Moreover, Defendants took pains to refute the specific concerns that were raised in the Razor Report with respect to the Salesforce partnership. For example, when an analyst asked Defendant Barretto to elaborate on whether Sprout was seeing any changes in the enterprise space—with the Razor Report having raised concerns that Sprout was unable to win deals against the likes of competitors like Sprinklr—Barretto responded that Sprout was "***in more deals than ever before from a large enterprise and an enterprise perspective***," and "[w]e feel really great about the win rates that we've seen within that space." Barretto also strongly reiterated the purported strength of the Company's "inbound" sales model and the success of its 30-day trial in winning enterprise customers against competitors, stating:

> *We feel really great, obviously, about the go-to-market motion that we've built and we've honed over 13-plus years. Our 30-day free trial continues to be the best weapon within— in the space*, and we've built the foundation of our business there where the majority of

our customers actually get their hands on a keyboard and they're in the product . . . ***So no, not seeing any material change or difference in the market, certainly under enterprise.***

130.    Defendants further represented—contrary to what was said in the Razor Report about the Company's Social Studio opportunity soon drying up—that Social Studio migrations would continue to make large substantial contributions to the Company's upmarket customer growth.   And, in a clear reference to the Razor Report, while an analyst noted that, "***there's a narrative out there that it's been the larger customers that have moved first***," Defendants responded that this was not in fact true, and instead "***it [was] likely the opposite from what we've seen both in terms of what we executed on so far and the visibility into the pipeline that we have in front of us***."   Barretto claimed that there was in fact a "tremendous amount of opportunity remaining within [the Social Studio] base," including deals within above $10,000, above, $50,000, and even above $250,000+ , such that the Company was "***still pretty early on in the [Salesforce] opportunity in front of us with a lot ahead of us***," and would continue to see its benefits "through [20[24].

131.    Analysts were reassured by these statements.   For example, a May 3, 2023 Baird report noted that "Social Studio migrations continue to impress, and we view [it] as a meaningful opportunity with Salesforce."   Morgan Stanley similarly noted that Sprout management had provided comfort with respect to the Company's growth continuing into 2024 by pointing to the "upside from Salesforce partnership."   William Blair likewise took comfort in the fact that "management highlight[ed] that it is still early days with this [Salesforce] partnership."

**2.    Sprout Reports Another Disappointing Quarter For Upmarket Growth, Reduces Its 2023 Guidance, And Announces An Expensive New Acquisition—An Influencer Marketing Platform—Admitting That It Had Previously Lacked This Critical Feature**

132.    Three months later on August 3, 2023, the truth continued to emerge.   That day, Defendants again surprised the market by announcing poor Q2 2023 results, with both ARR and

customer adds again falling below market expectations—causing Defendants to lower the full year 2023 revenue guidance they had reiterated just three months prior.

133.     Defendants further disclosed that Sprout's upmarket trajectory had decelerated because, despite years of claiming that Sprout's "powerful platform" had the "robust capabilities needed by the most demanding enterprise users" and there was "not any functionality we don't have to win these larger deals," in truth, the platform lacked a crucial component—influencer marketing.  Specifically, Defendants surprised investors by announcing that Sprout had taken on debt for the first time in its history as a public company to pay *$140 million—*an extraordinary amount that was equivalent to more than half of the Company's entire revenue for 2022—to acquire Tagger Media, Inc. ("Tagger"), an influencer marketing and social intelligence platform. In striking contrast to its recent assurances that "[t]here's not any functionality we don't have to win these larger deals," and that Sprout's product "check[ed] all the boxes" for enterprise customers, Defendants now admitted that influencer marketing—which it had utterly lacked until the Tagger acquisition—was "***critical***" to obtaining upmarket customers.  Indeed, Defendants disclosed that Tagger's capabilities were essential for upmarket growth because, as Defendants Howard and Barretto both stressed, influencer marketing was a "***customer requirement***" that Sprout saw "***in more than half of our enterprise RFPs***" and was also demanded in a "***substantial amount of the enterprise and even the mid-market deals that we're working on***."  Defendants further admitted that Sprout's lack of these "critical" enterprise tools that were needed to secure the majority of upmarket deals was not new to them, but had been known since at least "the beginning of last year"—i.e. Q1 2022—and that there had "been [] an upward trend for some time now" of prospective enterprise customers demanding influencer marketing.

55

134.    On this news, Sprout's stock price fell 12.3%, from a closing price of $53.38 per share on August 3, 2023, to a closing price of $46.81 per share on August 4, 2023.

135.    These disclosures prompted some analysts to raise further concerns about the Company's upmarket growth.  For example, CG Capital Markets queried whether Sprout was "***making an acquisition to mask deteriorating growth***."  And Cantor Fitzgerald noted that the "steep" purchase price was a clear indicator of Sprout's desperation to add influencer marketing, pointing out that Sprout was "likely to pay more in interest expense in 2024E than the revenue that Tagger is going to generate in 2023E."

136.    However, to quell these concerns, Defendants again assured investors that Sprout's business remained on track, while continuing to conceal the full truth.  For example, during the August 3, 2023 call, Defendants continued to tout the Social Studio opportunity as key to the Company's future growth, claiming again that it would reach a crescendo in Q4 2023, with Defendant Barretto asserting that Sprout "***continue[d] to expect [Salesforce] contributions to grow meaningfully and linearly over the course of 2023, building to a very strong Q4 as the largest and more complex deployments begin to make their migration over to Sprout***."  Barretto further asserted, in response to an analyst question about the size of the customers that had already moved to Sprout from Social Studio, that "***generally I would say that those lands are coming in larger than they were with Social Studio***"—*i.e.*, that these customers were spending even more with Sprout than they were with Social Studio—such that Sprout was "***getting a premium on most of those accounts as they move over***."  Defendants also claimed that overall demand for Sprout's products, "especially up in the mid market enterprise," had "***never been stronger.***"

**3.     While Internally Scrambling To Stave Off An Impeding Growth Cliff, Defendants Continue To Falsely Assure Investors That Their Sales Strategy Was "*Built For The Very High-End Enterprise*"**

137.    On September 27, 2023, Sprout held its second ever Investor Day and proclaimed that the Company expected to reach $1 billion in annual revenue by 2028—or three times the $333.6 million in revenue it earned in 2023—due to continuing growth in the enterprise segment. Defendants also again touted that Sprout had "disrupt[ed]" the enterprise market with its inbound 30-day trial mode, asserting that "*we [] can land customers incredibly fast because of this trial model.  You look at the speed and the velocity in which we're still closing customers because customers have a chance to prove that the product works*."  Defendants asserted that they had also "complemented" their winning inbound model with "*great outbound motions as well*," which was "*the right model for us to continue to sustain growth*."  In fact, Defendants proclaimed that Sprout's products were "*built for the very high-end enterprise, a very sophisticated user*."

138.    On October 30, 2023, Akram's Razor issued an update to its April 4, 2023 short report, which continued to assert that Defendants were being "disingenuous" about "underlying growth substantially slowing."   The report quoted additional former Sprout sales reps the author had interviewed who stated (much like the former employees described *supra* at §IV(F)) that Sprout did not "*really have any inbound business*."  Further, Sprout's Chief Marketing Officer Jamie Gilpin had recently and abruptly announced her resignation in September 2023, and according to these former employees, the real reason she had resigned was a collapse in the Company's sales pipeline:  "*The challenge for her was it's the, the selling environment has changed a lot since she joined the business and yeah the, the inbound has just completely collapsed*."

139.    As set forth above, unbeknownst to investors, as the Company's inbound pipeline dried up in early 2023, Sprout had begun to aggressively offer massive and unsustainable discounts

to land larger customers, keep new revenue flowing in, and avoid reporting another disappointing growth quarter—which Defendants knew they could not afford to do.  Accordingly, on November 2, 2023, Defendants reported "incredibly strong third quarter results," with revenue up 31% and ARR up 33% compared to the same quarter the prior year, above the Company's guidance range. The Company also raised its full year 2023 ARR guidance to 30%, from 28-29%.

140.    Significantly, when analysts asked whether the Company's inbound strategy required any changes or additional investments, Defendants unequivocally assured the market that there were "***no major changes to call out***" in the Company's sales strategy and "***no surprises for all of you in the way that we grow our business***," as the "***go-to-market strategy is working***." Defendants also again touted the Salesforce partnership as significantly contributing to ARR growth, proclaiming that Sprout "expect[ed] another record ARR contribution in Q4, as complex deployments [i.e., the larger ARR enterprise customers] begin their migration to Sprout."

141.    As Defendants would ultimately acknowledge just six months later, however, Defendants' positive statements were utterly false.  Indeed, as Defendants belatedly admitted at the end of the Class Period, rather than their go-to-market strategy "working" with "no major changes to call out," Defendants were already, by the time of these statements, scrambling to "***redraw our go-to-market model***" entirely, as it decidedly did not work for enterprise clients, and Sprout was facing a dire situation where "***we didn't have enough pipeline built.***"

> **4.      Despite the Resignations of Sprout's Chief Marketing Officer, Chief Revenue Officer, Chief Technology Officer, And Its CEO, Defendant Howard, Defendants Continue To Reassure Investors That Sprout's Sales Strategy And Products Are Successful In The Enterprise Space**

142.    As Sprout's long-term growth prospects were collapsing, and at the same time as Defendants were secretly revamping their entire go-to-market strategy, three of Sprout's most senior officers abruptly resigned.  First, as noted above, on September 7, 2023, Sprout announced

the resignation of its Chief Marketing Officer, Jamie Gilpin, effective at the end of 2023, without the Company having named a successor. Then, in November 2023, Sprout's Chief Revenue Officer, John Schoenstein, quietly departed the Company without any public announcement, after just over a year on the job. Further, on December 14, 2023, Sprout announced that Aaron Rankin, the Company's Chief Technology Officer, would resign ***effective immediately***.

143. Then, on February 20, 2024, Defendants reported a disappointing deceleration in ARR growth and announced disappointing Salesforce customer adds, equal to the same quarter the prior year, despite the Company's recent and repeated assurances that Q4 would be a particularly strong. Defendants also issued unexpectedly conservative 2024 revenue growth guidance of 27.5%—lower than the 30%+ revenue growth Defendants had touted during the September 2021 Investor Day—and declined to offer any ARR guidance for the year. However, Defendants again assured investors that this was only a brief speedbump and that their upmarket strategy was succeeding. For example, while analysts noted that they thought Sprout would be getting more customers from Salesforce in Q4 based on Defendants' prior positive statements, Defendant Barretto directed investors to focus on the "40% gain in ARR from those customers." Howard further asserted that Sprout's upmarket strategy was continuing to outperform even in the face of macroeconomic headwinds, such that it remained "***a growing opportunity and one that is probably as healthy as it's ever been both in terms of pipeline and our outlook***."

144. On February 23, 2024, Sprout filed its 2023 Annual Report on Form 10-K ("2023 10-K") with the SEC. Strikingly, while (unbeknownst to investors) Defendants had already been scrambling for at least the prior five months to overhaul its entire inbound sales model and develop the "outbound" sales teams they desperately needed to win enterprise clients, the 2023 10-K again asserted that the key to Sprout's growth was its "***product driven strategy, where potential***

*customers are led to our website and sign up for a free trial or to request a demonstration of our products*." Indeed, the 2023 10-K again emphasized to investors that Sprout's inbound sales strategy remained effective with enterprise clients, allowing it to "*cost-effectively drive strong lead generation, upgrade free trials to paying customers and achieve growth of our platform*."

145. Moreover, despite the fact that Defendants had at this time already decided to abandon ARR as a reported metric precisely because they purportedly "*no longer believ[ed] that ARR [...was a] key performance indicator[] of Sprout Social's business*"—the 2023 10-K *once again reiterated that ARR was a "key business metric"* that remained a critical "indicator of the scale of our entire platform while mitigating fluctuations due to seasonality and contract term."

146. Even as late as a March 6, 2024 Sprout investor conference, with just three weeks left in the first quarter (and just two months before the end of the Class Period), Defendant Del Preto again stressed to investors his confidence that Sprout would reach its full year 2024 guidance and potentially "*exceed*" it, explaining that Sprout "*left [them]selves enough room to over-perform*" the guidance and that "*we actually think there's opportunity to[...] exceed that*, and so *that's the only thing that I would call out...*" And Defendants yet again emphasized their short sales cycles, with Defendant Barretto asserting that "*even in the mid-market and enterprise, there's great velocity in our business*" due to the Company's trial-based sales model, such that "*we'll close mid-market and enterprise deals within 30 days, within the trial.*"

147. On April 15, 2024, Sprout abruptly announced that its founder and CEO, Defendant Howard, would also be stepping down effective October 1, 2024.

**H.      The Truth Is Fully Revealed When Defendants Stun The Market By Revealing That They Had To Completely "*Redraw[] Our Go-To-Market-Model*" Because Sprout's Product And Infrastructure Were "*Orders Of Magnitude*" Different Than What Was Necessary To Successfully Obtain Enterprise Clients**

148.      On May 2, 2024, Sprout reported extraordinarily poor results for Q1 2024 and made a series of stunning disclosures that completely contradicted what Defendants had told investors throughout the Class Period, including as recently as just weeks earlier.

149.      First, Defendants reported that Sprout's critical "upmarket" growth in large mid-market and enterprise customers had fallen off a cliff.  Indeed, while the Company had consistently described "mid-market" and "enterprise" customer adds in the >$10K ARR and >$50K ARR cohorts as the critical "measure[s] of our ability to scale with large customers and attract sophisticated organizations," Sprout now announced that it had added only 134 customers to the ">$10K ARR" mid-market cohort in Q1—*a decline of nearly 80%* from the prior quarter, and the lowest number of such additions since 2019.  For the even more important enterprise ">$50K ARR" enterprise cohort, Sprout had added only 50 customers—*a decline of two thirds from the prior quarter*.  Consequently, Sprout not only missed revenue expectations, but it was forced to dramatically slash 2024 full-year guidance from 28% to 22% growth year-over-year—a mere *two months* after Defendants had not only reiterated their guidance but had told investors they were likely to "exceed" this purportedly conservative forecast.

150.      Second, while Defendants had incessantly told investors throughout the Class Period that Sprout's inbound, trial-based go-to-market model was the Company's "secret sauce" and its "secret weapon" that supposedly gave it a "significant competitive advantage" in the enterprise space, Defendants now admitted that the exact opposite was true.  Indeed, Defendants explicitly acknowledged that Sprout's "completely inbound highly transactional model" was "*orders of magnitude different*" from what was necessary to successfully obtain enterprise-level

clients. In Defendants Barretto's own words, Defendants had to completely "***redraw[] our go-to-market model***" for enterprise clients by making significant new investments to "build[] vertical sales teams"—meaning dedicated, specialized sales teams with in-depth expertise in a particular industry that were necessary to target enterprise clients. In fact, Defendants had been forced to make numerous additional changes to service large enterprise clients—including "accelerating promotions in our mid-market and enterprise teams," "adjusting our account coverage model" and "prioritizing Tagger enablement for all our customer-facing teams." Remarkably, contrary to their statements throughout the Class Period that their inbound sales model was entirely effective with enterprise clients, Defendants now conceded that these dramatic changes were necessary because Sprout's business had in fact "***changed materially***" given its upmarket focus.

