# Exhibit

# 1

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| RICHARD MUNCH, Individually and on Behalf of All Others Similarly Situated, | Case No.: 1:24-cv-03867 |
| | Hon. Jeffrey I. Cummings |
| Plaintiff, | <u>CLASS ACTION</u> |
| v. | |
| SPROUT SOCIAL, INC., JUSTYN HOWARD, RYAN BARRETTO, and JOE DEL PRETO, | |
| Defendants. | |
| CITY OF HOLLYWOOD POLICE OFFICERS' RETIREMENT SYSTEM, Individually and on behalf of all others similarly situated, | Case No.: 1:24-cv-05582 |
| | Hon. Jeffrey I. Cummings |
| Plaintiff, | <u>CLASS ACTION</u> |
| v. | Consolidated Cases |
| SPROUT SOCIAL, INC., JUSTYN HOWARD, RYAN BARRETTO, and JOE DEL PRETO, | |
| Defendants. | |

**DEFENDANTS' JOINT AMENDED MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS THE CONSOLIDATED CLASS ACTION COMPLAINT**

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ............................................................................. 1

BACKGROUND ................................................................................................... 4

    A.    The Company and Its Business................................................................ 4

    B.    Sprout Completes Its IPO and Expands Its Mid-Market and Enterprise Business. 5

    C.    Sprout Successfully Adheres to Its Stated Strategy – For Years ........................... 8

    D.    Sprout Supplements Its Growth Through Strategic Partnerships and Acquisitions 9

         1.    Salesforce Partnership................................................................... 10
         2.    Tagger Acquisition....................................................................... 10

    E.    Sprout Reaffirms Its Commitment to Mid-Market and Enterprise Business........ 11

    F.    A Short-Term Guidance Miss Amid a Successful Long-Term Strategy ............. 12

    G.    Plaintiffs' Action................................................................................. 13

ARGUMENT ...................................................................................................... 13

I.     PLAINTIFFS' 10B-5 CLAIM SHOULD BE DISMISSED................................... 13

    A.    The CAC Fails to Allege Any Actionable Misstatement Under Section 10(b).... 13

         1.    The CAC Fails to Plead Falsity. .................................................. 14
         2.    Statements Concerning Sprout's Go-To-Market Strategy ........................ 15
         3.    Statements Concerning the Length of Sprout's Sales Cycles................... 20
         4.    Statements Concerning Sprout's Ability to Service Mid-Market and Enterprise Clients................................................................................... 24
         5.    Statements Concerning the Salesforce Partnership.................................. 26

    B.    The Alleged Misstatements Are Inactionable as a Matter of Law....................... 29

         1.    Many of Defendants' Alleged Misstatements Are Inactionable Statements of Corporate Puffery or Optimism.......................................................... 29
         2.    Many of Defendants' Alleged Misrepresentations Are Inactionable Statements of Opinion or Belief. ....................................................... 31
         3.    Many of the Alleged Misstatements Are Forward-Looking Statements Protected by the PSLRA's Safe Harbor................................................. 34

    C.    The CAC Fails to Plead Scienter. .......................................................... 36

         1.    Plaintiffs' CW Allegations Do Not Plead Scienter................................. 37
         2.    Plaintiffs' Motive Allegations Do Not Plead Scienter............................. 41
         3.    Routine Departures of Non-Defendant Executives Bearing No Indicia of Fraud Do Not Support Scienter................................................................. 44
         4.    The CAC's Remaining "Must Have Known" Allegations Are Insufficient To Plead Scienter. ....................................................................... 45

    D.    The CAC Fails to Plead Loss Causation.......................................................... 47

i

II.     PLAINTIFFS' SECTION 20(A) CLAIM SHOULD BE DISMISSED .......................... 50

CONCLUSION.................................................................................................................... 50

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Arazie v. Mullane*,
2 F.3d 1456 (7th Cir. 1993) .....................................................................................23

*Babin v. Shchekin*,
2017 WL 403568 (N.D. Ill. Jan. 30, 2017)...............................................................14

*In re Career Educ. Corp. Sec. Litig.*,
2006 WL 999988 (N.D. Ill. Mar. 28, 2006)..............................................................38

*Caremark, Inc. v. Coram Healthcare Corp.*,
113 F.3d 645 (7th Cir. 1997) ....................................................................................47

*In re CBOE Volatility Index Manip. Antitrust Litig.*,
435 F. Supp. 3d 845 (N.D. Ill. 2020), *aff'd*, 42 F.4th 619 (7th Cir. 2022) ..............36

*Chandler v. Ulta Beauty, Inc.*,
2022 WL 952441 (N.D. Ill. Mar. 30, 2022)........................................................25, 29

*Chew v. Moneygram Int'l, Inc.*,
2024 WL 4346522 (N.D. Ill. Sept. 30, 2024) ................................................. *passim*

*Constr. Workers Pension Fund-Lake Cnty. & Vicinity v. Navistar Int'l Corp.*,
2014 WL 3610877 (N.D. Ill. July 22, 2014)........................................................28, 29

*Cornielsen* v. *Infinium Cap. Mgmt., LLC*,
916 F.3d 589 (7th Cir. 2019) ...............................................................................36, 46

*Coronel v. Quanta Cap. Holdings Ltd.*,
2009 WL 174656 (S.D.N.Y. Jan. 26, 2009) ..............................................................48

*In re Coty Inc. Sec. Litig.*,
2016 WL 1271065 (S.D.N.Y. Mar. 29, 2016) ...........................................................39

*Davis v. SPSS, Inc.*,
431 F. Supp. 2d 823 (N.D. Ill. 2006) ...................................................................29, 39

*DiLeo v. Ernst Young*,
901 F.2d 624 (7th Cir. 1990) ...............................................................................45, 46

*In re DraftKings Inc. Sec. Litig.*,
650 F. Supp. 3d 120 (S.D.N.Y. 2023)..................................................................27, 28

*In re Fairway Grp. Holdings Corp. Sec. Litig.*,
  2015 WL 4931357 (S.D.N.Y. Aug. 19, 2015), *report and recommendation adopted*, 2015 WL 5255469 (S.D.N.Y. Sept. 9, 2015).............................................32

*In re Fifth Third Bancorp Deriv. Litig.*,
  2023 WL 2429009 (N.D. Ill. Mar. 8, 2023)...............................................................47

*Francisco v. Abengoa, S.A.*,
  624 F. Supp. 3d 365 (S.D.N.Y. 2022)........................................................................44

*Glickenhaus & Co. v. Household Int'l, Inc*.,
  787 F.3d 408 (7th Cir. 2015), *reh'g denied* (July 1, 2015)....................................29

*Higginbotham* v. *Baxter Int'l, Inc.*,
  495 F.3d 753 (7th Cir. 2007) ............................................................................36, 38

*Hunter v. Elanco Animal Health Inc.*,
  2022 WL 3445173 (S.D. Ind. Aug. 17, 2022) ......................................................29, 41

*Johnson v. Tellabs, Inc.*,
  262 F. Supp. 2d 937 (N.D. Ill. 2003) ..................................................................35, 41

*Long Miao v. Fanhua, Inc.*,
  442 F. Supp. 3d 774 (S.D.N.Y. 2020)........................................................................27

*Makor Issues & Rights, Ltd. v. Tellabs Inc*.,
  513 F.3d 702 (7th Cir. 2008) ....................................................................................36

*Makor Issues & Rts., Ltd. v. Tellabs, Inc.*,
  437 F.3d 588 (7th Cir. 2006), *vacated and remanded on other grounds*, 551 U.S. 308 (2007)...............................................................................................31, 36

*In re Midway Games, Inc. Sec. Litig.*,
  332 F. Supp. 2d 1152 (N.D. Ill. 2004) ......................................................................31

*Omnicare v. Laborers Dist. Council Const. Indus. Pension Fund*,
  575 U.S. 175 (2015)............................................................................................32, 33

*Pension Tr. Fund for Operating Eng'rs v. Kohl's Corp*.,
  895 F.3d 933 (7th Cir. 2018) ....................................................................................46

*Phoenix Ins. Co. v. ATI Physical Therapy, Inc.*,
  690 F. Supp. 3d 862 (N.D. Ill. 2023) ..................................................................44, 45

*Pierrelouis v. Gogo, Inc.*,
  414 F. Supp. 3d 1164 (N.D. Ill. 2019) ................................................................17, 22

*Plumbers & Pipefitters Loc. Union No. 630 Pension-Annuity Tr. Fund v.*
  *Allscripts-Misys Healthcare Sols., Inc.*,
  778 F. Supp. 2d 858 (N.D. Ill. 2011) ............................................................31, 34

*Premier Cap. Mgmt., L.L.C. v. Cohen*,
  2003 WL 21960357 (N.D. Ill. Aug. 15, 2003) ............................................. *passim*

*Pugh* v. *Tribune Co.*,
  521 F.3d 686 (7th Cir. 2008) ...............................................................36, 50

*Ret. Sys. v. Anixter Int'l, Inc.*,
  2011 WL 1303387 (N.D. Ill. Mar. 31, 2011).................................................5, 43

*Ret. Sys. v. Anixter Int'l, Inc.*,
  2012 WL 1068761 (N.D. Ill. Mar. 29, 2012).....................................25, 40, 42, 43

*Ret. Sys. v. Hospira, Inc.*,
  2013 WL 566805 (N.D. Ill. Feb. 13, 2013) ......................................................38

*Ret. Sys. v. MGIC Inv. Corp.*,
  2010 WL 5095294 (E.D. Wis. Dec. 8, 2010), *aff'd sub nom. Fulton Cnty.*
  *Emps. Ret. Sys. v. MGIC Inv. Corp.*, 675 F.3d 1047 (7th Cir. 2012)...................40

*Ret. Sys. v. PrivateBankcorp, Inc.*,
  2011 WL 5374095 (N.D. Ill. Nov. 3, 2011) ......................................................41

*Roth v. OfficeMax, Inc.*,
  2006 WL 2661009 (N.D. Ill. Sept. 13, 2006) ...................................................31

*Societe Generale Sec. Servs., GbmH v. Caterpillar, Inc.*,
  2018 WL 4616356 (N.D. Ill. Sept. 26, 2018) ...................................................47

*St. Lucie Cty. Fire Dist. Pension Trust Fund v. Motorola, Inc.*,
  2011 WL 814932 (N.D. Ill. Feb. 28, 2011) ......................................................29

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
  551 U.S. 308 (2007).....................................................................................36

*In re Tibco Software, Inc.*,
  2006 WL 1469654 (N.D. Cal. May 25, 2006) ...................................................35

*Tricontinental Indus., Ltd. v. PricewaterhouseCoopers, LLP*,
  475 F.3d 824 (7th Cir. 2007) .........................................................................48

*Vallabhaneni v. Endocyte, Inc.*,
  2016 WL 51260 (S.D. Ind. Jan. 4, 2016)....................................................37, 44

*Vrana v. FedEx Freight, Inc.*,
  638 F. Supp. 3d 927 (C.D. Ill. 2022) ........................................................................5

*W. Palm Beach Firefighters' Pension Fund v. Conagra Brands, Inc.*,
  495 F. Supp. 3d 622 (N.D. Ill. 2020), *aff'd sub nom. Nat'l Elevator Indus.*
  *Pension Fund v. Conagra Brands, Inc.*, 2022 WL 1449184 (7th Cir. May 9,
  2022) ...................................................................................................................35, 46

*Wade v. WellPoint, Inc.*,
  892 F. Supp. 2d 1102 (S.D. Ind. 2012) ..................................................................43

*Zerger v. Midway Games, Inc.*,
  2009 WL 3380653 (N.D. Ill. Oct. 19, 2009)...........................................................29

**Statutes**

15 U.S.C.A. § 78t(a) ..........................................................................................................50

15 U.S.C. § 78t-1 ...........................................................................................2, 13, 25, 50

15 U.S.C. § 78u–4(b)(1)(B) ..............................................................................................14

Private Securities Litigation Reform Act of 1995 ............................................... *passim*

**Other Authorities**

17 C.F.R. § 240.10b-5......................................................................................2, 13, 43, 50

17 C.F.R. § 240.10b-5-1 ...................................................................................................41

Fed. R. Civ. P. 9(b) ...........................................................................................................36

Fed. R. Civ. P. 12(b)(6).......................................................................................................5

G2, *Best Software for Enterprise Businesses* (2024), *available at*
  https://www.g2.com/best-software-companies/2024/enterprise................................9

## PRELIMINARY STATEMENT

On May 2, 2024, Sprout Social, Inc., a global social media management company ("Sprout" or the "Company"),[1] suffered a 40.1% drop in its stock price after announcing that its first-quarter 2024 revenues missed Wall Street expectations (by less than half a percent) and lowering guidance. This shortfall was prompted by tightening demand in the industry and intensified by a longstanding – and ultimately successful – strategic realignment that Sprout adopted several years earlier, designed to prioritize high-profitability and more durable customers. That strategic shift – from a focus that encompassed small-scale customers who contributed modest revenue to "Enterprise" customers (those with over 1,000 employees) – was plainly disclosed to investors, as was the risk that shifting strategic gears could impact short-term results in return for the long-term benefits of building a strong Enterprise customer base.

From the start, Sprout expressed confidence in its ability to attract and service Enterprise customers. That confidence proved justified. Sprout increased its revenue in every successive quarter since its December 2019 IPO and surpassed analyst revenue and earnings-per-share (EPS) estimates almost as often, attributable in large part to its growing Enterprise base, which now comprises a substantial portion of its revenue. And its software was routinely recognized as a top software product for Enterprise customers by G2 – a prominent third-party software review platform that evaluates products based solely on user feedback – throughout the Class Period.

But in early 2024, Sprout determined that – precisely because of its success in the Enterprise segment (along with what proved to be macroeconomic headwinds affecting that segment) – it would refine its operations to adjust to a meaningfully different customer

---

[1] Unless otherwise indicated, capitalized terms have the same meaning as provided in the Consolidated Class Action Complaint for Violations of the Federal Securities Laws (the "CAC," ECF No. 40). References to paragraphs in the CAC are provided as "CAC ¶__."

composition. This macro-driven setback was not limited to Sprout; the software industry at large struggled in the same time period, with Sprinklr – a Sprout competitor mentioned no fewer than 41 times in the CAC – likewise missing revenue expectations and revising its own growth targets due to macroeconomic headwinds and intensifying competition. Nevertheless, this lawsuit predictably followed the Company's stock drop, asserting far-fetched and expansive claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and Rule 10b-5 on behalf of a putative class of Sprout stockholders.

