## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| RICHARD MUNCH, Individually and on Behalf of All Others Similarly Situated, | No. 1:24-cv-03867 |
| Plaintiff, | Hon. Jeffrey I. Cummings |
| vs. | <u>CLASS ACTION</u> |
| SPROUT SOCIAL, INC., JUSTYN HOWARD, RYAN BARRETTO, and JOE DEL PRETO, | |
| Defendants. | |
| CITY OF HOLLYWOOD POLICE OFFICERS' RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated, | No. 1:24-cv-05582 |
| Plaintiff, | Hon. Jeffrey I. Cummings |
| vs. | <u>CLASS ACTION</u> |
| SPROUT SOCIAL, INC., JUSTYN HOWARD, RYAN BARRETTO, and JOE DEL PRETO, | Consolidated Cases |
| Defendants. | |

## LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE CONSOLIDATED CLASS ACTION COMPLAINT

**TABLE OF CONTENTS**

I.     PRELIMINARY STATEMENT .................................................................................... 1

II.    STATEMENT OF FACTS ........................................................................................... 7

    A.    Leading Up To The Class Period, The Key Question Facing Sprout Was
        Whether Its "Inbound," Trial-Based Sales Strategy And Its Social Media
        Marketing Platform Were Effective In The Large Enterprise Space ..................... 7

    B.    Throughout The Class Period, Defendants Assured Investors That Their
        "Inbound" Model Was Sprout's "*Secret Weapon*" That Gave The Company
        A "*Significant Competitive Advantage*" In The Enterprise Space, And That
        Sprout's Platform "*Check[ed] All The Boxes*" For Enterprise Clients ................. 8

    C.    Defendants Promised An Additional Growth Boost From A New
        Partnership With Salesforce And Continued To Assure Investors That
        Sprout's Product And Sales Motion Were Sufficient For Sustained
        Upmarket Growth ................................................................................................ 10

    D.    In The Face Of Post-Covid Headwinds, Defendants Emphasized That
        Sprout's "Secret Weapon" Inbound Model Was Enabling Continued
        Upmarket Success ................................................................................................ 11

    E.    In Truth, Sprout Never Had The Product, Strategy, or Sales Infrastructure
        For Sustained Growth With Enterprise Clients .................................................... 12

    F.    The Truth Began To Leak Out, But Defendants Continued To Tell
        Investors Their Upmarket Strategy Was Working ............................................... 18

    G.    The Truth Was Fully Revealed In May 2024 ...................................................... 20

III.   ARGUMENT ........................................................................................................... 23

    A.    The Complaint Adequately Pleads Material Misstatements And Omissions ........ 23

        1.    Defendants Made Materially False And Misleading Statements
            That Sprout's "Inbound," "Trial Based" "Product Led" Sales
            Motion Was Sufficient For Enterprise Clients ......................................... 23

        2.    Defendants Made Materially False And Misleading Statements
            About Their Product's Adequacy For Enterprise Clients......................... 28

        3.    Defendants Falsely Told Investors That Sprout's Sales Cycles For
            Enterprise Clients Were "Rapid" And In-Line With Smaller Clients ....... 31

        4.    Defendants Falsely Promoted The Salesforce Partnership As A
            Substantial Growth Lever ......................................................................... 34

        5.    Defendants' Cursory "Puffery," "Opinion," And "Forward Looking
            Statements" Arguments Fail ..................................................................... 36

    B.    The Complaint Raises A Strong And Compelling Inference Of Scienter ............. 39

        1.    Sprout's False Statements Concerned The Most Pressing Question
            Facing The Company's Business During The Class Period:

i

Whether Its Sales Motion And Product Could Deliver Sufficient "Upmarket" Growth And Profitability ....................................................... 40

2. Defendants' Admissions, And Analysts' Strong Negative Reactions Thereto, Support An Inference Of Scienter ............................................. 41

3. The CWs Support Scienter ....................................................... 43

4. Suspiciously Timed Resignations Support Defendants' Scienter ............. 44

5. The Razor Report And Defendants' Response Supports Scienter ........... 45

6. Defendants' Class Period Stock Trading Supports Scienter ................... 46

7. Defendants' Abandonment of ARR Supports Scienter ........................... 48

C. The Complaint Pleads Loss Causation ................................................ 48

IV. CONCLUSION ............................................................................................... 50

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**CASES**

*Allison v. Oak St. Health, Inc.*,
2023 WL 1928119 (N.D. Ill. Feb. 10, 2023)............................................................. 6, 24, 37, 49

*Arazie v. Mullane*,
2 F.3d 1456 (7th Cir. 1993) ............................................................................................ 34

*Azar v. Grubhub, Inc.*,
2021 WL 4077327 (N.D. Ill. Sept. 7, 2021) ..................................................................... 38, 40

*Azar v. Yelp, Inc.*,
2018 WL 6182756 (N.D. Cal. Nov. 27, 2018) .................................................................... 25

*Babin v. Shchekin*,
2017 WL 403568 (N.D. Ill. Jan. 30, 2017) ...................................................................... 28

*Beaver Co. Emps. Ret. Fund v. Tile Shop Holdings*,
94 F. Supp. 3d 1035 (D. Minn. 2015) ............................................................................... 31

*Bond v. Clover Health Invs., Corp.*,
587 F. Supp. 3d 641 (M.D. Tenn. 2022) ........................................................................... 35

*Bucks Cnty. Emps. Ret. Sys. v. Norfolk S. Corp.*,
2025 WL 897540 (N.D. Ga. Mar. 24, 2025) ...................................................................... 43

*Carpenters Pension Tr. Fund for N. California v. Allstate Corp.*,
2018 WL 1071442 (N.D. Ill. Feb. 27, 2018).................................................................... 42

*Carter v. Brackenbox, Inc.*,
2024 WL 4278485 (N.D. Ill. Sept. 24, 2024) .................................................................. 30

*Chew v. Moneygram Int'l, Inc.*,
2024 WL 4346522 (N.D. Ill. Sept. 30, 2024) .................................................................. 28

*Chow v. Archer-Daniels-Midland Co.*,
2025 WL 790854 (N.D. Ill. Mar. 12, 2025) ..................................................................... 40

*Constr. Indus. & Laborers Joint Pension Tr. v. Carbonite, Inc.*,
22 F.4th 1 (1st Cir. 2021) ................................................................................................ 29

*Constr. Workers Pension Fund-Lake Cnty. & Vicinity v. Navistar Int'l Corp.*,
114 F. Supp. 3d 633 (N.D. Ill. 2015)............................................................................ 39, 43

*Coronel v. Quanta Cap. Holdings Ltd.*,
2009 WL 174656 (S.D.N.Y. Jan. 26, 2009) ..................................................................... 50

*Dang v. Amarin Corp. plc*,
    750 F. Supp. 3d 431 (D.N.J. 2024) ........................................................................... 47

*Dura Pharms., Inc. v. Broudo*,
    544 U.S. 336 (2005) ................................................................................................. 48

*Duran v. Henkel of Am., Inc.*,
    450 F. Supp. 3d 337 (S.D.N.Y. 2020) ..................................................................... 30

*E. Ohman J:or Fonder AB v. NVIDIA Corp.*,
    81 F.4th 918 (9th Cir. 2023) .................................................................................... 26

*Energizer, LLC v. MTA Trading, Inc.*,
    2021 WL 2453394 (E.D.N.Y. June 16, 2021) ......................................................... 31

*Flynn v. Exelon Corp.*,
    2021 WL 1561712 (N.D. Ill. Apr. 21, 2021) ........................................................... 34

*Freudenberg v. E*Trade Fin. Corp.*,
    712 F. Supp. 2d 171 (S.D.N.Y. 2010) ............................................................... 44, 47

*Fryman v. Atlas Fin. Holdings, Inc.*,
    2022 WL 1136577 (N.D. Ill. Apr. 18, 2022) .................................................. *passim*

*Fulton Cnty. Emps.' Ret. Sys. v. MGIC Inv. Corp.*,
    2010 WL 5095294 (E.D. Wis. Dec. 8, 2010) .......................................................... 44

*Gambrill v. CS Disco, Inc.*,
    2025 WL 1088224 (W.D. Tex. Apr. 9, 2025) .......................................................... 40

*Garden City Employees' Ret. Sys. v. Anixter Int'l, Inc.*,
    2012 WL 1068761 (N.D. Ill. Mar. 29, 2012) .......................................................... 47

*Glazer Capital Mgmt., L.P. v. Forescout Techs., Inc.*,
    63 F.4th 747 (9th Cir. 2023) .................................................................................... 44

*Hedick v. Kraft Heinz Co.*,
    2021 WL 3566602 (N.D. Ill. Aug. 11, 2021) .................................................. *passim*

*Holwill v. AbbVie Inc*,
    2020 WL 5235005 (N.D. Ill. Sept. 1, 2020) ..................................................... 28, 40

*Hunt v. Bloom Energy Corp.*,
    2021 WL 4461171 (N.D. Cal. Sept. 29, 2021) ....................................................... 34

*In re Akorn, Inc. Sec. Litig.*,
    240 F. Supp. 3d 802 (N.D. Ill. 2017) ................................................. 23, 45, 48, 49

*In re AppHarvest Sec. Litig.*,
    684 F. Supp. 3d 201 (S.D.N.Y. 2023) .................................................... 30

*In re Apple Inc. Sec. Litig.*,
    2020 WL 6482014 (N.D. Cal. Nov. 4, 2020)........................................... 42

*In re Cassava Scis., Inc. Sec. Litig.*,
    2023 WL 3442087 (W.D. Tex. May 11, 2023) ....................................... 45

*In re DraftKings Inc. Sec. Litig.*,
    650 F. Supp. 3d 120 (S.D.N.Y. 2023) .................................................... 36

*In re EQT Corp. Sec. Litig.*,
    504 F. Supp. 3d 474 (W.D. Pa. 2020) .................................................... 46

*In re First Merchants Acceptance Corp. Sec. Litig.*,
    1998 WL 781118 (N.D. Ill. Nov. 4, 1998) ............................................. 27

*In re HD Supply Holdings, Inc. Sec. Litig.*,
    341 F. Supp. 3d 1342 (N.D. Ga. 2018) .................................................. 27

*In re Ironnet, Inc.*,
    2023 WL 5110932 (E.D. Va. Aug. 9, 2023).............................................. 34

*In re Molycorp, Inc. Sec. Litig.*,
    157 F. Supp. 3d 987 (D. Colo. 2016) ..................................................... 46

*In re Quality Sys., Inc. Sec. Litig.*,
    865 F.3d 1130 (9th Cir. 2017) ............................................................... 32

*In re Upstart Holdings, Inc. Sec. Litig.*,
    2023 WL 6379810 (S.D. Ohio Sept. 29, 2023)....................................... 47

*Indiana Pub. Ret. Sys. v. Pluralsight, Inc.*,
    45 F.4th 1236 (10th Cir. 2022) ....................................................... 43, 47

*Leventhal v. Chegg, Inc*.,
    721 F. Supp. 3d 1003 (N.D. Cal. 2024) ................................................. 27

*Lowry v. RTI Surgical Holdings, Inc.*,
    532 F. Supp. 3d 652 (N.D. Ill. 2021) ......................................... 33, 39, 40

*Macovski v. Groupon, Inc.*,
    553 F. Supp. 3d 460 (N.D. Ill. 2021) ............................................ *passim*

*Makor Issues & Rts., Ltd. v. Tellabs Inc.*,
    513 F.3d 702 (7th Cir. 2008).......................................................... 39, 44

v

*Phoenix Ins. Co. v. ATI Physical Therapy, Inc.*,
690 F. Supp. 3d 862 (N.D. Ill. 2023) ............................................................. *passim*

*Pub. Emps.' Ret. Sys. of Mississippi v. TreeHouse Foods, Inc.*,
2018 WL 844420 (N.D. Ill. Feb. 12, 2018) ...................................................... 36

*Rensin, Tr. of Rensin Joint Tr. v. United States Cellular Corp.*,
755 F. Supp. 3d 1048 (N.D. Ill. 2024) .............................................................. 40

*Robbins v. Altopa, Inc.*,
2023 WL 2484827 (E.D.N.C. Mar. 13, 2023) ................................................... 27

*Ross v. Career Educ. Corp.*,
2012 WL 5363431 (N.D. Ill. Oct. 30, 2012) ..................................................... 33

*Seeks v. Boeing Co.*,
752 F. Supp. 3d 992 (N.D. Ill. 2024) ................................................................ 38

*Shash v. Biogen, Inc.*,
84 F.4th 1 (1st Cir. 2023) .................................................................................. 37

*Silverman v. Motorola, Inc.*,
2008 WL 4360648 (N.D. Ill. Sept. 23, 2008) ................................................... 36

*Sinnathurai v. Novavax, Inc.*,
645 F. Supp. 3d 495 (D. Md. 2022) .................................................................. 47

*Uniformed Sanitationmen's Ass'n Comp. Accrual Fund v. Equinix, Inc.*,
2025 WL 39936 (N.D. Cal. Jan. 6, 2025) ......................................................... 35

*United States Sec. & Exch. Comm'n v. Ustian*,
229 F. Supp. 3d 739 (N.D. Ill. 2017) ................................................................ 31

*Van Noppen v. InnerWorkings, Inc.*,
136 F. Supp. 3d 922 (N.D. Ill. 2015) ................................................................ 46

*Washtenaw Cnty. Employees' Ret. Sys. v. Walgreen Co.*,
2019 WL 4597518 (N.D. Ill. Sept. 23, 2019) ................................................... 50

Lead Plaintiff Employees' Retirement System of the City of Baltimore ("Plaintiff"), respectfully submits this memorandum of law in opposition to Defendants' Motion to Dismiss.[1]

## I.     PRELIMINARY STATEMENT

Sprout provides a subscription-based platform for businesses to manage their social media marketing.  Prior to the Class Period, Sprout's business model targeted small and medium-sized businesses ("SMBs").  However, Sprout's business was not profitable, as SMBs paid modest subscription fees and often churned out of the Company's services quickly.  Accordingly, by the start of the Class Period, Sprout had shifted its business strategy to larger "mid-market" and "enterprise" corporate clients that had the potential to provide much higher revenue and profit margins.  Thus, the most critical question facing the Company was whether this transition was successful, and whether Sprout had the sales model and platform capabilities to obtain the large corporate clients that the Company needed to grow its business.