151. Significantly, Defendants also admitted that this massive sales infrastructure and strategy overhaul was not a recent development, but had been well underway ***for eight months***—*i.e.*, at the same time that Defendants were falsely assuring investors that there were "***no major changes to call out***" and "***no surprises***" regarding the efficacy of their inbound sales strategy in the enterprise space. Specifically, Defendant Barretto admitted that "***the decisions on all this happened in Q4***" of 2023—*i.e.*, the quarter beginning October 1, 2023. Despite this admission, Barretto himself had insisted during the Company's November 2, 2023 earnings call—which took place in the middle of Q4—that "***our go-to-market strategy is working***" and that the Company's sales system was thus "***going to be very consistent with what we've done before and so no surprises for all of you in the way that we grow our business***." Even as recently as two months earlier, in Sprout's 2023 10-K filed on February 23, 2024, Defendants had reiterated that Sprout's "product driven strategy, where potential customers are led to our website and sign up for a free trial or to request a demonstration of our products," had allowed the Company to "cost-effectively

drive strong lead generation, upgrade free trials to paying customers, drive strong conversion of demonstration requests, and achieve growth of our platform."  Now, Defendants were admitting that those statements were entirely false—Defendants had long known that their inbound strategy was **not** "achieving growth" with enterprise clients.

152.    Third, even though Defendants had repeatedly assured the market that Sprout's sales model led to "faster sales cycles" of just "***30 to 45 days on average***" which included enterprise clients, and was purportedly a "massive differentiator" in the industry, Defendants now claimed that the Company's sales cycles had suddenly changed because of the "***longer-type sales cycles***" that were required to land enterprise clients.  Analysts were incredulous at Defendants' about-face, pointedly noting that they flew in the face of Defendants' prior representations that "***Sprout has always had really quick close rates and short sales cycles***."  Indeed, analysts emphasized that the Company had begun its upmarket push by the "***beginning [of] last year***," and therefore the problems to which Defendants were now admitting should have long been apparent. In response, Defendant Barretto was forced to acknowledge that the Company's "larger, sophisticated customers" had produced a "***longer sales cycle***," admitting: "***Yes.  You're right.  I mean, we are definitely seeing lengthening of our sales cycles as the composition of the customer base and the prospect base is changing*** . . . "

153.    Fourth, despite repeatedly touting ARR as the Company's "key business metric" that Defendants implored investors to "focus on" throughout the Class Period—including as recently as less than two months earlier in Sprout's 2023 Form 10-K—Defendants now asserted that ARR was meaningless.  Indeed, Defendants revealed that Sprout's business had deteriorated so significantly that it would no longer report ARR or customer count to investors because Defendants purportedly "***no longer believ[ed] that ARR and total number of customers are key***

*performance indicators of Sprout Social's business due to our evolving customer mix and we will no longer report these metrics*." Thus, Defendants were now **completely abandoning** ARR and implying that it should have been abandoned long ago, despite having repeatedly implored investors to "focus on the ARR that we're getting" in evaluating Sprout's upmarket growth.

154. Analysts refused to accept Defendants' explanation for their sudden removal of a key metric, noting that they were "puzzled by the decision there because, by definition, right, [ARR is] the revenue over the next twelve months." Remarkably, in response, Defendant Howard claimed that ARR had been an inapt measure of the Company's performance **for at least the previous two years** precisely because Sprout's enterprise deals were **not** closing every 30 days—contradicting what Defendants had represented throughout the Class Period—and this dynamic was supposedly "create[ing] a lot of noise in the ARR numbers":

> I think that **if you look at how pronounced the move over the last couple of years has been towards the back of period**, whether it be a quarter, a month or the full year, **it has created a lot of noise in the ARR numbers, in the ARR comparison. We have a business that is shifting toward the end of the year** . . . this is different than where our company was when we came out where it was highly predictable. It was smooth across months. It was smooth across quarters. It was smooth across the year.

155. Fifth, Defendants further surprised analysts by revealing, for the first time, that the Salesforce partnership was, in fact, not the growth engine they had promised it was. Indeed, despite Defendants' previous boasts that the Salesforce partnership was a significant "multiyear revenue opportunity" that was another "building block to $1 billion" representing "really good ARR opportunities," Defendant Barretto suddenly downplayed the Salesforce partnership, admitting that "**both Social Studio and non-Social Studio business [from Salesforce clients] accounted for slightly less than 15% of our new business in 2023 and less in 2022**," or "roughly 3% contribution to our total 2023 revenue growth"—"**significantly less than many may have previously assumed**." And, relatedly, Defendants announced that while Sprout had previously

"disclosed [customer] numbers and contributions" from Salesforce "with the goal of transparency," it would no longer do so.

156.    Finally, Defendants made crystal clear that the Company's dire financial condition was not the result of external forces, and that the Individual Defendants were entirely at fault for these problems.  Indeed, Defendant Barretto repeatedly called the Company's failure to capture upmarket enterprise growth "*self-induced*," expressly admitting: "*I own this*."

157.    In direct response to Defendants' disclosures, the price of Sprout Social stock plummeted 40.1% in a single day—falling from a closing price of $48.15 per share on May 2, 2024, to a closing price of $28.82 per share on May 3, 2024.  As reported by Bloomberg, this was the "*biggest intraday percentage drop since March 2020*," "*the stock [was] trading at lowest since September 2020*," "*[d]own [the] [m]ost [s]ince [Sprout's] IPO*."

158.    Analysts were stunned by these revelations and excoriated management for their prior misrepresentations, with several analysts downgrading Sprout's stock and pointedly noting that the Company's disclosures contradicted what Defendants had been telling the market for years.  For example, analysts at Cantor Fitzgerald declared that Sprout "*will be in the proverbial 'dog house'*" and opined that "transparency, leadership turnover [i.e. the resignations of Sprout's CEO and three other C-level executives within just eight months], and execution are on top of every investors' mind," while emphasizing management's lack of credibility for failing to disclose these problems earlier: "*the execution issues [Sprout] is now facing, which are a result of its [go-to-market] strategy, should have been apparent much earlier than today*."  Jefferies similarly emphasized Defendants' misrepresentations, noting the "*puzzling . . . disconnect between the actions that were taken at the beginning of the year . . . and now a material guide down*."  KeyBanc likewise questioned "*what took the Company by surprise*," given that its upmarket

transition had long been underway, and commented that "with 1Q revenue missing the mark on poor execution and poor business modeling," "we do not expect shares to outperform our coverage in the coming quarters—*especially now that management will have to earn back some credibility*."

159.     Baird downgraded Sprout's stock and underscored the "big surprise coming from 2024 revenue guidance being lowered amid execution challenges," adding that "[i]n sum, the call was a 'perfect storm' of lowered guidance, pulled metrics, and a choppy growth narrative. Sales changes (and lack of GTM leader) portend further uncertainty."  Piper Sandler similarly described the Company's Q1 results as "a *continuation / deepening of concerning ARR trends with less obvious cause* given the zeroing out of the low-end by the end of last year."   Canaccord Genuity analysts "totally" understood shareholder disapproval of the "laundry list of issues – executive departures and transition, uncertainty surrounding GTM changes, less disclosure on KPIs, fewer but chunkier deals, and ultimately a notably lower revenue growth outlook versus 90 days ago." In calling out Sprout's management, Canaccord Genuity bluntly stated: "[w]ell, that wasn't great…*This is a team that, in our view, hasn't done itself any favors* … [t]his quarter was *clearly a disappointment and the magnitude of changes surprised us*."

160.     Analysts further excoriated Defendants for their sudden and inexplicable removal of ARR from the Company's financial reporting, doubting management's assertions that ARR was somehow no longer a useful metric for the business (after management's repeated insistence that it was), and questioning whether management was simply reducing transparency to mask deteriorating growth.   For example, Barclays commented that Defendants' decision to "stop[] disclosing ARR and total customer count" would "*raise skepticism in the investment community*." Canaccord Genuity asserted that Defendants were "*stripping some visibility into what's*

*occurring*." Cantor Fitzgerald bluntly questioned, "***Why no more ARR***?" given that "for a business whose revenue consists of 99% subscription, we question how it is not a KPI***…this makes the business less-transparent and opens up more questions***." Cantor Fitzgerald further noted that "***becoming less-transparent and more-aggressive with accounting treatments is never beneficial to how investors view valuation***." Jefferies emphasized that a "bigger negative[]" was that Sprout was "[n]o longer reporting ARR, customer count, or channel partner contributions."

161.    In lowering the Company's stock to neutral, Piper Sandler noted that it "is ***hard for us to imagine a near-term revival in investor sentiment with ARR & total customer metrics going away***." Baird similarly commented that "removing three metrics at once"—ARR, customer count, and partnership contributions—"while reducing guidance ***should challenge investor confidence***." Goldman Sachs also lamented the loss of transparency with the removal of ARR, stating that "with the removal of total customer and ARR disclosures***, we find it incrementally challenging to track the impact to growth from Sprout's 20K+ customers under $10K in ACV [which] . . . reduces visibility*** into the drivers of forward estimates amidst business model disruption."

162.    Analysts also expressed extreme skepticism about management's substitute metrics for ARR—Remaining Performance Obligations ("RPO") and Current Remaining Performance Obligations ("cRPO"), which merely described the total remaining value of Sprout's contracts rather than its annual recurring revenue. For example, KeyBanc opined that Defendants had deliberately cherry-picked these metrics in order to continue to make Sprout's growth look substantially better than it actually was: "***Forgive us for our skepticism that the metrics that are growing around 50% are better indicators of performance as back-half revenue was just guided to growth in the teens***." Cantor Fitzgerald similarly opined that RPO was "a less transparent metric than ARR" because it failed to accurately account for contracts less than one year in length.

I. **Post-Class Period Admissions Further Confirm That Defendants Made Materially False Statements To Investors During The Class Period**

163.    In the wake of Defendants' stunning disclosures at the end of the Class Period, additional information was released that confirmed Defendants' material misrepresentations to investors. For example, at the May 15, 2024 19th Annual Needham Technology, Media, & Consumer Conference, analysts continued to be perplexed as to why Defendants failed to disclose the issues plaguing Sprout's business during the Class Period. In response to analysts' "***number one***" question regarding what purportedly "***changed so quickly in the [Company's] business***," Defendant Rechel admitted that Sprout had been forced to revamp its sales infrastructure, including training "***the entire sales and success organization***" and establishing "***vertical sales teams***," which the Company had been working on "***over the last 18 months***"—*i.e.*, ***since the end of 2022***. Thus, Defendants admitted that for years, Sprout's sales strategy and infrastructure were so deficient that they required significant and costly changes that not only remained undisclosed to investors, but that directly contradicted Defendants' repeated assurances to the market.

164.    Similarly, on December 11, 2024, Sprout presented at the Barclays Annual Global Technology Conference. During the conference, Defendant Del Preto admitted that the Company's "very heavy inbound trial-led motion"—the very sales strategy that Defendants had incessantly touted as the "key" to their success and a "massive differentiator" that gave Sprout a "significant competitive advantage" in the industry—was in fact not effective to succeed in the enterprise space, as Sprout "***need[ed] more BDRs, [] more outbound motion***." Remarkably, even at that late date—years after Defendants had announced their purportedly successful move upmarket to focus on mid-market and enterprise clients—Del Preto admitted that the Company's wholly positive representations had been a farce, as it was still "***early innings as far as like where we are in the overall like move up market***.

**J.     Defendants Barretto And Howard Sold $63 Million Worth of Sprout Stock At Prices Inflated By Their Fraud**

165.     During the Class Period, Defendants capitalized on their misrepresentations to investors by making significant and suspiciously-timed sales of their personally held Sprout stock. Indeed, with the Company's stock price artificially inflated as a result of the Defendants' false and misleading statements, Defendants Barretto and Howard—who together made the majority of the Company's false and misleading statements during the Class Period—sold ***more than one million shares*** of Sprout stock totaling nearly ***$63 million***.

166.     Significantly, the sales by Defendants Barretto and Howard were highly suspicious because they were substantially more than what these Defendants sold pre-Class Period.  Indeed, Barretto sold ***more than three times as many shares*** during the Class Period as he sold before it, for proceeds that were ***nearly three times the stock sale proceeds*** he obtained for the period from Sprout's December 12, 2019 IPO until the start of the Class Period.  Moreover, Barretto's sales were highly significant, amounting to ***45%*** of his total vested Sprout shares both held and acquired during the Class Period.  These insiders' sales and proceeds during the Class Period are as follows:

| Insider | Number of Shares Sold From December 12, 2019 IPO to the Start of the Class Period, September 22, 2021 | Proceeds | Number of Shares Sold During The Class Period | Proceeds |
|---|---|---|---|---|
| **Barretto** | 95,811 | $6,999,722 | **306,164** | **$19,603,907** |
| **Howard** | 552,500 | $29,885,783 | **695,000** | **$43,279,109** |

167.     Furthermore, while $11.2 million of Defendant Barretto's total Class Period sales were made pursuant to 10b5-1 trading plans, significantly, Barretto entered at least two of these plans ***during the Class Period at highly suspicious times***.  Specifically, Barretto entered one of

these plans on November 8, 2022, just after Defendants announced on November 3, 2022 that Sprout was dramatically increasing its pricing across all of its customer cohorts—an action CW 14 confirmed was secretly done to "inflate our numbers" and make up for the enterprise deals Sprout was in reality failing to land.  Moreover, Barretto entered into a second 10b5-1 plan on August 31, 2023—*i.e.*, at the same time that, as numerous former employees confirmed, Sprout's executives had explicitly directed employees to "discount like crazy" to stave off a decline in growth, and Defendants knew that the Company's sales strategy and infrastructure were so inadequate to succeed with enterprise clients that they were forced to implement costly "major changes" to completely "***redraw[] our go-to-market model***" for the enterprise space.[22]

168.    Defendant Howard's sales are similarly suspicious.  Indeed, Howard significantly increased his selling during the Class Period compared to his pre-Class Period trading activity, selling 142,500 more shares than prior to the Class Period and pocketing ***45% more in proceeds*** than prior to the Class Period.