The crux of the allegations in the CAC is that the Defendants engaged in a four-year fraud, during which they overstated the effectiveness of Sprout's inbound sales model and capabilities of its platform with respect to Enterprise customers, which artificially inflated Sprout's stock. Plaintiffs' claims are severely flawed.

At the outset, Plaintiffs' entire case rests on a nonsensical theory: that Sprout's management secretly pursued a strategy it knew could not succeed for nearly two and a half years. Its absurdity aside, Plaintiffs' theory also flies in the face of four straight years in which, entirely consistent with Defendants' statements, the Company's strategy ***did*** successfully acquire and retain Enterprise customers, all while earning unparalleled kudos for its software in Enterprise-specific rating systems. In fact, the CAC is merely a concocted conspiracy, with Plaintiffs cherry-picking and mischaracterizing Defendants' public statements while ignoring Sprout's actual performance history and its disclosures of the very risks that materialized.

Their allegations, riddled with inaccuracy and inconsistency, fall far short the heightened pleading requirements imposed by the Private Securities Litigation Reform Act of 1995 ("PSLRA") and must be dismissed for at least three reasons:

*First*, the CAC fails to adequately allege any actionable misstatement of material fact. To begin with, Plaintiffs cannot plead that the challenged statements – most of which address Sprout's ability to acquire, retain, and service Enterprise customers – were false at the time they were made. Plaintiffs' principal support for the purported falsity of these representations consists of generalized statements from former low-level Sprout sales representatives who provide zero actual, particularized facts or data to refute a single one of these representations. As for statements anticipating the future results of Sprout's Salesforce partnership (*i.e.*, the quantum of former Salesforce customers that would convert to the Sprout platform), Plaintiffs hang their hat on a single short-seller report and a "confidential witness" ("CW") who only repeats rumors from his former colleagues. None of these sloppy and often pejorative-filled allegations even approach clearing the PSLRA's high hurdle for establishing falsity. In any event, even if Plaintiffs could plead falsity, Defendants' statements touting Sprout's business model and future prospects are textbook examples of corporate puffery, statements of opinion and/or forward-looking statements protected by the PSLRA safe harbor, all inactionable as a matter of law.

*Second*, Plaintiffs fail to plead scienter. The CAC relies primarily on 15 CWs consisting of former low-level employees who (i) are not identified with sufficient detail to serve as reliable sources, (ii) are not alleged to have ever worked with, or, in all but one instance, to have directly interacted with, any Individual Defendant, and (iii) would have no insight into Defendants' state of mind. Even before the "discount" ascribed to CWs, Plaintiffs' allegations fall far short of establishing a strong inference of fraudulent intent. Equally unavailing are Plaintiffs' reliance on (a) "motive" allegations based on certain Individual Defendants' stock trades, which were either effected under normal-course 10b5-1 trading plans and/or consistent with prior trading patterns (and often did not even exploit the purported "corrective disclosures"); (b) the "core operations"

theme, as this Circuit has long rejected scienter based on high-ranking executive positions; (c) two routine executive departures across a nine-month span before the final alleged corrective disclosure; and (d) stray "must have known" allegations based on speculation and not particularized allegations of fact as required by the PSLRA.

**Third**, Defendants fail to allege loss causation. The alleged "corrective disclosures" – relating to earnings results and Sprout's strategic decision to refine certain aspects of its business model – bear no relation to the purported misstatements, which center on the Company's overarching ability to attract and service Enterprise customers. Absent a well-pled connection between corrective disclosures and alleged misstatements, there is no basis to infer that the alleged fraud (the misstatements) caused Plaintiffs' injury (the ensuing stock drop), and Plaintiffs cannot plead loss causation.

For these reasons and those set forth below, the CAC should be dismissed with prejudice.

## BACKGROUND

### A. The Company and Its Business

Sprout is a global social media management and analytics company that provides comprehensive solutions including publishing and engagement functionality, customer care, influencer marketing, advocacy and AI-powered business intelligence. *See* CAC ¶1.[2] Sprout's customers can broadly be categorized into three buckets:

1. Small and medium-sized businesses (fewer than 50 employees) ("SMBs"). SMBs are a high-volume segment with lower average contract values (limiting their profit potential) and a high rate of turnover or "churn."

2. "Enterprise" customers (entities with 1,000 or more employees). Enterprise customers offer significant profit potential because they have higher average contract values (due to buying more licenses for more expensive plans) and lower rates of

---

[2] The Individual Defendants—Messrs. Barretto, Del Preto, Howard, and Rechel—are, respectively, Sprout's current CEO, current CFO, former CEO, and former V.P. of Investor Relations. CAC ¶¶24–27.

churn.  They are fewer in number than SMBs and employ a more rigorous software and services vendor selection process.

3. "Mid-Market" customers (entities with 50 to 999 employees).  These bridge the gap between SMBs and Enterprise and have diverse profiles; some emulate SMBs while others operate (and purchase software and services) more like Enterprise.

Initially, as a rising but modestly-sized startup, Sprout mainly attracted SMBs.  But as the Company expanded, its Mid-Market and Enterprise customer base grew as well.  *See id.*  While these segments still comprised a minority of Sprout's total customers by number at the time of its IPO, they generated an outsized portion of revenue and exhibited far less churn than SMBs: once they began using Sprout's services.  *See id.*  Recognizing this, in 2019, Sprout shifted its strategic focus to attracting more Mid-Market and Enterprise clients, based on the straightforward premise that higher-paying, long-term customers were preferable.  *See id.*; *see also* Ex. 1 at 7 (Feb. 26, 2020 Q4 2019 Earnings Call Transcript) (discussing focus on Mid-Market and Enterprise clients).[3]

## B.    Sprout Completes Its IPO and Expands Its Mid-Market and Enterprise Business

Sprout went public on December 12, 2019 and continued to prioritize building out its Mid-Market and Enterprise customer base.  This strategy and its potential financial implications were fully disclosed to the market.  For example, Sprout's 2019 10-K, issued within three months of its IPO, disclosed "substantial growth" in Mid-Market and Enterprise customers, but cautioned that this expansion could result in longer, more volatile sales cycles and affect financial results:

> If we are successful in expanding our customer base to include more enterprise customers, ***our sales cycles may lengthen*** and become less predictable, ***which, in turn, may adversely affect our financial results***.

---

[3] Exhibits are referred to herein as "Ex. __."  In deciding a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the Court may consider documents incorporated into the CAC by reference and matters of public record of which judicial notice can be taken, including documents filed with the SEC. *Vrana v. FedEx Freight, Inc.*, 638 F. Supp. 3d 927, 929 (C.D. Ill. 2022); *Garden City Emp.s' Ret. Sys. v. Anixter Int'l, Inc.*, 2011 WL 1303387, at *12 (N.D. Ill. Mar. 31, 2011).

Ex. 2 at 6, 33 (2019 Form 10-K). In the earnings call, Mr. Barretto echoed that Sprout had "seen a lot of progress and demand" in the "[M]id-[M]arket and enterprise space." Ex. 1 at 12.

The Company reiterated this strategy quarter after quarter. In Sprout's May 6, 2020 Q1 2020 earnings call, a William Blair analyst alluded to Sprout's pre-pandemic pivot toward larger customers and asked if that trend was evolving with the onset of Covid-19. *See* Ex. 3 at 14 (May 6, 2020 Q1 2020 Earnings Call Transcript). Mr. Barretto confirmed that Enterprise growth "continue[s] to be [an] area[] of strength for us and [an] area[] of focus," and Mr. Howard added that Sprout was "align[ing] resources around what we think is a heightened opportunity" in the "enterprise and even the [M]id-[M]arket" space. *Id.*

On the next earnings call, Messrs. Del Preto and Barretto reiterated the Company's focus on Enterprise, noting that Sprout was "selectively accelerating hiring with a focus on the enterprise and Mid-Market segments" and had "seen really strong attachment rates, especially in our [M]id-[M]arket and [E]nterprise space." Ex. 4 at 8, 11 (Aug. 5, 2020 Q2 2020 Earnings Call Transcript). Asked about the potential impact of the pandemic – and especially the ubiquity of online, remote work – Mr. Barretto advised that Sprout "certainly saw acceleration" in its Mid-Market and Enterprise segments. *Id.* at 16.

Sprout continued to reiterate this message throughout 2021 and 2022. As Mr. Howard noted at the September 22, 2021 Inaugural Investor Day ("September 2021 Investor Day"), Sprout was "doubling down on the success that we've seen in the [M]id-[M]arket [E]nterprise [sector]." Ex. 5 at 6 (Sept. 22, 2021 Inaugural Investor Day Transcript). Then, on the Company's November 2, 2021 Q3 2021 earnings call, Mr. Howard stated that Sprout was "focused in applying resources, both from marketing and sales, toward the [M]id-[M]arket [E]nterprise and those larger deals and as you saw in the shift of – the mix shift around the large deal volume that we saw this quarter."

Ex. 6 at 10 (Nov. 2, 2021 Q3 2021 Earnings Call Transcript). At the same time, Mr. Del Preto cautioned to "keep in mind for your models, we have historically seen many large [E]nterprise customers sign in Q4 with invoicing terms beginning in Q1, which has created some modest seasonal headwinds." *Id.* at 8. Similarly, on the February 22, 2022 Q4 2021 earnings call, Mr. Del Preto explained that Sprout continued to "accelerate our pace of hiring across both our sales and marketing teams with an emphasis on content marketing and SEO on the marketing side and our [M]id-[M]arket [E]nterprise and growth sales teams" and noted that "our strong [E]nterprise momentum [] could lead to greater Q4 seasonality in years ahead." Ex. 7 at 8 (Feb. 22, 2022 Q4 2021 Earnings Call Transcript).

Sprout was equally clear about its sales strategy – also referred to as its "go-to-market model" (*see e.g.*, Ex. 7 at 7) – vis-à-vis Mid-Market and Enterprise customers. In its first earnings call on February 26, 2020, Sprout described the distinguishing features of its "product-led" approach. Ex. 1 at 8. Competitors, it explained, provided only "demos" of their products prior to purchase; customers could only access the full suite of features – and begin onboarding and training personnel – after they entered a contract, leading to "long sales cycles, customization and long deployments." *Id.* at 7. By contrast, Sprout's "product-led" (*id.* at 8) approach gave prospective clients a ***full-access*** trial period prior to purchase, letting them familiarize themselves (and their personnel) with the platform in advance and streamlining post-purchase implementation.

One component of Sprout's approach, colloquially referred to as a "secret weapon" (a "secret" that's openly and publicly discussed by Sprout executives), is a free, thirty-day trial of Sprout's platform for prospective customers, which, as noted above, grants full access prior to purchase. Ex. 3 at 7. But contrary to Plaintiffs' assertion in the CAC (*see e.g.*, CAC ¶150), the

7

trial is not unique to inbound sales efforts: it is offered to any prospective client regardless of origin and remains a key feature of Sprout's current go-to-market strategy.

Sprout also differentiated itself through an "inbound" sales strategy, successfully attracting prospective customers to its website (and free trial sign-up) via organic and paid marketing content and search engine optimization. It maintained that strategy post-IPO, as SMBs then accounted for a significant portion of Sprout's client base. During Sprout's February 26, 2020 Q4 2019 earnings call, Mr. Barretto noted that for "SMB[s] and lower in the market[,] [the] inbound funnel is incredibly valuable to us." Ex. 1 at 13. At the same time, Sprout also began ramping up its "outbound" sales efforts in early 2020 in connection with its Enterprise focus. As Mr. Barretto noted in Sprout's November 9, 2020 Q3 2020 earnings call:

> [Sprout] saw a huge opportunity in [E]nterprise. ***We shifted some of our resources both from a marketing perspective and an outbound prospecting perspective to focusing on [E]nterprise.*** We got to the gates really fast [] hiring our [E]nterprise reps. And we are just continuing to see the dividends pay off there.

Ex. 8 at 15 (Nov. 9, 2020 Q3 2020 Earnings Call Transcript).

### C. Sprout Successfully Adheres to Its Stated Strategy – For Years

Apart from the favorable economic terms that accompanied its Enterprise business line, Sprout was confident that it could attract – and that its platform could capably serve – large customers. Thus, between 2021 and 2023, the Individual Defendants expressed their confidence in Sprout's ability to leverage its platform and sales function to build its Enterprise base.

That belief was borne out. From 2021 through 2023, Sprout increased revenue in each successive quarter and beat analyst revenue and EPS estimates more than 90% of the time, mainly because of its ability to attract large customers to its platform. At the September 2021 Investor Day, Sprout disclosed a 30% year-over-year increase in client conversion rates, including in the

Mid-Market and Enterprise spaces. Ex. 5 at 15–16, 18. Likewise, on the November 2, 2021 Q3 2021 earnings call, Mr. Howard noted Sprout's addition of a "record number" of customers contributing over $10,000 and $50,000 in annualized recurring revenue ("ARR") – a metric that indicates Sprout's ability to attract and scale with its largest customers – and its "outsized momentum in the mid-market and enterprise segments, which are now collectively approaching 70% of our ARR." Ex. 6 at 4–5. That success continued in 2022: at the August 11, 2022 Canaccord Genuity Growth Conference, Mr. Del Preto noted that Mid-Market and Enterprise clients amounted to "65% to 70% of our business now combined[,] pretty evenly split[.] Enterprise is a little bit higher." Ex. 9 at 5 (Aug. 11, 2022 Canaccord Genuity Growth Conference Transcript). And on the November 3, 2022 Q3 2022 earnings call, Mr. Howard disclosed the Company's "40% year-over-year growth in customers spending $10,000 or more in ARR [and] 76% year-over-year growth in customers spending $50,000 or more in ARR[.]" Ex. 10 at 4 (Nov. 3, 2022 Q3 2022 Earnings Call Transcript).

Beyond the numbers, Sprout's belief in its platform was validated externally: industry outlets have lauded the Company's capabilities based on customer feedback. In 2024 – when Plaintiffs allege Sprout had reached the apex of its futility with Enterprise clients – G2, a platform for finding and reviewing software and services based on real user feedback, ranked Sprout Social #5 on its list of Best Products for Enterprise (Top 50) based on user reviews of over 800 eligible software products. Ex. 11 at 3–4 (G2 Best Software for Enterprise Business for 2024).[4]

### D.    Sprout Supplements Its Growth Through Strategic Partnerships and Acquisitions

Meanwhile, in 2022 and 2023, Sprout bolstered its organic sales efforts with strategic partnerships and acquisitions to strengthen its Mid-Market and Enterprise presence. These

---

[4] *See* https://www.g2.com/best-software-companies/2024/enterprise.

included a partnership with Salesforce, a cloud-based Customer Relationship Management ("CRM") platform, and a merger with Tagger Media, Inc. ("Tagger"), an end-to-end influencer marketing platform.