Throughout the Class Period, Defendants repeatedly and consistently assured investors that Sprout's transition to servicing "upmarket" clients was a resounding success.  Defendants emphasized that Sprout provided all the features and capabilities needed to service large corporate customers, stating that the Company was "well equipped" and "check[ed] all the boxes" for these upmarket clients, and that there was "***not any functionality we don't have to win these larger deals***."  Significantly, Defendants also assured investors that Sprout had the sales strategy and infrastructure needed to capture enterprise-level customers—a significant point of concern for the market given that Sprout, unlike its competitors, did not use a traditional and costly sales force to

---

[1] The Class Period runs from September 22, 2021 through May 2, 2024, inclusive.  "MTD" or "Br." refers to the Joint Amended Memorandum of Law in Support of Defendants' Motion to Dismiss (ECF No. 51).  Citations to "¶_" are to paragraphs in the Consolidated Class Action Complaint for Violations of the Federal Securities Laws (the "Complaint") (ECF No. 40).  Terms not otherwise defined herein have the same meanings as in the Complaint.  Unless otherwise noted, emphasis is added, and internal citations and quotations are omitted.

directly pitch its services to prospective clients, but instead used a low-cost, "inbound" and "product-led" sales "motion" that relied on advertising and free trials to lure in customers. Indeed, Defendants not only asserted that Sprout's "inbound" sales motion was highly effective "***even []*** ***for sophisticated customers in the mid-market and enterprise***" space, but they touted that their inbound strategy was Sprout's "***secret sauce***" and a "***secret weapon…in the enterprise [market]***" which "***allowed us to land much larger customers faster***." The inbound sales motion was purportedly so successful that Defendants claimed that it was a "***massive differentiator***" in the industry and gave Sprout a "***significant advantage***" over its competitors because it provided a reliable and steady stream of revenue.

Defendants' statements had their intended effect. Analysts parroted Defendants' representations, highlighting that Sprout's "product-led" strategy was "***a key differentiator***" that allowed it to succeed with "***larger enterprise customers***." In turn, Sprout's stock price rose as high as $144 per share and remained trading at inflated levels throughout the Class Period. Defendants Barretto and Howard capitalized on their misrepresentations, selling more than one million shares for proceeds of ***$63 million*** during the Class Period at substantially inflated prices.

However, as was ultimately revealed, Defendants' statements to investors were materially false and misleading. As no less than 14 former Sprout employees ("CWs") confirmed, and as Defendants ultimately ***admitted***, Sprout's services and its "secret weapon" sales motion were completely inadequate to obtain and service enterprise clients. Indeed, contrary to Defendants' claim that there was "no functionality we don't have to win these larger deals," Sprout's platform lacked numerous fundamental features required by large, complex corporations, including "social listening" tools that enterprise clients used to analyze social media conversations about a brand or industry; high quality application program interfaces that allowed social media networks to

integrate with third-party apps and tools; advanced analytics capabilities that corporations used for real-time monitoring and reporting; and full scalability and language functionality that complex organizations relied upon to unify their global operations. These CWs also confirmed that Sprout lacked influencer marketing capabilities—a feature so critical that fully **half** of Sprout's prospective enterprise clients explicitly demanded it in request for proposals ("RFPs"). As a former Sprout executive succinctly stated: "***The infrastructure we had at Sprout was simply not as good as the competitors***." Moreover, these former employees confirmed that, rather than being a "secret weapon" for the Company, Sprout's "inbound" sales model was so "***very ineffective***" for larger enterprise clients that the Company "***had no business competing in the enterprise space***."

The truth about Sprout's business began to emerge in 2023. On April 4, 2023, a noted short seller, Akram's Razor, reported that Sprout was struggling to land enterprise clients because its platform lacked the robust capabilities of competitors in the enterprise space. In response, during a May 2, 2023 earnings call, Defendants took pains to refute the specific concerns that were raised in the report, denying that there were any issues with Sprout's platform or its ability to effectively compete for enterprise customers. When analysts asked whether there were any changes to report in the enterprise space, Barretto assured them that Sprout was "***in more deals than ever before from a large enterprise and an enterprise perspective***," and declared in no uncertain terms: "***So no, not seeing any material change or difference in the market, certainly under enterprise***."

In August 2023, Sprout surprised the market by disclosing that its services lacked critical influencer marketing capabilities, and as a result, the Company was forced to acquire an influencer marketing company, Tagger Media, at the exorbitant price of $140 million. On this news, Sprout's stock price fell more than 12% in a single day. Significantly, however, Defendants continued to assure investors that Sprout's sales model was perfectly suited for larger corporate clients, and that

3

demand for its products had "***never been stronger***."  Indeed, as late as November 2023, Defendants boasted to investors that their "***go-to-market strategy is working***," and there were "***no surprises for all of you in the way that we grow our business***," and in March 2024—just two months before the full truth was revealed—Defendants claimed that, "***even in the mid-market and enterprise, there's great velocity in our business***."

The market was therefore stunned when, on May 2, 2024, Sprout slashed the guidance for 2024 that it had issued just two months earlier and announced plummeting growth in new larger corporate customers, making clear that Sprout's platform was wholly inadequate for those customers.  Indeed, Defendants reported the lowest number of mid-market customer additions since 2019, and enterprise customer additions that plunged ***two-thirds*** from the previous quarter.

Moreover, despite touting for three years that Sprout's inbound, trial-based motion provided a "significant competitive advantage" with enterprise customers, Defendants now admitted that the opposite was true: Sprout's inbound sales motion was in fact an abject failure when it came to obtaining enterprise clients.  In Defendants' own words, Sprout's business had "***changed materially***" given its upmarket focus, and Sprout's "completely inbound highly transactional model" was "***orders of magnitude different***" from what was necessary to succeed in the enterprise space.  As a result, Defendants had been forced to completely "***redraw[] our go-to-market model***," including making massive additional investments to build out "***our mid-market and enterprise teams***."  Significantly, Defendants made clear that they knew full well about this situation by no later than the fall of 2023, a full eight months earlier,  when they specifically admitted that "***the decisions on all this happened in Q4 [2023]***."

On this news, Sprout's stock price collapsed, plummeting 40%, or $19.33 per share, in a single day—the largest stock price decline in Sprout's history.  Analysts immediately reacted with

astonishment, noting that it was obvious that Defendants knew about these facts during the Class Period and did not disclose them to the market. Cantor Fitzgerald emphasized that "***the execution issues [Sprout] is now facing, which are a result of its [go-to-market] strategy, should have been apparent much earlier than today***." Jefferies similarly highlighted the "***puzzling . . . disconnect between the actions that were taken at the beginning of the year . . . and now a material guide down***." And KeyBanc openly questioned "***what took the Company by surprise***," and asserted that, in light of these revelations, "***management will have to earn back some credibility***."

In the face of these highly detailed and well-pled allegations, Defendants try to rewrite history, claiming that Sprout's end-of-Class-Period disclosures were not admissions of failure, but of triumph. Indeed, Defendants assert that Sprout's sales model was working so well that the Company was actually "leaning into its *success*" by changing it. This argument is completely contradicted by the facts: Sprout did not completely "redraw" its sales model because that model was a "success"; analysts did not question management's "credibility" because the Company accurately disclosed information; and Sprout's stock price did not plummet 40% in a single day because the Company achieved a "successful" upmarket transition.

Defendants' other arguments similarly fail. For example, Defendants argue that the Complaint does not establish that Defendants' statements were false at the time they were made. But Defendants themselves ultimately *admitted* facts that rendered their statements false when made, including that they had long been aware that Sprout needed, and lacked, influencer marketing, and that Sprout had abandoned its much touted "inbound" sales model long before the end of the Class Period—despite contemporaneously claiming that "no changes" were needed to the model. The 15 CWs only further bolster that Defendants' statements were false when made.

Additionally, Defendants' argument that many of their statements were puffery fails.

Defendants' statements concerned the most highly material topic to Sprout's investors—its ability to achieve upmarket growth by targeting enterprise clients. Moreover, Defendants' statements about the efficacy of their sales motion, the capabilities of their products, and the lengths of their sales cycles were "determinate and verifiable," and thus not puffery. *Phoenix Ins. Co. v. ATI Physical Therapy, Inc.*, 690 F. Supp. 3d 862, 878 (N.D. Ill. 2023). And further, Defendants' statements were material because they were made in "direct response to an analyst's inquiry." *Allison v. Oak St. Health, Inc*., 2023 WL 1928119, at *5 n.1 (N.D. Ill. Feb. 10, 2023).

Defendants also argue that they lacked scienter. But the Complaint alleges a host of facts supporting scienter, including Defendants' own admissions, the pervasiveness of problems with Sprout's sales motion and product (as confirmed by numerous CWs), the critical nature of the subject matter of Defendants' statements, Defendants' own Class Period statements touting their close monitoring of enterprise sales, Defendants' suspicious Class Period stock sales, and the sudden and suspicious resignations of C-suite executives within a short period of time near the end of the Class Period. These facts are more than sufficient to plead a strong inference of scienter.

Third, Defendants argue that, even if they misled investors, there was no loss causation, as their disclosures supposedly "bear no relation to the purported misstatements." Defendants are wrong. The connection between Defendants' statements about their ability to attract and service enterprise customers, and their disclosures—which concerned adding features and sales infrastructure needed to attract those same enterprise customers—is more than sufficient at this stage. *See, e.g., Macovski v. Groupon, Inc.*, 553 F. Supp. 3d 460, 488 (N.D. Ill. 2021) (the "misstatements and omissions concealed the circumstances that ***bear upon*** the loss suffered").

Defendants' motion to dismiss should be denied in its entirety.

## II.     STATEMENT OF FACTS

### A.     Leading Up To The Class Period, The Key Question Facing Sprout Was Whether Its "Inbound," Trial-Based Sales Strategy And Its Social Media Marketing Platform Were Effective In The Large Enterprise Space

Sprout offers a software platform that enables businesses to manage and track their social media marketing across a variety of channels, including Facebook, Instagram, and X (Twitter). ¶33. Sprout generates revenue from subscriptions under a software-as-a-service ("SaaS") model. *Id.* In the years leading up to the Class Period, Sprout's business model was built primarily around targeting SMBs that purchased Sprout's services through inexpensive, month-to-month subscriptions. ¶34. Sprout primarily targeted these customers using an "inbound" and "product-led" sales motion, meaning that it relied on advertising and marketing to bring customers to its website or call center, at which point they would be offered a free trial of Sprout's services. *Id.*

Sprout repeatedly emphasized that this inbound, free-trial-based motion was the keystone of its sales strategy. For example, Sprout's Form 10-K for 2021 explained that "[o]ur model is focused on a product driven strategy, where potential customers are led to our website and sign up for a free trial of our products." ¶35. As such, Defendants explained, "[t]his approach allows us to cost-effectively drive strong lead generation, upgrade free trials to paying customers and achieve growth of our platform within organizations of all sizes." *Id.* In pre-Class Period investor conferences, Defendants touted this inbound model as "***a competitive differentiator***" and "a ***driving force in the new business acquisition*** in the top of the funnel." ¶36.

Although Sprout's business grew in the years prior to the Class Period, it also experienced consistent net losses, as it could not achieve profitability with SMBs, which required extensive and costly customer support, provided low revenue, and churned out of Sprout's business quickly. ¶¶1, 38-39. Accordingly, by the start of the Class Period, Sprout had shifted its strategy to target "upmarket" growth—*i.e.*, growth with larger "enterprise" corporate customers, which would

provide higher annual contract values ("ACV") and be more profitable for Sprout. ¶40. This "upmarket" move would purportedly enable the sustained revenue growth that Sprout needed to achieve profitability. Indeed, Defendants repeatedly told investors that, thanks to its "upmarket" strategy, Sprout anticipated growth "*at greater than 30% annual pace through at least 2025*," and that this was "*only scratching the surface of the ultimate opportunity*." ¶43.

> **B.** **Throughout The Class Period, Defendants Assured Investors That Their "Inbound" Model Was Sprout's "*Secret Weapon*" That Gave The Company A "*Significant Competitive Advantage*" In The Enterprise Space, And That Sprout's Platform "*Check[ed] All The Boxes*" For Enterprise Clients**

Throughout the Class Period, Defendants assured investors that their "inbound," "product-led" and "free-trial-based" sales model was just as effective with enterprise clients as it was with SMBs (¶49), and that Sprout had all the features needed to win those larger clients. Indeed, in every Sprout investor call during the Class Period, and often in direct response to analysts' questions, Defendants emphasized that their "inbound" sales motion was the "*secret weapon*" and "*secret sauce*" that was highly effective "*even [] for sophisticated customers in the mid-market and enterprise*." ¶42. Moreover, Defendants claimed that Sprout's strategy was highly effective with large clients precisely because its platform was "*well equipped*" for those customers and did not lack "*any functionality*" they required—*i.e.*, it "*checked all the boxes*" for the enterprise market. *Id.* Defendants also made clear that this inbound model provided quick sales cycles of just "30 to 45 days on average," which was a "significant advantage" versus competitors. *Id.*

For example, on September 22, 2021—the first day of the Class Period—during Sprout's first ever Investor Day conference, Defendants predicted growth "*at greater than 30% annual pace through at least 2025*." ¶43. Notably, Defendants emphasized that the key to that growth was large enterprise clients—especially those who provided more than $50,000 in annual recurring revenue ("ARR"), which Defendants repeatedly emphasized was the primary financial metric that

investors should use to value the Company. ¶¶43-44, 54, 58. Responding to analysts' concerns as to whether Sprout's existing sales motion was sufficient to land those clients long term, Barretto not only emphasized that the inbound strategy was sufficient, but that it was the "***secret sauce***" for landing those clients, whereby "***we lead with the product and specifically with trials. And we do this even if for sophisticated customers in the mid-market and enterprise***." ¶46.

Moreover, Barretto emphasized that this "secret sauce" was "extremely powerful for enterprise" clients because it enabled a quick turnaround in acquiring customers—*i.e.*, a short sales cycle, which allowed Sprout to "move faster with a focus on speed to ROI by getting [enterprise users'] hands on the keyboard." *Id*. As such, Sprout's sales model was purportedly a "***huge differentiator***" and a "***significant advantage***" in the enterprise space. *Id.* Analysts were reassured, noting that "the high point" of the conference was that the Company promised "***annual revenue & ARR growth of >30% through at least [2025]***," while expressing "confiden[ce] on the sustainability of [Sprout's] growth trajectory" because of the "projected ***outsized growth in the upmarket segments***." ¶47.

Similarly, in a November 2, 2021 earnings call, when analysts again questioned whether Sprout could continue its growth with enterprise clients without moving to a more "outbound focused" strategy with "direct sales teams," Barretto emphasized that "***not a lot has to change in our current [sales] motion***" because Sprout's "differentiated" and "disruptive" inbound model was in fact superior for targeting enterprise clients. ¶48. Defendants made similar claims at a December 7, 2021 Barclays investor conference (the "inbound" model was "really effective" "even in the enterprise space") and during their February 22, 2022 earnings call (Sprout's "product-led" motion was the driving force behind their growth and was a "***big competitive advantage***," and Sprout's sales cycles were just "30 to 45 days on average" even for large enterprise clients). ¶49.