169.    Significantly, while Howard also made certain of these sales pursuant to 10b5-1 plans, Howard also made ***$8.3 million*** of these sales outside of any such trading plan which were highly suspicious in their timing.  Specifically, after making no out-of-plan sales for most of the Class Period, Howard suddenly made four outsized, out-of-plan sales ranging from 20,000 shares to 75,000 shares in a single day between September 2023 and March 2024—*i.e.*, just before the full truth was ultimately revealed, and at the same time that, as Defendants themselves ultimately

---

[22] Plaintiffs are unable to determine all of Barretto's 10b5-1 sales that were made pursuant to these two plans as Sprout did not begin reporting this information in its Form 4s until May 2023. However, Barretto's Form 4s from May 2023 forward confirm that all of Barretto's 10b5-1 sales from June 2023 through April 2024—*i.e.*, during the exact same time the truth about Defendants' fraud was slowly emerging but had not yet been fully revealed—were made pursuant to these two suspiciously timed plans.

admitted, Sprout was forced to completely overhaul its vaunted sales model because it was ineffective in the enterprise space. Indeed, as late as March 7, 2024, less than two months before the full truth would be revealed, and just one month before he would resign, Howard sold 40,000 shares and pocketed over $2.3 million outside of his trading plan. Specifically, Howard sold the following amounts outside of his 10b5-1 plan, all at inflated prices *as high as double* the $28.82 per share price Sprout's stock plummeted to immediately after the full truth was revealed:

| Date | Share Price | Shares Sold Outside of 10b5-1 Plan | Proceeds Outside of 10b5-1 Plan |
|---|---|---|---|
| 9/6/2023 | $51.85 - $52.68 | 75,000 | $3,892,319.83 |
| 11/9/2023 | $47.48 | 20,000 | $949,660.00 |
| 12/7/2023 | $54.83 - $55.60 | 20,000 | $1,105,720.86 |
| 3/7/2024 | $58.23 - $59.03 | 40,000 | $2,334,530.22 |
| **9/6/2023 – 3/7/2024 TOTALS** | | **155,000** | **$8,282,230.91** |

170. Furthermore, like Defendant Barretto, Defendant Howard entered two 10b5-1 plans during the Class Period, both of which were suspiciously timed. Howard entered the first plan on July 7, 2022, as Sprout's organic growth was drying up, leading Defendants to dramatically increase pricing in November 2022 in a desperate attempt to prop up the Company's revenue growth. Howard's second plan was entered on August 10, 2023, just as the Company was frantically "discount[ing] like crazy" to stave off its enterprise growth decline and Defendants were preparing to implement their extensive changes to the Company's sales strategy and infrastructure to effectively compete in the enterprise space.

171. Accordingly, Defendants were highly motivated to perpetuate the fraud to capitalize on Sprout's artificially inflated share price, which they knew was almost certain to plummet once the Company hit its growth cliff.

## V. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS

172. During the Class Period, Defendants made materially false and misleading statements and omitted material facts, in violation of Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder. Throughout the Class Period, Defendants' SEC filings, press releases, and analyst and investor presentations included material misstatements and omissions concerning Sprout's financial and operational condition, which included, among other misrepresentations, statements concerning the capabilities of the Company's platform and inbound go-to-market sales strategy to attract and capture large customers, Sprout's sales cycles with midmarket and enterprise clients, sales pipeline in the midmarket and enterprise business, and revenue opportunity from the Salesforce partnership.

173. As discussed above and further below, Defendants' representations were materially false and misleading when made and omitted material facts either required to be disclosed or necessary to make the statements not misleading. These material misstatements and omissions had the effect of creating an unrealistically positive assessment of Sprout's business and operational status. In truth, Defendants had falsely presented to investors a materially misleading portrayal of the Company.

### A. Sprout Social's September 22, 2021 Inaugural Investor Day

174. On September 22, 2021, the first day of the Class Period, the Company hosted its first-ever Investor Day. At the Investor Day, Defendants repeatedly touted the effectiveness of its inbound free trial go-to-market model for upmarket growth. For example, Defendants represented

to investors that Sprout's inbound trial model was a "*powerful differentiator[]*" in the enterprise space, and the "*secret sauce*" that "*enabled [Sprout] to win customers in 30 to 45 days on average*" even "*for sophisticated customers in the mid-market and enterprise.*"

175.    Defendant Barretto emphasized that the "*big part of the secret sauce is that we lead with the product and specifically with trials," "even if for sophisticated customers in the mid-market and enterprise . . . They simply see value much faster with Sprout than anywhere else. And that has enabled us to win customers in 30 to 45 days on average*."

176.    Later during the Q and A session, in response to an analyst question regarding whether the upmarket move "change[d] the way in which [Sprout would] go to market," including whether Sprout "require[d] different salespeople, different customer success motion" or "an evolution in [Sprout's] sales and marketing strategy," Barretto further confirmed that Sprout's "*secret sauce*" was that, "*regardless of the size and sophistication of the organization*," the Company had "*the same background and the same foundation on how do we go to market*" with its inbound model, which purportedly gave the Company a "*significant advantage*" in the enterprise space. Indeed, Barretto asserted that "*we have more inbound even in the mid-market and enterprise in most companies*" and "*we've had a lot of success there in large part because of our inbound*." Barretto further stated that, to the extent Sprout also needed to do "outbound" selling to acquire certain enterprise clients, "*we're complementing our inbound effort to go after customers that we think are just going to be a great long-term fit for Sprout*."

177.    The statements in ¶¶174-76 were materially false and misleading, and omitted material facts when made. First, contrary to Defendants' claims, Sprout's "secret sauce" inbound go-to-market model was not a "powerful differentiator" with mid-market and enterprise customers. Rather, as Defendants admitted at the end of the Class Period, the exact opposite was true: Sprout's

inbound sales model was so ineffective and "***orders of magnitude***" different than what was necessary to effectively compete in an "enterprise-heavy" space that the Company was forced to entirely "***redraw[] [its] go-to-market model***." Indeed, as described *supra* in §IV(F), a multitude of former employees confirmed that Sprout's sales strategy was an abject failure with enterprise clients throughout the Class Period. For example, CW 3 described Sprout's inbound trial strategy as "***very ineffective***" and "***not something that was successful for enterprise***," and CW 7 similarly stated that Fortune 500 companies simply did not use free trials, and, consequently, according to CW 2, "[i]nbound leads fell off because we were no longer focused on SMB." Defendants were consequently forced to make significant additional investments such as adding and promoting sales personnel and creating vertical sales teams in order to develop an outbound-oriented model.

178.     Second, contrary to Defendants' claims of being able to land enterprise clients by "lead[ing] with the product," in reality the platform lacked numerous critical features required by upmarket clients, including one particularly crucial component—influencer marketing—that, as Defendants would later admit, more than half of enterprise clients were demanding, and that Sprout completely lacked. Indeed, CW 3 stated that "influencer marketing was huge and we were losing that battle with our competitors." As set forth in detail *supra* at IV(F), former employees and customers further confirmed that Sprout lacked myriad other key enterprise capabilities of its competitors, such as advanced analytics capabilities, advanced social listening, APIs, collaboration tools, and foreign language capabilities, such that Sprout resorted to "***crazy discounts***" to win enterprise customers—who often refused to renew their contracts or even canceled them once they realized the platform's inadequacies. In sum, as CW 1 explained "***[w]e had no business competing in the enterprise space. The infrastructure we had at Sprout was simply not as good as the competitor's like Sprinklr.***"

179.    Third, Sprout's inbound model did not result in "sophisticated customers in the mid-market and enterprise" signing up for Sprout's platform in short sales cycles that ranged from "30 to 45 days on average." Rather, as Defendants would later admit, Sprout's sales cycles had "*chang[ed] materially*" due to the Company "*definitely seeing lengthening of our sales cycles*" with enterprise clients. Again, former Sprout employees confirmed Defendants' admissions. Far from short sales cycles of 30-45 days, CW 7 confirmed that, in reality "[e]nterprise contracts would take six months to a year to complete." CW 1 similarly described the Company's attempt to close enterprise clients "*a total sh\*t show because you couldn't close [enterprise clients] in 30 days, you just needed a longer time*."

**B.    Q3 2021 Earnings Call and Barclays Global TMT Conference**

180.    On November 2, 2021, Sprout reported its financial results for Q3 2021. During the Company's earnings call that day, an analyst asked whether Sprout would "establish[] direct sales teams that are going to be a lot more outbound-focused and going after accounts maybe that you haven't seen." Barretto responded that "*not a lot has to change in our current motion*," as Sprout's "*very differentiated*" product-led trial strategy was very effective with enterprise clients and was a competitive advantage for Sprout because it was "*highly disruptive to our competitive set that typically sell on demos and much longer sales cycles*." Indeed, Barretto asserted that "*many of the deals that we're closing every single quarter, even in the enterprise, start with these customers in the product*," such that "*so for us, we really like this motion*."

181.    The statements in ¶180 were materially false and misleading, and omitted material facts when made. Although Barretto claimed that "not a lot has to change in [Sprout's] current motion," as revealed at the end of the Class Period, the exact opposite was true: Sprout had to completely "redraw[] [its] go-to-market model" because the Company's "enterprise-heavy" business was "orders of magnitude" different from before and Sprout's inbound model was wholly

ineffective with enterprise clients. Indeed, former employees confirmed these admissions, with CW 3 describing Sprout's inbound trial strategy as "*very ineffective*" and "*not something that was successful for enterprise*," and CW 7 similarly stating that Fortune 500 companies simply did not use free trials, such that, according to CW 2, "*[i]nbound leads fell off because we were no longer focused on SMB*." Defendants were consequently forced to make significant additional investments such as adding and promoting sales personnel and creating vertical sales teams to develop a more outbound-oriented model. As a result, Sprout's sales motion was not "very differentiated" nor "highly disruptive" versus competitors that had "much longer sales cycles." Indeed, as Defendants admitted at the end of the Class Period, they too had "longer sales cycle[s]" and were "definitely seeing lengthening of our sales cycles" with enterprise clients. Former Sprout employees confirmed Defendants' admissions. CW 7 stated that "*[e]nterprise contracts would take six months to a year to complete*." CW 4 likewise emphasized that "*[e]nterprise contracts always took longer*" requiring "*multiple months*" to close.

182.    During the Barclays Global TMT Conference on December 7, 2021, Defendant Del Preto continued to promote "*the fact that we're 90% inbound with our trial model*," as a "*driver*" of growth and reason for Sprout being "*efficient on the go-to-market side*." Also during the conference, an analyst again asked whether Sprout needed to adjust its "inbound" sales strategy for enterprise. In response, Barretto asserted that "*even in the enterprise space, we're getting inbound*," and the Company was "*driv[ing] more inbound from more sophisticated customers and a higher level of executives*," Barretto boasted that Sprout was "*different than others in the space*" because compared to competitors they "believe that the best way to evaluate and buy is to actually get your hands on the keyboard and be on the product. *And so that trial motion is really effective for [Sprout] even in the enterprise space*." Additionally, Barretto assured the market

that the "DNA of the organization"—the "***inbound motion that's been a huge part of the foundation***,"—remained "***a big part of our mid-market and enterprise play today***."

183.     The statements in ¶182 were materially false and misleading, and omitted material facts when made.  Contrary to Defendants' claims, Sprout's inbound model was not "really effective" for enterprise clients.  As Defendants admitted at the end of the Class Period, Defendants were forced to completely "***redraw[] [Sprout's] go-to-market model***" because the Company's "enterprise-heavy" business was "***orders of magnitude***" different from before, and as a result, Sprout's inbound model simply did not work with enterprise clients.  Indeed, directly contrary to Defendants' statements, CW 3 stated that Sprout's inbound trial strategy was "very ineffective" and "not something that was successful for enterprise," and CW 7 similarly stated that Fortune 500 companies simply did not use free trials, such that, according to CW 2, "[i]nbound leads fell off because we were no longer focused on SMB."  Defendants were consequently forced to make significant additional investments such as adding and promoting sales personnel and creating vertical sales teams in order to develop a more outbound-oriented model.

**C.     January 12, 2022 Annual Needham Virtual Growth Conference**

184.     On January 12, 2022, during the 24th Annual Needham Virtual Growth Conference, Defendants continued to tout the purported effectiveness of Sprout's "inbound" model upmarket.

185.     In response to analyst inquiry regarding "what's driven [Sprout's] success upmarket," Defendant Del Preto stated that the "majority" of Sprout's enterprise clients were resulting from the Company's "inbound" model: "*[W]e're 90% inbound end even up in the mid-market enterprise, Scott, we still get a majority of that business comes with a[n] inbound funnel*."  Del Preto also claimed during this call "***one of the bigger drivers***" of Sprout's upmarket success was its "***full suite of products***," which had purportedly allowed Sprout to "***check[] a lot of boxes with a lot of these enterprise clients***."

186.    The statements in ¶185 were materially false and misleading, and omitted material facts when made. First, while Defendants claimed that Sprout was getting inbound leads "even up in the mid-market enterprise," as Defendants would later admit, Defendants were forced to completely "redraw[] [Sprout's] go-to-market model" because the Company's "enterprise-heavy" business was "orders of magnitude" different from before, and as a result, Sprout's inbound model did not work with enterprise clients.  Indeed, CW 3 described Sprout's inbound trial strategy as "very ineffective" and "not something that was successful for enterprise," and CW 7 similarly stated that Fortune 500 companies simply did not use free trials, such that, according to CW 2, "[i]nbound leads fell off because we were no longer focused on SMB."  Defendants were consequently forced to make significant additional investments such as adding and promoting sales personnel and creating vertical sales teams in order to develop a more outbound-oriented model. As Del Preto ultimately admitted, Sprout did not truly know "how to build [] an enterprise-grade team, what type of rigor, what type of rituals, like the organizational structure you need in order to execute in that kind of enterprise environment" until late 2024.

187.    Second, far from being able to "check[] a lot of boxes with a lot of these enterprise clients" with Sprout's "full suite of products," in reality, the platform lacked numerous critical features required by upmarket clients, including one particularly crucial component—influencer marketing—that, as Defendants would later admit, more than half of enterprise clients were demanding.  For example, CW 3 stated that "influencer marketing was huge and we were losing that battle with our competitors."  As set forth in detail *supra* at §IV(F), these former employees further confirmed that Sprout lacked myriad other key enterprise capabilities of its competitors, such as advanced analytics capabilities, advanced social listening, APIs, collaboration tools, and foreign language capabilities, such that Sprout resorted to "making promises we couldn't keep"

and "crazy discounts" to win enterprise customers, and customers would cancel their contracts or refuse to renew them when they learned of Sprout's gross inadequacies. Thus, as CW 1 explained "*[w]e had no business competing in the enterprise space. The infrastructure we had at Sprout was simply not as good as the competitor's like Sprinklr*." Indeed, even as late as December 2024—three years after the Company's "upmarket" push, and seven months after the end of the Class Period—Defendant Del Preto admitted it was still "*early innings as far as like where we are in the overall like move up market*," underscoring that the Company's wholly positive representations about Sprout's purported success in the enterprise space had been a farce.