### 1. Salesforce Partnership

Having discontinued its own social media management software (Social Studio), Salesforce partnered with Sprout in 2022 to make Sprout the preferred social media management solution for Salesforce customers and facilitate their migration to the Sprout platform. CAC ¶51. At the time, Sprout believed that could potentially convert many of the 3,000 to 4,000 estimated Social Studio of Salesforce's estimated 200,000-plus customers. *Id.* ¶¶51–53; *see* Ex. 9 at 8 (Mr. Del Preto noting that Sprout "estimate[s] they have between 3,000 to 4,000 Social Studio customers. … [W]e think it's a pretty large opportunity"); Ex. 12 at 7 (May 2, 2023 Q1 2023 Earnings Call Transcript) ("When [Sprout] announced [its] partnership [with Salesforce] … [it] shared an estimate of 3,000 to 4,000 Social Studio customers.").

Within two years, migrating Salesforce customers – the incidence and impact of which Sprout consistently disclosed (*see* CAC ¶¶51–53) – were contributing nearly 15% of Sprout's new business revenue. *See* Ex. 13 at 6 (May 2, 2024 Q1 2024 Earnings Call Transcript). The partnership continues to generate value to this day. *See* Ex. 14 at 5 (Feb. 25, 2025 Q4 2024 Earnings Call Transcript) (Mr. Barretto noting that "[o]ur partner ecosystem also continues to evolve with deepening integrations like Salesforce").

### 2. Tagger Acquisition

A niche industry before, influencer marketing ballooned during the Covid-19 pandemic. As Sprout would disclose, this prompted the Company to actively explore potential opportunities to enter the space in 2022. That opportunity materialized in August 2023, when Sprout acquired Tagger, a leading influencer marketing company. CAC ¶7; Ex. 15 at 5, 8 (Aug. 3, 2023 Q2 2023

Earnings Call Transcript) (disclosing Tagger acquisition). Market reaction was positive, with Sprout's stock price exceeding its pre-acquisition value within a month of closing. *See* Ex. 16 at 1 (Feb. 20, 2024 Q4 2023 Earnings Call Transcript) (stock price). Analysts likewise praised Sprout's decision to expand its product offerings to this important adjacent market. William Blair opined that the Tagger deal "g[ave] Sprout an advantage over competitors in the space, particularly in the enterprise, as the combination of influencer marketing and organic social in one offering appeals to customers looking for a broader social platform." Ex. 17 at 2 (Nov. 3, 2023 Williams Blair Report). Baird similarly noted Sprout's resulting ability to bring "a differentiated offering to the market." Ex. 18 at 1 (Nov. 3, 2023 Baird Equity Research Report).

### E. Sprout Reaffirms Its Commitment to Mid-Market and Enterprise Business

As these growth initiatives took shape, Sprout continued prioritizing Mid-Market and Enterprise clients. This focus was consistently disclosed in the marketplace. On Sprout's February 21, 2023 earnings call, Mr. Del Preto noted that Sprout was adding Enterprise and Mid-Market business through its "strategic alignment around [its] most sophisticated customers[.]" Ex. 19 at 9 (Feb. 21, 2023 Q4 2022 Earnings Call Transcript). At the next earnings call (on May 2, 2023), Mr. Howard echoed the sentiment, noting that Sprout was "aligning around an incredibly strong core business while deprioritizing the long tail of low-value business" (*i.e.*, SMBs). Ex. 12 at 4.

The transition carried into 2024. On its February 20, 2024 earnings call for Q4 2023, Sprout explained that its new, Enterprise-focused customers "tend to be on our more expensive plans over longer durations." *Id.* at 11. Mr. Del Preto added that Sprout's "expanding enterprise" client base would "make our cash flow more seasonally weighed" than before, when the SMB-weighted customer base produced rapid sales cycles. *Id.* at 8. He also clarified that the Tagger acquisition, which was still in the integration phase, "wasn't a significant driver" of the

new business. *Id.* at 13. Mr. Barretto reiterated Sprout's de-emphasis on SMB businesses in favor of Mid-Market and Enterprise clients, where investments were being concentrated. *Id.* at 12–13.

### F. A Short-Term Guidance Miss Amid a Successful Long-Term Strategy

As Sprout's public disclosures made clear, 2023–2024 marked an inflection point for the Company's transition to Enterprise and Mid-Market customers. In Q1 2024, Sprout missed revenue expectations in by less than 0.5%, prompting a downward revision in earnings guidance based on reduced growth expectations. *See* Ex. 13 at 1 (noting actual revenue was 0.43% below consensus estimate). Sprout attributed this to challenges in implementing new sales team structures in connection with its reorientation to Enterprise and Mid-Market clients – an explanation entirely consistent with its prior disclosures about increased investment in outbound sales, the still-nascent Tagger integration, and its transition to a more seasonal business model. *See, e.g.*, Ex. 7 at 8. (Mr. Del Preto disclosing that Sprout had "accelerate[d] our pace of hiring across both our sales and marketing teams with an emphasis on content marketing and SEO on the marketing side and our mid-market enterprise and growth sales teams" and that "our strong enterprise momentum [] could lead to greater Q4 seasonality in years ahead"); Ex. 16 at 13 (Messrs. Del Preto and Barretto noting, respectively, that Tagger "wasn't a significant driver" of business to date and that Tagger integration was "continu[ing] into this year").

Market reaction was harsh, with Sprout's stock falling approximately 40% on May 3, 2024 following earnings results. This was in line with recent trends: Sprinklr, a competitor, suffered a 34% stock drop preceding Sprout's Q1 2024 results and a further 15% decline post-announcement for similar reasons. Still, the overarching benefits of Sprout's strategic shift have endured. Sprout has continually and materially grown both its annual revenues and its large customer base: in fiscal year 2022 and 2023, respectively, the number of customers contributing over $50,000 in ARR grew 59% and 44%, respectively. Ex. 20 at 64 (2022 Form 10-K); Ex. 21 at 68 (2023 Form 10-K).

And it has sustained its positive performance, beating Wall Street expectations in seven of the last eight quarters – with one 0.5% miss in Q1 2024, when it significantly *exceeded* EPS estimates – despite macroeconomic headwinds and intensifying competition affecting the broader software and services industry.[5]

### G. Plaintiffs' Action

This action followed about two weeks later. The CAC asserts claims under Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5, alleging that the Individual Defendants made false and misleading statements regarding, in principal part: (i) the effectiveness of Sprout's inbound sales model; (ii) the capabilities of its software platform for Enterprise adoption; (iii) the anticipated benefits of its partnership with Salesforce; (iv) the propriety of certain financial metrics; and (v) financial guidance. Plaintiffs assert that these misstatements inflated Sprout's stock price until purported "corrective disclosures" on May 2, 2023, August 3, 2023 and May 2, 2024 announcing disappointing financial results.

This is Defendants' opening brief in support of their motion to dismiss the CAC.

## ARGUMENT

## I. PLAINTIFFS' 10B-5 CLAIM SHOULD BE DISMISSED

### A. The CAC Fails to Allege Any Actionable Misstatement Under Section 10(b).

The PSRLA's strict pleading standards require more than identifying misstatements. To avoid dismissal of a Section 10(b) claim, Plaintiffs must plead particularized facts showing "the

---

[5] *See* Ex. 22 at 1 (Feb. 25, 2025 Q4 2024 Earnings Call Transcript) (exceeding consensus estimate by 0.33%); Ex. 23 at 1 (Nov. 7 2024 Q3 2024 Earnings Call Transcript) (exceeding consensus estimate by 0.58%); Ex. 24 at 1 (Aug. 1, 2024 Q2 2024 Earnings Call Transcript) (exceeding consensus estimate by 0.70%); Ex. 13 at 1 (May 2, 2024 Q1 2024 Earnings Call Transcript) (actual revenue 0.43% below consensus estimate; actual EPS of 0.10 exceeded consensus estimate of 0.01); Ex. 16 at 1 (Feb. 20, 2024 Q4 2023 Earnings Call Transcript) (exceeding consensus estimate by 3.18%); Ex. 25 at 1 (Nov. 2, 2023 Q3 2023 Earnings Call Transcript) (exceeding consensus estimate by 1.57%); Ex. 15 at 1 (Aug. 3, 2023 Q2 2023 Earnings Call Transcript) (exceeding consensus estimate by 0.75%); Ex. 12 at 1, 8 (May 2, 2023 Q1 2023 Earnings Call Transcript) (consensus estimate of $75.07 million and actual revenue of $75.2 million).

reason or reasons why [each] statement is misleading[.]" 15 U.S.C. § 78u–4(b)(1)(B).  As this Court has aptly explained, "claiming that a particular statement was false or misleading is not enough; ***plaintiffs must explain, with particularity, the factual basis for their assertion that the statement was false or misleading.***"  *Chew v. Moneygram Int'l, Inc.*, 2024 WL 4346522, at \*4, \*15 (N.D. Ill. Sept. 30, 2024) (emphasis added); *accord Premier Cap. Mgmt., L.L.C. v. Cohen*, 2003 WL 21960357, at \*2–3 (N.D. Ill. Aug. 15, 2003); *Babin v. Shchekin*, 2017 WL 403568, at \*8–9 (N.D. Ill. Jan. 30, 2017) ("[I]t is not sufficient to merely claim that a statement was false or misleading. … [P]laintiffs must state with particularity the facts—known to the speaker at the time—that render the statement false or misleading.") (citation and internal quotations omitted).

Despite weighing in at 128 pages and 305 paragraphs, the CAC is long on generalized and often pejorative disputations of Defendants' public statements and strikingly short on well-pled facts.  Dispositively, it lacks ***any*** facts – particularized or otherwise – showing that a single challenged statement was false when made, and judicially noticeable information and documents incorporated by reference support the opposite conclusion.  Even if it pled such facts, the alleged misrepresentations would fail to support a Section 10(b) claim because they constitute inactionable "puffery," opinions, and/or forward-looking statements that fall within the PSLRA's safe harbor.

### 1.     The CAC Fails to Plead Falsity.

The CAC characterizes 37 public statements across 31 months as purportedly misleading. Those statements fall into four categories relating to Sprout's performance and operations:[6]

- Statements relating to the effectiveness of Sprout's go-to-market model in acquiring Enterprise customers (**Stmts. 2, 3, 4, 5, 6, 7, 9, 10, 14, 15, 16, 19, 23, 24, 26, 28, 30, 33, 34, 36**);

---

[6] These identifying numbers are also used in Appendix A, which, for the Court's convenience, lists each of the alleged misstatements, the corresponding paragraph(s) of the CAC, the source of the statement (SEC filings, press releases, earnings calls, and investor presentations), safe harbor statements, and the ground(s) on which it should be dismissed.

- Statements relating to the length of Sprout's sales cycle for acquiring Enterprise customers (**Stmts. 1, 2, 4, 9, 10, 13, 17, 18, 19, 21, 22, 24, 25, 26, 31, 33**);

- Statements relating to the suitability of Sprout's product and infrastructure for Enterprise customers (**Stmts. 1, 2, 3, 4, 6, 7, 8, 9, 10, 11, 13, 14, 15, 16, 17, 18, 19, 22, 23, 26, 27, 33, 34**); and

- Statements about the success of Sprout's partnership with Salesforce in helping Sprout acquire additional Enterprise customers (**Stmts. 12, 20, 25, 29, 35, 37**).

As described below, the CAC fails to adequately plead that any of the statements in these categories was false at the time they were made (or ever).

### 2. Statements Concerning Sprout's Go-To-Market Strategy

A central tenet of the CAC is that Defendants' positive statements about Sprout's "inbound" sales model and thirty-day free product trial misrepresented the effectiveness of Sprout's go-to-market strategy for acquiring Enterprise customers. In particular, Plaintiffs allege that Defendants falsely claimed that Sprout's go-to-market model (i) differentiated Sprout from its competitors, (ii) gave it a strategic advantage, (iii) facilitated more efficient customer acquisition, and (iv) allowed Sprout to secure Enterprise customers monthly. The CAC repeatedly calls out statements that this inbound model and thirty-day free trial, as opposed to a more expensive and labor-intensive "outbound" model, was the "secret sauce" through which Sprout acquired many of its Enterprise customers. These included:

- Sprout's inbound trial model was a "powerful differentiator" in the Enterprise space, and the "secret sauce" that enabled Sprout to win Enterprise customers;

- The free trial permitted Enterprise customers to quickly "see value" in Sprout's product;

- Sprout is "90% inbound with [its] trial model," the model is a "driver" of growth and reason for Sprout being "efficient on the go-to-market side";[7]

---

[7] Ex. 26 at 5 (Dec. 7, 2021 Barclays Global Technology, Media, and Telecommunications Conference Transcript); *see also* Ex. 27 (Jan. 12, 2022 Annual Needham Virtual Growth Conference Transcript).

- The model is "highly disruptive to [Sprout's] competitive set that typically sell on demos and much longer sales cycles";

- "[M]any of the deals that [Sprout is] closing every single quarter, even in the [E]nterprise, start with [thirty-day free trial] customers in the product";

- The Company's thirty-day trial go-to-market strategy allowed it to close Enterprise deals "every single month";

- "[T]he same strategy in SMB is working even better in the [E]nterprise";[8]

- "[Defendants] feel really great about the win rates that we've seen within that space"; and

- Sprout's "go-to-market strategy is working."

CAC ¶¶3, 8, 11, 42, 46, 49, 50, 129, 140, 150, 151, 174, 175, 176, 177, 180, 182, 185, 190, 197, 202, 204, 220, 227, 229, 258. Their theory presupposes that Sprout's go-to-market strategy (i) relied solely on internet advertising to draw prospective customers to its website or call center (the "inbound" portion), and (ii) offered ***those*** customers the thirty-day free trial.