Defendants also reiterated their 30% growth target on a November 3, 2022 earnings call, emphasizing that they were "*really confident about our ability to continue to hit the 30% [target] every year through 2025*." ¶58.

In addition to their inbound sales motion, Defendants also repeatedly insisted that Sprout's platform was more than adequate to meet the needs of enterprise clients. For example, during a January 12, 2022 investor conference, Defendant Del Preto touted that "one of the bigger drivers" that supported Sprout's upmarket progression was "*[b]eing able to have a full suite of products*" that specifically "*checked a lot of boxes with a lot of these enterprise clients*." ¶50. And during Sprout's February 22, 2022 earnings call, Defendant Howard similarly asserted that Sprout was "*well equipped*" because it maintained all the platform features needed for "*landing larger customer deals*." *Id.* Similarly, Sprout's 2021 Form 10-K confirmed that Sprout's "powerful platform" had all "the *robust capabilities needed by the most demanding enterprise users*." *Id.*

Importantly, throughout the Class Period, Defendants also emphasized that investors should consider growth in Sprout's key ARR metric as the best way to measure the Company's upmarket growth success. For example, Sprout's Class Period Form 10-Ks referred to ARR as a "*key business metric*" that Defendants used to "*evaluate our business, measure our performance, identify trends, formulate financial projections and make strategic decisions*." ¶37. And Defendants told investors during investor calls that "the best way to think about [our upmarket growth] … *is to focus on the ARR that we're getting from those customers*." ¶58.

### C. Defendants Promised An Additional Growth Boost From A New Partnership With Salesforce And Continued To Assure Investors That Sprout's Product And Sales Motion Were Sufficient For Sustained Upmarket Growth

On March 7, 2022, Sprout announced a partnership with Salesforce that would purportedly provide a massive additional boost to the Company's upmarket growth. ¶¶51-52. Specifically, over the following two years, Salesforce would discontinue its own social media marketing

platform, Social Studio, and steer its customers to Sprout.  ¶51.  At a June 7, 2022 investor conference, Barretto boasted that the Salesforce partnership would boost growth because it would provide thousands of new customers "that are going to migrate over the next couple years" to Sprout's platform, which was "***the very best option for any Salesforce customer***."  ¶52.

Meanwhile, Defendants continued to promise that Sprout's sales motion and product had everything needed to win over enterprise customers.  For example, during an August 9, 2022 investor conference, Del Preto insisted that Sprout ***did not lack "any feature sets or [have] any [gaps] in our feature sets***" for enterprise clients.  ¶53.  And during an August 11, 2022 investor conference, Del Preto emphasized that there was "***not any functionality we don't have to win these larger deals***" and that "***when we go into these customers, we check all the boxes***."  *Id.*

### D.    In The Face Of Post-Covid Headwinds, Defendants Emphasized That Sprout's "Secret Weapon" Inbound Model Was Enabling Continued Upmarket Success

 While Sprout had experienced a COVID-fueled boom in its business, by late 2022, that boom had begun to wane, as small and medium businesses faltered, and Sprout faced challenges acquiring enough mid-market and enterprise customers to make up for its customer losses.  ¶56.  Consequently, Sprout sought to make up for lost revenue by implementing significant price increases across the board.  Sprout announced these price increases on November 3, 2022.  ¶57.

However, notwithstanding the price increases, Defendants continued to assert that no meaningful changes were needed to Sprout's sales motion or platform.  Indeed, during the Company's November 3, 2022 investor call, Howard emphasized to investors that "***we're still going to lea[d] with the same inbound, product-led motion that's made us so successful***," and that enterprise customers still landed "with similar costs and similar sales cycles as the rest of our customer base."  ¶57.  And, in response to analyst concerns about whether Sprout required "any changes around the go-to-market or sales motion, either with more outgoing sales hires or

11

enterprise focused sales individuals," Barretto insisted that no such changes were needed, because "our customers *continue to come in and trial the product and that continues to be a major differentiator for us even in the enterprise* […] And so for us, *we love that in the enterprise, massive differentiator*." ¶58.  Barretto received similar questions during the Company's February 21, 2023 earnings call (whether, as the Company "focus[es] more on the enterprise," Sprout needed "any refinement" to the Company's "trial-led go-to-market model"), and, Barretto again emphasized maintaining the same "secret weapon" model that "we know…works really well for our enterprise customers."  ¶60.

### E.    In Truth, Sprout Never Had The Product, Strategy, or Sales Infrastructure For Sustained Growth With Enterprise Clients

Defendants' statements were false and misleading.  Indeed, as more than a dozen former Sprout employees who were directly familiar with its product and sales motion confirmed, and as Defendants later *admitted*, Sprout's product lacked critical features and functionalities required by enterprise clients.  Further, Sprout's sales motion was *not* highly successful with enterprise clients, and not the Company's "secret weapon" or a "significant advantage" in the enterprise space.  To the contrary, Sprout's strategy was such an abject failure with large corporate clients that the Company would ultimately be forced to abandon its "inbound" sales motion, completely "redraw" its go-to-market model, and adopt the "more outbound motion" that Defendants had previously disparaged Sprout's competitors for using.  ¶¶150, 164.

### 1.    Sprout Had "*No Business Competing In The Enterprise Space*" Given That Its Platform Lacked Several Essential Features Required By Enterprise Customers

As numerous former employees confirmed, and in direct contrast to Defendants' Class Period statements, Sprout's platform did not have all the "robust capabilities needed by the most demanding enterprise users," and in fact lacked critical "functionalit[ies]" that were needed "to win

12

these larger deals." ¶¶66-67.  Indeed, Sprout's platform was so inadequate for enterprise customers that, as one CW put it, Sprout had "***no business competing in the enterprise space***."  ¶66.

*First*, as CWs confirmed, and as Sprout later admitted, Sprout lacked influencer marketing capabilities.  CW 2 stated that, prior to the August 2023 Tagger acquisition, "Sprout didn't have the complexity level nor the influencers necessary to compete with companies like Sprinklr," its main competitor.  ¶68.  CW 3 explained that "influencer marketing was huge, and we were losing that battle with our competitors."  ¶69.  CW 4 and CW 5 corroborated this, with CW 4 explaining Sprout was "***making promises we couldn't keep***" about influencer marketing capabilities.  ¶72.  Thus, CW 1 explained, "the reality is that Sprout had to go out and acquire Tagger because whatever we were doing" in influencer marketing "was just not powerful enough."  ¶71.  Thus, Defendants' claims that there were no "deficiencies" in Sprout's features were "***bullsh\*t***" and "***not the truth***."  *Id.*

*Second*, Sprout's platform lacked sufficient "social listening" tools necessary to analyze social media conversations about a brand or industry.  ¶73.  CW 1 explained that Sprout "never had the full in-depth granular capabilities and metrics as the competition" in the enterprise space, and CW 2 concurred, noting that Sprout "didn't compete well with other enterprise solutions like Sprinklr" because "the social listening tools Sprout had were lackluster."  ¶¶73, 75.  CW 6 likewise agreed that Sprout did not "provide a customer 360[-degree] view of what's happening on social," although this was a "very basic" functionality.  ¶75.

*Third*, Sprout lacked high quality application program interfaces ("APIs")—which allowed social media networks to integrate with third-party apps—although enterprise clients required them.  ¶76.  CW 7 observed that "Sprout's API's weren't robust," and CW 2 corroborated that "[Sprout] had bad API" that was insufficient in the "majority of [client] demonstrations."  *Id.*

*Fourth*, Sprout lacked the advanced analytics capabilities required by enterprise clients.

For example, CW 1 stated that competitors like Sprinklr could "provide more analytics on paid social capability" and had "more in-depth analytics with [] listening data." ¶77. CW 4 and CW 2 corroborated that Sprout "needed more robust reporting and needed to monitor the web real time" in order to compete with companies like Sprinklr, for enterprise customers. ¶78. And CW 6 explained that while Sprout's capabilities might have been "fine for companies where you have five people in the marketing department," "[w]hen you have a multinational company" and "social leads in different countries" and "different product marketing teams that each will need to have access to a tool like that to get performance metrics … that kind of analytics… Sprout can't do that." ¶79.

*Fifth*, Sprout lacked scalability to support enterprise customers. As CW 8 explained, "[w]e did not have as many capabilities, to be able to scale things for large customers like franchises with multiple locations," and that "[w]e lost out to Sprinklr, our largest enterprise competitor, frequently because of that." ¶80. CW 4 similarly corroborated these problems. *Id.*

*Sixth*, CW 7 confirmed that Sprout's platform only operated in a small handful of languages, and was thus unusable by global clients who needed other languages. ¶81. CW 1 confirmed that Sprout lacked sufficient "language capabilities" for global enterprise clients. *Id.*

In sum, as CW 6 explained, even by 2024, Sprout was not "***fully enterprise-grade***" because "***[Sprout] doesn't necessarily have all the potential integrations, API, and so on that other tools may have to get into those large complex tech stacks***." ¶83. Asked whether Sprout was competitive for enterprise clients, CW 6 unequivocally declared: "***the answer is no***." *Id.* CW 1 confirmed that "[t]here was an understanding that we were struggling or that we couldn't compete with Sprinklr" due to these gaps, "and for this reason, this customer is going to go with a different solution." ¶84.

### 2. CWs Confirm That Sprout's "Inbound" Sales Strategy Was "*Very Ineffective*" and "*Definitely Not Successful*" With Enterprise Clients

Numerous former employees explained that, contrary to Defendants' public statements,

Sprout's "inbound 30-day trial approach" was decidedly not a "massive differentiator" for the Company and did not give Sprout a "huge strategic advantage" with enterprise clients. CW 3 described Sprout's inbound strategy as "***very ineffective***," "***not something that was successful for enterprise***," and "***definitely not successful***" with enterprise clients—to the point that post-sales teams "actively [] fought against" this strategy for enterprise because it negatively impacted their sales performance. ¶91. CW 7 similarly explained that Sprout's inbound enterprise pipeline "was rather weak" and that its free-trial sales model did not work for selling to large Fortune 500-type companies. ¶92. CW 2 confirmed the inbound model did not work for enterprise clients, recounting that by January 2023, "[i]nbound leads fell off because we were no longer focused on SMB." *Id.*

Former employees also confirmed that, contrary to Defendants' representations, Sprout's sales model did not produce "faster sales cycles" with enterprise clients—instead, the opposite was true. As Defendants later admitted, Sprout was experiencing "lengthening of our sales cycles" as it moved upmarket. ¶93. CW 7 confirmed that "[e]nterprise contracts would take six months to a year to complete." *Id.* CW 4 corroborated that "[e]nterprise contracts always took longer," as did CW 12. ¶¶95, 97. CW 10 described a similar timeline, which he attributed to the large numbers of decisionmakers involved at large corporations. ¶97. And CW 11 corroborated this, explaining that Sprout would be "dealing with larger procurement processes and more red tape." *Id.*

### 3. Sprout's Only "Competitive Advantages" With Enterprise Customers Were Cheap Prices And False Promises, Such That When Sprout Tried To Raise Prices, Its Inbound Pipeline Dried Up

Numerous former employees confirmed that Sprout's true strategy for generating "inbound" business was reliant almost entirely on low pricing, and that Sprout's services were too deficient to support the price increases Sprout sought to impose on its customers. As CW 4 explained, "Sprout did not generate Enterprise business, basically the Enterprise businesses would call into our call center for service," to see if they could save money versus competitors like

Sprinklr. ¶98. CW 11 and CW 2 fully corroborated this, and CW 2 explained that, once he learned in 2022 that the Company was roughly tripling the prices of its standard, professional, and advanced packages, he and his colleagues wondered "How the hell are we going to sell this?" *Id.*

As predicted, CWs confirmed that, due to these price increases, Sprout's sales pipeline began to dry up beginning at the end of 2022 and plummeted into 2023. CW 2 recalled a sharp drop in sales by January 2023 as "[w]e were trying to compete with companies like Sprinklr [], but *we didn't have their capability and our prices were not competitive*." ¶99. CW 13 recalled that, following the price hikes, "[sales] [p]eople were not performing because sales plummeted." *Id.* As CW 13 summarized: "*It became the perfect storm of price increases causing lead decreases*." *Id.* CW 14 confirmed a steep decline in enterprise sales following the price hikes, and estimated that 20-30% of existing customers terminated their contracts due to the increases. CW 10 similarly recalled "a lot of churn and customers leaving" due to the price hikes. ¶100.

As Sprout lost customers due to price increases and its inbound model struggled, in early 2023, management scrambled to shift the Company's business away from the pure inbound sales model and toward a more outbound model. However, Sprout lacked sufficient sales infrastructure to do so and continued to struggle in the enterprise space as a result. As Defendants later admitted, and as CWs confirmed, Sprout lacked an "enterprise-grade team" and lacked the "vertical sales" teams (specialized teams for particular industries) needed to target enterprise clients. ¶¶107, 150. CW 1 explained that "having verticals, such as representatives who could focus on particular targets like pro sports or the hospitality industry and tailor their outreach, is a basic sales motion and *something that should have happened as soon as the company started to go upmarket*," but that this was lacking. ¶107. CW 7 confirmed that "*[t]here was no large verticalization set up for our large team sellers*"; instead, Sprout had a "tiny, tiny vertical strategy" for enterprise. *Id.*

16

Rather than fully invest in a proper outbound salesforce, however, Sprout attempted to repurpose its existing teams and pressure them to do outbound sales, a makeshift strategy that had little success. For example, CW 7 explained that "[w]ith inbound leads drying up our teams started a project to transition from inbounding to outbounding," and CW 3 similarly corroborated this account. ¶108. But CW 7 explained that this failed, as outbound sales "was a difficult skill to train in such a short time" and that by Q2 2023, there was "a good number of sales reps struggling to pick up on outbounding at the pace Sprout needed to be successful." ¶110. CW 3 observed that sales teams "weren't prepared" for outbounding to the enterprise market, and that, consequently "across the board everyone was struggling to hit their quotas." ¶111. CW 14 recalled that, by Spring 2023, "[p]eople were not hitting their numbers and there was a large drop-off of clients being signed." *Id.* CW 2 corroborated that Sprout's employees were struggling with the new focus on outbound sales, that Sprout put few resources toward this effort, and that, consequently, sales began plummeting by January 2023. ¶112. CW 12 further corroborated this. ¶113.