### D. Q4 2021 Earnings Call

188. On February 22, 2022, Sprout reported its financial results for Q4 2021. During Sprout's earnings call the same day, Defendant Howard again emphasized the success of Sprout's upmarket strategy. When asked by an analyst during the call if there were "any major technical areas or lack of certain feature sets in your offering today that you feel still notable headwinds to . . . *landing larger customer deals*[,]" Howard promoted the Company's platform as comprehensive enough to serve all customers of all sizes, and declared emphatically, "*we're well equipped for the deals that are out there. . . . So there's not anything that we would look to and put on the board as deficiencies.*"

189. Defendant Howard's statements in ¶188 were materially false and misleading, and omitted material facts when made. Despite claiming that Sprout's platform was "well equipped for the deals that are out there," Defendants disclosed in August 2023 that Sprout lacked the ability to provide influencer marketing, "a requirement" showing up in "more than half of our enterprise conversations." Moreover, as set forth in detail *supra* at IV(F), former Sprout employees and customers further confirmed that Sprout lacked myriad other key enterprise capabilities of its competitors, such as advanced analytics capabilities, advanced social listening, APIs, collaboration

tools, and foreign language capabilities, such that Sprout resorted to "making promises we couldn't keep" and "discount[ing] like crazy" to win enterprise customers—who often refused to renew their contracts or even canceled them once they realized the platform's inadequacies. For example, CW 2 confirmed that "[Sprout] had bad API," and explained that in the "majority of demonstrations" he did for customers he had to tell the customer that Sprout lacked certain capabilities they wanted due to API limitations. CW 2 recalled that the "[v]ast majority of enterprise customers" wanted a "robust social listening tool" and "went to competitors like Sprinklr or Khoros." CW 4 similarly explained that, in reality, "Sprout Social did not have advanced analytics capabilities that these enterprise companies desired." In sum, as CW 1 explained "*[w]e had no business competing in the enterprise space. The infrastructure we had at Sprout was simply not as good as the competitor's like Sprinklr*."

190. Also during the February 22, 2022 call, in response to analyst inquiry regarding the "context of [Sprout's] pipeline," Defendant Barretto responded: "So I think *one of the things that's been a really big competitive advantage for us,* and Justyn touched on it a little bit *is just the inbound motion that still exists for our business today and the product-led motion, which we apply even in the enterprise*." Barretto further claimed that, unlike Sprout's competitors in the enterprise space, the Company's 30-day trial go-to-market strategy "*creates rapid sales cycles for us*" that averaged "*between 30 to 45 days,*" and allowed it to close enterprise deals "*every single month*":

> But the other benefit that we have here is *with that inbound model, we still get a significant amount of pipeline in the enterprise every single month*, which is setting up our teams to be able to execute. And *we're still running at a sales cycle that runs between 30 to 45 days on average.* And *we will see deals in the mid-market and enterprise that hit those timelines* . . . So a lot of balance, I would say, *a lot of predictability around that pipeline.* And because we're getting people into the product, and using the product and using it in a 30-day trial, it creates a nice sense of urgency, because they're doing a lot of the work,

they've built the processes and workflows in place, ***they don't want to lose that after the 30-day trial, which creates rapid sales cycles for us.***

191.     The statements in ¶190 were materially false and misleading, and omitted material facts when made.  First, Sprout's "inbound motion" was not "a really big competitive advantage" for the Company.  In fact, the opposite was true: as Defendants admitted at the end of the Class Period, Sprout's sales strategy and infrastructure were such an abject failure that Defendants were forced to completely "redraw[] our go-to-market model" for enterprise clients, as targeting those clients was "orders of magnitude different" from Sprout's inbound model.  Indeed, as set forth in detail *supra* at IV(F), according to former Sprout employees, including CW 3, CW 7, and CW 2, Sprout's inbound trial strategy was "very ineffective" and "not successful" for enterprise clients and resulted in inbound leads "f[alling] off."  Additionally, Sprout's "product-led motion" was not a "really big competitive advantage" given Sprout's lack of critical features for large clients, including the influencer marketing capabilities required by "half of the deals in enterprise," as well as advanced analytics capabilities, advanced social listening, APIs, collaboration tools, and foreign language capabilities.

192.     Second, Defendants did not have "rapid sales cycles" in mid-market enterprise. Rather, and as Defendants were ultimately forced to admit, Sprout's ineffective sales motion caused Sprout to endure "much longer sales cycles."  As Barretto put it, "lengthening of the cycle is a dynamic in our business" and Sprout was "definitely seeing lengthening of [its] sales cycles." According to CW 7, CW 12 and CW 1, sales cycles for enterprise customers were always considerably longer than what Sprout disclosed.

### E.     June 2022 Investor Conferences

193.     The following month, at the William Blair 42nd Annual Growth Stock Conference on June 7, 2022, Defendant Barretto continued to claim that the Company's "inbound" go-to-

market strategy was a competitive advantage in the enterprise space. For example, William Blair analyst Arjun Bhatia asked Barretto about whether there was a "competitive element . . . that's enabling [Sprout] to have more success [upmarket]." In response, Barretto emphasized Sprout's "***different approach to enterprise***" putting the "***outbound sales***" method used by "***[t]raditional enterprise organizations***" that included "***heavy deployment times***," "***on its head***." Barretto added that the "***dynamic in the approach to the business has worked really well for us***."

194. The statements in ¶193 were materially false and misleading, and omitted material facts when made. Defendants' claim that Sprout's "different approach to enterprise" put the "outbound sales" method used by "[t]raditional enterprise organizations" "on its head" were false. As Defendants revealed at the end of the Class Period, the exact opposite was true: Sprout's sales strategy and infrastructure were so ineffective that Defendants had to completely "redraw[] our go-to-market model" in order to compete with enterprise clients because targeting those clients was "orders of magnitude different" from the inbound model Sprout had been relying on before. Indeed, according to former Sprout employees, including CW 3, CW 7, and CW 2, Sprout's inbound trial strategy was "very ineffective" for enterprise clients and resulted in inbound leads "f[alling] off." Further, despite asserting that only Sprout's competitors had "heavy deployment times," Defendants ultimately admitted they were "definitely seeing lengthening of our sales cycles" in the enterprise space. As Barretto put it, "lengthening of the cycle is a dynamic in our business." According to CW 7, CW 12 and CW 1 sales cycles for enterprise customers were always considerably longer than what Sprout disclosed.

195. Defendant Barretto also asserted during the William Blair conference that the Salesforce partnership presented a massive new trove of clients for Sprout's platform that would contribute to growth for years to come. Specifically, Barretto explained that he was "***excited about***

*the customers in our Social Studio that are going to migrate over the next couple years and there's 4,000ish of them*," and further crowed that there were hundreds of thousands of other potential customers from the Salesforce partnership, explaining that, "beyond that, there's a couple hundred thousand customers that Salesforce works with. *And we -- our vision is that we are building a solution that's going to be the very best option for any Salesforce customer*."

196.    The statements in ¶195 were materially false and misleading, and omitted material facts when made.  As Defendants would admit at the end of the Class Period, rather than providing a source of continued growth with 4,000 Salesforce customers migrating over to Sprout, Salesforce in truth accounted "for slightly less than 15% of our new business in 2023 and less in 2022," and was only "roughly 3%" of Sprout's revenue growth in 2023—as Defendants admitted, "*significantly less than many have previously assumed*."  Indeed, CW 1 stated that the Salesforce partnership and its purported benefits were "nothing more than a talk track" as "[t]here was an overwhelming sentiment that those customers did not want to pay for Sprout Social."

197.    On June 9, 2022, Defendants Rechel and Del Preto presented at the Stifel Cross Sector Insight Conference and again touted the Company's go-to-market model, claiming that virtually nothing about it needed to change in order for Sprout to be successful upmarket.  For example, regarding the "go-to-market side," Del Preto proclaimed, "*we haven't had to make any real significant changes*."  Unlike "competitors," who needed "PowerPoint presentations, and demos," Sprout was "still leading with the product and with the trial," "*even in those upper mid-market enterprise deals*," and as a result, was "*seeing a lot of success even up market*" as "*the same strategy in SMB is working even better in the enterprise.*"  Del Preto further claimed that Sprout's sales cycles were so fast that its enterprise reps were "*on monthly quotas*" and should not be "*used to long sales cycle or trying to oversell a product over multiple months*."

198.    The statements in ¶197 were materially false and misleading, and omitted material facts when made.  While Defendants emphatically claimed that they did not have "to make any real significant changes on the go-to-market side," at the end of the Class Period, Defendants admitted that the exact opposite was true:  in order for any chance at success with enterprise clients, Sprout had to completely "redraw[] our go-to-market model" for these clients, which required a sales strategy and infrastructure that was "orders of magnitude different" from Sprout's inbound model. As set forth in detail *supra* at IV(F), former Sprout employees confirmed Defendants' admissions.  For example, CW 3, CW 7, and CW 2 stated that Sprout's in-bound trial strategy was "very ineffective" for enterprise clients and resulted in inbound leads "f[alling] off" and "inbound sales dropping."   As a result, and contrary to Defendants' statements that Sprout was not subjected to "long sales cycle[s]" for enterprise clients, Sprout was in reality "definitely seeing lengthening of [its] sales cycles."  Indeed, CW 7, CW 12 and CW 1 all confirmed that sales cycles for enterprise customers were always considerably longer than what Sprout disclosed.

F.    **August 2022 Investor Conferences**

199.    During investor conferences in August 2022, Defendants continued to promote the success of the Company's inbound trial model and Sprout's enterprise-grade products in attracting enterprise clients.  For example, at the August 9, 2022 Keybanc Conference, Defendant Del Preto claimed that Sprout's platform already had all the capabilities needed to land upmarket clients such that "***in these larger enterprises, we don't have any feature sets or any [gaps] in our feature sets***[,]" and which was fueling "***this move into the mid-market and enterprise***" clientele. Additionally, Del Preto touted that Sprout's "inbound" model was so effective that Sprout was immune from macroeconomic pressures, stating that even "***during these kind of macro times*** . . . because ***we're an inbound model, 90% of our business comes inbound,*** most of the folks, they're in our funnel. They're coming to us with a need. So -- and ***our funnel hasn't slowed down at all***."

200.    The statements in ¶199 were materially false and misleading, and omitted material facts when made. First, in reality, Sprout absolutely lacked the "feature sets" required by "larger enterprises," as the Company lacked numerous significant and fundamental product capabilities necessary for enterprise clients, including the ability to provide influencer marketing, "a requirement" showing up in "more than half of our enterprise conversations." Indeed, as set forth in detail *supra* at §IV(F), CW 3 stated that "influencer marketing was huge and we were losing that battle with our competitors," with CW 4 confirming that enterprise customers would cancel their contracts when they learned Sprout lacked these capabilities. CW 2 confirmed that "[Sprout] had bad API," and explained that in the "majority of demonstrations" he did for customers had to tell the customer that Sprout lacked certain capabilities they wanted due to API limitations. CW 2 recalled that the "[v]ast majority of enterprise customers" wanted a "robust social listening tool" and "went to competitors like Sprinklr or Khoros." CW 4 similarly explained that, in reality, "Sprout Social did not have advanced analytics capabilities that these enterprise companies desired."

201.    Second, rather than Sprout's "inbound" model being so effective that the Company was immune from macroeconomic pressures because "our funnel hasn't slowed down at all," in reality, the exact opposite was true. As Defendants admitted at the end of the Class Period, Sprout had to completely "redraw[] our go-to-market model" in order to obtain enterprise clients because the "enterprise-heavy" space was "orders of magnitude different" from what the Company's inbound model could effectively obtain and service. Indeed, as set forth in detail *supra* at §IV(F), multiple former Sprout employees, including CW 3, CW 7, and CW 2 confirmed that Sprout's inbound trial strategy was "very ineffective" for enterprise clients and resulted in inbound leads "f[alling] off" and "inbound sales dropping."

202.    Two days later at the Canaccord Genuity 42nd Annual Growth Conference on August 11, 2022, Defendant Del Preto underscored the breadth and comprehensiveness of the Company's platform to serve enterprise customers.  In response to an analyst's question seeking to understand the inflection in upmarket growth, and whether growth factors were "product-driven" or "go-to-market investment[,]" Del Preto answered, "*Yes, it's a combination of both*" and claimed that with respect to Sprout's enterprise products, "*[t]here's not any functionality we don't have to win these larger deals. So I think one is on the product. So now when we go into these customers, we check all the boxes*." Del Preto also assured investors that Sprout's inbound strategy worked so well that Sprout did not "have to go out and like do this outbound sales motion," and thus the Company was not subject to macroeconomic pressures impacting the rest of the SaaS industry: "[*W]e're 90% inbound, right*? And so most of the customers coming into our funnel are coming to us already with a need or a pain point. *We don't have to go out and like do this outbound sales motion during these times to convince customers who buy Sprout—they're already kind of in the funnel. And so from that perspective, we haven't seen that demand wane at all*."

203.    The statements in ¶202 were materially false and misleading, and omitted material facts when made.  First, despite claiming that Sprout's platform "check[ed] all the boxes" for enterprise clients, Defendants admitted in August 2023 that Sprout lacked the ability to provide influencer marketing—"a requirement" showing up in "more than half of our enterprise conversations."  Moreover, as set forth at §IV(F), *supra*, former Sprout employees uniformly confirmed that Sprout lacked numerous other features required by large enterprise clients, including sufficient APIs, scalability for large numbers of users, sophisticated analytics, and adequate foreign language capabilities, all of which Sprout's competitors like Sprinklr possessed.

204.    Second, Sprout's "90% inbound" model did not relieve the Company of "hav[ing] to go out and like do this outbound sales motion" such that it was immune from macroeconomic pressures.  Rather, as Defendants admitted at the end of the Class Period, Sprout had to completely "redraw[] our go-to-market model" in order to obtain enterprise clients because an enterprise-heavy business was "orders of magnitude different" from what Sprout's inbound model could effectively obtain and service.  Indeed, former Sprout employees, including CW 3, CW 7, and CW 2 confirmed that Sprout's in-bound trial strategy was "very ineffective" for enterprise clients and resulted in inbound leads "f[alling] off" and "inbound sales dropping."  Defendants were consequently forced to make significant additional investments such as adding and promoting sales personnel and creating vertical sales teams in order to develop a more outbound-oriented model.  Indeed, even as late as December 2024—three years after the Company's "upmarket" push, and seven months after the end of the Class Period—Defendant Del Preto admitted it was still "*early innings as far as like where we are in the overall like move up market*," underscoring that the Company's wholly positive representations about Sprout's purported success in the enterprise space had been a farce.

G.    **Q3 2022 Earnings Call**

205.    On November 3, 2022, Sprout announced its financial results for the third quarter of 2022.  During the earnings call on that date, Defendants continued to make wholly positive statements about Sprout's sales strategy and denied that there were any issues with it, claiming that it gave Sprout an advantage over its competitors.  For example, during the call, an analyst asked Defendant Barretto whether Sprout was "looking to make any changes around the go-to-market or the sales motion, either with more upon sales hires or enterprise-focused sales individuals?"

206.    In response, Barretto represented that no such change was needed, and maintained that **"*the number one,*" "*major differentiator for us even in the enterprise*"** was Sprout's 30-day

trial model, stating: **"[O]ur customers continue to come in and trial the product and that continues to be a major differentiator for us even in the enterprise, and it's one of our number one plays** is get their hands on the keyboard. And so for us, we love that in the enterprise, **massive differentiator**, and so we'll continue to be working on that as well." Defendant Howard similarly emphasized during the call that "**we're still going to lea[d] with the same inbound, product-led motion that's made us so successful."** Howard also again claimed that enterprise clients, like Sprout's SMB accounts, were being secured on shorter sales cycles, stating that larger "**customers land with similar costs and similar sales cycles as the rest of our customer base**, bearing an LTV many multiples higher and net dollar retention north of 120%."