Plaintiffs purport to show that these statements were false with general and purely qualitative statements from CWs (mostly low-level former Sprout representatives),[9] who claim:

- Sprout's inbound trial strategy as "***very ineffective***" and "***not something that was successful for [E]nterprise***" (emphases added);

- Fortune 500 companies simply did not use free trials;

- "[I]nbound leads fell off because we were no longer focused on SMB" and Sprout needed to create vertical sales teams to develop an outbound-oriented model;

- By the end of 2022, Sprout's inbound pipeline was "drying up"; and

- Sales collapsed[10] around the winter of 2022–23 following Sprout's price increases.

---

("[W]e're 90% inbound and even up in the mid-market enterprise[.]"); Ex. 28 at 3 (Dec. 7, 2022 Barclays Global Technology, Media, and Telecommunications Conference Transcript).
[8] Ex. 29 at 14 (June 9, 2022 Stifel Cross Sector Insight Conference Transcript).
[9] In fact, a sizeable portion of the CWs held the lowest positions at Sprout on their respective teams.
[10] The CAC says three CWs confirmed that by January 2023 "Sprout's inbound pipeline was 'drying up'" (CAC ¶214) – such that the inbound model had collapsed and Sprout's sales were plummeting. But ***none***

*Id.* ¶¶91-92, 99-100, 108, 138, 177, 181, 183, 186, 191, 194, 198, 201, 204, 207, 211, 214, 219, 221, 249.

None of these general statements is sufficient to establish falsity.  *See Pierrelouis v. Gogo, Inc.*, 414 F. Supp. 3d 1164, 1173 (N.D. Ill. 2019) (requiring "particularized allegations" to establish the falsity of a statement).  Although Plaintiffs offer conclusory observations about Sprout's go-to-market strategy, they lack any ***particularized facts*** rebutting Defendants' representations relating to that strategy.  *See Premier Cap. Mgmt., L.L.C.*, 2003 WL 21960357, at *2 (claims that statement was untrue not sufficient without particularized facts showing falsity).  For example, ***none*** of the CWs provide ***any*** data describing (i) the number of Enterprise customers Sprout actually acquired throughout the Class Period with the use of the inbound model, (ii) the number of Enterprise customers Sprout actually acquired throughout the Class Period with the use of an outbound mode, (iii) a percentage of total Enterprise customers acquired through either mode, (iv) win or conversion rates through the use of either mode, (v) the number of Enterprise leads in the Sprout's sales pipeline, and (vi) the performance of its inbound model (using any metric) versus a competitor's go-to-market strategy.  They likewise offer nothing about the ***frequency*** with which Sprout landed Enterprise customers.

Accordingly, other than pejorative-filled conclusory assertions of failure, Plaintiffs' CWs provide ***no*** specific facts from which to infer that the go-to-market model actually failed.  The CAC contains no specific facts to contradict that the inbound model allowed Enterprise customers to "see value" in Sprout's product, was a driver of Enterprise growth, disrupted competitors, landed Enterprise customers monthly, worked better for Enterprise customers than SMBs, or produced

_____

of the CWs referenced in the CAC stated that "the inbound model" had collapsed.  Instead, CW 14 stated that sales collapsed ***after a price increase***.  *Id.* ¶100.  The CAC's actual "support" for this concept is a short-seller report quoting unidentified former employees saying that "the inbound has just completely collapsed."  *Id.* ¶138.  The premise is thus neither attributable to Plaintiffs' CWs nor well-pled.

high win rates. Plaintiffs' CWs merely deem the model ineffective and, thus, Defendants' statements untrue. This tactic far from suffices under the PSLRA to establish falsity. *See, e.g.*, *Chew*, 2024 WL 4346522, at *4, 15; *Babin*, 2017 WL 403568, at *8–9.

Mindful of these inadequacies, Plaintiffs try to bolster their allegations with supposed "admissions" from Sprout's May 2, 2024 earnings call, claiming that

> Sprout's sales infrastructure and strategy were so woefully deficient and inadequate to successfully obtain [E]nterprise business that Defendants were forced to make wholesale changes at the end of 2023 to reorient the Company's sales model toward selling to [E]nterprise clients, including "building new vertical sales teams," "accelerating promotions in our [M]id-[M]arket and [E]nterprise teams" and "adjusting our account coverage model."

CAC ¶208. Charitably, Plaintiffs butchered the actual colloquy. The full transcript reveals the substantial liberties they took to concoct their so-called admissions. For instance, the CAC purports to quote Mr. Barretto's comments, which in fact were the following:

> Let's start with Q1 results. We ... ultimately didn't meet our revenue goals. After a record back half of 2023, ... we walked into 2024 with a different business. We're now [E]nterprise-heavy, and the linearity of our business has changed materially which affects our revenue recognition and planning. Our months, quarters and years are now more heavily weighted to traditional [E]nterprise buying cycles. We underestimated the magnitude of this shift and the quickly changing dynamics in our customer mix.
>
> On top of this, we made several important strategic decisions heading into Q1, such as building new vertical sales teams, accelerating promotions in our [M]id-[M]arket and [E]nterprise teams, adjusting our account coverage model and prioritizing Tagger enablement for all of our customer-facing teams. We thought we could manage these changes without disruption, but they collectively set us back. I believe each of these moves support our long-term strategy and better positions us for the future. But in the short term, there were execution headwinds that were self-induced.

Ex. 13 at 5. There was no "admission" that the inbound sales model was deficient or inadequate, nor requiring "wholesale changes." Instead, Mr. Barretto said the opposite: Sprout had been so

*successful* in acquiring Enterprise customers that its business profile – and customers' associated "buying cycles" – had changed to a degree the Company had not fully anticipated, and Sprout built new sales teams and made other changes to better capitalize on its success in the Enterprise segment, not its failures.

Plaintiffs similarly mischaracterize statements about Sprout's modification of its go-to-market model to maximize its altered customer mix as an "admission" that the existing model was a failure. Specifically, Plaintiffs cite Mr. Barretto's statements at the Q1 2024 earnings call for the proposition that "Defendants admitted ... [that] Sprout had to completely 'redraw[] [its] go-to-market model' in order to obtain [E]nterprise clients because the '[E]nterprise-heavy' space was 'orders of magnitude different' from what the Company's inbound model could effectively obtain and service." CAC ¶201. Mr. Barretto's actual statements say nothing of the sort:

> Coming into 2024, ... we have new clarity on where to optimize and redraw our teams and go-to-market efforts to accelerate our path to $1 billion in revenue. While we believe this is a powerful unlock for both our growth and efficiency, the benefits will not materialize overnight. We believe that ***redrawing our go-to-market model around the most successful cohorts is a massive unlock to our future potential***. We know that our best customer cohorts are ... the most efficient expansion opportunities, and they are the least likely to cancel, each by orders of magnitude. We will invest aggressively against these cohorts with improved economic efficiency. At the same time, we plan to de-invest in the parts of the market where these attributes don't exist, even if this results in walking away from immediate revenue.

> We're already beginning to realize the benefits to gross retention from our 2023 model changes being nicely ahead of Q1 plan here. And we believe that by prioritizing the market cohorts where we can predict future economic potential, and get surgical with where we will allocate our time, we can scale a durable, efficient upmarket land-and-expand motion. We believe the results will be higher future NDR and improved efficiency across the entire organization.

> [W]ith compounding SaaS models, our Q1 performance does flow through the year from a revenue perspective. But the downward pressure from Q1 revenue flowing through, the changing linearity of the business and the need to create space as we

execute on our go-to-market changes, I needed to tighten up our forecast to ensure we deliver on our commitments. The underlying reality is that ***our business today is orders of magnitude different from the business you knew at the time of our IPO***. Once a completely inbound highly transactional model, we're now [E]nterprise-heavy and are constructed that way from products to customer success. Because of this, we should be measured on different metrics that properly align with this current state.

Ex. 13 at 5–6 (emphases added). Nowhere does he say that Sprout was abandoning its inbound sales model to serve Enterprise clients. Rather, he explained earlier-disclosed changes aimed at increasing focus on, and investment in, the highest value customers (mostly Enterprise), while deprioritizing lower value customers (mostly SMB). In short, Sprout was not reacting to a failure by refining its model; it was leaning into its ***success*** in acquiring Enterprise customers. Plaintiffs' allegations – whether sourced from CWs or Defendants' statements – do not suffice to establish falsity. *See, e.g.*, *Chew*, 2024 WL 4346522, at *4, 15; *Babin*, 2017 WL 403568, at *8–9.

### 3. Statements Concerning the Length of Sprout's Sales Cycles

The CAC likewise targets numerous statements regarding Sprout's sales-cycle, including:

- Sprout won customers in 30 – 45 days on "average," its sales cycles were rapid, and its inbound sales model allowed it to shorten sales cycles;

- Sprout "will see" deals in Mid-Market and Enterprise that hit those timelines;

- Competitors have longer sales cycles;

- Sprout "generally" has a faster sales cycle than other Enterprise software players;

- Sprout approaches the market in an opposite way to its competitors who lead with customized demos "and really long sales cycle times";

- Sprout was "landing" Enterprise customers every month;

- Sprout will "close [M]id-[M]arket and [E]nterprise deals within 30 days, within [its] free trial period," but "not all of them look like that,"[11] and "for [Sprout], it's kept the sales cycle very different for most enterprise companies";

---

[11] Ex. 41 at 7 (March 6, 2024 Keybanc Emerging Technology Summit Transcript).

- Sprout did not want sales representatives who were "used to long sales cycles or trying to oversell a product over multiple months"; and

- Sprout "land[s]" large customers with similar costs and similar sales cycles as the rest of its customer base.

CAC ¶¶3, 12, 42, 46, 49, 50, 152, 174, 175, 179, 180, 190, 192, 197, 206, 209, 213, 217, 226, 239, 254, 258, 263. While Plaintiffs cast these statements as lies, they plead no ***particularized*** facts supporting that accusation. Instead, they cite a smattering of non-particularized CW statements, many of which ***corroborate*** the representations. Most prominent is CW 1, a former Sprout "Customer Development Account Executive" who purportedly stated that: (i) Sprout's sales cycles were getting longer in 2021 and 2022; (ii) large customers took 2 to 3 times longer to close than smaller ones; and (iii) Enterprise closings "became a total shit show because [sales representatives] could not close these [customers] in 30 days, [the representatives] just needed [a] longer time." *Id.* ¶94.

Distilled, none of CW 1's statements refute Defendants' assertions about Sprout's ***average*** length of sales cycles for ***all*** its customers (SMB, Mid-Market and Enterprise). Nor do they dispute that Sprout's sales cycles in the aggregate are more "rapid" or "shorter than its competitors," nor that Sprout landed Enterprise customers monthly and in some cases on time frames emulating those of smaller customers. And they say nothing of sales-cycle lengths Sprout "will see" in the future. At most, CW 1's statements say that, for some unspecified subset of Enterprise customers, Sprout's sales cycle took longer than the disclosed "average" in ***some*** of the Class Period.[12]

---

[12] CW 1's observations also fail to undermine Defendants' statements as to sales-cycle lengths because, while Defendants referred to Enterprise customers when discussing sales length, they never purported to disclose sales-cycle length by customer segment. On the contrary, Defendants – when describing delineated time frames – referenced "averages" and, as the CAC acknowledges, specifically disclosed that "not all" of its Enterprise customers have short sales cycle lengths. Observing similarities in sales cycle length across these customer segments does not mean that the cycle time is identical for every customer in each segment. Against that backdrop, CW 1's observations about sales-cycle lengths for a nondelineated

Plaintiffs' other CW allegations exhibit the same defects. The CAC alleges that CW 7, a former sales operations employee, stated that Sprout "could close contracts [for small businesses] in the same month [,] corporate sales in 60 – 90 days, and '[E]nterprise contracts would take six months to a year to complete.'" CAC ¶93. First, for many of Sprout's sales (those to small businesses), this statement corroborates Defendants' statements on "average" sales cycles lengths. Even as of the end of 2020 – the year before the class period commenced – Sprout had over 26,000 customers. *See* Ex. 30 at 6–7, 17 (2020 Form 10-K). This large customer counts obviously drives the referenced "averages." Second, the notion that a nondelineated portion of Sprout's Enterprise customers took longer to close during some undefined time period lacks sufficient particularity to render any of Defendants' sales-cycle statements false. *See Pierrelouis*, 414 F. Supp. 3d at 1173 (requiring "particularized allegations" to establish the falsity of a statement).

Plaintiffs' reliance on CW 12 is even more lacking. CW 12 claims that Sprout's sales cycles took considerably longer for Enterprise customers because they "ha[d] a lot of moving parts" and "a thousand things … going on." CAC ¶97. CW 12 provides no factual allegations as to how long the sales took, for which Enterprise customers, or in what time period. That is far from the particularity required to negate Defendants' representations.[13] *Babin*, 2017 WL 403568, at *8; *Premier Cap. Mgmt., L.L.C.*, 2003 WL 21960357, at *2.

_____

portion of Sprout's Enterprise customers is insufficient under the PSLRA to plead that any of the challenged statements were false when made. *See Babin*, 2017 WL 403568, at *8 (plaintiff must plead specific facts demonstrating why an alleged misstatement is false); *Premier Cap. Mgmt., L.L.C.*, 2003 WL 21960357, at *2 ("Claiming that a particular statement was untrue is not enough–plaintiffs must explain, with particularity, the factual basis for their assertion that the statement was untrue.").

[13] The other CW statements on which Plaintiffs rely also lack the type of particularized facts or data necessary to support falsity. *See* CAC at ¶¶95-97 (citing CW 4's statements that Enterprise "contracts always took longer" based on various factors and identifying two purported examples; CW 9's statements that it "took forever to close things" because, *e.g.*, Enterprise customers often were already in long-term contracts; CW 10's statements that Enterprise deals took six months to a year to consummate because of negotiations; and CW 11's statements that Enterprise deals took "multiple times longer" because of "red

Finally, Defendants' "supposed admissions" at the end of the Class Period – which purportedly "corrected" earlier misrepresentations – are equally inadequate. Plaintiffs point to statements from the May 2, 2024 earnings call during which Defendants said that Sprout was "definitely seeing lengthening of [its] sales cycles as the composition of the customer base ... [was] changing." CAC ¶152; *see* Ex. 13 at 11. Nothing in this statement – as it notes a current phenomenon in an inherently dynamic industry subject to macroeconomic changes – relates to the veracity of statements made months or years earlier. Defendants are not alleged to have promised never-changing sales cycle lengths. Indeed, Sprout's disclosures throughout and even before the Class Period, starting with its 2020 Form 10-K, filed in 2021, warn of exactly the opposite in a risk factor warning investors that sales cycles may change. *See* Ex. 30 at 32 (providing that "[c]hanges in the sizes or types of organizations that purchase our platform or products could affect our business and our financial results may fluctuate due to increasing variability in our sales cycles"). This risk factor disclosure reappeared in Sprout's subsequent public filings throughout the class period in substantially the same form. *See* Ex. 31 at 31 (2021 Form 10-K); Ex. 20 at 32 (2022 Form 10-K); Ex. 21 at 31–32 (2023 Form 10-K); Ex. 32 at 31 (2024 Form 10-K). Moreover, the mere proximity of Defendants' May 2, 2024 statement about the lengthening of sales cycles to earlier statements on sales-cycle length does not render the earlier statements false at the time they were made. *See Arazie v. Mullane*, 2 F.3d 1456, 1467 (7th Cir. 1993) (temporal proximity does not create an inference that earlier statements were fraudulent). Hence, Defendants' supposed corrective disclosure is not an admission, but an update on a dynamic operational metric. It fails to establish falsity, just like the other general CW statements on which Plaintiffs rely in the CAC.