### 4. Sprout's Boost From The Salesforce Partnership Was Short-Lived, Its Price Increase Failed, And Sprout Resorted To Rampant Discounting

With Sprout's inbound strategy struggling with enterprise customers and lacking a proper "enterprise-grade" sales system, Sprout sought a temporary boost to growth from its Salesforce partnership. However, Salesforce never delivered anywhere near the promised growth—as CW 1 explained, it was seen as a "lifeline" but ultimately proved to be "a total flop," because Salesforce's customers "didn't want to pay for Sprout." ¶116. Thus, CWs confirmed that Sprout resorted to "crazy discounts" to stave off a growth decline. ¶117. For example, CW 2 explained that "[t]here was a feeling of desperation," and recalled that C-suite management had told everyone to "[t]hrow any offer at the client to close the deal," so he "was giving insane 70% discounts" across the board. ¶121. CW 13 similarly recalled that, by February or March 2023, "[w]hen Sprout realized they

17

weren't doing so great (with the price increases) *we started to discount like crazy*."  ¶122.

**F.      The Truth Began To Leak Out, But Defendants Continued To Tell Investors Their Upmarket Strategy Was Working**

On April 4, 2023, a short seller called Akram's Razor released a report that cast doubt on Sprout's repeated claims regarding its success and competitiveness in the enterprise market.  ¶123. The report explained, in detail, that Sprout's "off-the-shelf" product was struggling in the enterprise market, including because it had been built for SMBs and was not up to par with competitors like Sprinklr.  ¶124.  The Razor Report quoted the author's calls with numerous enterprise customers who, just like the CWs, confirmed that Sprout lacked a variety of critical features and tools needed by those customers, while also being "just as expensive" as Sprinklr following the price increases.  *Id.*  As such, these customers found it to be a "no-brainer decision as to why we wouldn't use [Sprout]," which was "just super, super unreliable."  *Id.*

The report further provided a detailed analysis explaining why Sprout's much-touted business boost from the Salesforce partnership was already in the "last innings" of customer migration.  ¶125.  In fact, the report detailed that this growth boost was only temporary and had "obfuscated the organic realities of [Sprout's] business."  ¶126.  Rather than admit this, the report opined, Sprout had been "play[ing] [] up/mischaracterize[ing] [the Salesforce Partnership] to investors as evidence of a sudden and successful strategic shift upmarket by them."  *Id.*

A few weeks later, on May 2, 2023, Sprout reported disappointing financial results—including its lowest number of new enterprise customers in over two years.  On this news, Sprout's share price dropped $9.79, or more than 20%, from a close of $48.32 on May 2, 2023 to $38.53 on May 4, 2023.  ¶127.  Significantly, however, Defendants stemmed any further decline by making a series of highly positive statements that contradicted the Razor Report and reassured investors that Sprout's poor results were a temporary blip.  Indeed, Defendants *raised* their annual

ARR guidance to "***greater than 33% [ARR growth] year over year***" (¶128), and assured investors that "***we're seeing just really great progress in our enterprise***" and that "*[w]e feel really great, obviously, about the go-to-market motion that we've build and we've honed over 13-plus years*," while further boasting that it "continues to be the best weapon [] in the space." ¶¶128-29.

Then, on August 3, 2023, Sprout again surprised the market by reporting disappointing ARR and customer additions. In addition, despite assuring investors for years that Sprout had the "robust capabilities needed by the most demanding enterprise users" and there was "not any functionality we don't have to win these larger deals," Defendants now revealed that they lacked at least one absolutely critical feature—influencer marketing—and, as a result, Sprout had been forced to pay an exorbitant $140 million price for Tagger to acquire that capability. ¶133. Significantly, Defendants confirmed that they had long been aware that Sprout's platform lacked this critical feature, as they acknowledged that influencer marketing was a "***customer requirement***" that Sprout saw "***in more than half of our enterprise RFPs***" and that a "***substantial amount of the enterprise and even the mid-market deals that we're working on***" required it—a fact they had been aware of since at least "the beginning of last year," *i.e.*, ***in January 2022***. *Id.* On this news, Sprout's stock price fell 12.3%, from a close of $53.38 per share on August 3, 2023, to a close of $46.81 per share on August 4, 2023. ¶134. Nonetheless, Defendants represented that they were still able to "***land [enterprise] customers incredibly fast because of [our] trial model***" and that they had "***seen a lot of success with our enterprise team***" because Sprout's "***products are perfectly positioned for these enterprises***." ¶¶137, 227.

Following this announcement, a wave of C-Suite executive resignations began, with Sprout's Chief Marketing Officer, Chief Revenue Officer, and co-founding Chief Technology Officer all leaving their positions between September and December 2023. ¶142. And on April

15, 2024, Sprout abruptly announced that co-founder and CEO Defendant Howard would be stepping down as CEO effective October 1, 2024. ¶147. However, Defendants continued to make blatantly false statements about the supposed effectiveness of their model. For example, during a November 2, 2023 earnings call, at the exact same time Defendants were completely "redrawing" their inbound sales model because it was so ineffective—Defendant Barretto insisted that "***our go-to-market strategy is working***" and that Sprout's sales model remained "***very consistent with what we've done before and so no surprises for all of you in the way that we grow our business***." ¶151. And even as late as February 23, 2024—just two months before the end of the Class Period—Sprout's Form 10-K touted its "product driven strategy, where potential customers are led to our website and sign up for a free trial or to request a demonstration of our products," allowing Sprout to "cost-effectively drive strong lead generation, upgrade free trials to paying customers, drive strong conversion of demonstration requests, and achieve growth of our platform." *Id.*

### G. The Truth Was Fully Revealed In May 2024

On May 2, 2024, Defendants stunned the market by revealing that, contrary to their positive statements throughout the Class Period, Sprout's platform and "inbound" sales model were an abject failure with enterprise customers, forcing Sprout to totally "redraw" its model. Specifically, Sprout announced "significantly lower" full year guidance, due in large part to a dramatic slowdown in upmarket sales, and slashed its growth guidance to just 22%—far below the 30% target that they had repeatedly touted as the key to achieving sustained success and profitability. ¶¶10, 43, 58, 128, 139, 149. Significantly, the disclosure revealed that Sprout's enterprise business growth had fallen off a cliff, with new mid-market customer additions cratering nearly ***80%*** from the prior quarter (to the lowest level since 2019) (¶149), and new enterprise customers falling by nearly ***two thirds***. *Id.*

Moreover, contradicting their prior statements that Sprout's inbound model was a "secret

weapon" and a "significant competitive advantage" with enterprise clients, Defendants now admitted that the opposite was true—selling to enterprise customers was "***orders of magnitude different***" from SMBs, forcing Defendants to completely "***redraw[] our go-to-market model***." ¶150. Among other things, the Company now disclosed that Sprout had to make significant and costly new investments in building out vertical sales teams, as well as "accelerating promotions in our mid-market and enterprise teams," "adjusting our account coverage model" and "prioritizing Tagger enablement for all our customer-facing teams." *Id.* In other words, Sprout was forced to implement a complete overhaul of its "inbound" model and convert it to an "outbound" model. Defendants further admitted that, contrary to their prior representations, Sprout's enterprise focus had led to longer sales cycles—*i.e.*, that "***we are definitely seeing lengthening of our sales cycles as the composition of the customer base and the prospect base is changing***." ¶152.

Significantly, Defendants admitted that they had known of these problems ***since at least the fall of 2023, or eight months earlier***. Indeed, as Barretto acknowledged, "***the decisions on all this happened in Q4***" of 2023 (the quarter beginning October 1, 2023). ¶151. Additionally, in an obvious effort to conceal any further decline in Sprout's enterprise business, Defendants announced that, after telling investors for years to "focus on" ARR as Sprout's "key business metric" for growth, they supposedly "***no longer believe[d] that ARR and total number of customers are key performance indicators of Sprout Social's business*** due to our evolving customer mix and ***we will no longer report these metrics***." ¶153. Further, contrary to their recent statements touting the Salesforce partnership as a significant "multiyear revenue opportunity" for enterprise growth, Barretto announced that former Salesforce clients "accounted for slightly less than 15% of our new business in 2023 and less in 2022," with a mere "3% contribution to our total 2023 revenue growth," which was "significantly less than … previously assumed." ¶155.

Finally, Defendants made clear that the issues impacting Sprout's business were not the result of external factors, and that Defendants themselves were to blame. Indeed, Barretto stated that Sprout's upmarket failure was "***self-induced***," expressly admitting: "***I own this***." ¶156.

In direct response to these disclosures, the price of Sprout Social stock plummeted 40.1% in a single day—falling from a closing price of $48.15 per share on May 2, 2024, to a closing price of $28.82 per share on May 3, 2024—the largest drop since the Company's IPO.[2] ¶157.

Analysts were stunned and excoriated management for not disclosing the issues impacting Sprout's business earlier. Cantor Fitzgerald emphasized that Sprout "***will be in the proverbial 'dog house'***" and opined that "transparency, leadership turnover, and execution are on top of every investors' mind," while noting that "***the execution issues [Sprout] is now facing, which are a result of its [go-to-market] strategy, should have been apparent much earlier than today***." ¶158. Jefferies underscored the "***puzzling . . . disconnect between the actions that were taken at the beginning of the year . . . and now a material guide down***." *Id.* KeyBanc questioned "***what took the Company by surprise***" given that its upmarket transition had been long underway, opining that "***management will have to earn back some credibility***." *Id.* Canaccord bluntly stated: "***This is a team that, in our view, hasn't done itself any favors . . .*** [t]his quarter was ***clearly a disappointment and the magnitude of changes surprised us***." ¶159.

Analysts further noted that Sprout's decision to stop reporting ARR was further evidence of the Company obscuring the truth about its business, and would "***raise skepticism in the***

---

[2] Defendants' MTD claims that "Sprinklr, a competitor, suffered a 34% stock drop preceding Sprout's Q1 2024 results and a further 15% decline post-announcement for similar reasons." Br. at 12. However, Defendants provide no factual support for their claim, and Sprinklr's stock price did not suffer any large price drops in the weeks either immediately before or immediately after May 2, 2024. Moreover, Defendants themselves expressly denied that Sprout's failures were due to broader industry or market phenomena, instead calling them "self-induced." ¶156. Regardless, it would be inappropriate to draw any inferences at this stage from purported stock price movements in another Company's stock, which could have occurred for any number of reasons unrelated to the allegations in this case.

*investment community*." ¶160.  Canaccord Genuity asserted that Defendants were "***stripping some visibility into what's occurring.***"  *Id.*  Cantor Fitzgerald bluntly questioned, ***"Why no more ARR?"*** given that "for a business whose revenue consists of 99% subscription, we question how it is not a KPI…this ***makes the business less transparent***."[3]  *Id.*

## III. ARGUMENT

### A. The Complaint Adequately Pleads Material Misstatements And Omissions

In evaluating whether a statement was false or misleading, "a court must consider the context in which the statement was made and determine whether the facts alleged are sufficient to support a reasonable belief as to the misleading nature of the statement or omission." *Groupon*, 553 F. Supp. 3d at 474.  "Even statements that are literally true can still be actionable … if they are susceptible to another interpretation by a reasonable investor." *Id.*  A statement should only be dismissed as immaterial if it is "so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance."  *In re Akorn, Inc. Sec. Litig.*, 240 F. Supp. 3d 802, 815 (N.D. Ill. 2017)

> #### 1. Defendants Made Materially False And Misleading Statements That Sprout's "Inbound," "Trial Based" "Product Led" Sales Motion Was Sufficient For Enterprise Clients

Throughout the Class Period, Defendants made highly specific statements touting Sprout's "inbound" sales strategy as a "secret weapon," the "best weapon," and a "massive differentiator" that enabled upmarket success with "enterprise customers."  ¶¶58, 60, 206, 213, 220, 226.  For example, from the outset of the Class Period, Defendant Barretto claimed Sprout's inbound model

---

[3] Following the Class Period, Defendants made further admissions.  For example, during a May 15, 2024 investor conference, Defendant Rechel admitted that Sprout had been working on revamping the Company's sales infrastructure—including training "the entire sales and success organization" and establishing "vertical sales teams," – "***over the last 18 months***"—*i.e.*, ***since the end of 2022***.  ¶163.  And in a December 11, 2024 investor conference, Defendant Del Preto admitted that the Company needed "more outbound motion," to reach enterprise clients, and confirmed that it was still "***early innings as far as like where we are in the overall like move up market***."  ¶164.

was the "secret sauce" enabling success "even [] for sophisticated customers in the mid-market and enterprise." ¶175. Similarly, Barretto insisted that Sprout's "industry-leading approach to inbound" was "winning in the enterprise," "allowed [Sprout] to land much larger customers faster," and was the "right model for us to continue to sustain growth"; or, in other words, Sprout's "go-to-market strategy [was] working." ¶¶222, 229. Del Preto also crowed that the inbound motion was "working even better in the enterprise"; Howard asserted that it was the "inbound, product-led motion that's made us so successful"; and Rechel praised the "efficient go-to-market model … up through the largest of enterprises." ¶¶197, 206, 218.

Significantly, in light of the critical importance of Defendants' upmarket growth strategy, analysts regularly questioned whether the Company's existing sales motion was truly sufficient for enterprise clients, with analysts regularly asking if Sprout's upmarket move necessitated a "change [in] the way in which [Sprout would] go to market," an "evolution in [Sprout's] sales and marketing strategy," or whether the new client prospects required "direct sales teams that are going to be a lot more outbound focused." ¶¶176, 180. In response, Defendants consistently insisted throughout the Class Period that their sales motion and product were perfectly well-suited to those customers, and that "not a lot has to change." *See, e.g.,* ¶¶176, 180, 182, 193, 205-06, 213, 229. Such statements were thus highly material to investors, not only because they concerned matters of critical importance to Sprout's growth strategy, but because they were made in "direct response to an analyst's inquiry." *Oak St. Health*, 2023 WL 1928119, at *5 n.1. Indeed, analysts relied on these responses and specifically lauded Sprout's supposed "differentiated go-to-market model" and "ability to leverage its product-led [go-to-market] engine" as reasons for the Company's success with "larger enterprise customers." ¶¶4, 47, 55.

However, Defendants' statements were materially false and misleading. In reality, as

24

Defendants later admitted, Sprout's inbound model was a failure with enterprise clients, and as a result, enterprise growth plummeted. Indeed Defendants themselves admitted that, as a direct result of these failures, Sprout had been forced to abandon its inbound sales strategy and "redraw[] [its] go-to-market model" by shifting to an "outbound" sales motion, because the enterprise space was "orders of magnitude different" from the SMB space for which Sprout's inbound model was designed. ¶150. Significantly, multiple CWs uniformly confirmed that these issues plagued the Company's business throughout the Class Period, and Defendants themselves also admitted that they had initiated these dramatic changes by no later than the fall of 2023, stating that "*the decisions on all this happened in Q4*" 2023—*i.e.*, at the same time that they told investors in November 2023 that there were "no major changes to call out" because the "motion [] we have today" worked. ¶¶152, 229. It was materially false and misleading for Defendants to represent to the market that Sprout's sales motion "worked" and that there were "no major changes" to report on that front when, behind the scenes, that sales motion in reality was ineffective to land enterprise customers, and Defendants were forced to completely "redraw" that very motion because of its inadequacies. ¶150. *Groupon*, 553 F. Supp. 3d at 474 (statements that marketing strategy was working were false); *Azar v. Yelp, Inc.*, 2018 WL 6182756, at *17 (N.D. Cal. Nov. 27, 2018) (company's acknowledgement of a "*modest slowdown*" felt "*halfway through the quarter*" evidenced falsity for statements made at "*almost the exact halfway point of*" the quarter and later).