207.    The statements in ¶206 were materially false and misleading, and omitted material facts when made. Sprout's 30-day trial strategy was not a "major," "massive differentiator" in the enterprise space. Rather, as Defendants admitted at the end of the Class Period, Sprout had to completely "redraw[] our go-to-market model" in order to obtain enterprise clients because its business was now "orders of magnitude different" and Sprout's inbound trial model did not work for enterprise clients. Indeed, former Sprout employees, including CW 3, CW 7, and CW 2 confirmed that Sprout's inbound trial strategy was "very ineffective" for enterprise clients and resulted in inbound leads "f[alling] off" and "inbound sales dropping."

208.    By Defendants' own admission, Sprout's sales infrastructure and strategy were so woefully deficient and inadequate to successfully obtain enterprise business that Defendants were forced to make wholesale changes at the end of 2023 to reorient the Company's sales model toward selling to enterprise clients, including "building new vertical sales teams," "accelerating promotions in our mid-market and enterprise teams" and "adjusting our account coverage model."

### H.     December 7, 2022 Barclays Global Technology, Media and Telecommunications Conference

209.    During the Barclays Global Technology, Media, and Telecommunications Conference held on December 7, 2022, Defendant Del Preto once again touted the Company's "inbound" go-to-market strategy, stating it was "***really powerful***" for upmarket clients and resulted in shorter sales cycles:  "***[W]e haven't seen a major change in the way we win new business.  It's still 90% of it comes inbound, even up in the mid-market enterprise*** ... even in these larger deals, one of our major kind of plays on the go-to-market side… was to get them into the trial… *that kind of play even up in the enterprise is still really powerful. . . .And so we're also then shortening that buying cycle because they're in the product.*"

210.    Expounding on the velocity in Sprout's inbound sales process, Del Preto also stated that Sprout maintained a "***tight sales cycle***" that was "***35 to 41 days***."

211.    The statements in ¶¶209-10 were materially false and misleading, and omitted material facts when made.   Contrary to Defendants' claims, the "trial" sales strategy for the Company was not "really powerful" for "mid-market" and "enterprise" customers—the opposite was true: as Defendants admitted at the end of the Class Period, in order to be successful upmarket, Sprout had to completely "redraw[] our go-to-market model" around enterprise clients because targeting those clients was "orders of magnitude different" from Sprout's inbound trial model. Indeed, as set forth *supra* in §IV(F), numerous former Sprout employees, including CW 3 and CW 7, confirmed that Sprout's inbound trial strategy was "very ineffective" for enterprise clients and resulted in inbound leads "f[alling] off."  Indeed, even as late as December 2024—three years after the Company's "upmarket" push, and seven months after the end of the Class Period—Defendant Del Preto admitted that it was still "***early innings as far as like where we are in the overall like***

*move up market*," underscoring that Defendants' wholly positive representations about Sprout's purported success in the enterprise space were materially false and misleading when made.

212.    Second, Defendants did not have "tight" sales cycles in mid-market enterprise that averaged 35 to 41 days.  In reality, as Defendants admitted, Sprout's ineffective sales motion caused Sprout to endure "much longer sales cycles," such that "lengthening of the cycle is a dynamic in our business."  According to multiple former Sprout employes, including, among others, CW 7, CW 4, and CW 1, sales cycles for enterprise customers were always considerably longer than what Sprout disclosed.  *See also supra* in §IV(F).

**I.     Q4 2022 Earnings Call and March 20, 2023 Investor Call**

213.    Following market close on February 21, 2023, Sprout Social issued a press release reporting its financial results for the fourth quarter of 2022.  On the accompanying earnings call that same day, an analyst asked whether, now that Sprout was solely focused upmarket, the "trial-led go-to-market model… resonate[d]..at the high end of the market." In response, Barretto confirmed that this model worked and was "incredibly differentiated" in the enterprise space because of the shorter sales cycles it created:  "***[It] is the same motion, and we are incredibly excited about that trial motion, especially in the enterprise, because it is incredibly differentiated***.  Most enterprise solutions, certainly in our space, … usually lead with really heavily customized demos and *really long sales cycle times* and heavy services. ***And that's the opposite of the way that we approach the market***."  Barretto further asserted that Sprout's trial-model was in fact its "secret weapon," particularly because Sprout's product "work[ed] really well for enterprise customers":  ***So it's actually been, I'd call it, a secret weapon for us in the enterprise***. It's something that we try and have every customer engage with the product because ***we're so proud of the product itself, and we know that it works really well for our enterprise customers***."

214. The statements in ¶213 were materially false and misleading, and omitted material facts when made. First, contrary to Defendants' claims, the "trial motion" was not a "secret weapon" for the Company and did not "work[] really well for [Sprout's] enterprise customers." As revealed at the end of the Class Period, the exact opposite was true: Sprout had to completely "redraw[] our go-to-market model" around enterprise clients because targeting those clients was "orders of magnitude different" and Sprout's inbound trial model no longer worked. Indeed, as CW 7, CW 2 and CW 13 all confirmed, by the end of 2022, Sprout's inbound pipeline was "drying up"—such that, by January 2023, the inbound model had collapsed and Sprout's sales were plummeting. Further, as CW 2 explained, by the beginning of 2023 "[w]e were trying to compete with companies like Sprinklr Social Media, but we didn't have their capability and our prices were not competitive." CW 13 similarly noted that following the price increases, there were no promotions or bonuses as "[p]eople were not performing because sales plummeted," and "[i]t became the perfect storm of price increases causing lead decreases." Moreover, Sprout's product did not "work[] really well" for enterprise customers given Sprout's lack of critical features for large clients, including the influencer marketing capabilities required by "half of the deals in enterprise," as well as sufficient APIs, scalability for large numbers of users, sophisticated analytics, and adequate foreign language capabilities, all of which competitors like Sprinklr possessed

215. During the Q4 2022 earnings call, Defendant Barretto also told investors that upmarket growth was directly attributable to the Salesforce partnership. Indeed, Barretto claimed, with respect to migrating Social Studio clients that "***the pipeline heading into this year is bigger than it had been ending the year***" and "***There's still a decent amount of time left on the process…for Social Studio… [w]e think that there's plenty of upside***."

216.    Defendants' statements concerning the remaining "upside" and "pipeline" from the Salesforce partnership were materially false and misleading.  As the Razor Report explained only two months later, in April 2023, by the beginning of 2023, most of the largest Social Studio customers had already migrated away from that product, and most of them had gone to platforms other than Sprout.  Indeed, these facts were further corroborated by CWs, including CW 1, who stated that the Salesforce partnership and its purported benefits were "nothing more than a talk track" as "[t]here was an overwhelming sentiment that those customers did not want to pay for Sprout Social."  And while Defendants vehemently denied the Razor Report's claims in Sprout's subsequent earnings call in May 2023, they ultimately admitted at the end of the Class Period that, rather than providing ongoing rapid enterprise growth, Salesforce in truth accounted "for slightly less than 15% of our new business in 2023 and less in 2022," and was only "roughly 3%" of Sprout's new revenue—"significantly less than many may have previously assumed."

217.    On March 20, 2023, during an interview, Defendant Rechel continued to tout the unique effectiveness of Sprout's inbound go-to-market model and the effectiveness of Sprout's purportedly enterprise-grade products.  For example, in response to a question concerning macroeconomic headwinds that were impacting the SaaS industry potentially causing a "slower sales cycle," Defendant Rechel asserted that Sprout's 30-day trial model was a cure-all to the macroeconomic downturn due to the faster sales cycles it created: "*[B]ecause we're inbound and because we put all of our customers, whether inbound or outbound into a free 30-day trial, those factors on the new business side tend to allow us to keep sales cycle shorter. They tend to allow us to be able to execute and control our own destiny from a sales execution perspective through economic cycles*."

218.     Defendant Rechel further represented that, versus competitors' "outbounding and cold calling into accounts trying to create demand where there might not," Sprout had the "***huge strategic advantage***" of not having to, and was thus "able to apply sales resources against warm leads." "***And Sprout, by putting our customers in the trial, is able to check all of those boxes, where in our market, particularly our competitors are not able to say those things or to be able to achieve those things. And that's a huge weapon for us on the new business side***." Later on the call, in response to a question asking why "structural business challenges…aren't also impacting Sprout" and "what it meant for the competitive landscape," Rechel again claimed that Sprout's "live trial" approach was a "***huge differentiator***" and allowed Sprout to "***have an efficient go-to-market model…up through the largest of enterprises***."

219.     The statements in ¶¶217-18 were materially false and misleading, and omitted material facts when made. First, contrary to Defendants' claims, the Company's trial model was not a "huge strategic advantage" or a "huge weapon" against competitors because the model did not work with enterprise clients. As Defendants admitted at the end of the Class Period, in order to be successful upmarket, Sprout had to completely "redraw[] our go-to-market model" around enterprise clients because targeting those clients was "orders of magnitude different" and Sprout's inbound trial model was an abject failure in the enterprise space. Indeed, as CW 7, CW 2 and CW 13 all confirmed, by the end of 2022, Sprout's inbound pipeline was "drying up"—such that, by January 2023, the inbound model had collapsed and Sprout's sales were plummeting. Nor were Defendants able to "keep sales cycles shorter" with Sprout's trial model. Rather, in reality and as Defendants admitted, Sprout's ineffective sales motion caused Sprout to endure "much longer sales cycles," such that "lengthening of the cycle is a dynamic in our business." According to CW 1, CW 7, and CW 12, sales cycles for enterprise customers were considerably longer than what Sprout

disclosed. Second, Sprout's product was not "able to check all those boxes" for enterprise customers given Sprout's lack of critical features for large clients, including the influencer marketing capabilities required by "half of the deals in enterprise."

**J.      Q1 2023 Earnings Call**

220.    After the close of the markets on May 2, 2023, the Company issued a press release announcing its financial results for the first quarter of 2023.  During the earnings call held that day, Defendant Barretto again praised Sprout's "go-to-market motion" and "free trial" as the "best weapon" the Company had in landing upmarket clients.  Specifically, despite being asked about competition against more established upmarket competitors—due to concerns that had been recently highlighted to investors by the Razor Report—Barretto insisted "***We feel really great, obviously, about the go-to-market motion that we've built and we've honed over 13-plus years. Our 30-day free trial continues to be the best weapon within -- in the space, and we've built the foundation of our business there where the majority of our customers actually get their hands on a keyboard and they're in the product***."  He later confirmed that the "free trial" was a "***differentiator for Sprout***."  Barretto therefore informed investors that "***We're in more deals than ever before from a large enterprise and an enterprise perspective***," and "***We feel really great about the win rates that we've seen within that space.***"

221.    The statements in ¶220 were materially false and misleading, and omitted material facts when made. Contrary to the Defendants' claims that its go-to-market motion was "the best weapon" with upmarket customers or a "differentiator for Sprout," Defendants later admitted the exact opposite was true: in order to be successful upmarket, Sprout had to completely "redraw[] our go-to-market model" around enterprise clients because targeting those clients was "orders of magnitude different" and Sprout's inbound trial model no longer worked.  Moreover, Sprout's product-led "free-trial" model was *not* leading to sustainable growth in the enterprise space

because its product was not enterprise-grade, as numerous CWs and Defendants' own admissions at the end of the Class Period subsequently confirmed. For example, numerous CWs confirmed the exact product flaws that the Razor Report highlighted (*see* §IV(F), *supra*), and CW 7, CW 2 and CW 13 all confirmed, by the end of 2022, Sprout's inbound pipeline was "drying up"—such that, by January 2023, the inbound model had collapsed and Sprout's enterprise sales were plummeting. Nor were Defendants experiencing high "win rates" with enterprise clients versus Sprout's competitors—to the contrary, and as multiple CWs confirmed, Sprout's products were woefully inferior to those of its competitors such that Sprout was "losing [the] battle" to acquire enterprise customers against competitors.

### K. Sprout's Second Investor Day

222. On September 27, 2023, Sprout hosted its second ever Investor Day. Defendant Barretto used the presentation to again tout Sprout's trial model, stating "[w]e also ***can land customers incredibly fast because of this trial model***" and therefore Sprout was "***winning in the enterprise and we're doing it in a uniquely Sprout way, which means that we still lead with the product… [which] also allowed us to land much larger customers faster because of this approach***." Barretto further emphasized to investors that Sprout's "***industry-leading approach to inbound***[]" was purportedly "***complemented [] with great outbound motions as well***," assuring the market that "***this is the right model for us to continue to sustain growth***."

223. Defendant Barretto went so far as to claim that the trial-led go-to-market was so powerful, Sprout used it with Salesforce customers as well. In response to whether Sprout had the resources to capture the "big Salesforce opportunity," Barretto proclaimed: "***the short answer is just the go-to-market motion is the exact same for us, whether it's with the Salesforce partnership or anywhere else, the motion feels the same. We lead with the product, we lead with the trial***." Barretto also confirmed that the Salesforce opportunity was "***absolutely massive***."

224.    The statements in ¶¶222-23 were materially false and misleading, and omitted material facts when made.  Defendants' go-to-market motion was not an "industry-leading approach" that was "winning" in enterprise, nor was it the "exact same."  Rather, as Defendants would starkly admit at the end of the Class Period, the opposite was true: *at the exact same time that Defendant Barretto made these representations*, Defendants were in the process of completely "*redraw[ing] [Sprout's] go-to-market model*" because it was wholly ineffective with enterprise clients.  Indeed, as Defendants later admitted, by this time they were already entirely overhauling their sales model and attempting to convert it to an outbound model, including by "building vertical sales teams, accelerating promotions in our mid-market and enterprise teams," and "adjusting our account coverage model," investments that "set [Sprout] back" and forced the company to significantly slash its 2024 revenue growth guidance.  Nor did Defendants go-to-market model allow the Company to "land much larger customers faster."  To the contrary, and as Defendants would further admit at the end of the Class Period, Sprout's ineffective sales motion caused Sprout to endure "much longer sales cycles," such that "lengthening of the cycle is a dynamic in our business."  Indeed, even as late as December 2024—three years after the Company's "upmarket" push, and seven months after the end of the Class Period—Defendant Del Preto admitted that it was still "*early innings as far as like where we are in the overall like move up market*," underscoring that the Company's wholly positive representations about Sprout's purported success in the enterprise space had been a farce.

225.    Moreover, by this time, Defendants already well knew that the Salesforce opportunity was not "absolutely massive" for Sprout.  Instead, as the Razor Report explained, Sprout was "far closer to the last innings of the [Social Studio] migration than the start" because most large Social Studio clients had already migrated to other platforms.  Indeed, as Defendants

admitted at the end of the Class Period, the clients and revenue added from the Salesforce partnership by this time were "significantly less than many may have previously assumed."