---

tape" and negotiations). As noted, generalities and anecdotal data are insufficient to plead scienter. No CW offers particularized facts to refute Defendants' statements about the ***average*** length of Sprout's sales cycles, their length vis-à-vis competitors, or the frequency of Sprout's Enterprise customer acquisitions.

4.  **Statements Concerning Sprout's Ability to Service Mid-Market and Enterprise Clients**

The CAC's dearth of falsity allegations extends to Defendants' statements about Sprout's product.  Plaintiffs rely on CW opinions that the product lacked key capabilities critical for serving Enterprise customers – *e.g.*, influencer marketing, certain analytics, API interfaces, reporting capabilities, scalability, and multi-lingual and customer-care capabilities.  CAC ¶¶66–89.  But these CW criticisms are largely mismatched against the statements they seek to falsify.  While Plaintiffs principally offer them to show that Defendants misrepresented the effectiveness of an inbound (versus outbound) sales model and the velocity of its sales pipeline, the product capabilities the CWs discuss have nothing to do with these issues.  And the proof is in the pudding; Sprout's steady growth in, and awards received for, Enterprise service undercuts Plaintiffs' assertion that the product was profoundly unsuitable for Enterprise sales.  Thus, the CWs' critiques do not impugn Defendants' representations about the methods and speed of customer acquisition.

Moreover, Plaintiffs only point to two representations in the CAC that even relate to Sprout's product.  The first is from Mr. Barretto, stating that Sprout had "a solution that['s] perfectly aligned to [the] most sophisticated companies in the world."  CAC ¶53; *see* Ex. 33 at 12 (June 7, 2022 William Blair 42nd Annual Growth Stock Conference Transcript).  The second is from Mr. Del Preto, saying that Sprout did not have any gaps in the product's feature set necessary to win large clients.[14]  *Id.*; *see* Ex. 9 at 4; Ex. 34 at 7 (Aug. 9, 2022 KeyBanc Capital Market Technology Leadership Forum Transcript).  None of these generalized statements contain a single representation about the product's specific capabilities, including any boasts about influencer marketing or analytics.  If these attributes were missing from the product, as alleged, that does not invalidate statements relating to the product's customer alignment or features to win Enterprise

---

[14] As noted in Section I.B., *infra*, these statements are inactionable puffery and opinions about the product.

24

business. If that were true, and the statements were falsifying, Sprout would not have won its plethora of Enterprise customers nor received the recognition it received for serving this market.[15]

Plaintiffs' heavy emphasis on the absence of "influencer" marketing is equally ineffective in pleading falsity. Alleging that the absence of this functionality forced Sprout to make the Tagger acquisition, a deal that Plaintiffs allege manifests the Company's previous inability to serve Enterprise customers, again defies logic. The addition of functionality to provide Sprout a competitive edge in the Enterprise segment cannot be contorted into an admission of the inability to serve that entire segment, especially when Sprout was selling to, serving, and being recognized for excellence in that very segment prior to the acquisition. In fact, following the Tagger acquisition, independent analysts noted that Sprout's new ability to offer influencer marketing services gave it "***an advantage over competitors in the space, particularly in the enterprise***, as the combination of influencer marketing and organic social in one offering appeals to customers looking for a broader social platform" (Ex. 17 at 2) and noted that the Tagger acquisition allowed Sprout to bring "***a differentiated offering to the market***" (Ex. 18 at 1). Accordingly, as with

---

[15] Plaintiffs also allege misrepresentations about the suitability of Sprout's sales infrastructure for Enterprise customers. *See, e.g.*, Appendix A, Stmt. No. 8 ("[W]e're well equipped for the deals that are out there[.]"); *id.* Stmt. No. 12 ("[W]e are building a solution that's going to be the very best option for any Salesforce customer[.]"); *id.* Stmt. No. 27 (Sprout has "seen a lot of success with our enterprise team[.]"). By way of support, Plaintiffs cite CW statements that Sprout lacked a dedicated Enterprise sales team, tailored Enterprise training and sufficient outbound Enterprise leads. *See* CAC ¶¶106–115. But Defendants are not alleged to have made *any* specific representations about the structure or training of Sprout's sales team, outside lead generation, the number of outside leads or win rates for outside leads. Plaintiffs thus offer no direct connection between the CW statements and any alleged misrepresentation. *See Garden City Emps.' Ret. Sys. v. Anixter Int'l, Inc.*, 2012 WL 1068761, at *13 (N.D. Ill. Mar. 29, 2012) (dismissing Section 10(b) and 20(a) claims where "nothing said by the CWs makes Defendants' [] statements fraudulent"). Plaintiffs' "square peg in a round hole" attempt to connect these CW statements to general, favorable statements about the Company's model and platform likewise fails, as the CWs fail to explain how, if these infrastructure components were so critical to Enterprise customers, Sprout achieved robust Enterprise sales and growth. *Chandler v. Ulta Beauty, Inc.*, 2022 WL 952441, at *6 (N.D. Ill. Mar. 30, 2022) ("Plaintiff must explain, with particularity, the factual basis for his assertion that the statement was untrue[.]").

Plaintiffs' other product-deficiency allegations, the absence of influencer marketing capabilities cannot establish the falsity of any of Defendants' alleged misrepresentations.[16]

### 5.    Statements Concerning the Salesforce Partnership

Plaintiffs also fail to plead that Defendants' statements about its March 2022 Salesforce partnership were false.  As stated above, that partnership paved the way for Sprout to acquire Salesforce's legacy "Social Studio" customers, a soon to-be-retired social media management platform.  Plaintiffs allege that Defendants misrepresented the Social Studio pipeline and customer conversion opportunity, including Mr. Barretto's statements that he was "excited about the customers in our Social Studio that are going to migrate over the next couple years and there's 4,000ish of them," as well as "a couple hundred thousand customers that Salesforce works with."[17] CAC ¶195; Ex. 33 at 8.  Their falsity allegation rests on a single April 4, 2023 short seller report (the "Razor Report") and one CW.  *See* Ex. 35 (The Razor Report, April 4, 2023).  Neither suffices.

The Razor Report, issued on April 4, 2023, reflected an investment thesis by "Akram's Razor" ("Akram") the pseudonym of an anonymous and self-professed short seller of Sprout who admitted that he would achieve "significant gains" should Sprout's stock value decrease.  *Id.* at 65.  The Razor Report posited that Sprout would shortly face a growth cliff because the migration of Salesforce customers was purportedly "'much farther along than Sprout has disclosed or wants to admit' with very little of the opportunity remaining" and that this would detrimentally impact Sprout's financials.  CAC ¶125; *see* Ex. 35 at 2.  This conclusion – and the one that Sprout was "unable to compete" with competitors for the largest Salesforce Enterprise clients – were mostly derived from anonymous "customer" interviews.  CAC ¶¶124–25; *see* Ex. 35 at 1, 3.  From those,

---

[16] As discussed in Section I.B., *infra*, many of the statements regarding Sprout's platform capabilities are also inactionable puffery, opinions and/or forward looking under the PSLRA safe harbor.

[17] As discussed *infra* at Section I.B., Mr. Barretto's Salesforce statements are also inactionable as corporate puffery and forward-looking predictions of customer conversions.

Akram concluded that "*despite what Sprout might be claiming, we are far closer to the last innings of the [Social Studio] migration than the start—every source I have looked through points to this.*"  CAC ¶¶125; Ex. 35 at 17.

Allegations tethered to the anonymous Razor Report should be discarded in their entirety. Courts are rightfully leery of short seller reports given their authors' "obvious motive to exaggerate the infirmities of the securities in which they speculate," *Long Miao v. Fanhua, Inc.*, 442 F. Supp. 3d 774, 801 (S.D.N.Y. 2020) (citation omitted), any always approach them "with caution."  *In re DraftKings Inc. Sec. Litig.*, 650 F. Supp. 3d 120, 154 (S.D.N.Y. 2023).  But where, as here, a short seller report relies on anonymous sources to support its contentions, the "methodological shortcomings" of any related allegations are too severe to satisfy the PLSRA.  *Id.* at 155.  The related allegations here, based on ubiquitous "calls with numerous major enterprise customers," consist of vague contentions that Sprout was "unable to compete for larger [E]nterprise clients" and "failed to win most of the larger Social Studio customers … because its product and platform were significantly inferior to that of Sprout's competitor Sprinklr."  CAC ¶¶124–125.  Suffice it to say, statements attributed to unidentified witnesses whose basis of knowledge is never articulated "suffer from all the indicia of unreliability."  *DraftKings*, 650 F. Supp. 3d 120 at 155.

The issue is compounded by the lack of collaborating allegations.  The CAC's sole support  – again from CW 1 – is neither particularized nor corroborating.  CW 1 purports to say that, following the pandemic in 2021 and 2022:

> Sprout entered into the Salesforce partnership as a "lifeline" to generate more enterprise leads [but that] the purported benefits were "nothing more than a talk track," [and] that the goal of the partnership was to help make up for the slowdown in leads coming organically.

CAC ¶116.  But these allegations speak to Sprout's motive for the Salesforce partnership.  They do nothing to render Defendants' statements describing the opportunity presented by the

partnership. Equally unavailing is the allegation that CW 1 "he has spoken to colleagues who are still at Sprout who reported, '*that [it] was a total flop*.'" *Id.* The only "flop" is this allegation in its falsity efforts. Rumormongering and hearsay aside, such a bald conclusion embodies "non-particularized." So, too, do the rest of CW 1's Salesforce-related allegations, that:

> Salesforce customers had been using Social Studio for free as part of their Salesforce deal and many of them did not want to start paying for social media management. CW 1 stated that "[i]t was just a ploy to say – we're partnered with Salesforce, and a way for Sprout to get access" to the customer list as reps had access to the names of people who were discontinuing with Social Studio. "There was an overwhelming sentiment that those customers didn't want to pay for Sprout Social."

*Id.* (alternations in original). Its vagueness aside, as a former **Sprout** employee, CW 1's speculation as to **Salesforce customers'** motives for using (or not using) Social Studio is irrelevant, and his or her musing about "sentiments" inherently lacks particularity. *See Chew*, 2024 WL 4346522, at *4 (saying a statement was untrue without pleading particularized facts is insufficient). CW 1 offers no data about the number of Social Studio customers (i) in "the pipeline" or (ii) that Sprout later acquired. Put simply, a former low-level employee's hypothesis that the Salesforce partnership was a "ploy," lacks any direct connection to the truth of statements concerning the size of the Salesforce conversion opportunity. *Constr. Workers Pension Fund-Lake Cnty. & Vicinity v. Navistar Int'l Corp.*, 2014 WL 3610877, at *5 (N.D. Ill. July 22, 2014) ("The PSLRA requires plaintiffs not only to identify specific false or misleading statements, but also to **explicitly connect those statements to factual allegations** demonstrating that they are false.") (emphasis added). CW 1's failure to corroborate the Razor Report dooms Plaintiffs' Salesforce allegations from the start.[18]

---

[18] Plaintiffs also argue that Sprout's May 2, 2024 announcement that it would no longer disclose ARR as a metric rendered earlier representations about ARR's significance false and misleading. *See* CAC ¶¶153–154, 237–238. That is baseless. Ceasing to use a financial metric is a business judgment, not securities fraud, especially where Defendants are transparent about the choice and explain, as Sprout did, why it was

**B.      The Alleged Misstatements Are Inactionable as a Matter of Law.**

Even if Plaintiffs properly plead falsity, none of their allegations allege "material misstatements."  A plaintiff must plead such material misstatements to survive a motion to dismiss. *See Glickenhaus & Co. v. Household Int'l, Inc*., 787 F.3d 408, 414 (7th Cir. 2015), *reh'g denied* (July 1, 2015).  Statements that constitute puffery, opinions, or are forward looking do not qualify as "material."  *See Hunter v. Elanco Animal Health Inc.*, 2022 WL 3445173, at *20 (S.D. Ind. Aug. 17, 2022) ("Puffery and optimistic rhetoric generally cannot provide a basis for a securities fraud action.") (quotations omitted); *Davis v. SPSS, Inc.*, 431 F. Supp. 2d 823, 829 (N.D. Ill. 2006) ("[O]pinions, however, are generally not actionable under § 10(b)."); *Chandler*, 2022 WL 952441, at *7 ("Statements of pure opinion are [] generally not actionable.").  As set forth below, many of Defendants' purported misstatements fall into one of these three categories.

**1.      Many of Defendants' Alleged Misstatements Are Inactionable Statements of Corporate Puffery or Optimism.**

Plaintiffs base much of their claim on statements of optimism or puffery.  Where a "statement amounts to vague aspiration or unspecific puffery, it is not material." *Zerger v. Midway Games, Inc.*, 2009 WL 3380653, at *6 (N.D. Ill. Oct. 19, 2009).  These types of statements are inactionable, as "[i]nvestors do not rely on vague statements of optimism like 'good,' 'well-regarded,' or other feel-good monikers." *St. Lucie Cty. Fire Dist. Pension Trust Fund v. Motorola, Inc.*, 2011 WL 814932, at *7 (N.D. Ill. Feb. 28, 2011) (quotations omitted).

---

no longer material to investors (*i.e.*, other metrics aligned with Sprout's peers and were better leading indicators of Sprout's performance).  Plaintiffs allege no facts showing that Defendants' disclosures around ARR were untrue, instead pointing to post hac analyst reports bemoaning Sprout's withdrawal of the metric. *See id.*  But those reports bear no connection to, and offer no explanation as to why, Defendants' earlier representations were false when made. *See Constr. Workers Pension Fund*, 2014 WL 3610877, at *5 (plaintiff must "explicitly connect [misstatements] to factual allegations demonstrating that they are false").