Unable to refute these allegations, Defendants argue that their end-of-Class-Period admissions were not admissions at all. Instead, Defendants implausibly claim that they completely redrew their entire go-to-market model not because it was a failure, but because in reality it was "so successful in acquiring Enterprise customers" that the changes to the go-to-market strategy were indicative of Sprout "*leaning into its success*." Br. 18-20.

25

Defendants' argument is absurd. Sprout's disclosures at the end of the Class Period refute Defendants' spin and establish that Sprout was doing the exact opposite of "leaning into its success." Indeed, Sprout was forced to "redraw" its sales model at the same time as it reported an 80% decline in new mid-market customers, a two-thirds decline in new enterprise customers, a significant revenue miss, and a dramatic reduction in the guidance it had issued a mere two months prior. ¶¶149-50. A company does not "redraw" its sales model if that model is a rousing "success." In fact, these failures were so dramatic that Barretto was compelled to ***issue an apology***, stating "***I own this***," and confessing that the misses were "***self-induced***." ¶156. Nor did analysts interpret Sprout's dismal results as a "success"—rather, analysts put Sprout in the "***dog house***," expressly noting "***disappointment***" in the "***magnitude of the changes***" and lamenting that the "***execution issues [Sprout] is now facing, which are a result of its [GTM] strategy, should have been apparent much earlier than today***." ¶¶157-159.[4] Investors likewise did not see "success," but instead sent Sprout's stock price crashing 40% in a single day—to its lowest point since its IPO. ¶157. Defendants' counter-narrative is belied by the facts and must be rejected.

Moreover, and notably, Defendants' disclosures coincided with an overhaul in Sprout's executive management—in which the Company's Chief Marketing Officer (who led "marketing and GTM strategy"), Chief Revenue Officer, Chief Technology Officer/co-founder, and CEO/co-founder all resigned from their executive positions in a matter of months as the truth of Defendants' fraud was revealed. ¶265. The resignation and replacement of the primary C-suite officers

---

[4] *See, e.g., E. Ohman J:or Fonder AB v. NVIDIA Corp.,* 81 F.4th 918, 937 (9th Cir. 2023), *cert. granted sub nom. NVIDIA Corp. v. Ohman J,* 144 S. Ct. 2655 (2024), and *cert. dismissed as improvidently granted,* 604 U.S. 20, 145 S. Ct. 33, 220 L. Ed. 2d 259 (2024) ("The response of investors and analysts after [the] disclosures … make clear that [the defendants'] statements during the Class Period were materially false and misleading.").

responsible for Sprout's business strategy are not indicative of a Company's "success."[5]

Defendants also claim that the Complaint fails to plead the go-to-market statements are false because the Complaint purportedly lacks "any data" about the number of customers acquired through the inbound model, the "conversion rates" under either the inbound or outbound model, or the success of inbound versus competitors.  Br. at 16-17.  However, not only is that level of specificity not required at the pleading stage,[6] but Defendants' argument ignores that they *admitted* at the end of the Class Period that Sprout's inbound sales model was a failure with enterprise customers, and as a result, Sprout had to completely "***redraw***" its entire sales model because selling to enterprise clients was "***orders of magnitude different***" than selling to SMBs—meaning that Sprout's inbound model was completely different than what was needed to succeed in the enterprise space.  Furthermore, Defendants admitted that this had become apparent by Fall 2023 ***at the latest***.  ¶¶107, 150-51.  These allegations are more than sufficient to establish falsity. *Groupon*, 553 F. Supp. 3d at 477 (falsity where defendants presented "narrative" that would supposedly "lay the foundation for long-term [] growth" despite contrary adverse information).

Moreover, Defendants' argument fundamentally misapprehends Plaintiffs' theory of falsity. The Complaint does not allege that Sprout *never* obtained *any* larger customers, but rather that Sprout could not obtain sufficient enterprise clients to achieve the levels of revenue growth needed

---

[5] Defendants' argument that Plaintiff took "liberties" to "concoct" admissions by supposedly "butcher[ing] the colloquy" fails.  Br. at 18-20.  It is unsurprising that Defendants attempted to couch their admissions in the context of positive spin (e.g. that redrawing the go-to-market model was a "massive unlock to our future potential"), but none of this alters the fact that, in announcing these dramatic changes, Defendants were implicitly admitting that (1) their previously-touted inbound model was not actually sufficient for enterprise clients, and (2) they had long known this, even as they repeatedly publicly claimed otherwise.

[6] *See, e.g., Leventhal v. Chegg, Inc*., 721 F. Supp. 3d 1003, 1012 (N.D. Cal. 2024) ("such detailed quantification is unnecessary"); *In re First Merchants Acceptance Corp. Sec. Litig*., 1998 WL 781118, at *8 (N.D. Ill. Nov. 4, 1998) ("precise amount of the overstatement" not needed as that requires "records in the hands of defendants and obtainable through discovery");  *In re HD Supply Holdings, Inc. Sec. Litig*., 341 F. Supp. 3d 1342, 1356 (N.D. Ga. 2018) (no need to "specifically quantify how false the statements were" as "[t]his will be made clear through discovery"); *Robbins v. Altopa, Inc*., 2023 WL 2484827, at *2 (E.D.N.C. Mar. 13, 2023) ("[T]he PSLRA does not require plaintiffs to set forth facts which, because of the lack of discovery, are in the exclusive possession of the Defendants").

to become profitable—*i.e.*, the 30% year-on-year revenue growth Sprout proclaimed Sprout would achieve through at least 2025.[7]  ¶¶10, 43, 58, 128, 139, 149.  And further, Defendants ignore the Complaint's allegations that many of the enterprise customers that Sprout did acquire chose Sprout primarily on cheaper pricing, false promises, or prodding from Salesforce, rather than because of Sprout's "inbound" model or its platform capabilities.  ¶¶98-100, 126; *see Holwill v. AbbVie Inc*, 2020 WL 5235005, at *3 (N.D. Ill. Sept. 1, 2020) (false to "attribut[e] growth and success" to "sales and marketing practices and programs" where unsustainable factors were true cause).[8]

### 2. Defendants Made Materially False And Misleading Statements About Their Product's Adequacy For Enterprise Clients

Throughout the Class Period, Defendants assured investors that Sprout's platform had everything needed to win enterprise clients.  Indeed, in response to analyst concerns about whether Sprout's product was competitive with larger clients, Defendants assured that there was "***not any functionality we don't have to win these larger deals***," that there were not "any [gaps] in our feature sets," that Sprout "check[ed] all the boxes," and that it was "well equipped for the deals that are out there" with enterprise clients.  ¶¶50, 53.  These statements were not only "factual [and] specific," but were highly material to investors, as they were made "in response to questions from analysts" about whether Sprout lacked any features needed to land enterprise clients.  *Hedick v.*

---

[7] Sprout's most recent financial results released May 8, 2025 showed that Sprout's revenue grew just 13% from the same quarter prior year—less than half of the needed growth—and that Sprout continued to operate at a net loss.

[8] Defendants' authorities are inapposite.  Indeed, Defendants' heavy reliance on *Babin v. Shchekin*, 2017 WL 403568 (N.D. Ill. Jan. 30, 2017) (Br. at 14, 18, 20, 22, n. 12), is demonstrative of this deficiency, as *Babin* involved a 16-page complaint that merely listed false statements and did "not set forth specific facts or contradictory information known to [the defendant]." *Id*. at *8.  Similarly, Defendants' present-tense statements (the "go-to-market strategy is working" and the reason for upmarket growth was "in large part because of our inbound" (¶¶176, 229)), distinguish the facts here from the vague, forward-looking statements in *Chew v. Moneygram Int'l, Inc.*, 2024 WL 4346522, at *7, *9 (N.D. Ill. Sept. 30, 2024) (Br. at 14, 18, 20, 28, 33, 42), which involved "descriptions of the *purpose* of MoneyGram's efforts" in regulatory compliance but "no claims whatsoever about the *results* of those efforts." (emphasis in original).

*Kraft Heinz Co.*, 2021 WL 3566602, at *10 (N.D. Ill. Aug. 11, 2021). *See* ¶¶188, 199, 202.[9]

However, Defendants' statements were materially false and misleading. *First*, as Defendants admitted on August 3, 2023, Sprout clearly lacked one crucial feature—influencer marketing—which was a "critical" "requirement" showing up in "more than half of our enterprise conversations" and in more than half of enterprise client RFPs. ¶133. Indeed, this was further corroborated by a former customer success manager, who explained that, prior to acquiring Tagger, "influencer marketing was huge and we were losing that battle with our competitors." ¶178.

*Second*, numerous CWs detailed a plethora of other features that were needed by enterprise clients but either lacking or severely underdeveloped at Sprout, such as advanced analytics capabilities, advanced social listening, APIs, collaboration tools, and foreign language capabilities. ¶¶106-14. *See, e.g., Constr. Indus. & Laborers Joint Pension Tr. v. Carbonite, Inc.*, 22 F.4th 1, 7-8 (1st Cir. 2021) (statements that product "is just completely competitive and just a super strong product" and "improves our performance for backing up virtual environments and makes us really competitive" were misleading when the complaint alleged that the product "could not back up virtual environments"); (statements actionably false and misleading where they were "flat-out claims about [defendants' product] as it then stood"). *Id.* at 11. Indeed, as CW 1 put it, due to these product deficiencies, "*[w]e had no business competing in the enterprise space.*" ¶178.

Defendants nonetheless argue that their statements were not "specific" and did not "contain

---

[9] Defendants incorrectly assert that "Plaintiffs only point to two representations in the CAC that even relate to Sprout's product." Br. at 24. But the MTD omits to address Defendant Del Preto's August 11, 2022 statement, in direct response to an analyst question (about whether growth was "product-driven,") that there was "not any functionality we don't have to win these larger deals" and that, "when we go into these customers, we check all the boxes." ¶¶53, 202. Additionally, the MTD mischaracterizes another of Defendants' statements – Defendant Howard's February 22, 2022 claim that "we're well equipped for the deals that are out there. . . . So there's not anything that we would look to and put on the board as deficiencies" as being about Sprout's "sales infrastructure" rather than its product. Br. at 25, n. 5. But Defendant Howard's statement was in response to an analyst question about whether there were "any major ***technical areas or lack of certain feature sets in your offering today*** that you feel still notable headwinds to . . . landing larger customer deals[.]" This statement was about Sprout's product and not its "sales infrastructure." ¶188.

a single representation about the product's specific capabilities, including any boasts about influencer marketing or analytics." Br. at 24. This is nonsense. Claiming that there was "not any functionality we don't have to win these larger deals" and that Sprout did not lack "any feature sets or [have] any [gaps] in our feature sets" was undeniably specific. ¶¶50, 53. Sprout either did or did not have these enterprise-level functionalities—a "testable binary proposition." *Duran v. Henkel of Am., Inc.*, 450 F. Supp. 3d 337, 348 (S.D.N.Y. 2020) (statement that product causes "no flakes" was "[f]ar from puffery …the gel either leads to flaking, or it does not"). Such statements are "determinate and verifiable." *Phoenix Ins.*, 690 F. Supp. 3d at 878; *see also In re AppHarvest Sec. Litig.*, 684 F. Supp. 3d 201, 260 (S.D.N.Y. 2023) (statements that "thankfully COVID has not in any way impacted our operation" not puffery because it "convey[ed] that the global COVID-19 pandemic has had *no* impact…" such that "[t]f the pandemic had impacted [the company's] operations in any way … these statements would both be false") (emphasis in original).

Defendants next argue that Sprout's customer growth and accolades somehow refute that it lacked necessary functions needed to succeed in the enterprise market. MTD at 24-25. But the Complaint readily acknowledges that Sprout was able to win *some* enterprise customers, while alleging that Sprout's model and product were insufficient to win *enough* enterprise customers to achieve the 30% year-on-year growth it needed to become profitable. ¶¶126, 143, 269. Again, the notion that Sprout's platform was a resounding success in obtaining enterprise clients is belied by Defendants' own admissions and ignores the plethora of CWs uniformly confirming that the platform lacked numerous critical features required by large clients.[10]

---

[10] Additionally, any "awards" or "recognition" Sprout purportedly received—apparently from a website called G2— are not only irrelevant, but wholly outside the pleadings and thus inappropriate for consideration on a motion to dismiss, as they are not the sort of "universal truth" that is "generally known within the trial court's territorial jurisdiction," or that "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." *See* Br. at 9; *Carter v. Brackenbox, Inc.*, 2024 WL 4278485, at *3 (N.D. Ill. Sept. 24, 2024) (Cummings,

Defendants also argue it "defies logic" that the Tagger acquisition shows that Sprout had lacked capabilities it needed for enterprise clients. Br. at 25-26. But this is belied by Defendants' own explanation for the Tagger acquisition—i.e., that half of client RFPs required it. ¶133.[11]

### 3. Defendants Falsely Told Investors That Sprout's Sales Cycles For Enterprise Clients Were "Rapid" And In-Line With Smaller Clients

Defendants repeatedly touted that a key advantage of Sprout's inbound motion was that it led to unusually fast "sales cycles." In fact, on the first day of the Class Period, Barretto stated that "sophisticated customers in the mid-market and enterprise ... simply see value much faster with Sprout [a]nd that has enabled us to win customers in 30 to 45 days on average." ¶175. He later praised Sprout's "rapid sales cycles" that averaged "between 30 to 45 days," including "deals in the mid-market and enterprise." ¶190. Howard emphasized the point, bragging that enterprise customers "land with similar costs and similar sales cycles as the rest of our customer base." ¶206. These statements were highly material, as many were in direct response to analyst questions (*e.g.*, ¶¶176, 180, 213), and because Defendants hailed that Sprout's fast sales cycles were a competitive advantage as they were "very different for most enterprise companies." ¶¶226, 239; *Beaver Co. Emps. Ret. Fund v. Tile Shop Holdings*, 94 F. Supp. 3d 1035, 1049 (D. Minn. 2015) (statements that business model provided "competitive advantage" over peers were material).