**L.     Q3 2023 Earnings Call**

226.    On November 2, 2023, Sprout issued a press release announcing "incredibly strong third quarter results."  On the earnings call held later that day, Barretto again praised Sprout's go-to-market "***trial model that we leverage in the enterprise***" as a reason for the Company's success and "***a really big differentiator for us as we move forward***" and resulted in much faster sales cycles.  Specifically, Barretto claimed that "***we have this trial model that we leverage even in the enterprise.*** And so even in enterprise deals that might come from RFPs, ***we generally have a faster sales cycle than you might see with other enterprise software players***, both in our space and outside of it, because customers are in the product by the time they make a decision."  As Barretto proclaimed: "***Our deals move faster than most enterprise organizations***"—such that their "***speed and velocity***" required the Company's enterprise sales reps to "***have a certain level of speed to them in the way that they execute and to manage more accounts and transactions and deals than they might have at another legacy enterprise player***."

227.    Similarly, when asked what "key drivers" allowed Sprout to land "these much larger enterprise deals," Barretto further explained that Sprout had "***seen a lot of success with our enterprise team***" because Sprout's "***products are perfectly positioned for these enterprises***."

228.    The statements in ¶¶226-27 were materially false and misleading, and omitted material facts when made. First, contrary to the Defendants' claims that the "trial model" was a "really big differentiator," the opposite was true.  As Defendants would starkly admit at the end of the Class Period, at this exact same time—in the fourth quarter of 2023—Defendants were completely "redraw[ing] [Sprout's] go-to-market model" because it was wholly ineffective with enterprise clients, including by "building vertical sales teams, accelerating promotions in our mid-

97

market and enterprise teams," and "adjusting our account coverage model," investments that "set [Sprout] back" and forced the company to significantly slash its 2024 revenue growth guidance. Nor did Defendants' go-to-market model allow the Company to land deals with "velocity." To the contrary and as Defendants would further admit at the end of the Class Period, Sprout's ineffective sales motion caused Sprout to endure "much longer sales cycles," such that "lengthening of the cycle is a dynamic in our business." Second, Sprout's products were not "perfectly positioned for these enterprises." Rather, as set forth at §IV(F), *supra*, Sprout lacked numerous features required by large enterprise clients, including sufficient APIs, scalability for large numbers of users, sophisticated analytics, and adequate foreign language capabilities, all of which competitors like Sprinklr possessed.

229. Then when an analyst asked what investments the Company would make to proactively transition its business to address the larger upmarket clients, Barretto responded by underscoring the Company's "***consistent strategy***" and claimed that the Company "***fel[t] really good about the motion that we have today***" with "***no major changes to call out****."* Later on the call, Barretto yet again stressed that the Company's sales methods were successfully capturing enterprise clients, stating, "I'd just underline ***the consistency, our go-to-market strategy is working***" and noting that, as a result, "***these things are all going to be very consistent with what we've done before and so no surprises for all of you in the way that we grow our business.***"

230. The statements in ¶229 were materially false and misleading, and omitted material facts when made. Rather than using a "consistent strategy" with "no major changes to call out" and "no surprises in the way that we grow our business," the exact opposite was true. As Defendants would starkly admit at the end of the Class Period, at this exact same time—in the fourth quarter of 2023—Defendants were completely "redraw[ing] [Sprout's] go-to-market

model" because it was wholly ineffective with enterprise clients, including by "building vertical sales teams, accelerating promotions in our mid-market and enterprise teams," and "adjusting our account coverage model"—investments that "set [Sprout] back" and forced the company to significantly slash its 2024 revenue growth guidance. Indeed, even in December 2024—well after the Class Period ended—Defendant Del Preto admitted that it was still "***early innings as far as like where we are in the overall like move up market***," underscoring that the Company's wholly positive representations about Sprout's purported success in the enterprise space had been a farce.

231.    Defendants also addressed the remaining Salesforce opportunity during the Q3 2023 call. Barretto noted that Sprout "***continued to see great success there***," as Social Studio "***was certainly the immediate opportunity where we're seeing good execution***." Indeed, Barretto claimed "***We are still seeing new accounts and new deals that we had not seen before coming up, so there's still customers that are on [Social Studio]…[and] we'll continue to see really good ARR opportunities from those***." In fact, Barretto stated that Sprout "***expect[ed] another record ARR contribution in Q4, as complex deployments begin their migration to Sprout***."

232.    The statements in ¶231 were materially false and misleading, and omitted material facts when made. Defendants' statements that the Company was seeing "great success" with the Salesforce partnership, such that there would be "another record ARR contribution in Q4" as the largest enterprise clients migrated from Salesforce to Sprout, were materially false and misleading. As Defendants would admit during the Company's next earnings call, rather than contributing "record ARR" in Q4, the Salesforce contribution was disappointing, with the same number of Salesforce customer adds as the fourth quarter of the prior year. Indeed, as Defendants would admit at the end of the Class Period, rather than providing a source of significant revenue growth, the Salesforce partnership accounted "for slightly less than 15% of our new business in 2023 and

less in 2022," and was only "roughly 3%" of Sprout's revenue—"significantly less than many may have previously assumed." Indeed, CW 1 stated that the Salesforce partnership and its purported benefits were "nothing more than a talk track" as "[t]here was an overwhelming sentiment that those customers did not want to pay for Sprout Social."

**M.     2023 Form 10-K Filed on February 23, 2024**

233.    In Sprout's 2023 Annual Report on Form 10-K, filed on February 23, 2024, Defendants again touted the effectiveness of Sprout's go-to-market trial motion. For example, Defendants touted Sprout's "*highly efficient go-to-market strategy*"—which the Form 10-K defined as "a product driven strategy[] where potential customers are led to our website and sign up for a free trial of our products—as one of the Company's key "*Competitive Strengths*," and further asserted that Sprout's "*platform does not require long deployment and implementation cycles . . . which serves as one of our key competitive advantages*." The Form 10-K also claimed that Sprout's "go-to-market approach" was "*driven by the effectiveness and innovation of our platform and unpaid customer demand*," such that "[*a] substantial number of our customers subscribe without any interaction from our sales team*"—which the Form 10-K claimed allowed Sprout to "*cost-effectively drive strong lead generation, upgrade free trials to paying customers, drive strong conversion of demonstration requests, and achieve growth of our platform*."

234.    The statements in ¶233 were materially false and misleading, and omitted material facts when made. Sprout's inbound trial model was not "highly efficient" for "cost-effectively driv[ing] strong lead generation" across customer cohorts, nor was this model one of Sprout's "Competitive Strengths." As Defendants would starkly admit less than three months later, at the exact same time this Form 10-K was filed—in the first quarter 2024—Defendants were scrambling to completely "redraw [Sprout's] go-to-market model" because it was wholly ineffective with enterprise clients, including by "building vertical sales teams, accelerating promotions in our mid-

market and enterprise teams," and "adjusting our account coverage model"—investments that "set [Sprout] back" and forced the Company to significantly slash its 2024 revenue growth guidance. Nor did Sprout's free trial model avoid "long deployment and implementation cycles." To the contrary, and as Defendants further admitted, Sprout's ineffective sales motion caused Sprout to endure "much longer sales cycles," such that "lengthening of the cycle is a dynamic in our business." According to CW 7, CW 12 and CW 1 sales cycles for enterprise customers were always considerably longer than what Sprout disclosed.

235. The Form 10-K also warned—under "Risks Related to Our Business Model and Other Operations Risks"—that "[a]s more of our sales efforts target larger enterprise customers, *our sales cycles may become longer and more expensive and we may encounter increased pricing pressure and compliance changes*."

236. The statements in ¶235 were materially false and misleading, and omitted material facts when made. It was misleading for Defendants to hypothetically warn that the Company's sales cycles "*may* become longer and more expensive" when, as they would admit less than three months later, that risk had *already materialized.* Indeed, as Defendants would starkly admit at the end of the Class Period, in reality, sales cycles for Sprout's "enterprise-heavy" business had "changed materially" because of the "longer-type sales cycles" that were required for enterprise clients, such that "the lengthening of the cycle is a dynamic in our business." This was not a new development. According to CW 7, CW 12 and CW 1, sales cycles for enterprise customers were always considerably longer than what Sprout disclosed, ranging from six months to a year.

237. Finally, the Form 10-K listed "ARR" as a "Key Business Metric[]," stating "*[w]e believe ARR is an indicator of the scale of our entire platform while mitigating fluctuations due to seasonality and contract term*."

238. The statements in ¶237 were materially false and misleading, and omitted material facts when made. Defendants asserted exactly the opposite less than three months later, when they announced at the end of the Class Period that they "no longer believ[ed] that ARR" was a "key performance indicator[] of Sprout Social's business"—to the extent that Sprout would "no longer publicly disclose these metrics." Defendants further asserted that ARR—rather than "mitigating fluctuations due to seasonality and contract term," as Defendants represented above—could not accurately measure Sprout's business due to its purported failure to account for seasonality or contract term. Indeed, Defendants claimed that due to enterprise clients having longer contract terms—such that "[w]e have a business that is shifting toward the end of the year," thus subjecting the Company to "seasonality"—this "created a lot of noise in the ARR numbers" and purportedly rendered that metric completely useless.

**N.     March 6, 2024 KeyBanc Emerging Technology Summit**

239. On March 6, 2024, Sprout presented during the afternoon session of the KeyBanc Emerging Technology Summit and again lauded the Company's go-to-market strategy and the ability to close large deals with "velocity." Barretto specifically touted the "***fact that we lead with the products…we have a free trial" which Sprout used "from an SMB to the largest companies in the world***," and Del Preto reiterated the same point that "***even in those larger deals…we lead with the products***, like [Barretto] was saying, we're in these larger enterprise deals putting dozens of users into the trial." Thus, according to Barretto, "***even in the mid-market and enterprise, there's great velocity in our business. We'll close mid-market and enterprise deals within 30 days, within the trial***. Not all of them look like that, but for us, it's kept the sales cycle ***very different for most enterprise companies***."

240. The statements in ¶239 were materially false and misleading, and omitted material facts when made. As Defendants would reveal less than two months later, rather than Sprout's

"free trial" landing deals with "velocity"—such that enterprise deals were closing within "within 30 days, within the trial"—the exact opposite was true.  Indeed, at the exact same time Defendant Barretto was making these statements to the market, the Company was scrambling to "redraw [Sprout's] go-to-market model" because it was wholly ineffective with enterprise clients.  Thus, far from being able to close enterprise deals "within 30 days, within the trial," Sprout's ineffective sales motion in truth had caused Sprout's cycles to "change[] materially"—such that the Company was in reality "definitely seeing lengthening of our sales cycles."

241.    At the KeyBanc Summit, Defendant Barretto also assured investors that the Salesforce opportunity was still supporting Sprout's durable upmarket growth through both Social Studio transitions and other Salesforce integrations, claiming, "***we've got visibility into the pipeline[,]***" and noting, "at the same time, ***we've been building pipeline across the rest of the [Salesforce] ecosystem whether they're Social Studio customer or not.***"

242.    The statements in ¶241 were materially false and misleading, and omitted material facts when made.  Sprout revealed less than two months later that it did not have "visibility into the pipeline" and were not "building pipeline" with upmarket clients—rather, Defendants admitted they were focused instead on "execution versus building pipeline," "didn't cultivate enough [pipeline] in Q4," and therefore "walking into Q1, we didn't have enough pipeline built to close in Q1 that we needed to cover."  Furthermore, because the Company needed to make drastic changes to its go-to-market strategy, Defendants admitted that Sprout "didn't have enough time executing on deals in Q1."  Moreover, rather than providing a source of significant revenue growth, Defendants admitted at the end of the Class Period that the Salesforce partnership in fact accounted "for slightly less than 15% of our new business in 2023 and less in 2022," and was only "roughly 3%" of Sprout's revenue—"significantly less than many have previously assumed."  Indeed, CW

1 stated that the Salesforce partnership and its purported benefits were "nothing more than a talk track" as "[t]here was an overwhelming sentiment that those customers did not want to pay for Sprout Social."

243. At the KeyBanc Summit, Defendants further claimed that they expected Sprout to "overperform" in 2024, stating that "***when we gave out the guidance, we wanted to make sure we left ourselves enough room to over-perform***[.]"   Defendant Del Preto described the revenue guidance given for 2024 as intentionally placed on the low-end because of the ***"opportunity to, like exceed that, and so that's the only thing that I would call out,"*** and concluded the Q&A session by confidently asserting, *"**I don't think there's anything else to call out as far as the business performance itself***."

244. The statements in ¶243 were materially false and misleading, and omitted material facts when made. Rather than there being nothing to "call out" regarding Sprout's "business performance itself," at the exact same time Defendant Barretto was making these statements to the market, the Company was scrambling to "redraw [Sprout's] go-to-market model" because it was wholly ineffective with enterprise clients, including by "building vertical sales teams, accelerating promotions in our mid-market and enterprise teams," and "adjusting our account coverage model"— investments that "set [Sprout] back."  Accordingly, Defendants had no reasonable basis to assert that the Company could "overperform" its 2024 guidance, and in fact were forced into drastically "reducing total revenue" guidance for 2024 just weeks later due to the ineffectiveness of Sprout's go-to-market motion.

## VI.    ADDITIONAL ALLEGATIONS OF SCIENTER

245. Numerous facts, including those detailed above, considered collectively, demonstrate that Defendants knew they were making the above-detailed materially false and

misleading statements and omissions of material fact, or, at minimum, acted recklessly in making those statements and omissions.

246. *Defendants' admissions at the end of the Class Period demonstrate their knowledge that their Class Period statements were false and misleading when made*. Defendants' stark admissions that directly contradicted their numerous Class Period representations to the contrary are highly probative of their scienter. For example, on August 3, 2023, despite continuously claiming Sprout's platform was "well equipped for the deals that are out there" and there was "not any functionality we don't have to win these larger deals," Defendants disclosed that the Company lacked the ability to provide influencer marketing, a "critical" "requirement" showing up in "more than half of our enterprise conversations." Defendants admitted that they in fact knew that influencer marketing was a "very important part of [enterprise] strategy and an important part of their ask" "for some time now." In fact, Rechel later admitted on June 5, 2024, that Sprout appreciated the need for influencer capabilities in "the back half of 2022," i.e. since July 2022.

247. Defendants' admissions were even more significant at the end of the Class Period. Despite emphatically telling investors that Sprout's inbound trial-model was Sprout's "secret weapon" and a "massive differentiator" in the enterprise space—and despite repeatedly asserting that this model was working so well that Sprout did not require "any changes around the go-to-market or sales motion"—Defendants starkly admitted at the end of the Class Period that the exact opposite was true. Indeed, Defendants were ultimately forced to admit that Sprout's inbound sales strategy and infrastructure were "orders of magnitude different" from what was necessary to obtain and service an enterprise-heavy business. Indeed, this disparity was so profound that Defendants admitted that they had to completely "redraw[] [Sprout's] go-to-market model" because Sprout's "completely inbound highly transactional model" was wholly ineffective with enterprise clients,

and the "now enterprise-heavy" required the Company to make major changes, including "building new vertical sales teams" and repositioning upmarket and mid-market enterprise sales for "our outbound motions and where we invest our time prospecting." Significantly, Defendants repeatedly admitted that these issues were not the product of external factors and that they were entirely to blame for the problems, stating that they were "self-induced," with Defendant Barretto tellingly admitting: "I own this." Further, Defendant Del Preto admitted that even as late as December 2024—seven months after the end of the Class Period—it was still "early innings as far as like where we are in the overall like move up market."