Here, as detailed below, a significant portion of Defendants' alleged misstatements amount to expressions of optimism or puffery about Sprout's go-to-market approach, product or the Salesforce opportunity.[19]

<u>Puffery About Sprout's Go-to-Market Approach</u>

- The inbound trial model was "a powerful differentiator in the Enterprise space." (Stmt. No. 1).

- The inbound trial model was "the secret sauce that enabled [Sprout] to win customers in 30 to 45 days." (Stmts. No. 1 & 2).

- Customers "see value much faster with [Sprout] than anywhere else." (Stmt. No. 2).

- The inbound model "has been a really big competitive advantage." (Stmt. No. 9).

- "The same strategy in SMB is working event better in [E]nterprise." (Stmt. No. 13).

- Sprout "feel[s] really good about the motion that we have today." (Stmt. No. 28).

- The inbound sales mode is a "major" or "massive differentiator." (Stmt. No. 16).

- Sprout is "incredibly excited about the trial motion, especially in the Enterprise, because it is incredibly differentiated." (Stmt. No. 19).

- Sprout's inbound model is "a secret weapon for us in the [E]nterprise." (Stmt. No. 19).

- Sprout's inbound sales model was a "huge strategic advantage." (Stmt. No. 22).

- Sprout "feels really great, obviously, about the go-to-market motion that [it has] built and [it has] honed over 13-plus years." (Stmt. No. 23).

<u>Puffery About Sprout's Product</u>

- Sprout's product "check[s] a lot of boxes" with Enterprise customers. (Stmts. No. 7 & 15).

- Sprout does not "have feature sets or any gaps in [its] feature sets." (Stmt. No. 14).

- Sprout's "products are perfectly positioned for these [E]nterprises." (Stmt. No. 27).

---

[19] **Stmts. 1-3, 7, 9, 12–16, 19, 20, 22, 23, 25, 27, and 28** in Appendix A should be dismissed as puffery.

- Sprout is "so proud of the product itself, and [it] know it that it works really well for [its] [E]nterprise customers."  (Stmt. No. 19).

Puffery About the Salesforce Opportunity

- Sprout's team is "excited about the customer in our Social Studio that are going to migrate over the next couple of years.  And there's 4,000ish of them."  (Stmt. No. 12).

- Sprout's "vision is that [it] is building a solution that's going to be the very best option of any Salesforce customer."  (Stmt. No. 12).

- The Salesforce opportunity is "absolutely massive."  (Stmt. No. 25).[20]

- Sprout thinks "there's plenty of upside" in its customer pipeline.  (Stmt. No. 20).

None of these statements, whether boasts about the strength of its sales model or product or enthusiasm over the size of the Salesforce opportunity, are actionable.  *See, e.g.*, *In re Midway Games, Inc. Sec. Litig.*, 332 F. Supp. 2d 1152 (statement that "Midway believes these products comprise the strongest home video game lineup in the Company's history" was puffery); *Roth v. OfficeMax, Inc.*, 2006 WL 2661009, at *4 (N.D. Ill. Sept. 13, 2006) (statement that "combined office products business will be strategically stronger and better able to deliver compelling value" was puffery); *Plumbers & Pipefitters Loc. Union No. 630 Pension-Annuity Tr. Fund v. Allscripts-Misys Healthcare Sols*., Inc., 778 F. Supp. 2d 858, 872 (N.D. Ill. 2011); *Makor Issues & Rts., Ltd. v. Tellabs, Inc.*, 437 F.3d 588, 597 (7th Cir. 2006).  Hence, they cannot survive a motion to dismiss.

### 2.    Many of Defendants' Alleged Misrepresentations Are Inactionable Statements of Opinion or Belief.

Plaintiffs also challenge numerous inactionable statements of opinion.[21]   "[A] sincere statement of pure opinion is not an 'untrue statement of material fact,' regardless whether an investor can ultimately prove the belief wrong."  *Omnicare v. Laborers Dist. Council Const. Indus.*

---

[20] Ex. 36 at 24 (Sept. 27, 2023 Sprout Investor Day Transcript).
[21] **Stmts**. **2, 4–16, 18, 20, 22, 23–30, 32, 33, and 37** are statements of opinion and should be dismissed.

*Pension Fund*, 575 U.S. 175, 186 (2015).  Statements that are indeterminate or not otherwise verifiable are also inactionable as statements of opinion.  *In re Fairway Grp. Holdings Corp. Sec. Litig.*, 2015 WL 4931357, at *21 (S.D.N.Y. Aug. 19, 2015), *report and recommendation adopted*, 2015 WL 5255469 (S.D.N.Y. Sept. 9, 2015).

Large swaths of Defendants' supposed misrepresentations relating to Sprout's go-market-model, product and the Salesforce partnership are rife with opinions –

Opinions About Sprout's Go-to-Market Approach

- Customers "see value much faster with Sprout than anywhere else."  (Stmt. No. 2).

- "[N]ot a lot has to change in [Sprout's] current motion."  (Stmt. No. 4).

- The inbound sales device "has been a really big competitive advantage."  (Stmt. No. 9).

- "The same strategy in SMB is working event better in [E]nterprise."  (Stmt. No. 13).

- The inbound sales mode is a "major" or "massive differentiator."  (Stmt. No. 16).

- Sprout's inbound sales model was a "huge strategic advantage."  (Stmt. No. 22).

- Defendants "really like this motion" of closing Enterprise deals.  (Stmt. No. 4).

- Sprout is "efficient on the go to market side."  (Stmt. No. 5).

- The "best way to evaluate and buy" is through the thirty-day free trial.  (Stmt. No. 6).

- Sprout's "go-to-market strategy is working."  (Stmt. No. 28).

Opinions About Sprout's Product

- Sprout's product "check[s] a lot of boxes" with Enterprise customers.  (Stmts. No. 7 & 15).

- Sprout does not "have feature sets or any gaps in [its] feature sets."  (Stmt. No. 14).

- Sprout's "products are perfectly positioned for these [E]nterprises."  (Stmt. No. 27).

- Sprout is "well equipped for the deals that are out there."  (Stmt. No. 8).

<u>Opinions about the Salesforce Opportunity</u>

- The Salesforce opportunity is "absolutely massive."  (Stmt. No. 25).

- Sprout thinks "there's plenty of upside" in its customer pipeline.  (Stmt. No. 20).

- Sprout has "a lot of predictability" around its sales pipeline.  (Stmt. No. 10).

- Sprout's solution was "the very best option for any" former Salesforce customer.  (Stmt. No. 12).

- Sprout is "seeing good execution" on Salesforce partnership.  (Stmt. No. 29).

Because each constitutes "a sincere statement of pure opinion," it cannot be an "'untrue statement of material fact. …'"  *Omnicare*, 575 U.S. at 186.  To be actionably "untrue" under Section 10(b), Plaintiffs must plead "particularized allegation[s] that the speakers did not honestly hold the opinions they expressed."[22]  *Chew*, 2024 WL 4346522, at *12.  Similarly, an opinion cannot be "misleading" unless Plaintiffs plead with particularity the existence of omitted "facts that contradict or severely undermine the belief."  *See id.* (opinion is only misleading if plaintiffs "identify particular (and material) facts" whose omission makes it so).  The CAC does neither.

Plaintiffs do not even attempt to allege that Defendants disbelieved their favorable views of the go-to-market model and platform capabilities vis-a-vis Enterprise customers or the opportunities presented by the Salesforce partnership.  And for the same reasons the CAC fails to plead falsity with respect to Defendants' ***factual*** statements (which cover substantially the same ground) Plaintiffs come nowhere close to pleading particularized facts that "contradict or severely undermine" Defendants' ***opinions*** – a more difficult standard.  *See, supra*, Section I.A.  Accordingly, Defendants' opinion statements are inactionable as a matter of law.

---

[22] Even if the statements contained some embedded fact and were not "pure opinions," they would remain inactionable for the same reason discussed above and in Section I.A, *supra* – *i.e.*, the CAC alleges no facts showing that Defendants' assertions about Sprout's go-to-market model, platform capabilities and Salesforce partnership (the only topics that could even arguably comprise embedded facts) were untrue. *See id* (an opinion statement with an embedded fact is only actionable if the embedded fact is untrue).

### 3.      Many of the Alleged Misstatements Are Forward-Looking Statements Protected by the PSLRA's Safe Harbor.

Finally, several of the alleged misrepresentations are forward-looking statements[23] immune from liability under the PSLRA's statutory safe harbor.  *See Plumbers & Pipefitters Loc. Union*, 778 F. Supp. 2d at 872.  As shown below, they include, among others, statements about the anticipated success of Sprout's go-to-market model and the Salesforce partnership:

Forward-Looking Statements Relating to Sprout's Go-to-Market Approach

- Sprout is "complementing [its] inbound effort to go after customers that [it] thinks will be a great long term fit for Sprout."  (Stmt. No. 3).

- Sprout is "driv[ing] more inbound" leads from Enterprise customers.  (Stmt. No. 6).

- Sprout "will see deals in the [M]id-[M]arket and [E]nterprise" segments that hit a 30 to 45-day sales cycle length.  (Stmt. No. 10).

- Sprout is "going to lea[d]" its Enterprise sales marketing efforts with its inbound model.  (Stmt. No. 17).

- Sprout's use of its inbound sales model for Enterprise sales is going to be a "consistent strategy" and is "going to be very consistent with what [Sprout has] done before."  (Stmt. No. 28).

Forward-Looking Statements around the Sales Force Opportunity

- Sprout's "vision is that [it] is building a solution that's going to be the very best option for any Salesforce customer."  (Stmt. No. 12).

- "There's still a decent amount of time left on the process ... for Social Studio ... [w]e think that there's plenty of upside."  (Stmt. No. 20).

The statute protects statements (1) "identified as a forward-looking statement, and [] accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially"  or (2) made without "'actual knowledge' that [they were] 'false or misleading.'"  *See W. Palm Beach Firefighters' Pension Fund v. Conagra Brands, Inc.*, 495 F.

---

[23] **Stmts. 3, 4, 6, 10, 12, 17, 28, and 30** are protected by the PLSRA safe harbor and should be dismissed.

Supp. 3d 622, 654 (N.D. Ill. 2020), *aff'd sub nom. Nat'l Elevator Indus. Pension Fund v. Conagra Brands, Inc.*, 2022 WL 1449184 (7th Cir. May 9, 2022) (internal citations omitted).

Here, each prong is satisfied with respect to Defendants' forward-looking statements. ***First***, each forward-looking statement was demonstrably accompanied by robust safe harbor language. *See* Appendix A (organizing safe harbor language by statement). As previously noted, Sprout's 2021 Form 10-K admonished that:

> Changes in the sizes or types of organizations that purchase our platform or products could affect our business and our financial results may fluctuate due to increasing variability in our sales cycles. … [S]ales to ***enterprise customers may entail longer sales cycles, more significant selling efforts and greater uncertainty. … If we are successful in expanding our customer base to include more enterprise customers, our sales cycles may lengthen and become less predictable, which, in turn, may adversely affect our financial results***.

Ex. 31 at 32 (emphasis added). This language more than satisfies the PSLRA. *In re Tibco Software, Inc.*, 2006 WL 1469654, at *26 (N.D. Cal. May 25, 2006) (finding 10-K language that "[a]ny failure to successful integrate [an acquisition's] business operations could adversely affect our financial results" sufficient) (emphasis added); *Johnson v. Tellabs, Inc.*, 262 F. Supp. 2d 937, 954 (N.D. Ill. 2003) (identification of "risks associated with introducing new products, entering new markets, availability of resources" satisfied safe harbor requirements).

***Second***, even absent cautionary language, the safe harbor would apply; Plaintiffs do not allege "actual knowledge" (or any knowledge) of falsity. As noted in Section I.A, *supra*, the CAC pleads no facts undermining Defendants' statements about, among other things, the go-to-market model, Sprout's platform or the Salesforce partnership. Accordingly, none of the forward-looking statements referenced in the CAC are actionable.

### C. The CAC Fails to Plead Scienter.

The CAC should also be dismissed for the independent reason that Plaintiffs fail to adequately plead "a strong inference of scienter with respect to each" Defendant. *Pugh* v. *Tribune Co.*, 521 F.3d 686, 693 (7th Cir. 2008).

Plaintiffs' burden here is significant. Under the PSLRA and Rule 9(b), a plaintiff must plead particularized facts that each defendant acted with a contemporaneous "intent to deceive, demonstrated by knowledge of the statement's falsity or reckless disregard of a substantial risk that the statement is false." *Higginbotham* v. *Baxter Int'l, Inc.*, 495 F.3d 753, 756 (7th Cir. 2007).[24]

Recklessness requires "an extreme departure from the standards of ordinary care ... to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Tellabs I*, 513 F.3d at 704. Further, the PSLRA requires that Plaintiffs plead particularized facts establishing "a strong inference" of scienter (*Cornielsen* v. *Infinium Cap. Mgmt., LLC*, 916 F.3d 589, 601 (7th Cir. 2019)), which exists "only if a reasonable person would deem the inference ... cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 324 (2007). ("*Tellabs II*"). Plaintiffs must plead particularized facts "showing that the defendants had both the motive and opportunity to commit fraud,"[25] or "presenting strong circumstantial evidence of conscious misbehavior or recklessness." *In re CBOE Volatility Index Manip. Antitrust Litig.*, 435 F. Supp. 3d 845, 861 (N.D. Ill. 2020), *aff'd*, 42 F.4th 619 (7th Cir. 2022). The CAC does neither.

---

[24] Plaintiffs thus cannot plead "corporate scienter" without pleading scienter of an individual defendant. *See Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 708 (7th Cir. 2008).

[25] While some Courts in this district have treated motive and opportunity as a separate prong for scienter, the Seventh Circuit has endorsed the view that motive and opportunity "may be useful indicators" to be considered "collectively" with other allegations. *Makor Issues & Rts., Ltd.*, 437 F.3d at 601, *vacated and remanded on other grounds*, 551 U.S. 308 (2007).