However, as Defendants ultimately admitted, the exact opposite was true: the "enterprise

---

J.); *see also Energizer, LLC v. MTA Trading, Inc.*, 2021 WL 2453394, at *3, *5 (E.D.N.Y. June 16, 2021) (declining to take judicial notice of company's "good customer ratings" where such "facts" were outside the pleadings).

[11] Exs. 17 and 18 are also inappropriate for judicial notice. While courts sometimes take judicial notice of securities analyst reports, they have typically done so "to resolve questions about the materiality of alleged misrepresentations and omissions" or "to determine what may or may not have been disclosed to the public." *United States Sec. & Exch. Comm'n v. Ustian*, 229 F. Supp. 3d 739, 761–62 (N.D. Ill. 2017). Here, Defendants improperly seek to judicially notice analyst reports to support their argument that the Tagger acquisition gave Sprout "an advantage over competitors in the space" and "a differentiated offering to the market." Br. at 25-26. These subjective claims are hardly appropriate for judicial notice, and, in any case, are of no relevance. The fact that some analysts believed the Tagger acquisition gave Sprout an advantage does not contradict the Complaint's allegations that Sprout's lack of influencer marketing *prior to* the Tagger acquisition meant that Sprout had lacked a critical feature for enterprise clients until that point.

heavy" business meant Sprout experienced "longer-type sales cycles" and was "seeing lengthening of [its] sales cycles as the composition of the customer base and prospect base" changed. ¶152. Numerous CWs confirmed that enterprise sales were *never* "high velocity" but instead took "two to three times longer" to close than other customers, and at least "six months to a year." ¶¶93-95, 97. Thus, Sprout was *not* securing enterprise customers at the same pace as SMB clients. *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1143 (9th Cir. 2017) (statements distorting length of sales cycle are actionable).

Defendants argue that their sales cycle statements were not false because they were referencing Sprout's "average length" for "all its customers (SMB, Mid-Market and Enterprise)." Br. at 21-22. Defendants wholly ignore their own words. Defendants did not merely tell investors that they had a faster "average" sales cycle, they specifically told investors that their inbound model produced faster sales cycles ***specifically with enterprise clients***. For example, Howard told investors that enterprise customers had "***similar sales cycles as the rest of our customer base***" (¶206), and Barretto similarly expressly stated that, while competitors had "really long sales cycle times" due to "heavily customized demos," Sprout had quick sales turnarounds even with enterprise clients. ¶213. Tellingly, analysts understood that Defendants had represented that Sprout had short sales cycles with *all* clients, *including* enterprise clients. Indeed, at the end of the Class Period, analysts specifically noted that "Sprout has always had really quick close rates and short sales cycles," and highlighted that the issues to which Defendants were now admitting should have long been apparent given Sprout was *years* into its upmarket push. Tellingly, in response, Barretto was forced to acknowledge: "Yes. You're right. . . we are definitely seeing lengthening of our

32

sales cycles as the composition of the customer base and the prospect base is changing."[12]  ¶152.

Defendants also argue that the CWs provide "no particularized facts," including "how long sales took" or "which Enterprise customers" were affected. Br. at 21-22. But the CWs confirmed that the enterprise customers "***always*** took longer" and that the Company appreciated as much in 2021 and 2022 when Sprout shifted its focus upmarket. ¶¶94, 95; *Lowry v. RTI Surgical Holdings, Inc.*, 532 F. Supp. 3d 652, 661 (N.D. Ill. 2021) (crediting CW who stated it was "commonplace" for company to improperly ship orders early); *Ross v. Career Educ. Corp.*, 2012 WL 5363431, at *4 (N.D. Ill. Oct. 30, 2012) (falsity where CWs noted that company "often" misclassified information and "it was common practice" to improperly credit partial work). Moreover, Defendants ignore allegations that "larger customers like Kraft Heinz or Dicks Sporting goods" took "multiple months to close" and that the approval process at "Best Buy" took months—longer than Sprout's entire purported sales cycle. ¶¶95-97.  Further specificity is unnecessary at this stage.

 Defendants next challenge Barretto's admission by claiming his disclosure of the longer-type sales cycles for enterprise customers referred only to a "current phenomenon" that was only taking place at the time of the disclosure.  Br. at 23.  But this argument is directly contradicted by the fact that Defendants had falsely claimed as recently as two months earlier, on March 6, 2024, that sales cycles were *not* changing due to Sprout's targeting of enterprise, claiming that "***even in the mid-market and enterprise, there's great velocity in our business***," such that "***[w]e'll close mid-market and enterprise deals within 30 days, within the trial***."  ¶239.  The notion that sales cycles somehow remained entirely consistent throughout the Class Period, and yet suddenly and dramatically "lengthen[ed]" in the course of just two months, is not credible and not supported by

---

[12] Moreover, even assuming, arguendo, that Defendants were merely referring to the "average" sales cycle, it is established law that even "literally true" statements are misleading where they are "susceptible to another interpretation by a reasonable investor." *Groupon*, 553 F. Supp. 3d at 474.

the facts. Moreover, Defendants' argument is fundamentally undermined by the fact that they were forced to completely "redraw" their sales motion by October 2023—eight months prior to the disclosure—precisely because that motion was not effective for the enterprise market. ¶¶150-51. Indeed, Barretto acknowledged at the end of the Class Period the extended sales cycles were due to "the composition of the customer base." Br. at 23; ¶152.[13]

Finally, Sprout's risk warnings that sales cycles "may" change are irrelevant (Br. at 23) given that this "risk" had already materialized, and Defendants concealed this highly material information from investors. ¶¶150-51, 235; *Kraft*, 2021 WL 3566602, at *16 ("the cautionary language did not warn that any present facts about [the company's] business model could cause problems or were in fact causing problems"); *In re Ironnet, Inc.*, 2023 WL 5110932, at *8 (E.D. Va. Aug. 9, 2023) (warnings that sales cycles may be long were misleading when defendants knew "those serious risks were dangerously close to materializing"); *Hunt v. Bloom Energy Corp.*, 2021 WL 4461171, at *12 (N.D. Cal. Sept. 29, 2021) (warning that company "may" experience delays was misleading where CW reported that "sales cycle is typically 12 to 18 months").[14]

### 4. Defendants Falsely Promoted The Salesforce Partnership As A Substantial Growth Lever

Defendants repeatedly touted the Salesforce partnership as a significant driver of Sprout's growth, claiming it would bring a substantial influx of new enterprise customers. In June 2022, Barretto highlighted that "4,000ish" Social Studio customers would "migrate over the next couple

---

[13] Furthermore, Defendants' counter-narrative contradicts the CW allegations that enterprise customers "always" required more time to close (¶95), and, at best, creates a question of fact that "is inappropriate at the motion to dismiss stage to resolve[.]" *Flynn v. Exelon Corp.*, 2021 WL 1561712, at *7 (N.D. Ill. Apr. 21, 2021).

[14] The decision in *Arazie v. Mullane*, 2 F.3d 1456, 1467-68 (7th Cir. 1993) (Br. at 23) is inapposite as the court merely held that close proximity of general statements stressing a "firm's strengths and announcements of poor economic performance" cannot show falsity because it merely suggests a "disagree[ment]" with defendants' "predictions based on known facts." Here, however, Defendants' sales cycle statements were specific—not general positive information—and were not "predictions" of future performance but statements of present fact.

years"; in early 2023, he said that the Salesforce "pipeline heading into this year is bigger than it had" ever been and there was "plenty of upside" from Salesforce until at least 2025; and in late 2023, Barretto said Sprout "continued to see great success" from the partnership. ¶¶195, 215, 231.

These statements were materially false and misleading because the Salesforce partnership was never capable of providing the substantial growth and flood of new customers that Defendants claimed. As revealed in the Razor Report,[15] Social Studio's largest customers migrated to other platforms *before* Sprout even announced the partnership and the remaining opportunity was destined to hit a "growth wall" in Q1 2023—well before the 2025 timeframe touted by Defendants. ¶¶125-126. In truth, and as Defendants admitted at the end of the Class Period, the Salesforce partnership accounted for "significantly less" new business than Defendants had led the market to believe as it resulted in "less than 15% of our new business in 2023 and less in 2022." ¶155. Former employees further corroborated these admissions, with CW 1 stating that the "[t]here was an overwhelming sentiment that [Salesforce] customers did not want to pay for Sprout." ¶196; *See Groupon*, 553 F. Supp. 3d at 480 (statement that product would be "driver to increasing customer purchase frequency and growing business over time" was misleading where defendants

---

[15] Defendants implore that short reports must be "discarded in their entirety." Br. at 27. However, it would "significantly overstep the court's role" to discredit a short seller report that "reli[ed] on confidential sources" where the facts were "corroborated by the CWs and even by the defendants' own response," especially where, as here, the report sets forth the basis for its findings in painstaking detail. *Bond v. Clover Health Invs., Corp.*, 587 F. Supp. 3d 641, 668 (M.D. Tenn. 2022); *see* Ex. 35 (the 66-page Razor Report). While Defendants take issue with the report's "unidentified witnesses" (Br. at 27), the court must assess "the amount of detail and specificity, the corroborative nature of the allegations, the plausibility of those allegations given the context, the number of sources quoted, and other factors." *Uniformed Sanitationmen's Ass'n Comp. Accrual Fund v. Equinix, Inc.*, 2025 WL 39936, at *4 (N.D. Cal. Jan. 6, 2025). Here, the Razor Report included detailed facts from its sources, the underlying basis for the information they provided, and supported their accounts with numerical analyses. *See, e.g.*, Ex. 35 at 16-17, 35, 48-50.Moreover, the Razor Report's findings are "corroborated by and consistent with other sources," including CW 1—who confirmed that most Social Studio customers were not transitioning to Sprout—and Barretto's admissions that the Social Studio opportunity was "significantly less than" what Defendants had previously let on. ¶¶116, 155; 216; *Equinix,* 2025 WL 39936 at *4 (crediting short-seller report supported by a single CW).

knew opportunity was "failing to boost purchase frequency").[16]

### 5. Defendants' Cursory "Puffery," "Opinion," And "Forward Looking Statements" Arguments Fail

Defendants argue that many of the alleged misstatements are non-actionable because they are puffery, opinions, or forward-looking (Br. at 29-35), but in so stating, Defendants simply list the challenged statements while providing little to no argument for what makes each statement inactionable puffery or opinion. Br. at 32-33. "[I]t is not the Court's role to make or flesh out the parties' arguments" and these contentions should be disregarded on this basis alone. *Fryman v. Atlas Fin. Holdings, Inc.*, 2022 WL 1136577, at *28 n.16 (N.D. Ill. Apr. 18, 2022).

This point is particularly salient with respect to puffery, since "context matters, and the context can add concreteness to otherwise vague, inactionable statements." *Kraft*, 2021 WL 3566602, at *10. Indeed, "[e]ven ephemeral words can describe a concrete idea that constitutes a misleading statement for the purposes of stating a claim, or can be viewed as supporting certain of [a defendant's] other alleged misrepresentations." *Id.*; *see also Pub. Emps.' Ret. Sys. of Mississippi v. TreeHouse Foods, Inc.*, 2018 WL 844420, at *3 (N.D. Ill. Feb. 12, 2018) (statements not puffery where defendants "made repeated representations that their management was handling business in a successful fashion," which "taken in context" could be understood as factual.).

Here, Defendants' statements were not puffery. Many of these statements were factual,

---

[16] Defendants' argument that CW 1 cannot be credited because he only provides information "as to Salesforce customers' motives" and not information about Sprout is plainly incorrect. Br. at 28. The Complaint alleges that the poor sentiment regarding the Salesforce customers was the feeling within Sprout—not the customers themselves. *See* ¶116 (noting the information came from colleagues at Sprout and pertained to the Company); *see also Silverman v. Motorola, Inc.*, 2008 WL 4360648, at *14 (N.D. Ill. Sept. 23, 2008) (crediting CW report that issue was "widely known" within company); *Kraft*, 2021 WL 3566602, at *12 (same). The claim that CW 1 failed to provide the specific number of customers in the Salesforce "pipeline" is irrelevant because, as noted above, CW information need not contain such allegations, and because Defendants admitted that Salesforce made up only 3% of new revenue and 15% of new customers (¶155) corroborating CW 1's report that Salesforce was a "total flop" from the start. ¶116. These facts are thus distinguishable from those in *In re DraftKings Inc. Sec. Litig.*, 650 F. Supp. 3d 120, 156 (S.D.N.Y. 2023) (Br. at 27-28), where the short report was the *only* source of the underlying misconduct.

36

specific, and verifiable, including statements that Sprout's "inbound" model had an enterprise sales cycle of "30 to 45 days" (¶174), that the GTM approach for "SMB is working even better in Enterprise" (¶197), that the product did not have "any gaps in [its] feature set" versus what was needed for enterprise customers (¶199), that the "full suite of products" allowed Sprout to "check[] a lot of boxes" with Enterprise clients (¶185), and that there were "4,000ish" Salesforce customers that "are going to migrate over the next couple years" (¶195). These are facts that are verifiably either true or not—and thus cannot be puffery. Moreover, many of these statements were not only "generally factual [and] specific," but "in response to questions from analysts," which is strongly indicative of materiality. *Kraft*, 2021 WL 3566602, at *10; ¶¶176, 185, 190, 195 197, 199, 202, 205-06, 213, 218, 220, 223, 227, 229. *See also Oak St. Health*, 2023 WL 1928119, at *5 n.1 (a "direct response to an analyst's inquiry" "went well beyond puffery").

With respect to purported "opinion" statements, many of the statements Defendants challenge were not opinions *on their face*. *See Kraft*, 2021 WL 3566602, at *9 (statements not opinions where "lacking anything like the characteristic phrasing, such as 'I think' or 'We believe'"); *Shash v. Biogen, Inc.*, 84 F.4th 1, 12 (1st Cir. 2023) ("[A] statement of fact ('the coffee is hot') expresses certainty about a thing, whereas a statement of opinion ('I think the coffee is hot') does not"). For example, the claim that the "same strategy in SMB is working even better in [] enterprise" (¶197) and that Sprout's GTM "strategy is working" and therefore would "be very consistent" going forward (¶229) convey verifiable facts. Similarly, the claim that Sprout's product did not have "any gaps in its feature sets" (¶199), "checked a lot of boxes with a lot of [] enterprise clients (¶185), was "well equipped for the deals that are out there" because it had "no deficiencies" (¶188), and was "perfectly positioned for these enterprises" (¶227) are not presented as matters of opinion and cannot be dismissed on that basis.