248.    *The highly detailed and cross-corroborating accounts of numerous former Sprout employees confirm Defendants' scienter.* Numerous former Sprout employees uniformly stated that, contrary to Defendants' public statements to investors during the Class Period, Sprout's sales strategy and infrastructure were an abject failure with enterprise customers, devastating the Company's highly touted upmarket growth and execution. *See* §IV(F).

249.    For example, multiple CWs confirmed that Defendants knew full well that Sprout's inbound sales model was wholly ineffective with enterprise customers. CW 3 stated the inbound trial strategy was "very ineffective" and "not something that was successful with enterprise." CW 7 similarly stated that it was well-known throughout the Company that "inbounding was not good," and "there weren't enough BDR's to assist the sales reps" with outbound selling. In fact, multiple CWs—CWs 7, 14, and 2—described how inbound leads completely "fell off" and "dri[ed] up" heading into 2023, causing sales to plummet, and resulting in the Company resorting to rampant heavy discounting to enterprise clients to prop up the Company's revenue.

250.    CWs also confirmed that—contrary to Defendants' repeated representations that Sprout's sales model produced consistent short sales cycles even for enterprise clients, which was

a "massive differentiator" and a "significant competitive advantage"—in reality, Sprout had always experienced longer sales cycles with enterprise clients. For example, CW 7 stated that "[e]nterprise contracts would take six months to a year to complete," and CW 4 similarly affirmed that enterprise clients would take "multiple-months" to close. CW 1 advised that dating as far back as 2021 and 2022, sales cycles were "100%" getting longer for the bigger clients and "management was definitely aware" that enterprise sales could not be closed within the timeframes Defendants were representing, with sales pressure coming directly from Defendant Barretto, and VP of Sales, Dan Summers. In fact, according to CW 1, Defendants Howard and Barretto would offer their personal help to land larger deals, and therefore, were undeniably aware of lengthening sales cycles.

251. CWs also completely undermined Defendants' representations concerning the breadth and success of Sprout's product and its ability to meet the needs of enterprise customers, calling Defendants' statements "bullsh*t" and "not the truth." For example, as set forth in detail *supra* in §IV(F), CW 8 reported that Sprout lacked the ability "to scale things for large customers like franchises with multiple locations," and that Barretto was on a sales call with him when Sprout lost the deal for that exact reason. CW 4 stated that "Sprout Social did not have advanced analytics capabilities that these enterprise companies desired," and only "won business" because "Sprout was much more affordable" than other platforms. Significantly, former employees confirm that Defendants knew full well about these limitations, with CW 1 confirming that Sprout's product limitations and challenges with getting up-market customers were "definitely" reported up the chain, including to the highest levels of Sprout.

252. CWs further confirmed that the Individual Defendants knew of these problems directly. CW 8 described monthly sales meetings regularly attended by Barretto where

107

management discussed "the competitors we lost to, our average close rate percentage and where we needed to focus the next month."  CW 7, CW 3, CW 9, CW 13, and CW 4 each confirmed management's access to Salesforce or Slack information, including "reports and overviews" on the sales team's struggles, mandatory detailed notes providing explanations for why a contract was lost or a customer left the Company, discounts being offered to lure clients, and a host of metrics relating to the inbound pipeline. As CW 1 and 14 noted Defendants "lived inside" the pipeline and were "always tracking upcoming sales closely." This was corroborated by CW 7 who reported that management specifically asked for an analysis of the inbound slump soon after the price increases and by CW 2 and CW 13 who each recalled a direct C-suite directive to "discount like crazy" in response. Indeed, multiple CWs noted that Barretto was an "in the trenches with you type" of manager, with CW 1, CW 9 and CW 8 explaining that Barretto "inquir[ed] about certain deals," asked to be "pulled in" to help close deals, and provided examples of when Barretto was actually on sales calls.

253.     *Defendants proclaimed throughout the Class Period that they "have so much data"* *and "were constantly monitoring the success" of the move upmarket, including the midmarket and* *enterprise sales teams, thus confirming their direct and detailed knowledge of information* *contradicting their public statements at the time they were made.*  Before, during, and after the Class Period, Defendants affirmed their direct involvement in monitoring all aspects of Sprout's move upmarket, which there asserted was made easy by Sprout's inbound sales model.  For example, Defendant Del Preto represented at an August 11, 2021 conference not only that Defendants "have so much data" and "information [to] understand what parts of the organization are working better than others" and where "to invest," but explained how the Individual Defendants personally "go through all the different metrics."  Del Preto stated, "***I spend, my team***

*spends, every month, we spend time with Ryan Barretto's team and all his leaders and we go by segment, we go by new business, we go by the success team . . . We are very data focus[ed]. Everything's based on all that internal unit economics we['] re looking at and based on that, we decide, okay here's what we want to invest, we want to step on the gas*."

254.     Defendants made similar representations throughout the Class Period, constantly reassuring investors that they personally monitored Sprout's metrics to ensure success in the move upmarket and stressed that Sprout's rapid sales cycles—which they kept a close eye on—provided Defendants with immediate insights.  On December 7, 2021, for example, Del Preto crowed how Sprout was "heavily data-driven because of the inbound model," which provided Defendants "really good visibility into where demand was coming from."   At the August 11, 2022 Canaccord Genuity Conference, Del Preto touted Sprout's ability to "drive the growth numbers we've given out" because Defendants "have such good data on the sales and marketing side," and "with [Sprout's] 30- to 45-day sales cycle" Defendants know "***what's working and what's not***."

255.     At a December 7, 2022 conference, Defendants again emphasized that "the finance team, meets on a monthly basis with each of the sales leaders and each of the business unit leaders across the go-to-market organization. . . to, ***on a real-time basis, understand what's working in the business, what's not working in the business, what needs more capacity and more investment***." Sprout management assured that as a result, "***in real time, we're constantly making refinements to the right level or the optimal level of investment***."  At Sprout's September 27, 2023 Investor Day, Defendant Barretto further explained that he and Del Preto personally spent a lot of time with Sprout's "leadership team to make sure that we've got a great handle on . . . the productivity per person within groups" like "***mid-market and enterprise . . . solution engineering that support the enterprise and places like customer success that we're supporting some of our***

*larger customers*." According to Barretto, he and Del Preto were "***constantly meeting to look at this data, to look at the success and figure out the right places to optimize and invest in growth***."

256.     *Defendants repeatedly emphasized to investors throughout the Class Period the success of Sprout's shifting "upmarket" focus to midmarket and enterprise clients, attributing that success specifically to the Company's "inbound" "product-led" free-trial-based sales strategy*.  Defendants made clear to investors that Sprout's shift upmarket was the centerpiece of Sprout's revenue growth.  Throughout the Class Period, Defendants consistently highlighted the upmarket move as the main growth lever for the Company, repeatedly highlighting the "outsized momentum in the mid-market and enterprise segments," the "steady drumbeat of upmarket expansion," the "growth of our larger size deals," and "the acceleration we're seeing upmarket" on every investor and conference call during the Class Period.

257.     Defendants made these representations because analysts were singularly focused on Sprout's upmarket success as the main driving force of the Company's growth.  For example, William Blair emphasized on November 9, 2022 "the durability of Sprout's growth" specifically because of "the company's increasing focus upmarket," while Morgan Stanley rated Sprout "above street" on December 13, 2022, with the number one reason being "1) Sprout Social's move upmarket."  Piper Sandler noted on February 21, 2023 that "[t]he focus on these upmarket customers has provided SPT with momentum and potential growth levers post-price increases," and William Blair touted on November 3, 2023 "the changes Sprout is making in the business to focus further upmarket."  Even in 2024, analysts remained glued to Sprout's upmarket success, with Jefferies expressly highlighting on February 7, 2024 that Sprout's "continued shift upmarket."

258.     As the purported engine of their upmarket growth strategy, Defendants also repeatedly emphasized their inbound, product-led sales model and the purportedly enterprise-grade

capabilities of its product. Indeed, Defendants repeatedly told investors that this was the "secret weapon for us in the enterprise [market]"; that Sprout's "secret sauce is that we lead with the product and specifically with [free] trials"; that this was highly effective "even [] for sophisticated customers in the mid-market and enterprise"; that Sprout's inbound, trial-based model ensured quick, efficient sales turnarounds, with sales cycles of just "30 to 45 days on average,"—giving Sprout a "significant advantage" in the marketplace and a "massive differentiator" versus its competitors; and that this "product-led" sales motion was highly effective with large clients precisely because Sprout's platform had everything those clients needed, i.e. that Sprout was "well equipped for the deals that are out there," there was "not any functionality we don't have to win these larger deals," and "when we go into these customers, we check all the boxes."

259. The fact Defendants repeatedly emphasized to investors and analysts Sprout's upmarket shift and the success of the Company's inbound sales motion, all of which were specifically credited by analysts as the drivers of Sprout's purported success, supports scienter.

260. *Defendants completely abandoned ARR—the metric Defendants had touted throughout the Class Period as the key metric of Sprout's revenue growth—to avoid closer scrutiny of the Company's faltering upmarket performance.* Throughout the Class Period, Defendants repeatedly highlighted ARR as a "Key Business Metric" and a crucial indicator of the Company's health and trajectory. Indeed, as recently as February 23, 2024, Sprout claimed that "ARR is an indicator of the scale of our entire platform while mitigating fluctuations due to seasonality and contract term." Given ARR's central importance and the metric's inclusion in every single quarterly report issued by Sprout, and its discussion during every single earnings and investor call throughout the Class Period, ARR was unquestionably highly material to investors and analysts.

261.    Due to the obvious materiality of ARR to Sprout's business and future revenue growth, analysts reacted strongly to Defendants' removal of the metric and excoriated Defendants for their lack of transparency.  Canaccord Genuity found that by no longer reporting ARR, Defendants were "stripping some visibility into what's occurring." Similarly, Cantor Fitzgerald bluntly questioned, "Why no more ARR?" given Sprout's "revenue consists of 99% subscription, we question how it is not a KPI…this makes the business less transparent and opens up more questions." A "bigger negative[]" for Jefferies was "[n]o longer reporting ARR, customer count, or channel partner contributions." Piper Sandler reported, that it "is hard for us to imagine a near-term revival in investor sentiment with ARR & total customer metrics going away."

262.    *Following the full disclosure of Defendants' fraud, securities analysts that closely follow the Company widely excoriated Defendants' credibility and specifically highlighted the stark contrast from Defendants' Class Period representations*.  When the full truth was revealed at the end of the Class Period, analysts excoriated Defendants for their prior misrepresentations, and widely opined that they needed to "earn back some credibility." *See* ¶¶158-62. For example, analysts at Cantor Fitzgerald highlighted the disparity between those disclosures and Defendants' Class Period representations, noting that Sprout had "announced its move to go up-market" well before 2024, and "thus the execution issues it is now facing, which are a result of its [go-to-market] strategy, ***should have been apparent much earlier than today***." KeyBanc's May 2, 2024 report likewise stressed incredulity, pointing out that "the absolute right question on the topic during the conference call" was "what took the Company by surprise, given it has been actively moving away from the down-market motion and ***focused entirely on the enterprise for over a year***."  Jefferies likewise was "***puzzl[ed] [with] the disconnect between the actions that were taken at the beginning of the year[], the subsequent issuance of full[-]year guidance on 2/21, and now a***

*material guide down*."  Canaccord Genuity analysts bluntly stated, "[w]ell, that wasn't great…This is a team that, in our view, hasn't done itself any favors…," ultimately declaring "[t]his quarter was clearly a disappointment and the magnitude of changes surprised us."  The reactions of prominent analysts to Defendants' disclosures highlighted the contrast from Defendants' Class Period representations, supporting a strong, cogent, and compelling inference of scienter.

263.  *Defendants' specific, regular public remarks to investors, including in response to direct analyst inquiries, about Sprout's platform, its "massively differentiated" sales strategy, and its quick sales cycles are demonstrative of their intimate knowledge about those subjects and Defendants' understanding of the critical importance thereof.*  Defendants made a plethora of specific statements throughout the Class Period that (i) Sprout's "really powerful" "inbound trial-led" sales motion was a "major differentiator" that gave the Company a "significant advantage" in the enterprise space; (ii) Sprout's platform was "perfectly aligned to [the] most sophisticated companies in the world," "well-equipped for the deals that are out there," and "check[ed] all the boxes" for enterprise RFPs; (iii) Sprout was "as healthy as its ever been in terms of pipeline" in February 2024; and (iv) the Company's sales cycle was "rapid" and "still 35 to 41 days." Defendants made these statements in direct response to specific inquiries from market analysts reflecting concern about those very topics, and Defendants' statements in fact reassured investors regarding the health and success of the Company.  The specificity and constant repetition of Defendants' statements themselves are probative of scienter.

264.  *Defendants' vehement denials of concerns articulated in short seller reports (which Defendants later implicitly admitted were true) are probative of Defendants' scienter.*  The short seller report issued on April 4, 2023 called into question Defendants' statements concerning the Salesforce and Sprout's ability to effectively compete with enterprise clients.  The report also

attacked Defendants' credibility, claiming management understood the short-term Salesforce boost but "*played it up/mischaracterized it to investors as evidence of a sudden and successful strategic shift upmarket*."  Defendants were unquestionably aware of the report, as Defendants took pains to strongly refute the claims in the report when raised to them by analysts during earnings and investor calls.  The fact that Defendants were unquestionably on notice of the issues raised in the short seller report, subsequently emphatically denied that such issues were prevalent at the Company in any way (*see* §IV(G), *supra*), and yet Defendants ultimately admitted that those very same issues significantly and negatively impacted Sprout during the Class Period, is compelling evidence supporting a strong inference of scienter.

265.  *The sudden and suspicious departures of numerous senior officers of the Company leading up to the end of the Class Period is indicative of scienter.*  Sprouts' reshuffling of its entire executive management team between Q3 2023 and Q1 2024 is probative of Defendants' scienter. On September 7, 2023, Chief Marketing Officer Jamie Gilpin, who "led the [C]ompany's marketing and GTM strategy," abruptly notified Sprout of her intention to resign without any replacement in place.  Two more top executive resignations followed before year end.  Chief Revenue Officer John Schoenstein—who was "responsible for the world-wide Sales, Demand Generation, Revenue Operations, Customer Success and Professional Services organizations" at Sprout—similarly resigned without a replacement in or about November 2023.  This was followed by the resignation of Aaron Rankin as Chief Technology Officer on December 14, 2023.  Finally, less than a month before the end of the Class Period, on April 15, 2024, Sprout announced that Defendant Howard would no longer be CEO at the Company.  These numerous senior executive departures provide additional support for scienter.