Plaintiffs plead **no facts** suggesting that **any** Individual Defendant believed (much less knew) at the time of the challenged statements that Sprout's Enterprise business was deteriorating or that either its sales process or its platform were ineffective vis-à-vis larger customers.[26] Rather, they rely on a grab-bag of allegations concerning (1) CW statements; (2) the Individual Defendants' supposed motive to defraud; (3) routine executive departures; (4) analyst reactions and Defendants' supposed after-the-fact "admissions"; and (5) the so-called "core operations" doctrine. None of the allegations, in isolation or collectively, impel a strong inference (or any inference) of Defendants' scienter.[27]

## 1. Plaintiffs' CW Allegations Do Not Plead Scienter.

Plaintiffs lean on a chorus of anecdotes from 15 CWs, all but one supposed former employees,[28] to suggest that Defendants knew about Sprout's alleged product and sales strategy failures. These anonymous accounts cannot carry Plaintiffs' pleading burden.

"The Seventh Circuit has reacted strongly against reliance on [CWs] in securities fraud cases," *Vallabhaneni v. Endocyte, Inc.*, 2016 WL 51260, at *8 (S.D. Ind. Jan. 4, 2016) – applying

---

[26] As discussed herein, the far more compelling inference, supported by Plaintiffs' own allegations and documents incorporated by reference, is that Defendants believed, at all relevant times, that Sprout was well-positioned to expand its Enterprise client base, while disclosing the potential risks attendant to a considerably different customer composition. That is not securities fraud.

[27] If any of Plaintiffs' anemic claims survive dismissal, this Court nevertheless should dismiss Jason Rechel as a Defendant. Plaintiffs allege he only made less than a handful of the alleged misrepresentations in the CAC, all of them relating to Sprout's purported competitive advantages, and none of them form a basis for liability. They point to statements from one investor call and one purported interview, where Mr. Rechel states that Sprout's thirty-day trial and go-to-market model were a "competitive differentiator," "nice" or a "huge strategic advantage, and that they "allowed" Sprout "to keep sales cycle shorter." CAC ¶¶36, 61, 218. According to the CAC, Rechel also said that Sprout "by putting [its] customers in the trial, is able to check all of those boxes ... [a]nd that's a huge weapon for us on the new business side." *Id.* at 61. With use of the words "huge," "nice" "weapon," and phrases like "check all the boxes" in expressing his enthusiasm about Sprout's competitive positioning, Mr. Rechel's few statements plainly constitute inactionable "puffery" and inherently are his opinions. Moreover, as discussed in Section I.A, *supra*, Plaintiffs failed to plead falsity properly with respect to any of these statements. Accordingly, the CAC's allegations against Mr. Rechel do not suffice for him to remain as a Defendant.

[28] CW 6 was a competitor employee who purportedly consulted with Sprout. No dates are alleged.

a "steep" discount to information from anonymous figures whose statements and motivations cannot be verified. *See Higginbotham*, 495 F.3d at 757. Here, Plaintiffs' quantity-over-quality approach – larding the CAC with opinions of low-level former employees with virtually no direct contact with the Individual Defendants – more than warrants that discount. *Id.*

To start, the CAC lacks sufficient detail to assess the accuracy or reliability of the CW information. Plaintiffs offer job titles, dates and cursory job descriptions for nine of the 15 CWs (nos. 1, 4, 6–10, 12, and 14), and *no* information about the work responsibilities for the remaining six (nos. 2–3, 5, 11, 13, and 15). Indeed, for all but three CWs (nos. 3, 13, and 14), the CAC fails even to provide an office location – a critical datapoint for assessing CWs' insight into the Defendants' intent. *See In re Career Educ. Corp. Sec. Litig.*, 2006 WL 999988, at *4 (N.D. Ill. Mar. 28, 2006) (job titles without description and location preclude Court from evaluating "access to or knowledge of the facts about which they have provided statements or whether they were merely repeating what they had heard from their co-workers or other third parties").

Of the allegations Plaintiffs *do* offer about the CWs, none remotely supports the inference that a *single* CW had firsthand knowledge of Sprout's entity-level performance and strategies, much less the Individual Defendants' state of mind. *See C. of Sterling Heights Gen. Emps.' Ret. Sys. v. Hospira, Inc.*, 2013 WL 566805, at *17 (N.D. Ill. Feb. 13, 2013) (rejecting CW statements where complaint lacked identifying information "support[ing] the probability that a person in the position occupied by the source would possess the information alleged"). Just the opposite: the CW profiles in the CAC only underscore their lack of reliability.

Among other deficiencies, the CAC identifies no specific internal report, meeting, or communication by which a Defendant learned facts contradicting their public statements – by a CW or anyone else. In fact, *none* of the 15 CWs is alleged to have reported to, or even worked

38

directly with, any Individual Defendant, or to have had anything more than one-off interactions with Messrs. Howard, Del Preto, or Rechel. That is not surprising, as the CWs were all low-level employees who would not have had direct interactions with the Individual Defendants on a regular basis or been privy to overarching Company strategy or results.[29] The sole suggestion of ***any*** direct contact is CW 9's statement (echoed by CWs 1 and 8) describing Mr. Barretto as "an 'in the trenches with you' type of manager," who would join group calls with prospective customers. CAC ¶105. Yet Plaintiffs fail even to note CW 9's title or employment dates, much less his basis for knowing that "Sprout's top management was very involved in the sales pipeline." *Id.* Similarly, CW 8 (a former Sales Manager in the Agency Department)[30] purportedly "described monthly sales meetings regularly attended by Barretto where management discussed 'the competitors we lost to, our average close rate percentage and where we needed to focus the next month.'" *Id.* ¶252. But there's no indication that CW 8 even attended those meetings, how he obtained the information, or whether the meetings even concerned Enterprise customers.[31]

These omissions are fatal. *Davis*, 431 F. Supp. 2d at 828 ("The Court must be able to tell whether a confidential witness is speaking from personal knowledge, or merely regurgitating gossip and innuendo.") (quotations omitted). But even the CWs were sufficiently reliable, the content of their statements does nothing to support scienter for at least two reasons.

---

[29] For this reason, courts reject low-level former employee accounts of executive scienter. *See Davis*, 431 F. Supp. 2d at 828 (absent firsthand knowledge, former sales employees lacked "accurate information" about company's overall condition); *see In re Coty Inc. Sec. Litig.*, 2016 WL 1271065, at *10 (S.D.N.Y. Mar. 29, 2016) (allegation by CW who "was not an executive or manager" insufficient to establish scienter).

[30] Plaintiffs concede that the Agency Department had no dealings with Enterprise clients. *See id.* ¶80 n.13.

[31] The allegations about the remaining CWs, including CW 1, are equally lacking. For instance, allegations that CWs 1 (an Account Executive) and 14 ("Enterprise Sales") knew that the Individual Defendants "always track[ed] upcoming sales closely," fail to specify how or from whom they obtained such information. *See* CAC ¶104. Those about CW 7 (a Sales Operations Analyst who worked solely with SMBs and Mid-Market clients), who allegedly said "management specifically asked for an analysis of the inbound slump soon after the price increases," offer no explanation of how and from whom CW 7 received the request, whether it related to Enterprise clients, and who "management" referred to. *Id.* ¶252.

***First***, the CAC fails to specify a time frame for the CW statements.[32]  For example, multiple CWs purportedly stated that Mr. Barretto "inquired about certain deals" (CAC ¶¶94, 252), which Plaintiffs cite to establish his awareness of Enterprise business challenges.  But Plaintiffs nowhere indicate ***when*** these purported inquiries took place.  Absent temporal information, CW statements cannot bear on knowledge or intent at the specific time of the alleged misrepresentations.  *In re Career Educ. Corp.*, 2006 WL 999988, at *6 (CW statements were "deficient" where "plaintiff failed to identify the time period when any of the alleged activities at issue occurred.").

***Second***, none of the CW statements indicates that any Defendant knowingly misstated anything.  The statements constitute: (i) CW opinions about the efficacy of Sprout's go-to-market model (*e.g.*, platform trials were "very ineffective"; Enterprise success was based on Sprout being "much more affordable" than competitors (*see* CAC ¶¶249, 251)) and (ii) purported actions of Defendants (*e.g.*, attending meetings (*id.* ¶252); participating in teleconferences (*id.*)).  Neither has ***any*** bearing on the Individual Defendants' knowledge or intent, or even whether the alleged misstatements were false or misleading.  *Garden City*, 2012 WL 1068761, at *13 (no scienter where the "information provided by the CWs is not inconsistent with Defendants' disclosures").

Even at face value, opinions of low-level employees that Sprout's platform and marketing approach were ineffective do not inform the Individual Defendants' intent.  *Fulton Cnty. Emps.' Ret. Sys. v. MGIC Inv. Corp.*, 2010 WL 5095294, at *8 (E.D. Wis. Dec. 8, 2010), *aff'd sub nom. Fulton Cnty. Emps. Ret. Sys. v. MGIC Inv. Corp.*, 675 F.3d 1047 (7th Cir. 2012) (CW statements that defendant's business was "on the decline" and that "things were not good" ...  do little more than show that, in [the CWs' opinion], defendant's assets were overvalued").

---

[32] The one time Plaintiffs ***do*** specify a time frame – a single CW statement that in February or March 2023 Sprout "started to discount like crazy" (CAC ¶122) – they blatantly misconstrue the quote as a "direct C-suite directive to 'discount like crazy.'"  *Id.* ¶152.

Conversely, the few assertions about Individual Defendants' actions do not implicate the alleged misstatements' veracity. CW 1 noted that "Howard and Barretto would offer their personal help to land larger deals, and therefore, were undeniably aware of lengthening sales cycles." CAC ¶250. Even if true, their assistance in securing unspecified "larger deals" does not undermine general statements about the *average* length of sales cycles, much less show *knowledge* that such statements were false and intended to deceive investors. Nor, similarly, would Mr. Barretto's attendance at unspecified meetings about sales volume (*id.* ¶252) imply that public statements about the efficacy of Sprout's go-to-market model were knowingly false when made. *See Hunter*, 2022 WL 3445173, at *21 (CW statement that defendants "participated in monthly 'financial meetings' during which sales data [] was discussed" fails to support scienter under the PSLRA).

In sum, the only CW statements even purporting to bear on Defendants' *knowledge* are conclusory – *e.g.*, sales and product issues were communicated "up the chain" (CAC ¶¶85, 151) and "well-known" to management (*id.* ¶249), who had "access" to data and "was definitely aware" of Enterprise challenges (*id.* ¶¶94, 102, 103, 250, 252) – and cannot plead scienter. *See, e.g.*, *City of N.O. Emps.' Ret. Sys. v. PrivateBankcorp, Inc.*, 2011 WL 5374095, at *8 (N.D. Ill. Nov. 3, 2011) (insufficient to allege that "defendants must have been aware of a misstatement based simply on their positions within the company.") (citation and alterations omitted).

### 2. Plaintiffs' Motive Allegations Do Not Plead Scienter.

Plaintiffs likewise seek to establish "motive" through supposedly unusual or suspicious stock trading activity and SEC Rule 10b5-1 trading plans. Their allegations fail on their face.

To begin with, Plaintiffs only challenge 10b5-1 plans and stock sales of two Individual Defendants – Messrs. Barretto and Howard – which they theorize establishes motive for *all* Defendants. This alone undermines the allegations. *Johnson*, 262 F. Supp. 2d at 956 ("motive allegations are weakened" where only "half of the named Defendants" are alleged to have traded

suspiciously). And even with respect to Messrs. Barretto and Howard, Plaintiffs' theory defies logic (and their own theory of the case).

Contrary to Plaintiffs' unfounded claim that the Individual Defendants were motivated to "capitalize on Sprout's artificially inflated share prices" (CAC ¶171), each stock sale identified in the CAC occurred **after** two of the three alleged corrective disclosures and ensuing stock drops. Trading-based scienter allegations inconsistent with Plaintiffs' theory of fraud must be rejected. *Tellabs*, 262 F. Supp. 2d 956 (to support scienter, sales must take place "at times calculated to maximize the personal benefit from undisclosed inside information").

Moreover, the CAC alleges **no facts** suggesting that Messrs. Barretto's and Howard's 10b5-1 plans or trading activity were "unusual" or "suspicious" – *i.e.*, "dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information" – prerequisites for scienter. *Id.* The vast majority of trades referred to in the CAC were concededly made pursuant to 10b5-1 plans, which precludes an inference of scienter. *Garden City*, 2012 WL 1068761, at *13 (trading pursuant to a 10b5-1 plan "negates a finding of scienter"). Plaintiffs try to avoid that fate with half-hearted assertions that Messrs. Barretto's and Howard's 10b5-1 trading plans were "suspiciously timed." CAC ¶¶167, 170. But that premise is contradicted by the plans themselves, which (i) covered a full year and (ii) commenced **immediately upon expiration of a preceding plan**. Ex. 37 (Barretto Trading Plans); Ex. 38 (Howard Trading Plans).[33] In other words, the plans covered successive time periods to ensure seamless coverage of nondiscretionary trading from year to year. It is hard to imagine less "suspicious" timing. *Chew*, 2024 WL 4346522, at *22 (trades are not suspicious when executed

---

[33] While each trading plan covered a full year, they were not executed on a calendar year basis (*i.e.*, Mr. Barretto's plans for 2023 and 2024 were respectively executed in November 2022 and August 2023) to ensure compliance with the SEC's extension of the mandatory "cooling off" period for officers and directors (time between plan adoption and trading) from 30 days to a range of 90 – 120 days as of February 27, 2023.

as "part of preset trading plans"); *Wade v. WellPoint, Inc.*, 892 F. Supp. 2d 1102, 1137–38 (S.D. Ind. 2012) ("That [the individual defendant] instituted a new Rule 10b–5 trading plan in [the class period] does not, without more, raise a red flag.").

Plaintiffs' attempt to impugn the trades themselves fares no better. Initially, the CAC's failure to allege the "prior history of stock sales for [Defendants], the number of shares held by each Defendant or the percentage of shares each Defendant sold of his or her stock," forecloses a finding of scienter. *See Tellabs*, 262 F. Supp. 2d 956 (such "bare-bones stock sale allegations … [are] clearly are insufficient by themselves to create a strong inference of scienter"). So too does its failure to plead Messrs. Barretto's and Howard's net profits from their stock sales (the CAC alleges only gross proceeds (CAC¶166)). *Garden City*, 2012 WL 1068761 at *14 ("Pleading only gross proceeds, however, is insufficient to support a strong inference of scienter.").