37

Other statements are not opinions when viewed in context. *Fryman*, 2022 WL 1136577, at \*20 ("[c]ontext matters" when assessing opinions). The full statement that "not a lot has to change in our current motion" was not an opinion because Barretto supported it with the fact that "many of the deals that we're closing every quarter, even in the enterprise, start with [] customers in the product." ¶180. So too with the statements that the inbound model was a "big competitive advantage," "huge strategic advantage," and a "major differentiator" because Defendants supported these claims by explaining the model allowed customers to "see value much faster with Sprout than anywhere else" and "enabled" the purportedly quick sales cycles for enterprise customers. ¶¶175, 190, 206, 218. *See Azar v. Grubhub, Inc.*, 2021 WL 4077327, at \*5 (N.D. Ill. Sept. 7, 2021) ("statement regarding diner quality could reasonably be interpreted as a factual claim about how frequently new customers were ordering via the Grubhub platform"); *Seeks v. Boeing Co.*, 752 F. Supp. 3d 992, 1017 (N.D. Ill. 2024) ("the context in which the statements were made convey sufficient facts"). Even the single opinion statement that "we really like this motion" (¶180, Br. at 32) omitted the key underlying problems that the inbound model was ineffective for enterprise customers that "a reasonable investor would find conflicting with Defendants' opinion[s]," making it actionably misleading. *See Fryman*, 2022 WL 1136577, at \*17.

Defendants' argument that seven of the alleged misstatements are forward-looking statements protected by the PSLRA safe-harbor is even weaker. Br. at 34-35. Four of these statements are "firmly planted in the present or past, meaning that they are not entitled to the protection of the safe harbor." *Kraft*, 2021 WL 3566602, at \*15; ¶176 (Sprout was "***complementing*** [its] inbound effort"); ¶182 (Sprout is "***getting*** inbound" and "***driv[ing]*** more inbound from sophisticated customers"); ¶229 (the "***consistent*** strategy" was successful and Defendants were proud of the "motion that we have ***today***"); ¶215 ("the pipeline ***heading into this***

*year is bigger than it had been ending the year*" and there was "***still*** a decent amount of time left" on Social Studio opportunity).  Two others, when viewed in context, are "mixed present/future statement[s]" whose non-forward-looking portions are unprotected. *See Makor Issues & Rts., Ltd. v. Tellabs Inc.*, 513 F.3d 702, 705 (7th Cir. 2008); ¶190 (we're ***still*** running at a sales cycle that runs between 30 to 45 days on average. And we will see deals in the mid-market and enterprise that hit those timelines"); ¶206 ("we're still going to lea[d] with the same inbound, product-led motion ***that's made us so successful***.").  Moreover, the safe harbor does not apply because these statements were not accompanied by meaningful cautionary language. The risk warnings only cautioned that enterprise sales "may entail longer sales cycles" and "more significant selling efforts," but did not warn that inbound sales never worked for enterprise customers or that the lack of increased selling efforts and longer sales cycles were already harming operations. *Kraft*, 2021 WL 3566602, at *16 (generic risk disclosures insufficient when risk has already materialized).

## B.    The Complaint Raises A Strong And Compelling Inference Of Scienter

Scienter is alleged when a defendant "knew the[ir] statement was false" or was "reckless in disregarding a substantial risk that it was false." *Tellabs*, 513 F.3d at 704.  A plaintiff is "not required to plead facts regarding the defendants' motive to commit fraud to establish scienter," but "need only plead facts indicating an intent to deceive or reckless disregard for the truth." *RTI*, 532 F. Supp. 3d at 662.  "In determining whether plaintiff has adequately pleaded a strong inference of scienter, allegations are not to be scrutinized in isolation, but assessed holistically." *Constr. Workers Pension Fund-Lake Cnty. & Vicinity v. Navistar Int'l Corp.*, 114 F. Supp. 3d 633, 660–61 (N.D. Ill. 2015).  Taking the Complaint's allegations as true, the question is whether the Complaint creates an inference of scienter "at least as compelling as any opposing inference one could draw from the facts alleged." *Fryman*, 2022 WL 1136577, at *21.  In other words, "where two contrary inferences of scienter are equally probable, the tie goes to the plaintiff." *Id.*

39

1.     **Sprout's False Statements Concerned The Most Pressing Question Facing The Company's Business During The Class Period:  Whether Its Sales Motion And Product Could Deliver Sufficient "Upmarket" Growth And Profitability**

All of Defendants' false and misleading statements concerned the most critical question facing Sprout during the entire Class Period—namely, whether Sprout's "inbound" sales motion and product were really sufficient to deliver the enormous upmarket growth Sprout needed to become profitable.  Indeed, in *every single investor call during the Class Period*, Defendants repeatedly touted their "inbound" and "product-led" strategy as the keys to success in this upmarket growth, even touting it as a "competitive advantage," "massive differentiator."  ¶¶57-58, 233.  As such "Defendants' numerous statements regarding [Sprout's] sales and marketing practices and programs, and the importance that Defendants placed on those practices and programs to …constitute strong circumstantial evidence that Defendants had detailed information regarding [them]." *AbbVie*, 2020 WL 5235005, at *5;  *see also Grubhub, Inc.*, 2021 WL 4077327, at *5 ("officers can be assumed to know of facts critical to a business's core operation" where discussed regularly in investor communications); *Chow v. Archer-Daniels-Midland Co.*, 2025 WL 790854, at *4 (N.D. Ill. Mar. 12, 2025) (same); *RTI*, 532 F. Supp. 3d at 663 (leadership positions made defendants "privy to [the company's] operations at the highest levels and accountable for [its] internal business practices, especially with regard to its most important business segment").

Moreover, Defendants gave detailed answers to analysts about these topics, and thus "held themselves out as knowledgeable regarding topics about which analysts often asked." *Rensin, Tr. of Rensin Joint Tr. v. United States Cellular Corp.*, 755 F. Supp. 3d 1048, 1066 (N.D. Ill. 2024); *see also Gambrill v. CS Disco, Inc.*, 2025 WL 1088224, at *5 (W.D. Tex. Apr. 9, 2025) (defendants "specifically held themselves out as knowledgeable about the company's sales and their customers' use of their product").  Defendants also boasted regularly about how closely they monitored all

40

aspects of the Company's efforts to target enterprise clients. Defendant Del Preto spoke of how management "have so much data" and "information [to] understand what parts of the organization are working better than others," and spoke of how "every month, we spend time with Ryan Barretto's team and all his leaders and we go by segment, we go by new business. . . We are very data focus[ed]. Everything's based on all that internal unit economics we['re looking at and based on that…" ¶253. Del Preto also told investors that the Company was "heavily data-driven because of the inbound model," which provided Defendants "really good visibility into where demand was coming from," and explained that, "with [Sprout's] 30- to 45-day sales cycle" Defendants know "what's working and what's not." ¶254. Defendant Baretto said he and Del Preto were "constantly meeting to look at this data, to look at the success and figure out the right places to optimize and invest in growth." ¶255. And Defendants spoke of monitoring these issues "in real time."

In sum, the fact that Defendants repeatedly spoke about topics that were obviously critical to the Company, and told investors that Defendants were knowledgeable about those topics, creates a strong and compelling inference of scienter.

### 2. Defendants' Admissions, And Analysts' Strong Negative Reactions Thereto, Support An Inference Of Scienter

Defendants' Class Period and post-Class Period admissions strongly support their scienter. First, after repeatedly assuring investors that their product had the "robust capabilities needed by the most demanding enterprise users," such that "[t]here's not any functionality we don't have to win these larger deals," Defendants admitted on August 3, 2023, that there was, in fact, an essential feature that their product *did* lack—influencer marketing. ¶133. Indeed, in announcing the Tagger acquisition, Defendants revealed that influencer marketing was a "customer requirement" that Sprout saw "in more than half of our enterprise RFPs." And, as Defendants later admitted, they had been aware of this requirement by no later than "the back half of 2022." *Id*.; ¶246.

41

Second, at the end of the Class Period and thereafter, Defendants admitted that Sprout's inbound sales strategy and infrastructure were "orders of magnitude different" from what was necessary to obtain and service an enterprise-heavy business, such that Defendants had to "redraw[] [Sprout's] go-to-market model"—thus flatly contradicting their repeated Class Period assurances about the sufficiency of their inbound sales model. ¶150. Strikingly, Defendants also admitted that the need for these changes had not been a recent development, but had been well underway *for eight months*—*i.e.*, at the same time that Defendants were falsely assuring investors that there were "*no major changes to call out*" and "*no surprises*" regarding the efficacy of their inbound sales strategy—because "*the decisions on all this happened in Q4*" of 2023." ¶151. Moreover, Defendants acknowledged that the problems in Sprout's enterprise business were the result of the failures of its own sales motion and not external market forces, as Baretto called the problems "*self-induced*" and even apologized for them, saying "*I own this*." ¶156.

Numerous courts have found similar admissions supportive of scienter where, as here, they contained a temporal component that implied a previously undisclosed awareness of a problem at the time of a false statement. *See, e.g., Carpenters Pension Tr. Fund for N. California v. Allstate Corp.*, 2018 WL 1071442, at *6 (N.D. Ill. Feb. 27, 2018) (defendants admitted knowledge of a "tick up" in claims frequency at the time of positive statements about claims, suggesting defendants' assurances "were incorrect when made" and not merely "incorrect in retrospect"); *In re Apple Inc. Sec. Litig.*, 2020 WL 6482014, at *10 (N.D. Cal. Nov. 4, 2020) (CEO acknowledgement that he saw "troubling signs" of slowdown "as the quarter went on").

Moreover, analysts emphasized the clear contrast between Defendants' prior public statements and their admissions, criticizing management's lack of "transparency," observing that "the execution issues [Sprout] is now facing, which are a result of its [go-to-market] strategy,

42

*should have been apparent much earlier than today*," noting the "puzzling . . . disconnect between the actions that were taken at the beginning of the year . . . and now a material guide down," and questioning "what took the company by surprise." ¶158. These reactions—which demonstrate that analysts viewed the disclosures as admissions—further support scienter. ¶¶157-59. *See, e.g., Indiana Pub. Ret. Sys. v. Pluralsight, Inc.*, 45 F.4th 1236, 1262 (10th Cir. 2022).

Defendants nonetheless argue that these were not "admissions," and that the Complaint pleads mere "fraud by hindsight." Br. at 45-46. But this is wrong. Defendants' own admissions refer to being aware "for some time now" and "since the back half of 2022" that Sprout needed influencer marketing to be competitive for at least half of its enterprise business RFPs. ¶246. And similarly, Defendants admitted that "the decisions on all this"—i.e. the dramatic overhaul of Sprout's GTM motion—"happened in Q4" of 2023 while Defendants continued to make positive statements about their existing GTM motion and its ability to land enterprise clients. ¶151.[17]

### 3. The CWs Support Scienter

The Complaint cites 14 former Sprout employees, each of whom told cross-corroborating stories about pervasive problems with the Company's ability to land enterprise clients due to the insufficiency of its sales motion and due to Sprout's lack of critical product features.[18] The pervasiveness of these issues, alone, and the degree to which the reality observed by the CWs blatantly contradicted Defendants' public statements, supports scienter. *See, e.g., Bucks Cnty. Emps. Ret. Sys. v. Norfolk S. Corp.*, 2025 WL 897540, at *9 (N.D. Ga. Mar. 24, 2025) (CWs

---

[17] For related reasons, Defendants' mischaracterization of the Complaint's scienter allegations as mere "must have known" allegations fail. Br. at 45-47. While the Complaint does bolster an inference of scienter with strong core operations allegations and allegations concerning information that was widespread within the company, these must be considered "holistically," (*Navistar Int'l Corp.*, 114 F. Supp. 3d at 661) alongside the Complaint's extensive other scienter allegations.

[18] Defendants' argument that the Complaint provides "no information" about responsibilities for six of the CWs is plainly wrong. The Complaint provides more than sufficient details on the roles and work responsibilities of each of CW2 (¶¶76, 78, 112); CW 3 (¶¶69 n.6, 74, 91); CW 5 and CW 11 (¶¶97, 117 ); CW 13 (¶¶99, 122), and CW 15. ¶¶113.

recounted "the pervasiveness of Norfolk's safety violations that bolster the inference of scienter").

Defendants nonetheless minimize the CWs as low-level employees who did not have "direct interactions with the Individual Defendants on a regular basis." Br. at 38-39. This is incorrect. Several of the CWs not only described Company-wide problems that the Individual Defendants were aware of, but described specific directives from management to misrepresent Sprout's capabilities (¶71), complaints made to management about the product's deficiencies and Sprout's lack of verticalization (¶¶81, 84, 85, 86, 89, 107), customer losses (¶72), criticisms made to management about Sprout's sales model (¶91), and management's inquiries into the 2023 inbound sales pipeline slowdown (¶101).[19] Moreover, a "company-wide" inference can be gleaned from low-level employees who corroborate one another. *See, e.g., Tellabs*, 513 F.3d at 712 (crediting confidential witnesses not alleged to have had direct contact with defendants, but who described problems with the company's products); *Glazer Capital Mgmt., L.P. v. Forescout Techs., Inc.*, 63 F.4th 747, 771 (9th Cir. 2023) (crediting low-level CWs about company-wide issues); *Freudenberg v. E*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 197 (S.D.N.Y. 2010) ("numerous confidential witnesses support a strong inference of a Company-wide" problems and "a comprehensive survey of employees is not needed at the pleading stage").[20]

### 4. Suspiciously Timed Resignations Support Defendants' Scienter

The suspicious resignations of several C-level officers lends further support to a strong inference of scienter, particularly in combination with the Complaint's allegations. As the

---

[19] Defendants are also incorrect in their claim that the Complaint's "sole suggestion of any direct contact is CW 9." (Br. 39). In reality, the Complaint sets forth that both CW 8 and CW 9 had sales calls with Defendant Barretto on the line in which it was discussed that enterprise deals were lost due to poor product capabilities (¶86, 105). Moreover, CW 1 explained that he received direct pressure from Barretto to close deals faster (¶94, 103, 250) and CW 7—a Senior Sales Analyst—described large, desperate sales discounts that Barretto personally signed off on (¶119).

[20] The detailed CW allegations here are a far cry from those in *Fulton Cnty. Emps.' Ret. Sys. v. MGIC Inv. Corp.* (Br. at 40), wherein a single CW's opinion that defendant's business was "on the decline" and that "things were not good" was insufficient to show that defendants knew their assets were materially overvalued, particularly given that the employee had no financial or accounting background. 2010 WL 5095294, at *8 (E.D. Wis. Dec. 8, 2010).