266. *Defendant Barretto and Howard's insider selling supports a finding of scienter.* As set forth further, *supra*, Defendants Barretto and Howard sold a total of ***$63 million*** in Sprout stock during the Class Period at prices inflated by their fraud. These sales were suspicious in both timing and amount. First, Barretto's $19.6 million in Class Period sales comprised ***more than three times as many shares*** during the Class Period as he sold before it, for proceeds that were ***nearly three times the stock sale proceeds*** he obtained for the period from Sprout's December 12, 2019 IPO until the start of the Class Period. Moreover, Barretto's sales were highly significant, amounting to ***45%*** of his total vested Sprout shares both held and acquired during the Class Period. Similarly, Defendant Howard sold significantly more shares of Sprout stock during the Class Period than he did between the Company's IPO and the beginning of the Class Period—a total of 695,000 shares for proceeds of ***more than $43 million***—eclipsing his pre-Class Period proceeds by roughly 45%.

267. Moreover, many of these sales were made pursuant to 10b5-1 plans that were adopted ***during the Class Period under suspicious circumstances***. Indeed, Defendants Barretto and Howard each adopted new 10b5-1 plans *at least twice* during the Class Period, including each of them adopting new plans in August 2023, just as the Company was "discount[ing] like crazy" to stave off growth decline and preparing to completely overhaul its entire sales model precisely because Defendants knew that the Company's inbound model was an abject failure in the enterprise space. Further, Defendant Howard made several outsized, suspiciously timed sales *outside* of his 10b5-1 plan during this same suspicious time period—including sales as late as March 7, 2024 (just one month before he resigned and two months before the full truth came out)— for a total of $8.3 million in proceeds.

268.     Defendant Barretto and Howard's insider sales were thus highly suspicious in terms of both timing and magnitude.  Accordingly, these sales, along with the litany of other facts highlighted above, support a strong and compelling inference of Defendants' scienter.

## VII.    LOSS CAUSATION

### A.     May 2, 2023 Partial Corrective Disclosure

269.     On May 2, 2023, following the close of the markets, in announcing Sprout's results for the first quarter 2023, Defendants announced ARR growth dipping below 30% for the first time since 3Q20, the first ever quarter to quarter decline in customer count, and Sprout merely added 36 customers with ARR above $50k, the lowest quarter of such adds since 1Q21. Furthermore, Defendants announced that they were forced to "shift customer success resources away from [the Company's] lowest value customers" and instead focus "product and go-to-market strategies around mid-market and enterprise, a shift [the Company] accelerated over the past 90 days."

270.     On this news, the Company's stock price dropped $5.86 per share, or 12.1%, from $48.32 per share on May 2, 2023 to $42.46 per share on May 3, 2023 on unusually heavy volume. On May 4, 2023, Sprout's stock price dropped an additional $3.93 per share to $38.53 as the market continued to digest the news.  In total, this news caused an over 20% decline in Sprout's stock price over two trading days wiping out approximately $538 million in Company market capitalization.

271.     Notwithstanding the price decline following Defendants' May 2, 2023 disclosure, Sprout's stock price remained artificially inflated because Defendants continued to materially mislead the market regarding the true state of the Company's business, including by continuing to misrepresent its ability and success in shifting its customer mix to larger, mid-market and enterprise customers.

**B.     August 3, 2023 Partial Corrective Disclosure**

272.     On August 3, 2023, following the close of the markets, Sprout issued a press release announcing poor Q2 2023 results, with both ARR and customer adds again falling below market expectations—causing Defendants to lower the full year 2023 revenue guidance they had reiterated just three months prior.  Additionally, Sprout announced that it had acquired Tagger, a leading influencer marketing and social intelligence platform used by enterprise customers, for $140 million—a purchase price analysts thought to be "steep." During the accompanying conference call with analysts, Defendants disclosed that despite promoting Sprout's ability to land larger enterprise clients, the Company could not even address a critical need required by the majority of its target market. Specifically, Defendants admitted that Sprout acquired Tagger because the Company lacked the ability to provide influencer marketing even though "influencer [marketing was] a customer requirement showing up in more than half of our enterprise conversations." *See also supra*, ¶133.

273.     In response to these disclosures, Sprout Social stock price fell 12.3%—from a closing price of $53.38 per share on August 3, 2023, to a closing price of $46.81 per share on August 4, 2023, wiping out approximately $368 million in Company market capitalization.

274.     Notwithstanding the price decline following Defendants' August 3, 2023 disclosure, Sprout's stock price remained artificially inflated because Defendants continued to materially mislead the market regarding the true state of the Company's business, including by continuing to misrepresent its ability and success in shifting its customer mix to larger, mid-market and enterprise customers.

**C.     May 2, 2024 Corrective Disclosure**

275.     On May 2, 2024, after the close of the markets, Sprout issued a press release disclosing disappointing results for the first quarter of 2024 and slashed 2024 guidance due to

"self-induc[ed] sales execution headwinds." Sprout also announced that it would no longer disclose ARR and total number of customers—what it had previously referred to as "key business metrics." *See also supra*, ¶153.

276. Later, on the accompanying earnings conference call, Defendants disclosed that the Company "made several important strategic decisions heading into [the first quarter]" that included "building new vertical sales teams, accelerating promotions in our mid-market and enterprise teams, adjusting our account coverage model and prioritizing Tagger enablement for all of our customer-facing teams." Despite having pursued, purportedly successfully, the move "upmarket" for years, and in contrast to Defendants' prior statements, Defendants finally revealed they were now "redrawing our go-to-market model"; similarly, despite previously touting Sprout's short sales cycles even in the enterprise space, Defendants now admitted that they were " definitely seeing lengthening of our sales cycles, as the composition of our customer base . . . is changing." *See also supra*, ¶152.

277. In response to Defendants' stark admissions, Sprout Social stock plummeted 40.1% or $19.33 in a single day—falling from a closing price of $48.15 per share on May 2, 2024, to a closing price of $28.82 per share on May 3, 2024—on extraordinary trading volume, wiping out approximately $1.1 billion in Company market capitalization.

278. The decline in Sprout Social's stock price was a direct result of the nature and extent of Defendants' fraud finally being revealed to investors and the market. The timing and magnitude of the decline in the Company's share price negates any inference that the loss suffered by Lead Plaintiff and the other Class members was caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraudulent conduct.

## VIII.   PRESUMPTION OF RELIANCE

279.    At all relevant times, the market for the Company's securities was an open, efficient and well-developed market for the following reasons, among others:

a.  Sprout Social's common stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

b.  As a regulated issuer, Sprout Social filed periodic reports with the SEC and the NASDAQ;

c.  Sprout Social regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services, and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

d.  Sprout Social was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to those brokerage firms' sales force and certain customers. Each of these reports was publicly available and entered the public marketplace.

280.    As a result of the foregoing, the market for Sprout Social's securities reasonably and promptly digested current information regarding the Company from all publicly available sources and reflected such information in the price of the Company's common stock.  All investors who purchased the Company's securities during the Class Period suffered similar injury through their purchase of Sprout Social's securities at artificially inflated prices, and a presumption of reliance applies.

281.    A Class-wide presumption of reliance is also appropriate in this action under the U.S. Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128

(1972), because the Class's claims are grounded on Defendants' material omissions. Because this action involves Defendants' failure to disclose material adverse information regarding Sprout Social's business and operations—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the material misstatements and omissions set forth above, that requirement is satisfied here.

## IX. INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND THE BESPEAKS CAUTION DOCTRINE

282. The statutory safe harbor or bespeaks caution doctrine applicable to forward-looking statements under certain circumstances does not apply to any of the false and misleading statements pleaded in this Complaint. The statements alleged to be false or misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false or misleading may be characterized as forward-looking, they were not adequately identified as forward-looking statements when made, and there were no meaningful cautionary statements identifying important facts that could cause actual results to differ materially from those in the purportedly forward-looking statements.

283. To the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, each of these Defendants had actual knowledge that the particular forward-looking statement was materially false or misleading. Defendants are liable for the statements pleaded because, at the time each of those statements was made, Defendants knew the statement was false, and the statement was authorized

and/or approved by an executive officer and/or director of Sprout Social who knew that such statement was false when made.

## X.     CLASS ACTION ALLEGATIONS

284.    Lead Plaintiff brings this action as a class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of all persons or entities that purchased or otherwise acquired Sprout Social securities between September 22, 2021 and May 2, 2024, inclusive (the "Class"), and were damaged thereby.  Excluded from the Class are Defendants, the officers and directors of Sprout Social at all relevant times, members of their immediate families, and their legal representatives, heirs, agents, affiliates, successors or assigns, Defendants' liability insurance carriers, and any affiliates or subsidiaries thereof, and any entity in which Defendants or their immediate families have or had a controlling interest.

285.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Sprout Social's shares were actively traded on the NASDAQ.  As of April 26, 2024, the Company had more than 49.8 million shares of Class A common stock outstanding. While the exact number of Class members is unknown to Lead Plaintiff at this time, and can only be ascertained through appropriate discovery, Lead Plaintiff believes that there are at least thousands of members of the proposed Class.  Record owners and other members of the Class may be identified from records maintained by the Company, or its transfer agent(s), and may be notified of this class action using a form of notice similar to that customarily used in securities class actions.

286.    Lead Plaintiff's claims are typical of the claims of the other members of the Class as all members of the Class were similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

287. Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Lead Plaintiff has no interests that conflict with those of the Class.

288. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a. whether Defendants violated the Exchange Act by the acts and omissions as alleged herein;

b. whether Defendants knew or recklessly disregarded that their statements and/or omissions were false and misleading;

c. whether documents, press releases, and other statements disseminated to the investing public and the Company's shareholders misrepresented material facts about the business, operations, and prospects of Sprout Social;

d. whether statements made by Defendants to the investing public misrepresented and/or omitted to disclose material facts about the business, operations, and prospects of Sprout Social;

e. whether the market price of Sprout Social shares during the Class Period was artificially inflated due to the material misrepresentations and failures to correct the material misrepresentations complained of herein; and

f. the extent to which the members of the Class have sustained damages and the proper measure of damages.

289. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the

damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this suit as a class action.

## XI. CLAIMS FOR RELIEF

### COUNT I

**For Violations of Section 10(b) of the Exchange Act and Rule 10b-5
Promulgated Thereunder Against Defendants**

290. Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

291. Defendants carried out a plan, scheme, and course of conduct that was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Lead Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Sprout Social shares; and (iii) cause Lead Plaintiff and other members of the Class to purchase Sprout Social shares at artificially inflated prices. In furtherance of this unlawful scheme, plan, and course of conduct, Defendants, and each of them, took the actions set forth herein.

292. Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of conduct that operated as a fraud and deceit upon the purchasers of the Company's shares in an effort to maintain artificially high market prices for Sprout Social shares in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

293.    Defendants, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Sprout Social's business, operations, and prospects, as specified herein. Defendants employed devices, schemes, and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Sprout Social's business, operations, and prospects, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Sprout Social and its business, operations, and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices, and a course of conduct of business that operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

294.    Each of the Individual Defendants' primary liability and controlling person liability, arises from the following facts: (i) each of the Individual Defendants was a high-level executive and/or director at the Company and a member of the Company's management team or had control thereof; (ii) each of the Individual Defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development, and reporting of the Company's business, operations, and prospects; (iii) each of the Individual Defendants enjoyed significant personal contact and familiarity with the other Defendants and was advised of and had access to, other members of the Company's management team, internal reports, and other data and information about the Company's financial condition and performance at all relevant times; and (iv) each of the Individual Defendants was aware of the

Company's dissemination of information to the investing public, which they knew and/or recklessly disregarded was materially false and misleading.

295.     Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Sprout Social's operating condition, business practices, and prospects from the investing public and supporting the artificially inflated and/or maintained price of its securities. As demonstrated by Defendants' overstatements and misstatements of the Company's business, operations, and prospects, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

296.     As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Sprout Social shares was artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants or upon the integrity of the market in which the stock trades, and/or in the absence of material adverse information that was known or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants, Lead Plaintiff and the other members of the Class purchased Sprout Social shares during the Class Period at artificially inflated prices and were damaged thereby.

297.     At the time of said misrepresentations and omissions, Lead Plaintiff and other members of the Class were ignorant of their falsity and believed them to be true. Had Lead Plaintiff

and the other members of the Class and the marketplace known of the truth regarding the problems that Sprout Social was experiencing, which were not disclosed by Defendants, Lead Plaintiff and other members of the Class would not have purchased their Sprout Social shares, or, if they had purchased such shares during the Class Period, they would not have done so at the artificially inflated prices that they paid.

298.    By virtue of the foregoing, Defendants each violated § 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

299.    As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## COUNT II

**For Violations of Section 20(a) of the Exchange Act
Against the Individual Defendants**

300.    Lead Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

301.    The Individual Defendants acted as controlling persons of Sprout Social within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions with the Company, participation in, and/or awareness of the Company's operations, and intimate knowledge of the false statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that Lead Plaintiff contends are false and misleading.  Each of the Individual Defendants was provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by

126

Lead Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

302. In particular, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

303. As set forth above, Defendants each violated § 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their position as controlling persons, the Individual Defendants are liable pursuant to § 20(a) of the Exchange Act. As a direct and proximate result of these Defendants' wrongful conduct, Lead Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's shares during the Class Period.

## XII. PRAYER FOR RELIEF

304. WHEREFORE, Lead Plaintiff prays for relief and judgment as follows:

a) Declaring this action to be a class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

b) Awarding all damages and other remedies available under the Securities Exchange Act in favor of Lead Plaintiff and all other members of the Class against Defendants in an amount to be proven at trial, including interest thereon;

c) Awarding Lead Plaintiff and the other members of the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

d) Awarding such other and further relief as this Court deems appropriate.

## XIII. JURY DEMAND

305. Lead Plaintiff demands a trial by jury.

Dated: January 24, 2025

Respectfully submitted,

COHEN MILSTEIN SELLERS & TOLL PLLC

By: */s/ Carol V. Gilden*
Carol V. Gilden (Bar No. 6185530)
190 South LaSalle Street
Suite 1705
Chicago, IL 60603
Tel.: (312) 629-3737
Email: cgilden@cohenmilstein.com

*Liaison Counsel for Lead Plaintiff*

SAXENA WHITE P.A.
David R. Kaplan (*pro hac vice* forthcoming)
505 Lomas Santa Fe Dr., Suite 180
Solana Beach, CA 92075
Tel.: (858) 997-0860
Email: dkaplan@saxenawhite.com

-and-

SAXENA WHITE P.A.
Steven B. Singer
Kyla Grant (*pro hac vice* forthcoming)
Joshua H. Saltzman (*pro hac vice* forthcoming)
10 Bank Street, Suite 882
White Plains, NY 10606
Tel.: (914) 437-8551
Email: ssinger@saxenawhite.com

-and-

SAXENA WHITE P.A.
Lester R. Hooker
Jonathan Lamet (*pro hac vice* forthcoming)
7777 Glades Road, Suite 300
Boca Raton, FL 33434
Tel.: (561) 394-3399
Email: lhooker@saxenawhite.com

jlamet@saxenawhite.com

*Lead Counsel for Lead Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on January 24, 2025, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send a Notice of Electronic Filing to all counsel of record.

COHEN MILSTEIN SELLERS & TOLL PLLC

By: */s/ Carol V. Gilden*
Carol V. Gilden (Bar No. 6185530)
190 South LaSalle Street
Suite 1705
Chicago, IL 60603
Tel.: (312) 629-3737
Email: cgilden@cohenmilstein.com