In any event, the trades themselves were routine. Plaintiffs admit that Mr. Barretto's trades were made pursuant to nondiscretionary 10b5-1 plans, but say that his overall trading volume was unusually high. For Mr. Howard, they point to a series of allegedly suspicious and outsized sales made in 2023 and 2024. Each assertion is demonstrably wrong: Mr. Barretto sold ***more stock in the 21 months following Sprout's IPO than during the ensuing Class Period*** (*see* Ex. 42 (Exemplar SEC Form 4s Preceding the Class Period)) ***were routine and each reflected a single digit percentage of his holdings***. *Garden City*, 2011 WL 1303387, at *31 (stock sale reflecting a single digit percentage of defendant's holdings are insufficient to establish scienter). And like Mr. Barretto, Mr. Howard sold proportionally ***less*** stock in the 31-month Class Period than in the 21-month period ***preceding*** it. *Tellabs*, 262 F. Supp. 2d 956.; *Garden City*, 2011 WL 1303387, at *31 (fewer stock sales during class period than preceding it "undermine[s] any notion that a strong inference of scienter can be drawn from Defendants' stock sales"). Moreover, both Mr. Barretto

and Mr. Howard held ***more*** Sprout stock at the conclusion of the Class Period than they did at its inception.  Ex. 43; Ex. 44 (pre- and post-Class Period Form 4's for Messrs. Barreto and Howard, respectively); *Vallabhaneni,* 2016 WL 51260, at \*19 (the "retention of significant holdings of stock during the class period weighs against an inference of scienter").  The motive claims are empty.

### 3. Routine Departures of Non-Defendant Executives Bearing No Indicia of Fraud Do Not Support Scienter.

Plaintiffs next identify the alleged "departures" of four Sprout executives: Chief Marketing Officer Jamie Gilpin, Chief Revenue Officer John Schoenstein, Chief Technology Officer Aaron Rankin, and CEO Mr. Howard – as supporting a strong inference of scienter.  CAC ¶265.  Here, too, Plaintiffs' allegations are contradicted by public information: Mr. Rankin remained at Sprout as a director and co-founder, while Mr. Howard was appointed Executive Chairman and remained a director.  *See* Ex. 39 at 2 (April 15, 2024 Form 8-K).  Needless to say, for executive resignations to support a finding of scienter, the executives must actually resign from the company.  *Phoenix Ins. Co. v. ATI Physical Therapy, Inc.*, 690 F. Supp. 3d 862, 893 (N.D. Ill. 2023) (a resignation or termination may support scienter when the "defendant corporation forced certain employees to resign because of its knowledge of the employee's role in the fraudulent representations.").  Moreover, contrary to the CAC's allegation that Ms. Gilpin "abruptly notified Sprout of her intention to resign without any replacement in place" (CAC ¶265), in fact she informed the Company that she would resign three and a half months later and would assist in identifying her successor in the interim.  *See* Ex. 40 at 2 (Sept. 13, 2023 Form 8-K).

Factual liberties aside, Plaintiffs fail to allege anything uncharacteristic or suspicious about these "departures," precluding an inference of scienter.  *Phoenix*, 690 F. Supp. 3d at 893 (plaintiff must allege that "the resignation at issue was uncharacteristic when compared to the defendant's

44

typical hiring and termination patterns or was accompanied by suspicious circumstances"); *Francisco v. Abengoa, S.A.,* 624 F. Supp. 3d 365, 402 (S.D.N.Y. 2022) (a resignation alone is insufficient; "there are any number of reasons that an executive might resign"). The CAC lacks any mention of Sprout's typical hiring and termination patterns. That makes sense, because Plaintiffs cannot seriously contend two executive departures (Messrs. Howard and Rankin did not resign) over nine months preceding the purported corrective disclosure in May 2024 is uncharacteristic or suspicious. Tellingly, while Plaintiffs dutifully allege that the resignations of Ms. Gilpin and Mr. Schoenstein "are tied to misrepresentations" at issue, neither they nor Mr. Rankin is referenced ***at all*** in the remainder of the CAC. *Phoenix*, 690 F. Supp. 3d at 894. In sum, the departures do nothing to aid Plaintiffs' scienter allegations. *Id.*

### 4. The CAC's Remaining "Must Have Known" Allegations Are Insufficient To Plead Scienter.

Plaintiffs' remaining scienter allegations assert that Defendants must have known that their statements about the go-to-market model were misleading by virtue of (i) supposed after-the-fact "admissions," (ii) short-seller reports criticizing the Company's model (and Defendants' responses thereto), and (iii) the Individual Defendants' roles as high-level executives. These allegations, like their predecessors, fail to establish any inference of scienter, much less a strong one.[34]

***First***, Plaintiffs' attempt to paint the May 2024 Disclosure that Sprout would refine its go-to-market model as an "admission" that their earlier upbeat statements about the model were knowingly false is classic "fraud by hindsight," which the securities laws forbid. *DiLeo v. Ernst Young*, 901 F.2d 624 (7th Cir. 1990). For starters, Sprout's decision to modify its go-to-market

---

[34] Plaintiffs also suggest that Sprout's decision to shift away from ARR as a reporting metric is somehow indicative of fraud. That makes no sense. A change in reporting practice, without more, cannot sustain a strong inference of scienter. Here, Sprout's decision to stop reporting ARR (which is a non-GAAP operational metric, not a required disclosure) was announced and explained by Defendants openly. This is a far cry from an intent to deceive.

strategy does not, *a fortiori*, suggest that its existing model was flawed or ineffective. (After all, companies try daily to improve upon already-successful strategies.) But even if it did, Plaintiffs' claim would still fail because scienter requires particularized allegations that Defendants knew their statements were false ***at the time they made them*** – subsequent revelations or remedial measures do not suffice. *W. Palm Beach Firefighters'*, 495 F. Supp. 3d at 643.

***Second***, Defendants' repudiation of a hit piece short-seller report challenging Sprout's upmarket capabilities (CAC ¶264) is neither surprising nor indicative of scienter. It is entirely expected – and proper – for executives to defend their business when a short seller (who stands to profit from a stock decline) attacks it. Plaintiffs theorize that the short-seller was right in its criticisms – *e.g.*, Sprout's model was ineffective for Enterprise customers and its Salesforce partnership less valuable than promised – and Defendants secretly knew it. But the CAC provides ***no*** facts to support that presumption. On the contrary, Defendants had publicly maintained confidence in Sprout's model, and their response to the short-seller claims was fully consistent with those contemporaneous statements.[35] Plaintiffs allege no facts suggesting that, at the time of their denials, Sprout's management agreed with the short-seller or believed the short-seller was correct. The absence of such facts precludes an inference of scienter. *See DiLeo*, 901 F.2d 624 (management need not adopt a pessimistic view just because critics do).

***Finally***, Plaintiffs rely on the "core operations" doctrine: because Sprout's go-to-market model was "core" to its business strategy, the Individual Defendants as high-level executives must have known about any undisclosed problems (CAC ¶¶253–259). But this theory is no substitute

---

[35] There is no indication that Defendants' responses were geared specifically toward the short-seller allegations as opposed to general reaffirmation of their long-stated view on the viability of Sprout's model. This is particularly so given Plaintiffs' inability to allege that the Individual Defendants even reviewed the report. *Cornielsen*, 916 F.3d at 602 ("[A] complaint fails to satisfy the PSLRA's particularity requirements by making conclusory allegations of scienter derived from a defendant's mere access to information.").

for concrete allegations of scienter, which the CAC lacks entirely. *See Pension Tr. Fund for Operating Eng'rs v. Kohl's Corp.*, 895 F.3d 933, 937 (7th Cir. 2018). Plaintiffs point to Defendants' frequent discussions about Sprout's "secret sauce" inbound model and use of ARR and sales cycle length. But even repeated public emphasis on a topic, or personal monitoring of metrics, does not mean the speaker secretly knew contrary facts. Plaintiffs must plead facts showing that the speakers knew the statements were false when made. The core operations doctrine does not dispense with that requirement. *Societe Generale Sec. Servs., GbmH v. Caterpillar, Inc.*, 2018 WL 4616356 at *8 (N.D. Ill. Sept. 26, 2018) (defendants' knowledge of subject matter does not imply "that they disbelieved their statements or sought to deceive investors with their statements"); *see In re Fifth Third Bancorp Deriv. Litig.*," 2023 WL 2429009 at *19 (N.D. Ill. Mar. 8, 2023) (same). And as discussed *supra* at Section I.C, the CAC offers no particularized facts from which to infer knowledge of falsity.

### D. The CAC Fails to Plead Loss Causation.

"To plead loss causation, the plaintiff must allege that it was the very facts about which the defendant lied which caused its injuries." *Caremark, Inc. v. Coram Healthcare Corp.*, 113 F.3d 645, 648 (7th Cir. 1997). The CAC fails to allege any plausible causal nexus between the alleged misstatements and any drop in Sprout's stock price.

The CAC alleges three purported corrective disclosures that they contend show: (1) a May 2, 2023 earnings release and conference call ("May 2, 2023 Disclosure") (*see* Ex. 12); (2) an August 3, 2023 earnings and the disclosure of the Tagger acquisition ("August 3, 2023 Disclosure") (*see* Ex. 15); and (3) May 2, 2024 earnings and Sprout's guidance revision ("May 2, 2024 Disclosure") (*see* Ex. 13). None adequately pleads loss causation under Seventh Circuit law.

### The May 2, 2023 Disclosure

Plaintiffs allege that the May 2, 2023 Disclosure reported Q1 2023 results that showed "disappointing growth in upmarket clients." CAC ¶6. Yet, the CAC concedes that Defendants reaffirmed their assessment that Sprout's inbound sales model "continue[d] to be the best weapon" and denied any material change in Enterprise performance. *Id.* ¶6, 129, 220. By definition, a disclosure that reiterates the very statements Plaintiffs allege to be fraudulent cannot "correct" those alleged misstatements. And a stock drop following disappointing earnings, without any revelation that a prior statement was false or misleading, is not a corrective disclosure. *Tricontinental Indus., Ltd. v. PricewaterhouseCoopers, LLP*, 475 F.3d 824, 843 (7th Cir. 2007) (no loss causation where plaintiffs do not allege that the market learned of and reacted to the fraud). Plaintiffs' failure to tie the May 2023 Disclosure and ensuing stock decline to any revelation of prior alleged fraud is fatal to pleading loss causation.

### The August 3, 2023 Disclosure

Plaintiffs' assertion that the truth "beg[a]n to emerge" (CAC ¶6) with the August 3, 2023 Disclosure – announcing Sprout's Q2 results and the Tagger acquisition – is equally baseless. Their theory is that the Tagger merger "made clear" that Sprout had previously "lacked th[is] 'critical' influencer marketing capability." *Id.* ¶7. That theory fails as a matter of law. Sprout's decision to acquire a complementary business does not "reveal" that prior positive statements about its existing business were false. *See Coronel v. Quanta Cap. Holdings Ltd*., 2009 WL 174656, at *24 (S.D.N.Y. Jan. 26, 2009) (no loss causation where acquisition was not accompanied by admissions that prior statements were misleading). Plaintiffs' recasting of a strategic acquisition as an implicit admission of prior fraud is speculative at best, which is insufficient to plead loss causation. *See Tricontinental*, 475 F.3d at 843.

48

Moreover, as with the May 2, 2023 Disclosure, Plaintiffs acknowledge that Defendants maintained their positive outlook regarding Sprout's go-to-market model even after the Tagger merger announcement. CAC ¶7. A disclosure that is consistent with the statements Plaintiffs allege were false is not corrective and cannot establish loss causation.[36]

### The May 2, 2024 Disclosure

Plaintiffs' allegation that the May 2, 2024 Disclosure revealed the "full truth" (CAC ¶9) of the purported fraud fares no better. In that disclosure, Sprout reduced its guidance, reported weak Q1 2024 results, and stated it had "redrawn our go-to-market model." CAC ¶¶9–12. Plaintiffs insist that these disclosures were "corrective" because they were inconsistent with Defendants' prior statements that Sprout's inbound model was effective in the Enterprise segment. But the disclosures themselves contradict that assertion.

In fact, as discussed *supra* at Section I.A, Sprout's decision in May 2024 to modify its go-to-market model in no way renders Defendants' prior statements that the model was effective false. Nor does "redraw[ing]" the model "correct" earlier statements that the model was effective at the time of those earlier statements. The two categories are apples and oranges. Plaintiffs ignore a fundamental flaw in their theory: it is entirely plausible that a company may try to improve upon a sales model *even if that sales model is already effective*. Here, Plaintiffs do not (and cannot) establish a connective link between Sprout's modification of its model and prior statements that the Company's go-to-market model worked. As such, they cannot plead loss causation.

---

[36] Plaintiffs' logic is based on a flawed syllogism: (i) since Sprout acquired Tagger; and (ii) Tagger is a social influencer platform; then (iii) an influencer platform was critical to a successful go-to-market strategy. That logic falters on examination. Defendants' effort to improve their product does not impugn their honest belief in the strength of the preexisting product or suggest a "gap" in its capabilities.

Because none of the alleged corrective disclosures adequately reveal the falsity of any prior statement or demonstrate a causal link between Defendants' alleged fraud and Plaintiffs' supposed losses, the CAC fails to plead loss causation under the PSLRA and must be dismissed.

## II.    PLAINTIFFS' SECTION 20(A) CLAIM SHOULD BE DISMISSED

Here, a Section 20(a) claim is predicated on a primary violation of Section 10(b). 15 U.S.C.A. §78t(a); *see also Pugh*, 521 F.3d at 693. Plaintiffs' failure to plead a claim under Section 10(b) and Rule 10b-5 thus disposes of their Section 20(a) claim as well.

## <u>CONCLUSION</u>

For the foregoing reasons, the CAC be dismissed in its entirety, with prejudice.

Dated: March 31, 2025

WINSTON & STRAWN LLP

By: */s/ Dane Drobny*
Dane Drobny
35 West Wacker Drive
Chicago, IL 60601-9703
Telephone: (312) 558-5600
Email: ddrobny@winston.com

Matthew L. DiRisio (*pro hac vice*)
WINSTON & STRAWN LLP
200 Park Avenue
New York, NY 10166
Telephone: (212) 294-4686
Email: mdirisio@winston.com

*Counsel for Defendants*

<u>**CERTIFICATE OF SERVICE**</u>

The undersigned attorney hereby certifies that a true and correct copy of the foregoing Defendants' Motion to Dismiss was filed electronically with the Clerk of the Court and served on all counsel of record via CM/ECF system on March 31, 2025.

By: */s/ Dane Drobny*
Dane Drobny