Complaint alleges, on September 7, 2023, Sprout's Chief Marketing Officer—who led the Company's GTM strategy—resigned, effective within a few months and with no successor named. Notably, former employees tied her resignation directly to the failure of the Company's inbound strategy, which had "completely collapsed" by that time. ¶¶142, 158, 265. Then, two months later, in November 2023, Sprout's Chief Revenue Officer resigned, and a month after that, on December 14, 2023, Sprout's Chief Technology Officer resigned effective immediately. And finally, Defendant Howard himself announced his resignation as CEO on April 15, 2024, less than one month before the end of the Class Period. ¶147. These suspicious resignations "reinforc[e]" scienter. *Akorn*, 240 F. Supp. 3d at 820; *Phoenix Ins.*, 690 F. Supp. 3d at 893–94 (poorly explained and suspiciously-timed executive departures supported scienter where one lacked a successor).[21]

### 5. The Razor Report And Defendants' Response Supports Scienter

The Razor Report directly questioned Sprout's ability to compete in the enterprise space and cast doubt on the value of its Salesforce partnership for generating enterprise business, which it claimed Defendants had "***played [] up***" and "***mischaracterized [] to investors as evidence of a sudden and successful strategic shift upmarket***." ¶264. Defendants responded to the "narrative out there" on May 3, 2023, when they falsely represented that they were seeing "really great progress in our enterprise" and "really great progress from a competitive standpoint in terms of the execution from the sales team." ¶¶128, 130. By expressly denying these claims, Defendants demonstrated that they were aware of the claims and gave investors the impression that they had investigated the underlying facts, further supporting an inference of scienter. *See, e.g., In re Cassava Scis., Inc. Sec. Litig.*, 2023 WL 3442087, at *9 (W.D. Tex. May 11, 2023) (denials "can indicate that a defendant was either sufficiently familiar with the facts, or severely reckless in not

---

[21] While Howard and Rankin did not leave the Company entirely, it is unsurprising they remained on the Board in light of their roles as Sprout co-founders.

being familiar, to be in a position to issue a denial"); *In re EQT Corp. Sec. Litig.*, 504 F. Supp. 3d 474, 497–98 (W.D. Pa. 2020) (denials of third party's claims "provide a strong inference that [the defendants] were, at least, aware that their statements…could potentially be false").

## 6. Defendants' Class Period Stock Trading Supports Scienter

Although allegations of motive are not required to plead scienter (*see, e.g., Van Noppen v. InnerWorkings*, Inc., 136 F. Supp. 3d 922, 948 (N.D. Ill. 2015)), the Complaint alleges large, outsized, and suspiciously timed trading by Defendants Barretto and Howard. Specifically, these two Defendants, combined, sold more than one million shares of Sprout stock during the Class Period, earning them nearly $63 million in proceeds. ¶165. Defendant Barretto sold more than three times as many shares during the Class Period as he did from the Company's IPO to the start of the Class Period, and Defendant Howard also sold substantially more shares during the Class Period than during the prior period. ¶166. Notably, Barretto's sales amounted to more than 45% of his total vested Sprout shares both held and acquired during the Class Period.[22] *Id.*

Defendants' arguments that these trades were not suspicious are unsupported, and in at least one case, blatantly contrary to the facts. Specifically, Defendants cite Ex. 42 for the claim that "Mr. Barretto sold more stock in the 21 months following Sprout's IPO than during the ensuing Class Period." Br. at 43. But Defendants have misinterpreted the very exhibit they attached, as the first Form 4 in Exhibit 42 is marked with Transaction Code "F," meaning the listed transactions were not sales, but rather the "[p]ayment of exercise price or tax liability by delivering or withholding securities incident to the receipt, exercise or vesting of a security issued in accordance

---

[22] Contrary to Defendants' argument, the mere fact that some Defendants did not sell stock does not undercut scienter. *See, e.g., In re Molycorp, Inc. Sec. Litig.*, 157 F. Supp. 3d 987, 1010 (D. Colo. 2016).

with Rule 16b-3."[23]  Ex. 42 thus does not support Defendants' factually incorrect claim.[24]

Additionally, while some of Barretto's and Howard's Class Period sales were made pursuant to 10b5-1 trading plans, each of them entered at least two of these respective plans during the Class Period, and at suspicious times, negating their ability to serve as a defense to scienter at the pleading stage.  ¶¶167, 170.  *See, e.g., E*Trade*, 712 F. Supp. 2d at 200–01 (collecting cases).[25] And, in any case, Defendants' 10b5-1 plan documents (Exs. 37, 38) are not properly before the Court, as they are not incorporated into the Complaint by reference and not judicially noticeable.[26] *See, e.g., Dang v. Amarin Corp. plc*, 750 F. Supp. 3d 431, 457 (D.N.J. 2024) (denying judicial notice of non-public 10b5-1 trading plans).

Further, after making no out-of-plan sales for most of the Class Period, Howard suddenly made four outsized, out-of-plan sales between September 2023 and March 2024—at the exact same time that Defendants decided to "redraw" their sales motion—for proceeds of $8.3 million, just before the truth was revealed and Sprout's stock price fell 40% in a single day.  ¶169.  These suspiciously timed sales support scienter.  *See, e.g., Sinnathurai v. Novavax, Inc.*, 645 F. Supp. 3d 495, 528 (D. Md. 2022) (fact that defendants "timed at least one sale to take advantage of the fact that adverse information was soon to be disclosed" supported scienter).

---

[23] *See* https://www.sec.gov/edgar/searchedgar/ownershipformcodes.html

[24] Plaintiff was also unable to decipher which sales Defendants were claiming "were routine and each reflected a single digit percentage of his holdings" (Br. at 43).

[25] Defendants' argument that the plans were adopted "immediately upon expiration of a preceding plan" (Br. at 42) is irrelevant, as nothing required Defendants to enter a new plan at that time.  At best, this raises an issue of fact inappropriate for consideration here.

[26] Moreover, courts have grown skeptical of whether Rule 10b5-1 plans can serve as a scienter defense at the pleading stage, because "a defendant who knows the schedule of their 10b5–1 plan could be motivated to make material misrepresentations affecting the stock price to their benefit before a scheduled sale or to trigger a sale at a particular price."  *Pluralsight*, 45 F.4th at 1266. *See also In re Upstart Holdings, Inc. Sec. Litig.*, 2023 WL 6379810, at *21 (S.D. Ohio Sept. 29, 2023) (collecting cases).  *Garden City Employees' Ret. Sys. v. Anixter Int'l, Inc.*, 2012 WL 1068761, at *13 (N.D. Ill. Mar. 29, 2012) (Br. at 43) is inapposite due to Defendants' plain factual error, as, here, Defendants did not make greater stock sales prior to the Class Period than during the Class Period.  Additionally, in *Garden City*, the Court did not rely solely on defendants' 10b5-1 plans to negate scienter but on a lack of other suspicious facts. *Id.*

### 7. Defendants' Abandonment of ARR Supports Scienter

The fact that Defendants regularly touted ARR as a "key business metric" and the measure investors should focus on for enterprise growth, only to abandon that metric at the end of the Class Period, also supports scienter. ¶¶37, 54, 145, 153. Defendants argue that because the decision was "announced and explained by Defendants openly" it cannot support "an intent to deceive." Br. at 45 n.34. But this misapprehends Plaintiffs' argument. Defendants' decision to abandon ARR at the end of the Class Period—after touting it as the ideal way to understand Sprout's enterprise growth—is indicative of an intention to obscure the failures of their upmarket strategy. Indeed, analysts complained that, by removing the metric, Defendants were "stripping some visibility into what's occurring," "mak[ing] the business less transparent," and "open[ing] up more questions" about Defendants' veracity. ¶¶160, 261.

### C. The Complaint Pleads Loss Causation

Loss causation is "not meant to impose a great burden upon a plaintiff." *Akorn*, 240 F. Supp. 3d at 821. A complaint need only provide "some indication of the loss and the causal connection that the plaintiff has in mind." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 346-47 (2005). In the Seventh Circuit, plaintiffs must only show that the "misstatements and omissions concealed the circumstances that *bear upon* the loss suffered." *Groupon*, 553 F. Supp. 3d at 488.

Plaintiffs easily satisfy this standard. The Complaint alleges a series of false and misleading statements about *inter alia,* the adequacy of Sprout's platform to support enterprise clients, the capability of the inbound go-to-market model to land upmarket clients, the length of the Company's sales cycle, and the potential and success of the Salesforce partnership. The falsity of these statements was revealed by a series of three corrective disclosures, each of which caused Sprout's stock price to decline rapidly and precipitously. ¶¶269-77.

First, on May 2, 2023, Sprout disclosed its lowest number of large customer adds in two

years, revealing its sales motion and product were struggling with large customers, and causing Sprout's stock price to fall 20%.  ¶¶269-70. Second, on August 3, 2023, Defendants announced the Tagger acquisition, revealing that Sprout had lacked a "customer requirement," influencer marketing, thereby correcting Sprout's prior claims that it was not missing "any functionality" needed for large customers.  Sprout's stock price fell 12% on this news.  ¶¶133-34, 272-73.

Finally, on May 2, 2024, Sprout disclosed that its "completely inbound highly transactional" model did not work,  that it had to "redraw" the "go-to-market model" through verticalization and outbound staffing, that it suffered from "lengthening" sales cycles, and the Salesforce contributions were "significantly less than many may have previously assumed," contradicting their prior statements on these topics and causing Sprout's stock price to plummet 40%. ¶¶150-152, 276-277; *see Phoenix Ins.*, 690 F. Supp. 3d at 896 (disclosures "about continued efforts to address what had been previously allegedly concealed" sufficient for loss causation).

Defendants' loss causation challenges are meritless. Br. at 48-50. First, the fact that Defendants continued to "reaffirm" their false statements after their May 2 and August 3, 2023 disclosures is perfectly consistent with the Complaint's allegations that these disclosures only "partially revealed the truth" while Defendants "maintained their position" that their sales model was working. *Fryman*, 2022 WL 1136577, at *33.  It is well-settled that "loss causation may be pleaded on the theory that the truth gradually emerged through a series of partial disclosures." *Akorn*, 240 F. Supp 3d at 822; see also *Oak St. Health*, 2023 WL 1928119, at *11 (same).

Second, Defendants' argument that it was merely "disappointing earnings" (Br. at 48) rather than the lackluster enterprise additions that actually caused the May 2023 stock drop is "a more appropriate subject for summary judgment or trial."  *Groupon*, 553 F. Supp. 3d at 490.

Third, while Defendants claim the August 3, 2023 disclosure regarding Tagger did not

49

"reveal" the falsity of any prior statements, that argument wholly ignores the allegations. Br. at 48. Del Preto and Barretto both confirmed that influencer marketing was a "customer requirement showing up in **more than half** of our enterprise conversations" and revealed that Sprout purchased Tagger to fill that need. ¶¶133, 272. This disclosure thus partially corrected Defendants' statements that Sprout did not lack "any functionality" for enterprise clients. ¶¶133, 202, 246; *Phoenix Ins.*, 690 F. Supp. 3d at 896 (disclosure of efforts to remedy "operational problems" that had been "concealed" "constitute an admission" of those problems for loss causation purposes).[27]

Finally, Defendants' May 2, 2024 disclosures were not "apples and oranges" with their statements. Br. at 49. Defendants repeatedly assured investors that Sprout's GTM model was entirely effective for upmarket customers, did not require "major changes," and kept Sprout's sales cycles short. Sprout's May 2, 2024 disclosures revealed none of that was true, because Sprout suffered enormous declines in upmarket customers, needed to "redraw" its GTM model, and suffered longer sales cycles. ¶¶93-95, 97, 150-52. Moreover, Defendants ignore that the disclosures revealed poor results and reduced guidance which analysts tied to the Company's failed GTM strategy. ¶¶158-59. Such allegations are independently sufficient. *See Washtenaw Cnty. Employees' Ret. Sys. v. Walgreen Co.*, 2019 WL 4597518, at *8 (N.D. Ill. Sept. 23, 2019) (loss causation "supported by analysts' reactions" to slashed guidance).[28]

## IV.    CONCLUSION

For the foregoing reasons, Defendants' motion should be denied in its entirety.

---

[27] Defendants' portrayal of the decision in *Coronel v. Quanta Cap. Holdings Ltd.*, 2009 WL 174656, at *30 (S.D.N.Y. Jan. 26, 2009) is wildly inaccurate. That case had nothing to do with an "acquisition" or "admissions" relating thereto, (Br. at 48), but rather involved insurance reserves and the loss of a brokerage relationship. *Id.* The case's true facts do nothing to help Defendants' loss causation arguments because the stock drop there *predated* the disclosure, and the court unsurprisingly held that "price declines *prior* to the public disclosure of an omission may not be used to support a theory of loss causation." *Id.* at 30 (emphasis in original). Here, Sprout's stock dropped after the disclosures. ¶273.

[28] Since the Complaint adequately alleges violations under Section 10(b), Plaintiff has pled a control person claim under Section 20(a) against the Individual Defendants. *Fryman*, 2022 WL 1136577, at *34.

Dated:  May 23, 2025                    Respectfully submitted,

                                        SAXENA WHITE P.A.

                                        By: _Steven B. Singer_
                                        Steven B. Singer
                                        Kyla Grant (*pro hac vice*)
                                        Joshua H. Saltzman (*pro hac vice*)
                                        10 Bank Street, Suite 882
                                        White Plains, NY 10606
                                        Tel.: (914) 437-8551
                                        Email: ssinger@saxenawhite.com
                                                kgrant@saxenawhite.com
                                                jsaltzman@saxenawhite.com

                                        -and-

                                        SAXENA WHITE P.A.
                                        Lester R. Hooker
                                        Jonathan Lamet (*pro hac vice*)
                                        7777 Glades Road, Suite 300
                                        Boca Raton, FL 33434
                                        Tel.: (561) 394-3399
                                        Email: lhooker@saxenawhite.com
                                                jlamet@saxenawhite.com

                                        -and-

                                        SAXENA WHITE P.A.
                                        David R. Kaplan (*pro hac vice*)
                                        505 Lomas Santa Fe Dr., Suite 180
                                        Solana Beach, CA 92075
                                        Tel.: (858) 997-0860
                                        Email: dkaplan@saxenawhite.com

                                        *Lead Counsel for Lead Plaintiff*

                                        COHEN MILSTEIN SELLERS & TOLL PLLC
                                        Carol V. Gilden (Bar No. 6185530)
                                        200 S. Wacker Drive
                                        Suite 2375
                                        Chicago, IL 60606
                                        Tel.: (312) 629-3737
                                        Email: cgilden@cohenmilstein.com

                                        *Liaison Counsel for Lead Plaintiff*

## CERTIFICATE OF SERVICE

The undersigned attorney hereby certifies that a true and correct copy of the foregoing was filed electronically with the Clerk of the Court and served on all counsel of record via CM/ECF on May 23, 2025.

/s/ Steven B. Singer
Steven B. Singer