## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| RICHARD MUNCH, Individually and on Behalf of All Others Similarly Situated, | Case No.: 1:24-cv-03867 |
| | Hon. Jeffrey I. Cummings |
| Plaintiff, | <u>CLASS ACTION</u> |
| v. | |
| SPROUT SOCIAL, INC., JUSTYN HOWARD, RYAN BARRETTO, and JOE DEL PRETO, | |
| Defendants. | |
| CITY OF HOLLYWOOD POLICE OFFICERS' RETIREMENT SYSTEM, Individually and on behalf of all others similarly situated, | Case No.: 1:24-cv-05582 |
| | Hon. Jeffrey I. Cummings |
| Plaintiff, | <u>CLASS ACTION</u> |
| v. | Consolidated Cases |
| SPROUT SOCIAL, INC., JUSTYN HOWARD, RYAN BARRETTO, and JOE DEL PRETO, | |
| Defendants. | |

## DEFENDANTS' JOINT REPLY MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS THE CONSOLIDATED CLASS ACTION COMPLAINT

**TABLE OF CONTENTS**

Page

PRELIMINARY STATEMENT ................................................................ 1

ARGUMENT ...................................................................................... 2

    A.    The Opposition Fails to Establish that Plaintiff Properly Pled Falsity. ................. 2

        1.    Statements Concerning Sprout's Go-To-Market Strategy. ........................ 3

        2.    Statements About Sales Cycle Length. ........................................ 7

        3.    Statements About Sprout's Product Capabilities. ................................ 10

        4.    Statements Relating to the Salesforce Partnership ................................ 11

    B.    The Alleged Misstatements Are Inactionable as a Matter of Law ...................... 13

    C.    The Opposition Does Not Cure the CAC's Deficient Scienter Allegations. ........ 20

        1.    Plaintiff's "Must Have Known" Theories Remain Insufficient............... 20

        2.    The Opposition Cannot Cure Deficient CW Allegations. ....................... 23

        3.    The Opposition Underscores the Lack of Motive Allegations. ............... 24

        4.    The Executive Departures Remain Irrelevant to Scienter........................ 26

        5.    Sprout's Discontinuance of ARR Reporting Is Still Irrelevant. .............. 27

    D.    The Opposition Confirms That the CAC Fails to Plead Loss Causation............. 27

CONCLUSION................................................................................. 30

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*In re Advance Auto Parts, Inc., Sec. Litig.*,
2020 WL 599543 (D. Del. Feb. 7, 2020) ...............................................................................15

*In re Akorn, Inc. Sec. Litig.*,
240 F. Supp. 3d 802 (N.D. Ill. 2017) ....................................................................................27

*Allison v. Oak St. Health, Inc.*,
2023 WL 1928119 (N.D. Ill. Feb. 10, 2023) ........................................................................16

*In re AppHarvest Sec. Litig.*,
684 F. Supp. 3d 201 (S.D.N.Y. 2023)....................................................................................11

*In re Apple Inc. Sec. Litig.*,
2020 WL 6482014 (N.D. Cal. Nov. 4, 2020) ........................................................................22

*Azar v. Grubhub, Inc.*,
2021 WL 4077327 (N.D. Ill. Sept. 7, 2021) ...................................................................18, 21

*Azar v. Yelp, Inc.*,
2018 WL 6182756 (N.D. Cal. Nov. 27, 2018) ........................................................................6

*Boca Raton Firefighters' & Police Pension Fund v. DeVry Inc.*,
2012 WL 1030474 (N.D. Ill. Mar. 27, 2012)........................................................................27

*Bond v. Clover Health Invs., Corp.*,
587 F. Supp. 3d 641 (M.D. Tenn. 2022)................................................................................12

*Bucks County Emps. Ret. Sys. v. Norfolk Southern Corp.*,
775 F. Supp. 3d 1275 (N.D. Ga. 2025) .................................................................................23

*Buhrke Fam. Rev. Tr. v. U.S. Bancorp*,
726 F. Supp. 3d 315 (S.D.N.Y. 2024)...................................................................................16

*In re Cassava Scis., Inc. Sec. Litig.*,
2023 WL 3442087 (W.D. Tex. May 11, 2023) .....................................................................22

*Chew v. Moneygram Int'l, Inc.*,
2024 WL 4346522 (N.D. Ill. Sept. 30, 2024) .......................................................................14

*Chow v. Archer-Daniels-Midland Co.*,
2025 WL 790854 (N.D. Ill. Mar. 12, 2025)..........................................................................21

*City of Hollywood Police Officers' Ret. Sys. v. Henry Schein, Inc.*,
552 F. Supp. 3d 406 (E.D.N.Y. 2021) ........................................................3, 7, 8, 11

*City of Sunrise Gen. Emps.' Ret. Plan v. Fleetcor Techs., Inc.*,
2018 WL 4293143 (N.D. Ga. May 15, 2018) ...................................................14

*Constr. Labors. Pens. Tr. for So. Cal. v. CBS Corp.*,
433 F. Supp. 3d 515 (S.D.N.Y. 2020) .............................................................25

*Constr. Workers Pension Fund v. Navistar Int'l Corp.*,
114 F. Supp. 3d 633 (N.D. Ill. 2015) ..............................................................9

*Dang v. Amarin Corp. plc*,
750 F. Supp. 3d 431 (D.N.J. 2024) ..................................................................25

*DiLeo v. Ernst & Young*,
901 F.2d 624 (7th Cir. 1990) ..........................................................................22

*In re DraftKings Inc. Sec. Litig.*,
650 F. Supp. 3d 120 (S.D.N.Y. 2023)........................................................12, 27

*Duran v. Henkel of Am., Inc.*,
450 F. Supp. 3d 337 (S.D.N.Y. 2020) ...........................................................11

*E. Ohman J:or Fonder AB v. NVIDIA Corp.*,
81 F.4th 918 (9th Cir. 2023), *cert. granted sub nom. NVIDIA Corp. v. Ohman J*, 144 S. Ct. 2655 (2024), *and cert. dismissed as improvidently granted*, 145 S. Ct. 33 (2024) .....................................................................4

*In re EQT Corp. Sec. Litig.*,
504 F. Supp. 3d 474 (W.D. Pa. 2020)..............................................................23

*In re First Merchants Acceptance Corp. Sec. Litig.*,
1998 WL 781118 (N.D. Ill. Nov. 4, 1998) .......................................................5

*Fort Worth Emps.' Ret. Fund v. Biovail Corp.*,
615 F. Supp. 2d 218 (S.D.N.Y. 2009)..............................................................28

*Francisco v. Abengoa, S.A.*,
624 F. Supp. 3d 365 (S.D.N.Y. 2022).................................................................7

*Freudenberg v. E*Trade Fin. Corp.*,
712 F. Supp. 2d 171 (S.D.N.Y. 2010)..........................................................24, 25

*Fryman v. Atlas Fin. Holdings*,
2022 WL 1136577 (N.D. Ill. Apr. 18, 2022) ..............................................17, 18

iv

*In re Fusion-io, Inc. Sec. Litig.*,
  2015 WL 661869 (N.D. Cal. Feb. 12, 2015) ....................................................7, 11

*Gambrill v. CS Disco, Inc.*,
  2025 WL 1088224 (W.D. Tex. Apr. 9, 2025).........................................................21

*Garden City Emps.' Ret. Sys. v. Anixter Int'l, Inc.*,
  2012 WL 1068761 (N.D. Ill. Mar. 29, 2012)........................................................26

*Garnett v. RLX Tech. Inc.*,
  632 F. Supp. 3d 574 (S.D.N.Y. 2022), *aff'd, Tseng v. De Vries*, 2023
  WL 8073087 (2d Cir. 2023).......................................................................................4

*Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*,
  63 F.4th 747 (9th Cir. 2023) ...................................................................................24

*In re HD Supply Holdings, Inc. Sec. Litig.*,
  341 F. Supp. 3d 1342 (N.D. Ga. 2018) .....................................................................5

*Hedick v. Kraft Heinz Co.*,
  2021 WL 3566602 (N.D. Ill. Aug. 11, 2021) ...................................................10, 16

*Higginbotham v. Baxter Int'l, Inc.*,
  495 F.3d 753 (7th Cir. 2007) ...................................................................................23

*Holwill v. AbbVie Inc*,
  2020 WL 5235005 (N.D. Ill. Sept. 1, 2020) .......................................................7, 21

*Hopson v. MetroPCS Comms., Inc.*,
  2011 WL 1119727 (N.D. Tex. Mar. 25, 2011) ........................................................25

*Hunt v. Bloom Energy Corp.*,
  2021 WL 4461171 (N.D. Cal. Sept. 29, 2021) ........................................................10

*Indiana Pub. Ret. Sys. v. Pluralsight, Inc.*,
  45 F.4th 1236 (10th Cir. 2022) ................................................................................22

*In re Ironnet, Inc.*,
  2023 WL 5110932 (E.D. Va. Aug. 9, 2023)..............................................................10

*Johnson v. Tellabs Inc.*,
  262 F. Supp. 2d 937 (N.D. Ill. 2003) .......................................................................25

*Kusnier v. Virgin Galactic Holdings, Inc.*,
  639 F. Supp. 3d 350 (E.D.N.Y. 2022) ......................................................................15

*Leventhal v. Chegg, Inc.*,
  721 F. Supp. 3d 1003 (N.D. Cal. 2024) .....................................................................5

*Longman v. Food Lion, Inc.*,
    197 F.3d 675 (4th Cir. 1999) ................................................................15

*Lowry v. RTI Surgical Holdings, Inc.*,
    532 F. Supp. 3d 652 (N.D. Ill. 2021) ..............................................9, 21

*Macovski v. Groupon, Inc.*,
    553 F. Supp. 3d 460 (N.D. Ill. 2021) ...........................................5, 6, 28

*Makor Issues & Rts., Ltd. v. Tellabs, Inc.*,
    437 F.3d 588 (7th Cir. 2006), *vacated and remanded on other
    grounds*, 551 U.S. 308 (2007)................................................................16

*Makor Issues & Rts., Ltd. v. Tellabs, Inc.*,
    513 F.3d 702 (7th Cir. 2008) ...............................................................24

*Makor Issues & Rts., Ltd. v. Tellabs, Inc.*,
    735 F. Supp. 2d 856 (N.D. Ill. 2010) ..............................................16, 28

*In re Merit Med. Sys., Inc. Sec. Litig.*,
    2021 WL 1192133 (C.D. Cal. Mar. 29, 2021), *report and
    recommendation adopted by* 2021 WL 1753612 (C.D. Cal. May 3,
    2021) ......................................................................................................17

*In re Molycorp, Inc. Sec. Litig.*,
    157 F. Supp. 3d 987 (D. Colo. 2016)....................................................25

*Omnicare v. Laborers Dist. Council Const. Indus. Pension Fund*,
    575 U.S. 175 (2015)...............................................................................18

*Pension Tr. Fund for Operating Eng'rs v. Kohl's Corp.*,
    895 F.3d 933 (7th Cir. 2018) ...............................................................20

*Phoenix Ins. Co. v. ATI Physical Therapy, Inc.*,
    690 F. Supp. 3d 862 (N.D. Ill. 2023) ...............................11, 26, 27, 29

*In re Pivotal Sec. Litig.*,
    2020 WL 4193384 (N.D. Cal. 2020) .....................................................14

*Pugh v. Tribune Co.*,
    521 F.3d 686 (7th Cir. 2008) ...............................................................24

*Rensin, Tr. of Rensin Joint Tr. v. U.S. Cellular Corp.*,
    755 F. Supp. 3d 1048 (N.D. Ill. 2024) .................................................21

*Robbins v. Altopa, Inc.*,
    2023 WL 2484827 (E.D.N.C. Mar. 13, 2023) .........................................5

*Ross v. Career Educ. Corp.*,
    2012 WL 5363431 (N.D. Ill. Oct. 30, 2012)......................................................................9

*Seeks v. Boeing Co.*,
    752 F. Supp. 3d 992 (N.D. Ill. 2024) ...............................................................................18

*Sigman v. Nuscale Power Corp.*,
    2025 WL 1455432 (D. Or. May 21, 2025) ......................................................................17

*Silverman v. Motorola, Inc.*,
    2008 WL 4360648 (N.D. Ill. Sept. 23, 2008) .................................................................13

*Sinnathurai v. Novavax, Inc.*,
    645 F. Supp. 3d 495 (D. Md. 2022).................................................................................26

*Société Générale Sec. Servs., GbmH v. Caterpillar, Inc.*,
    2018 WL 4616356 (N.D. Ill. Sept. 26, 2018) .................................................................21

*Tricontinental Indus., Ltd. v. PricewaterhouseCoopers, LLP*,
    475 F.3d 824 (7th Cir. 2007) ...................................................................................27, 28

*U.S. Sec. & Exch. Comm'n v. Ustian*,
    229 F. Supp. 3d 739 (N.D. Ill. 2017) ...................................................................*passim*

*Uniformed Sanitationmen's Ass'n Comp. Accrual Fund v. Equinix, Inc.*,
    2025 WL 39936 (N.D. Cal. Jan. 6, 2025) ......................................................................12

*United Ass'n Nat'l Pension Fund v. Carvana Co.*,
    759 F. Supp. 3d 926 (D. Ariz. 2024) .............................................................................27

*W. Palm Beach Firefighters' Pension Fund v. Conagra Brands, Inc.*,
    495 F. Supp. 3d 622 (N.D. Ill. 2020) ..................................................................17, 22, 27

*Wade v. WellPoint, Inc.*,
    892 F. Supp. 2d 1102 (S.D. Ind. 2012) ..........................................................................25

*Washtenaw Cnty. Emps' Ret. Sys. v. Walgreen Co.*,
    2019 WL 4597518 (N.D. Ill. Sept. 23, 2019) .................................................................30

*Waswick v. Torrid Holdings, Inc.*,
    2024 WL 3740052 (C.D. Cal. July 23, 2024)..................................................................15

*Williams v. Globus Med., Inc.*,
    869 F.3d 235 (3d Cir. 2017)..............................................................................................4

*Ziolkowski v. Netflix, Inc.*,
    2018 WL 4587515 (N.D. Cal. Sept. 25, 2018) ...............................................................11

**Statutes**

Private Securities Litigation Reform Act of 1995 ................................................................. *passim*

## PRELIMINARY STATEMENT

Contrary to its title, Plaintiff's response to Defendants' opening motion to dismiss brief[1] doesn't "oppose" much of anything.[2] Instead, it regurgitates large swaths of the CAC's defective allegations, which fare no better on repeat. Otherwise, the Opposition variously ignores dispositive arguments in the Opening Brief and distorts the challenged statements, controlling case law, and, notably, Plaintiff's own pleading. Defendants' Opening Brief meticulously catalogued the various pleading failures for each of the CAC's 37 alleged misstatements and its utter lack of any well-pled facts even hinting that any Individual Defendant ***knowingly*** made a false statement. Put plainly, the Opposition falls far short of curing the CAC's three fatal defects under the PSLRA:

***First***, the CAC does not allege any actionable misstatement or omission. Tellingly, it fails to address (and thus disavows) six of the originally challenged statements and sharply retreats from the CAC's focus on CW allegations. Instead, Plaintiff tries to reverse-engineer fraud by contorting disclosures on a May 2024 earnings call into purported "admissions" that Defendants' earlier statements about Sprout's go-to-market sales strategy and product capabilities were false. That is the definition of "fraud by hindsight." Defendants' May 2024 disclosures about then-current business conditions do not imply, much less make a particularized factual showing, that statements months and years earlier were ***knowingly false when made***. Plaintiff even concedes that these May 2024 statements are, at best, "implicit admissions," which fail to satisfy the PSLRA under well-settled law. And regardless, the Opposition cannot credibly refute that Defendants' statements consist of inactionable puffery, opinions, and/or forward-looking statements.

---

[1] Unless otherwise noted, capitalized terms shall have the meanings ascribed to them in Defendants' Joint Amended Memorandum of Law In Support of Motion to Dismiss the Consolidated Class Action Complaint, ECF No. 51 (Apr. 2, 2025) ("Opening Brief"). Citations to the Opening Brief are denoted "Br. at ___").

[2] Lead Plaintiff's Opposition to Defendants' Motion to Dismiss the Consolidated Class Action Complaint, ECF No. 53 (May 23, 2025) ("Opposition"). Citations to the Opposition are denoted "Opp. at ___."

***Second***, the Opposition does not cure the CAC's deficient scienter allegations. Apart from speculating that Defendants "must have known" their statements were false based on the "core operations" theory, "implicit admissions," and responses to a short-seller report—which are insufficient under settled case law—Plaintiff points to (i) CW allegations that fail to particularize any Defendant's knowledge or recklessness, (ii) illusory motive allegations based on routine stock sales overwhelmingly made under 10b5-1 trading plans, and (iii) four executive "departures" (two of which never occurred). None comes close to pleading a strong inference of scienter.

***Finally***, the Opposition lays bare Plaintiff's failure to plead loss causation. Dispositively, none of the so-called "corrective disclosures"—including the purported "implicit admissions" in May 2024—corrects anything, as they neither explicitly nor implicitly acknowledge prior misstatements. Plaintiff fails to connect the stock drops at issue to a single alleged misstatement, and loss causation cannot rest solely on disclosures of negative financial information.

As explained herein and in the Opening Brief, the CAC should be dismissed with prejudice.

## ARGUMENT

### A.     The Opposition Fails to Establish that Plaintiff Properly Pled Falsity.

As noted in the Opening Brief, the CAC alleged 37 statements grouped into four categories. Plaintiff wholly ignores—and has thus disavowed—six of the 37 (Stmts. 21, 30, 32, 35, 36, and 37), which should be dismissed outright. *See U.S. Sec. & Exch. Comm'n v. Ustian*, 229 F. Supp. 3d 739, 771 (N.D. Ill. 2017).[3] As to the remaining 31, the Opposition largely abandons the CAC's CW assertions. Instead, it resorts to selectively excerpting Defendants' supposed "admissions" during Sprout's May 2, 2024 earnings call—"cobbling together selected, non-contextual, partial

---

[3] Even if not abandoned as a technical matter, these statements should be dismissed because, by failing to address their pleading flaws, Plaintiff necessarily fails to specify "the reason or reasons why [each] statement is misleading," as required by the PSLRA. 15 U.S.C. § 78u–4(b)(1)(B).

quotations." *See City of Hollywood Police Officers' Ret. Sys. v. Henry Schein, Inc.*, 552 F. Supp. 3d 406, 411 (E.D.N.Y. 2021). Plaintiff's attempt to convert "sow's ears into silk purses" cannot save the CAC's deficient allegations. *Id*. at 412.

### 1. Statements Concerning Sprout's Go-To-Market Strategy.

As shown in the Opening Brief, Defendants' May 2, 2024 statements about refinements to Sprout's sales model were not "admissions" that the 20 prior "go-to-market" statements were false when made. Br. at 18–19. Aside from the temporal chasm between May 2024 and the challenged statements—and the undisputed success of the go-to-market model—the transcript of the May 2 earnings call viewed in totality shows that Sprout's management was describing an adaptation of Sprout's overall go-to-market practices—not "admitting" (or even suggesting) that the inbound-sales model was a failure or that prior positive statements about its efficacy were false. *Id.*

Unable to find an "admission" that the model had failed, Plaintiff (i) speculates that this must be what Defendants meant because companies do not change an approach that is "a rousing success" (Opp. at 26), and (ii) mischaracterizes Mr. Barretto's statements—*i.e.*, "I own this" and Sprout's performance misses were "self-induced"—as "an apology" for strategic failures. *Id.*

To begin with, Plaintiff's theories are flatly contradicted by the earnings call transcript itself and Sprout's undisputed historical financial performance. There was no admission of failure in May 2024 because, in fact, Sprout's go-to-market model unquestionably succeeded. *See* Br. at 8 ("from 2021 through 2023, Sprout increased revenue in each successive quarter and beat analyst revenue and EPS estimates more than 90% of the time, mainly because of its ability to attract large customers to its platform").

Plaintiff's attempt to spin Mr. Barretto's "I own this" statement as indicative of mission failure is even more egregious. Viewed in context, Mr. Barretto's statement was limited to the impact of ***Q1 2024*** operational changes on ***that quarter's*** performance:

3

> [W]e made several important strategic decisions heading into Q1 such as building new vertical sales teams, accelerating promotions in our mid-market and enterprise teams, adjusting our account coverage model and prioritizing Tagger enablement … [that we] thought we could manage … without disruption, but [] collectively set us back. I believe each of these moves support our long-term strategy and better positions us for the future. But in the short term, there were execution headwinds that were self-induced. Although Q1 net new revenue … [was] not where we expected it to be, there was a lot of important learning, progress and momentum coming out of this process. I own this and fully expect us to be much better going forward.

(Ex. 13 at 5.)  Even then, most of the "self-induced" changes Mr. Barretto "owned" did not even relate to Sprout's existing inbound go-to-market model, much less repudiate the strategy.  The only one even touching on the subject—"vertical[izing] sales teams"—concerns the **organization** of Sprout's sales force and not the **use** of its inbound model.  The statement neither acknowledges failure of the model nor "admits" any falsity.  Plaintiff concedes as much, murmuring in a footnote that its curated snippets are "implicit[]" admissions.  Opp. at 27 n.5.  But "implied" admissions are not particularized facts.  *See, e.g.*, *Williams v. Globus Med., Inc.*, 869 F.3d 235, 244 (3d Cir. 2017) (plaintiffs' inferences do not suffice to plead falsity).

This is so irrespective of investor response.  Contrary to Plaintiff's argument, negative investor reaction to the May 2, 2024 earnings call does not bolster its "implied admission" theory.  *See Garnett v. RLX Tech. Inc.*, 632 F. Supp. 3d 574, 604 n.17 (S.D.N.Y. 2022), *aff'd*, *Tseng v. De Vries*, 2023 WL 8073087 (2d Cir. 2023) (market reaction alone does not indicate a failure to disclose); *cf. E. Ohman J:or Fonder AB v. NVIDIA Corp.*, 81 F.4th 918, 929–932 (9th Cir. 2023), *cert. granted sub nom. NVIDIA Corp. v. Ohman J*, 144 S. Ct. 2655 (2024), and *cert. dismissed as improvidently granted*, 145 S. Ct. 33 (2024) (falsity allegations upheld based not only on investor/analyst response but also on the presence of independent investigative reports confirming falsity).

4

Plaintiff likewise invokes the May 2, 2024 call to excuse the CAC's lack of allegations that Defendants were privy to data or other internal reports contradicting their public statements. Ignoring Defendants' detailed critique of the generalized CW statements (*see* Br. at 16–18), the Opposition incorrectly asserts (citing inapposite cases),[4] that such "data" and "specificity" are not required (Opp. at 27) and points to three other fragments from the May 2, 2024 call that it (again) frames as "admissions" that the 20 go-to-market statements were false. *Id*. (citing *Macovski v. Groupon, Inc*., 553 F. Supp. 3d 460, 477 (N.D. Ill. 2021)). But as before, viewing the excerpts in context reveals the liberties Plaintiff took to curate sound bites. ***First***, Plaintiff says that Mr. Barretto admitted Sprout was scrapping its go-to-market model by saying:

> Sprout had to completely "***redraw***" its entire sales model because selling to enterprise clients was "***orders of magnitude different***" than selling to SMBs— meaning that Sprout's inbound model was completely different than what was needed to succeed in the enterprise space. Furthermore, Defendants admitted that this had become apparent by Fall 2023 ***at the latest***.

Opp. at 27 (emphasis in original). But the actual exchange shows that Mr. Barretto never said that Sprout was "redrawing its entire sales model":

> Coming into 2024, with that business largely cycled out, we have new clarity on where to optimize and ***redraw our teams*** and go-to-market efforts to accelerate our path to $1 billion in revenue.

---

[4] In *Leventhal v. Chegg, Inc.*, 721 F. Supp. 3d 1003, 1012 (N.D. Cal. 2024), the complaint was found to plead particularized allegations of cheating where it included an empirical analysis of, among other things, "the number, subjects, and timeframe of unique user questions reviewed; [and] parameters used to identify cheating, with examples." In *In re First Merchants Acceptance Corp. Securities Litigation*, 1998 WL 781118, at *8 (N.D. Ill. Nov. 4, 1998), the plaintiff was excused from pleading the precise material misstatements in the financial statements where such information could not "be determined without a re-audit of the Company's financial records." In *In re HD Supply Holdings, Inc. Securities Litigation*, 341 F. Supp. 3d 1342, 1353–54, 1356 (N.D. Ga. 2018), plaintiff was not required "to specifically quantify how false the statements were when made" when it pled with particularity that metric data was false based on multiple CWs with access to data. And while *Robbins v. Altopa, Inc.*, 2023 WL 2484827, at *2 (E.D.N.C. Mar. 13, 2023), a four-page, out-of-Circuit opinion, said in *dicta* that plaintiffs need not plead facts in a defendant's exclusive possession, here the CAC alleges that CWs had direct knowledge of Sprout's enterprise sales. *See* CAC ¶¶90–97.

(Ex. 13 at 5 (emphasis added).)[5]  Reconfiguring the structure of Sprout's sales teams (*i.e.*, verticalization) is far different from abandoning its inbound sales model or its use of free trials.

*Second*, the reference to "orders of magnitude" does not refer to some supposed delta between Sprout's inbound model and the sales strategy necessary for enterprise sales.  Instead, Mr. Barretto said that the metrics used to evaluate performance should adapt to changes in Sprout's business, which had transitioned from "completely inbound highly transactional … [to] enterprise-heavy" and was thus "orders of magnitude different from the business [investors] knew at the time of [Sprout's] IPO."  *Id.* at 6.  Thus, any perceived connection between these business changes and Sprout's abandonment of its inbound sales strategy is purely of Plaintiff's making.

*Finally*, Mr. Barretto never "admitted" that a shift in Sprout's inbound sales strategy "bec[a]me apparent by Fall 2023 at the latest."  Opp. at 27.  During a Q&A session at the end of the May 2, 2024 call, Mr. Barretto said that the decisions to begin implementing the operational changes to which he had previously alluded—none of which changed or abandoned Sprout's use of its inbound sales model or 30-day free trial for enterprise clients—were made in the previous quarter.[6]  (Ex. 13 at 12.)  This is hardly an admission that Sprout concealed an impending overhaul in its sales model.  In sum, these three excerpts cannot salvage Plaintiff's go-to-market allegations.

---

[5] This refutes Plaintiff's claim that the statements "Sprout's sales motion 'worked' and that there were 'no major changes' to report on that front" were false because Sprout "completely redr[e]w that very motion." (Opp. at 25, 27). Neither *Groupon* nor *Azar v. Yelp, Inc.*, 2018 WL 6182756 (N.D. Cal. Nov. 27, 2018) change that conclusion.  The *Groupon* plaintiffs did not simply allege misstatements that the "marketing strategy was working," but specific, detailed representations (*e.g.*, the strategy "would 'almost double the average gross profit per customer'" and "metrics showed a '60 percent increase in purchase frequency and a 20 percent jump in average order value'") coupled with omissions of contrary information. *See* 553 F. Supp. 3d at 471.  And in *Yelp*, the statements were directly contradicted by defendants' public acknowledgment of a "modest slowdown" in sales forces.  2018 WL 6182756, at *17.  Here, Sprout saying it would "redraw" its "sales team" is neither at odds with Defendants' prior statements nor a repudiation of Sprout's inbound sales model.  (*See* Ex. 19 at 9 (Sprout was adding Enterprise business through its "strategic alignment around [its] most sophisticated customers[.]"); Ex. 12 at 4 (Sprout was "aligning around an incredibly strong core business while deprioritizing the long tail of low-value business").)

[6] Moreover, 25 of the 37 purported misstatements predate that quarter, and four others fall within it.  As explained *infra* at Section I.B, those are not alleged to have postdated any decision to implement go-to-market changes.

6

Beyond the May 2024 call, the Opposition argues that four executive resignations show an overall failure of the go-to-market model. Opp. at 26–27. That argument virtually dismisses itself. Plaintiff concedes (in another footnote) that two of the four stayed with Sprout. *Id*. at 45 n.21. Regardless, resignations alone do not plead falsity. *See Francisco v. Abengoa, S.A.*, 624 F. Supp. 3d 365, 402 (S.D.N.Y. 2022) ("there are any number of reasons that an executive might resign").

Sensing the weakness of its go-to-market allegations, Plaintiff abruptly recharacterizes its theory of falsity. Having pled that the sales model was ineffective for attracting "***any*** larger customers," it now surmises that "Sprout could not obtain ***sufficient*** enterprise clients to achieve the levels of revenue growth … [it] proclaimed [it] would achieve through at least 2025." Opp. at 28 (emphasis added). Plaintiff's about-face does not help it, because failing to meet a growth objective does not render the underlying statement (or its drivers) false. *See In re Fusion-io, Inc. Sec. Litig.*, 2015 WL 661869, at *18 (N.D. Cal. Feb. 12, 2015) (missed predictions on guidance do not support inference that earlier statements relating to such guidance were false).[7]

### 2. Statements About Sales Cycle Length.

The Opposition takes a similar tack for the 16 alleged misstatements concerning Sprout's sales cycle lengths—*i.e.*, repeating and labeling them sufficiently particularized on their face. But here, too, Plaintiff mischaracterizes the statements to create an "illusion of [a] particularized false statement[]." *City of Hollywood*, 552 F. Supp. 3d at 411. For instance, Plaintiff cites Mr. Barretto's statement that "sophisticated customers in the mid-market and enterprise … see value much faster with Sprout [a]nd that has enabled us to win customers in 30 to 45 days on average." Opp. at 31. But it deliberately omits the immediately preceding phrase—"And we do [trials] ***even if for***…"—which clarifies that he was discussing Sprout's customer base generally, not enterprise

---

[7] *Holwill v. AbbVie Inc*, 2020 WL 5235005 (N.D. Ill. Sept. 1, 2020), cited in the Opposition, is not analogous. *See id.* at *3 (boasts about sales and marketing practices driven by an "allegedly unlawful kickback scheme" were false).

customers specifically. (Ex. 5 at 25 (emphasis added).) Equally misleading is Plaintiff's description of Mr. Barretto's statement as praising Sprout's "rapid sales cycles" of "between 30 to 45 days," including "deals in the mid-market and enterprise." Opp. at 31. The actual statement was narrower—"***We will see deals*** in the mid-market and enterprise that hit those timelines"— clearly indicating only a ***subset*** of deals and an exception to the rule. CAC ¶190 (emphasis added). Plaintiff cannot manufacture particularity through selective quoting.[8] *City of Hollywood*, 552 F. Supp. 3d at 411.

To the same effect, Plaintiff's assertion that Defendants "ignore their own words" by arguing that the sales cycles statements referred to average lengths for ***all*** customers (Opp. at 32) gets it exactly backwards. It is Plaintiff twisting Mr. Barretto's words as saying that Sprout had quick sales turnarounds "even with enterprise clients." *Id*. Mr. Barretto never said that Sprout's sales cycles were quick ***for enterprise clients***. The statement cited described Sprout's differentiated go-to-market approach—emphasizing free trials—versus those of competitors, who lead with "heavily customized demos and really long sales cycle times and heavy services." (Ex. 19 at 18.) And even assuming his statement implicitly compared sales cycle lengths, the CAC contains no particularized allegations about competitor sales cycles by which to establish falsity.

Lacking particularized facts about sales cycle lengths, Plaintiff relies solely on alleged statements by CW 4 that enterprise customers "always take longer," exemplified by naming three customers whose deals purportedly took "months to close." Opp. at 33 (citing CAC ¶95). Hyperbole by a single CW that enterprise sales are "always" longer is not sufficiently particularized to plead falsity under the PSLRA. None of Plaintiff's cases says otherwise. *Lowry*

---

[8] Plaintiff also incorrectly quotes Justyn Howard as "bragging that enterprise customers 'land with similar costs and similar sales cycles as the rest of our customer base.'" Opp. at 31. In totality, the statement did not reference ***all*** enterprise customers or imply that "similar" meant "identical" timelines for every enterprise client. (Ex. 10 at 5.)

*v. RTI Surgical Holdings, Inc*., 532 F. Supp. 3d 652, 655, 661 (N.D. Ill. 2021), involved a long-term CW whose statements supported scienter allegations, not falsity. And in *Ross v. Career Educ. Corp*., 2012 WL 5363431, at *4 (N.D. Ill. Oct. 30, 2012), falsity was specifically corroborated by multiple CWs. Here, CW 4 is only alleged to have worked at Sprout for about one-third of the Class Period (June 2021–July 2022) (CAC ¶¶69 n.7, 95) and thus lacks knowledge and reliability about enterprise sales cycles at most relevant times. *See Constr. Workers Pension Fund v. Navistar Int'l Corp*., 114 F. Supp. 3d 633, 646 (N.D. Ill. 2015). Even if CW 4 was reliable, saying that three enterprise deals were protracted—when Sprout had nearly 1,400 large customers by the end of 2023 (Ex. 21 at 64)—cannot credibly falsify broader statements regarding average sales cycle lengths.

Nor can Plaintiff find refuge by arguing that Defendants "admitted" to misrepresenting sales cycle lengths in the May 2, 2024 earnings call (Opp. at 33). As detailed in the Opening Brief, these statements disclosed contemporaneous market conditions, not prior falsity. The Opposition points to a March 2024 statement in which Mr. Barretto supposedly emphasized rapid enterprise cycles, arguing that market conditions could not have changed between March and May. But it omits (again) a crucial portion of the March statement: Mr. Barretto's clarification that while some enterprise deals closed quickly, "not all of them look like that." (Ex. 41 at 7.) The March statement is thus entirely consistent with the May statement, which did not "correct" anything.

Finally, Plaintiff tries to evade Sprout's explicit risk disclosures about changes in sales cycle length by arguing that the warned-of risks "had already materialized." Opp. at 34. But its circular logic is predicated on the same fallacious "admissions" theory. *See* Br. at 19, 23. And Plaintiff cites no precedent applying the "materialized risk" theory based on "implicit admissions." In fact, Plaintiff's authority underscores the particularity requirement: each involved specifically

alleged facts known to defendants before disclosure. *See Hedick v. Kraft Heinz Co.*, 2021 WL 3566602, at *12, 16 (N.D. Ill. Aug. 11, 2021); *In re Ironnet, Inc.*, 2023 WL 5110932, at *8 (E.D. Va. Aug. 9, 2023); *Hunt v. Bloom Energy Corp.*, 2021 WL 4461171, at *12 (N.D. Cal. Sept. 29, 2021). Plaintiff's manufactured admissions and conclusory CW statements do not suffice.

### 3. Statements About Sprout's Product Capabilities.

Nor does the Opposition salvage the CAC's allegations regarding Defendants' 23 product-capability statements through which, Plaintiff asserts, Defendants misrepresented that (i) "there was '***not any functionality we don't have to win these larger deals***,' (ii) there were not 'any [gaps] in our feature sets,' (iii) Sprout 'check[ed] all the boxes,' and (iv) Sprout was 'well equipped for the deals that are out there' with enterprise clients." *See* Opp. at 28 (quoting CAC ¶¶50, 53).[9] Plaintiff tries to substantiate these allegations through CW statements that Sprout lacked critical influencer marketing capabilities prior to acquiring Tagger. Yet despite this supposed omission, Sprout demonstrably succeeded in acquiring significant numbers of enterprise customers during the relevant period. Br. at 8–9. Indeed, from 2021 through 2023, Sprout consistently grew its enterprise customer base, increasing the number of customers contributing over $50,000 in ARR from 610 to 1,399. (Ex. 20 at 59; Ex. 21 at 64.)

Forced to concede that Sprout acquired "some" enterprise clients, the Opposition pivots – now arguing that Defendants' statements were false because Sprout did not win "***enough***" of these customers to meet a purported 30% growth target. Opp. at 30. Yet the CAC nowhere alleges that Defendants ***ever*** linked product capabilities to achieving a specific growth rate or said the Tagger acquisition was necessary to secure enterprise clients. Rather, Defendants' statements make clear that the Tagger deal was driven by a recent increase in market demand for influencer marketing

---

[9] The statements are also inactionable puffery and opinions. *See infra* Section I.A.5.

tools. (Ex. 15 at 5, 7, 13.) Missed growth targets alone cannot retroactively falsify prior statements about capabilities. *See In re Fusion-io, Inc. Sec. Litig.*, 2015 WL 661869, at *18; *Ziolkowski v. Netflix, Inc.*, 2018 WL 4587515, at *3 (N.D. Cal. Sept. 25, 2018).

Plaintiff further argues that the absence of certain features (APIS, social listening, collaboration and foreign language tools) renders Defendants' broad product capability statements false. Opp. at 29. In doing so, Plaintiff mischaracterizes Defendants' generalized descriptions of Sprout's product as a "testable binary" proposition. Defendants never made specific, verifiable claims about the presence or absence of specific features. Instead, the only genuinely testable proposition is whether Sprout's product was sufficient to win enterprise customers—an objective Sprout achieved (more than doubling its enterprise customer count from 2021 to 2023). Thus, generalized assertions about missing features do not disprove Defendants' broad statements. *See City of Hollywood*, 552 F. Supp. 3d at 411.

Plaintiff's "testable binary" proposition cases involved specific factual statements readily verifiable on their face—*e.g.*, product attributes causing dried flakes in hair, employee retention rates, or COVID-19 impacts. *See* Opp. at 30 (citing *Duran v. Henkel of Am., Inc.*, 450 F. Supp. 3d 337, 348 (S.D.N.Y. 2020), *Phoenix Ins. Co. v. ATI Physical Therapy, Inc.*, 690 F. Supp. 3d 862, 878 (N.D. Ill. 2023), and *In re AppHarvest Sec. Litig.*, 684 F. Supp. 3d 201, 260 (S.D.N.Y. 2023)). Here, Defendants' general statements accurately reflected Sprout's proven ability to win enterprise business. Plaintiff offers no particularized facts contradicting a single representation.

### 4. Statements Relating to the Salesforce Partnership.

As for the six purported misstatements about Sprout's partnership with Salesforce, the Opposition continues to rely exclusively on an anonymous short-seller report (the Razor Report) and statements from a single CW (CW 1). Neither source comes close to satisfying Plaintiff's pleading burden.

Contrary to Plaintiff's insistence that the Razor Report can plead falsity (Opp. at 35), courts routinely reject short-seller reports that lack indicia of reliability. *See In re DraftKings Inc. Sec. Litig.*, 650 F. Supp. 3d 120, 155 (S.D.N.Y. 2023). As Defendants have shown, the Razor Report has two critical flaws: (i) it was authored anonymously and (ii) its allegations are predicated on anonymous sources with no credible basis of knowledge regarding Sprout's Salesforce partnership. *See id.* Consequently, the Razor Report lacks any indicia of reliability.

The Opposition's authority (Opp. at 35) only underscores that unreliability. The report in *Bond v. Clover Health Invs., Corp.*, 587 F. Supp. 3d 641, 649-50 (M.D. Tenn. 2022), had significant reliability indicators absent here: it was issued by a known market research firm (Hindenburg Research)—not an anonymous short seller—and corroborated by four distinct confidential witnesses. Likewise, the report in *Uniformed Sanitationmen's Ass'n Comp. Accrual Fund v. Equinix, Inc.*, 2025 WL 39936, at *2, *4–5 (N.D. Cal. Jan. 6, 2025), was substantially more credible than the Razor Report, as it was predicated on interviews with 37 former employees and corroborated by multiple independent sources (*i.e.*, reports from TD Cowen and Barclays) as well as the defendant's own actions. Indeed, the court explicitly emphasized that any single piece of evidence alone would be insufficient to plead falsity. *Id.* These cases highlight the "indicia of reliability" missing from the Razor Report.

Plaintiff's further attempt to bolster the Razor Report with so-called "corroborating" statements from CW 1 also falls short. CW 1's comments address purported motives behind the Salesforce partnership, not the partnership's performance or success. *See* Br. at 27–28. Moreover, CW 1's statements constitute hearsay and speculation based on purported conversations with unidentified "colleagues," rather than personal knowledge of concrete facts—such as the number of potential customers from Salesforce or conversion rates—necessary to plead falsity with

particularity.  Such conjecture neither pleads with particularity that Defendants' Salesforce-related statements were false nor corroborates the Razor Report.[10]

Finally, Plaintiff attempts to manufacture an "admission" of falsity by arguing that Mr. Barretto conceded during the May 2, 2024 earnings call that the fruits of the Salesforce opportunity were "significantly less" than Defendants previously represented.  Opp. at 35 n.15.  Plaintiff mischaracterizes Mr. Barretto's actual remarks.  His full statement on the call was:

> Salesforce partner revenue, including both Social Studio and non-Social Studio business, accounted for slightly less than 15% of our new business in 2023 and less in 2022.  *This amounts to a roughly 3% contribution to our total 2023 revenue growth, which I believe is significantly less than many may have previously assumed.  We value our partnership with Salesforce and other key partners, and we see a strong opportunity for future growth that powers through a 3% potential headwind in 2025, especially given all the opportunities we are creating within our ecosystem.*

(Ex. 13 at 6 (emphasis added).)  As such, Mr. Barretto stated only that the partnership's contribution was less than what "others may have previously assumed."  As neither Mr. Barretto nor any other Defendant is alleged to have had made prior representations quantifying the expected revenue from the Salesforce partnership, his remarks cannot falsify any earlier statement.

**B.     The Alleged Misstatements Are Inactionable as a Matter of Law.**

As set forth in the Opening Brief, independent of the CAC's failure to plead falsity, numerous of the alleged misrepresentations constitute inactionable puffery, opinions, or forward-looking statements.  The Opposition either neglects to address the statements outright or falls short of establishing that they are actionable.[11]

---

[10] *Silverman v. Motorola, Inc.*, 2008 WL 4360648, (N.D. Ill. Sept. 23, 2008), does not support Plaintiff, as it confirms that "general statements" and hearsay are insufficient on their own to plead falsity.  *Id.* at *14 (quotations omitted).

[11] Ironically, with respect to all these statements, Plaintiff argues that "context matters," a principle Plaintiff should have minded when pleading the falsity of its alleged misrepresentations.

**Puffery**:  As an initial matter, the Opposition fails to respond to Defendants' argument that Statement 20 (CAC ¶215) is puffery (Br. at 30–31), thus conceding that it is not actionable.  *See Ustian*, 229 F. Supp. 3d at 771.  With respect to the other 16 "puffery" statements identified in the Opening Brief, the Opposition merely announces that these statements are "verifiably either true or not," without explaining how such verification would unfold.  For example, it extracts "snippets of snippets" to argue that Statements 1, 2, 7, 12, 13, 14, and 15 are "factual."  *See* Opp. at 36–37.  They are not (and are addressed below in the order addressed in the Opposition).

- **<u>Stmts. 1 and 2</u>**:  The inbound trial model was "the secret sauce that enabled [Sprout] to win customers in 30 to 45 days."

The portion challenged in the CAC is that the inbound trial model was "the secret sauce" enabling Sprout to win customers in this time frame, which is classic puffery.  *See, e.g.*, *City of Sunrise Gen. Emps.' Ret. Plan v. Fleetcor Techs., Inc.*, 2018 WL 4293143, at *8 (N.D. Ga. May 15, 2018) (dismissing statements that "secret sauce" of success was sales and marketing the "old fashioned way"); *Chew v. Moneygram Int'l, Inc.*, 2024 WL 4346522, at *15 (N.D. Ill. Sept. 30, 2024) ("competitive advantage" statements were vague descriptors and puffery).  If, as Plaintiff now suggests, the representation just implicates the "factual question" of whether Sprout won any enterprise customers in "30 to 45 days," then it fails for lack of particularity, as the CAC does not allege that Sprout failed to acquire ***any*** enterprise customers within that time frame.

- **<u>Stmt. 13</u>**:  "The same strategy in SMB is working even better in enterprise."

The Opposition claims this statement is factual without any explanation as to what "working even better" means.  It could mean that Sprout is acquiring more total revenue than it does from SMBs, more actual enterprise customers, is achieving a higher conversion rate, or that the acquired enterprise customers are more profitable over time than SMBs.  Such  qualitative, comparative statements are clear puffery.  *See, e.g.*, *In re Pivotal Sec. Litig.*, 2020 WL 4193384,

at *14 (N.D. Cal. 2020) (saying a product or business is "strong across sectors" is "feel good" puffery).

- **Stmt. 14**: Sprout does not "have feature sets or any gaps in [its] feature sets."

Despite Plaintiff's conclusory assertion that this statement is "factual," it makes ***no*** express representations about any specific product features and thus constitutes puffery. *See, e.g.*, *Longman v. Food Lion, Inc.*, 197 F.3d 675, 685 (4th Cir. 1999) (statements that prices and products were "especially well suited to the demands of our customers" were inactionable puffery).

- **Stmts. 7 and 15**: Sprout's product "check[s] a lot of boxes" with enterprise customers.

Plaintiff makes no attempt to identify the "boxes" or how many constitutes "a lot." Nor could it. The statement is classic puffery. *See, e.g.*, *Waswick v. Torrid Holdings, Inc.*, 2024 WL 3740052, at *6–*7 (C.D. Cal. July 23, 2024) (statement that defendant had "flexibility to respond quickly to the latest sales trends and make adjustments to our current offering" was "classic puffery"); *Kusnier v. Virgin Galactic Holdings, Inc.*, 639 F. Supp. 3d 350, 374 (E.D.N.Y. 2022) ("classic puffery" when defendant touted "a tested and tried system that is performing well").[12]

- **Stmt. 12**: Sprout's team is "excited about the customers in our Social Studio that are going to migrate over the next couple of years. And there's 4,000-ish of them."

As with Statements 1 and 2, the CAC does not challenge the number of customers in the Salesforce pipeline (*i.e.*, no CW offers particularized allegations that the number was false), but rather takes issue with Mr. Barretto's optimism about Sprout's ability to migrate these customers. Again, this expression of optimism is inactionable puffery. *In re Advance Auto Parts, Inc., Sec.*

---

[12] Although the Opposition does not directly address the substance of the other "puffery" statements identified in the Opening Brief, they are likewise not "factual." *See, e.g.*, Stmt. 16 (CAC ¶206) (the inbound sales model is a "major" or "massive differentiator."); Stmt. 19 (CAC ¶213) (Sprout is "so proud of the product itself, and [it] know[s] that it works really well for [its] [E]nterprise customers.'"); Stmt. 25 (CAC ¶223) (the Salesforce opportunity is "absolutely massive.").

*Litig.*, 2020 WL 599543, at *5 (D. Del. Feb. 7, 2020) ("Courts have routinely found that statements using words like 'excited' and 'pleased' constituted inactionable puffery.") (collecting cases).

The Opposition further makes the blanket argument that those "puffery" statements made in response to analyst questions cannot be puffery as a matter of law. But merely answering an analyst's question does not immunize the answer from qualifying as puffery. *See Buhrke Fam. Rev. Tr. v. U.S. Bancorp*, 726 F. Supp. 3d 315, 343 n.13 (S.D.N.Y. 2024) ("highly general" statements were inactionable puffery, even if made when responding to analyst question). Unlike here, the cases Plaintiff cites for this proposition feature verifiable factual responses. *See Allison v. Oak St. Health, Inc.*, 2023 WL 1928119, at *5 (N.D. Ill. Feb. 10, 2023) (defendant provided specific, direct answer to question about how it sourced patients); *Kraft*, 2021 WL 3566602, at *10 (defendant provided specific, direct response about "fill rate"). Sprout's statements were far more generic. *See, e.g.*, Stmt. 14 (no "gaps in our feature sets" given in response to specific analyst question about whether Mr. Del Preto had been "describing one of the premium models" (Ex. 34 at 8)).[13] Consequently, the Opposition offers no basis to sustain the specified "puffery" statements.

**Statements of Opinion or Belief**: Again, the Opposition concedes, by failing to respond at all, that Statements 5–6, 11, 12, 18, 20, 23–26, 29, 30, 32, 33, and 37 (CAC ¶¶182, 193, 195, 209–10, 215, 220, 222–223, 226, 231, 233, 237, 239, and 243) are inactionable. *See Ustian*, 229 F. Supp. 3d at 771. Of the remaining opinion statements, the Opposition sets forth two subsets— one related to Sprout's go-to-market strategy and one related to its product capabilities—and

---

[13] The quotation from *Allison* cited in the Opposition comes directly from *Makor Issues & Rts., Ltd. v. Tellabs, Inc.*, 437 F.3d 588, 597 (7th Cir. 2006), *vacated and remanded on other grounds*, 551 U.S. 308 (2007) ("*Makor I*"). Opp. at 37. Unlike Defendants' statements here, the statements at issue in *Makor I* were directly responsive to analyst questions. *See Makor Issues & Rts., Ltd. v. Tellabs, Inc.*, 735 F. Supp. 2d 856, 918 (N.D. Ill. 2010) ("*Makor III*") (statements surviving *Makor I* included defendants' "response to an analyst's question about whether Tellabs was seeing 'any weakness' with the TITAN 5500: 'We are not. We are still seeing the product continue to maintain its growth rate and is still experiencing strong acceptance,'" and defendants' "response in Tellabs's Annual Report to a question about whether the TITAN 5500 'had peaked': 'No ... it's still going strong.'").

argues that they are not "opinions on their face." *See* Opp. at 37. As set forth below, these characterizations are incorrect.

- **Stmts. 13 and 28**: "[T]he same strategy in SMB is working even better on the enterprise." (Stmt. 13); Sprout's "go-to-market strategy is working." (Stmt. 28).

The Opposition asserts that both statements contain verifiable facts without specifying which supposed "facts" are verifiable. These representations only convey the Defendants' assessment of the strategy's progress—a classic opinion—and offer no verifiable facts. *See Sigman v. Nuscale Power Corp.*, 2025 WL 1455432, at *10–11 (D. Or. May 21, 2025) ("going quite well" and "looking pretty good" statements were inactionable descriptions of "general progress") (collecting cases); *In re Merit Med. Sys., Inc. Sec. Litig.*, 2021 WL 1192133, at *11 (C.D. Cal. Mar. 29, 2021), *report and recommendation adopted by* 2021 WL 1753612 (C.D. Cal. May 3, 2021) ("everything is working quite nicely" statement was inactionable corporate optimism). They are not factual and are not actionable.

- **Stmts. 7, 14, 15**: Sprout's product "check[s] a lot of boxes" with Enterprise clients. (Stmts. 7 and 15); Sprout does not "have feature sets or any gaps in [its] feature sets." (Stmt. 14).

Plaintiff argues that because these statements lack phrases like "I think" or "I believe," they are "not presented as matters of opinion and cannot be dismissed on that basis." *See* Opp. at 37. That is not the law, which requires no magic language. *See W. Palm Beach Firefighters' Pension Fund v. Conagra Brands, Inc.*, 495 F. Supp. 3d 622, 649 (N.D. Ill. 2020) (statements deemed opinions without "qualifiers such as 'I think' or 'I believe.'"); *Fryman v. Atlas Fin. Holdings*, 2022 WL 1136577, at *14 (N.D. Ill. Apr. 18, 2022) ("a strong feeling is still a feeling and not a fact."). Mr. Del Preto's actual words manifest ***how he feels*** about Sprout's product and its capabilities and contain no feature-specific representations. They are obvious opinions.

The Opposition further seeks to transform Defendants' representations about the "advantages" of Sprout's go-to-market model into statements of fact by asserting (ironically) that

they should be "viewed in context." *See* Opp. at 38. Specifically, it argues that these statements were "supported" by purportedly factual statements that the strategy "allowed customers to 'see value much faster with Sprout than anywhere else' and 'enabled' the purportedly quick sales cycles for enterprise customers." *Id*. But these statements were not made by the same person, on the same day, or to the same audience. *E.g.*, Stmt. 2 (CAC ¶175) (statement by Mr. Barretto during September 22, 2021, Inaugural Investor Day that customers "***see value much faster with Sprout than anywhere else***"); Stmt. 22 (*id*. ¶218) (statement by Mr. Rechel during a March 20, 2024 investor call that live trials were a "'***huge differentiator***' and allowed Sprout to '***have an efficient go-to-market model … up through the largest of enterprises***'"). Hence, Plaintiff's supposed added "context" is illusory and cannot redeem the identified opinion statements.[14]

***Protected Forward-Looking Statements***: Finally, the Opposition argues that none of the challenged statements are protected by the PSLRA safe harbor. It contends that four[15] of them—3, 6, 20, and 28—are "firmly planted in the present or past" and remain actionable. Opp. at 38. Abandoning context, it parses just a portion of Statement 3 noting that Sprout was "complementing [its] inbound effort," while omitting the surrounding text that clearly establish it as forward looking. CAC ¶176 ("to the extent Sprout also needed to do 'outbound' selling to acquire certain enterprise clients, 'we're complementing our inbound effort ***to go after*** customers that we think

---

[14] Nor do the cases cited in the Opposition offer any support to these "context" arguments. In *Azar v. Grubhub, Inc.*, 2021 WL 4077327 (N.D. Ill. Sept. 7, 2021), the court merely held that statements that the defendant was able to "acquire high-quality new diners" were not opinion statements where "[defendant] and investors also tracked the 'quality' or 'loyalty'" of diners with specific metrics which defined diner quality. *Id.* at *2, *5. The CAC lacks any allegations that Defendants ever provided specific data comparing Sprout to its competitors. *See supra* Section I.A.1; *see also Omnicare v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 186 (2015) (an opinion statement with an embedded fact is only actionable if the embedded fact is untrue). The statements in *Seeks v. Boeing Company*, 752 F. Supp. 3d 992, 1017 (N.D. Ill. 2024), that a particular model of airplane is safe, made after one of those airplanes crashed, bear no resemblance to Sprout's opinion statements that its go-to-market approach was a "big competitive advantage," "huge strategic advantage," and a "major differentiator." *Id.* at 1017. And *Fryman* is inapposite because Plaintiff here has not alleged the falsity of any statements that "the inbound model was ineffective for enterprise customers." 2022 WL 1136577 at *17; *supra* at Section I.A.1–4.

[15] Statement 12 is not addressed and, thus, is abandoned. *See Ustian*, 229 F. Supp. 3d at 771.

18

are just **going to be** a great long-term fit for Sprout.'" (emphasis added)). Similarly, in attempting to cast the statement that "these things are all going to be very consistent with what we've done before" (Stmt. 28) into the present tense, the Opposition omits that the remark was made in response to a question about "investments the Company **would make**." *Id.* ¶229 (emphasis added). It employs the same tactic with Statement 6 (*id.* ¶182), ignoring Mr. Barretto's full comment stating, "I think there's still a lot of opportunity for us to drive that inbound nature." (Ex. 26 at 8.) Statements about remaining opportunities are inherently forward-looking.

The same conclusion applies to Statement 20 ("the pipeline heading into this year is bigger than it had been ending the year" and there was "still a decent amount of time left" on Social Studio opportunity). CAC ¶215. That statement was made during Sprout's February 21, 2023 earnings call in which Mr. Barretto said "we feel really good about the momentum, heading into [2023]. We think that there's plenty of upside." (Ex. 19 at 17.) Again, Mr. Barretto's reference to upside for the remainder of 2023 is expressly future-looking and protected by the PSLRA safe harbor.[16]

Finally, the Opposition's halfhearted argument that Sprout's cautionary warnings were too generic is at odds with Plaintiff's whole theory of the case—that Sprout purportedly misled investors about its go-to-market sales model and sales cycles for enterprise customers. Those are precisely the issues covered by Sprout's risk warnings. (*See* Ex. 31 at 33 ("[S]ales to enterprise customers may entail longer sales cycles, more significant selling efforts and greater uncertainty").) Thus, each of the seven statements identified in Defendants' opening brief as forward looking remains entitled to the PSLRA's safe-harbor protections.

---

[16] Plaintiff concedes that Statements 10 (CAC ¶190) and 17 (*id.* ¶206) are, at best, "mixed present/future statement[s]." Opp. at 39. But as set forth *supra*, the CAC fails to plead that the present portions of those statements are false or non-puffery. *See* CAC ¶190 ("we're *still* running at a sales cycle that runs between 30 to 45 days on average. And we will see deals in the mid-market and enterprise that hit those timelines"); *id.* ¶206 ("we're still going to lea[d] with the same inbound, product-led motion **that's made us so successful**."). The full statement in ¶190 makes clear that the "30 to 45 days on average" applies to Sprout's full set of customers, not just enterprise, and with respect to ¶206, Plaintiff cannot rebut that Sprout led with its product or that it was successful in doing so.

### C.     The Opposition Does Not Cure the CAC's Deficient Scienter Allegations.

As shown in Defendants' opening brief, the CAC's scienter allegations fall far short of the strong inference required by the PSLRA, consisting of: (i) "must have known" allegations based on Defendants' senior roles, supposed post hoc "admissions" of the sort regularly rejected in this Circuit, and responses to a short-seller report; (ii) vague CW allegations lacking a single well-pled fact showing that Defendants knew that the challenged statements were false when made; (iii) routine stock sales under 10b5-1 plans; (iv) executive departures that were neither suspicious nor controversial; and (v) Sprout's discontinuance of a non-GAAP financial reporting metric (ARR). Br. at 36–47. The Opposition does nothing to rehabilitate these failures. Rather than confront Defendants' arguments head-on, Plaintiff recycles the same unavailing allegations from the CAC, confirming that its dismissal is warranted.[17]

### 1.     Plaintiff's "Must Have Known" Theories Remain Insufficient.

In large part, the Opposition simply rehashes the CAC's speculative allegations about "core operations" and Defendants' supposed "admissions" and reactions to a short-seller report. Repetition does not beget particularity.

*First*, Plaintiff argues that Defendants' "detailed answers" to questions about Sprout's most critical issues establish scienter. Opp. at 40. This is nothing more than a "core operations" argument, which fails without particularized allegations of knowledge of falsity and an intent to deceive. *See Pension Tr. Fund for Operating Eng'rs v. Kohl's Corp.*, 895 F.3d 933, 937–940 (7th Cir. 2018). Plaintiff's assertion that Defendants were data focused and periodically reviewed sales metrics (Opp. at 40–41) does not suffice, because the CAC never alleges that such data, or anything Defendants reviewed, contradicted their challenged statements (*see supra* Section I.A.1).

---

[17] The Opposition fails to respond at all to Defendants' argument that Jason Rechel should be dismissed as a defendant, thus confirming that dismissal is warranted. *See Ustian*, 229 F. Supp. 3d at 771.

Accordingly, the CAC cannot plead knowledge of falsity and thus fails to establish an inference of scienter. *See Société Générale Sec. Servs., GbmH v. Caterpillar, Inc.*, 2018 WL 4616356, at *8 (N.D. Ill. Sept. 26, 2018). Tellingly, the Opposition makes no effort to distinguish *Kohl's* or the other cases Defendants cited (Br. at 47). And those it does cite involved concrete allegations of defendants' knowledge contradicting their public statements.[18]

**Second**, Plaintiff claims that (i) the Tagger acquisition and (ii) Defendants' May 2, 2024 statements amount to "admissions" that prior statements like "[t]here's not any functionality we don't have to win these larger deals" were false and support scienter. That argument fails. As shown *supra*, Plaintiff concedes that Sprout successfully "won these larger deals," defeating the notion that the May 2024 disclosures were admissions of any product inadequacies (or that statements about those capabilities were false to begin with). Opp. at 30 ("the [CAC] readily acknowledges that Sprout was able to win **some** enterprise customers").

For similar reasons, as discussed *supra* at Section I.A.1, none of the May 2024 statements "admitted" that earlier statements praising Sprout's sales model were false. Plaintiff seeks to impute scienter by juxtaposing Mr. Barretto's statement on November 2, 2023 that there were "no major changes to call out" with his May 2, 2024 statement seven months later that the decisions to update aspects of Sprout's sales approach "all [ ] happened in Q4." Opp. at 42. Even if the two statements mirrored each other substantively (they do not), the CAC fails to plausibly allege that

---

[18] *See AbbVie*, 2020 WL 5235005, at *5 (alleging that defendants had detailed knowledge of illegal kickback scheme while publicly attesting to its legality); *Grubhub, Inc.*, 2021 WL 4077327, at *5 (applying core operations principles in tandem with particularized allegations that defendants analyzed data directly contradicting statements); *Chow v. Archer-Daniels-Midland Co.*, 2025 WL 790854, at *5 (N.D. Ill. Mar. 12, 2025) (defendants allegedly changed their compensation structure to exploit false accounting practices after exhibiting detailed knowledge of resulting profits); *Lowry*, 532 F. Supp. 3d at 663 (defendants allegedly violated their own revenue recognition practices while "repeatedly assert[ing]" effectiveness of internal controls). *Rensin, Tr. of Rensin Joint Tr. v. U.S. Cellular Corp.*, 755 F. Supp. 3d 1048 (N.D. Ill. 2024), and *Gambrill v. CS Disco, Inc.*, 2025 WL 1088224 (W.D. Tex. Apr. 9, 2025), are inapposite: whether Defendants held themselves out as knowledgeable about Sprout's go-to-market strategy, sales cycles, or the Salesforce partnership is irrelevant when the CAC alleges no internal information that contradicted their public statements.

the supposed Q4 decisions **predated** Mr. Barretto's statements, which were made on the second day of November. Since most of Q4 was still to come, logic compels the opposite inference. The *In re Apple Inc. Securities Litigation* case cited by Plaintiff illustrates this point. 2020 WL 6482014 (N.D. Cal. Nov. 4, 2020). There, Apple's CEO made optimistic statements about sales on November 1, 2018—two months before the company announced a guidance miss in January 2019. *Id*. at *1–2. About the miss, the CEO said that adverse sales signals emerged "as [Q4 2018] went on" and were "particularly bad in November," but that he had not seen December's numbers. *Id*. at *3. The court deduced that, by describing the troubling Q4 2018 signs as "particularly bad in November," the CEO was necessarily comparing November to another Q4 month—*i.e.*, October or December. Since he had not seen December numbers, process of elimination meant that he could only be referring to October—**before** his November 2 statements. *Id*. at *9. That was sufficient to infer scienter. Here, by contrast, there is no plausible inference that Sprout's Q4 2023 decision to update aspects of its sales approach preceded Mr. Barretto's November 2 statement one month into the quarter. Plaintiff's argument thus amounts to "fraud by hindsight." *DiLeo v. Ernst & Young*, 901 F.2d 624, 628 (7th Cir. 1990).[19]

**Third**, Plaintiff tries to demonstrate scienter by vilifying Sprout's supposed response to the Razor Report. That argument also collapses. The CAC does not even allege that Defendants reviewed, much less responded to, the report.[20] Instead, it cites an analyst question a month after

---

[19] Nor are post hoc accusations from analysts a substitute for particularized allegations that Defendants knew or recklessly ignored facts rendering statements false when made. *See Conagra Brands, Inc*., 495 F. Supp. 3d at 661 ("analyst speculation" that defendants' sources "could have set off warning flares month ago … cannot substitute for factual allegations about who those sources were or what information they provided.") (cleaned up). *Indiana Pub. Ret. Sys. v. Pluralsight, Inc.*, 45 F.4th 1236, 1260 (10th Cir. 2022), which Plaintiff cites, involved a clear and distinguishable admission whereby, having stated that as of January 2019, "we have about 250 quota-bearing sales representatives," defendant later acknowledged that "it's somewhat well documented we … came out of 2018 going into 2019 with about 200 quota-bearing sales reps."

[20] The two cases cited in the Opposition are distinguishable on this basis. Both included allegations of direct responses to the third-party claims. *See In re Cassava Scis., Inc. Sec. Litig.*, 2023 WL 3442087, at *9 (W.D. Tex. May 11, 2023)

22

the report was published vaguely alluding to "a narrative out there that it's been the larger customers [from Salesforce] that have moved first." (Ex. 12 at 13.) Using that question as a springboard, the Opposition argues that Sprout "responded to the 'narrative out there'" by "falsely represent[ing] that they were seeing 'really great progress in our enterprise' and '… in terms of the execution from the sales team.'" Opp. at 45 (quoting CAC ¶¶128, 130). That is both wrong and disingenuous. These statements were not made in response to the analyst's "narrative" question, but to a **_prior_** question that made zero reference to the Razor Report or any "narrative." (Ex. 12 at 12.) Plaintiff's attempt to transpose them into "express den[ials]" showing Defendants' "awareness of the claims" is baseless.

### 2. The Opposition Cannot Cure Deficient CW Allegations.

Unable to defend the CAC's threadbare CW allegations (Br. at 37–41), Plaintiff lobbies for a "company-wide" inference of scienter based purely on the quantum of CWs voicing negative views about Sprout's sales model and product features (most of whom worked in sales and are "former" employees for a reason). Opp. at 43–44. While not a surprising tactic given the CWs' lack of knowledge, it is facially inadequate even before the Seventh Circuit's standard "steep" discount of anonymous CWs. *Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d 753, 757 (7th Cir. 2007).

None of the Opposition's out-of-Circuit cases hold otherwise. In *Bucks County Employees Retirement System v. Norfolk Southern Corp.*, 775 F. Supp. 3d 1275 (N.D. Ga. 2025), CW allegations of inadequate safety controls merely corroborated sworn testimony by the CEO admitting that, contrary to prior assurances, the company's sole focus was profits. *Id.* at 1293–94.

---

(scienter found, in part, where defendant "issued a statement almost immediately" explicitly denying claims in third-party petition to the FDA); *In re EQT Corp. Sec. Litig.*, 504 F. Supp. 3d 474, 481, 497–98 (W.D. Pa. 2020) (defendant "consistently and repeatedly publicly denied" third-party criticisms, including in SEC registration statement).

Here, try as Plaintiff might to manufacture one, there is no such admission. And in *Glazer Capital Management, L.P. v. Forescout Technologies, Inc.*, 63 F.4th 747 (9th Cir. 2023), multiple CWs alleged that specific executives pressured them to record ***knowingly false*** sales. *Id.* at 772.[21] The routine sales pressure alleged by CWs here—usually without attribution to a specific Defendant— is fundamentally different. *E.g.*, CAC ¶71 (alleging a "directive from management" to push Sprout's influencer capabilities); *id.* ¶94 ("there was a ton of pressure coming from Defendant Barretto and the Company's VP of Sales … to close those deals faster."). Even crediting the allegations, "pressuring" salespeople to pursue sales is not securities fraud.

Taken at face value, the CW allegations are too vague to support scienter. Of the 10 paragraphs the Opposition cites to support the Individual Defendants' supposed "awareness" of certain "Company-wide problems" (Opp. at 44), only one even ***mentions*** an Individual Defendant—and then only to recall a single, unsuccessful sales call, with no details as to timing, participants, or significance. CAC ¶86. That is far from a particularized showing of scienter.[22]

### 3. The Opposition Underscores the Lack of Motive Allegations.

Per Defendants' Opening Brief, Plaintiff cannot shoehorn routine stock trades by Messrs. Barretto and Howard into a motive to commit fraud (for them or, obviously, any other Defendant).

---

[21] Plaintiff's other cases are equally inapt. In *Makor Issues & Rts., Ltd. v. Tellabs, Inc.*, the CWs were "persons who from the description of their jobs were in a position to know at first hand the facts to which they are prepared to testify." 513 F.3d 702, 712 (7th Cir. 2008) ("*Makor II*"). And in *Freudenberg v. E*Trade Fin. Corp.*, 712 F. Supp. 2d 171 (S.D.N.Y. 2010), the court credited confidential witnesses who (i) had "first-hand interactions with the Defendants concerning the matters alleged in the Complaint" (*id.* at 197) and (ii) recounted specific conversations with defendants that contradicted the public statements. *Id.* at 198. By contrast, the CAC alleges no facts evincing CW reliability—often omitting critical datapoints such as office location (Br. at 38) and time frames (*id.* at 40), all with virtually no direct interactions with Defendants. *See id.* at 39.

[22] The other CW assertions broadly refer to "management," with no allegation that anyone knowingly made a misstatement. *See* CAC ¶71 (sales team "issued a directive from management to push Sprout's purported influencer capabilities" that were "not powerful enough"); *id.* ¶81 (foreign language "limitation was brought up numerous times to management"). Paragraphs 72 and 91 do not even mention "management," much less an Individual Defendant. Such generalized allegations fail. *See Pugh v. Tribune Co.*, 521 F.3d 686, 697 (7th Cir. 2008) (scienter inquiry focuses on "the state of mind of the individual …who make[s] or issue[s] the statement" and not "the collective knowledge of all the corporation's officers and employees") (quotations omitted).

Br. at 41–42. The Opposition does not seriously challenge that proposition, pointing to a single out-of-Circuit case, *In re Molycorp, Inc. Securities Litigation*, 157 F. Supp. 3d 987 (D. Colo. 2016), where eight of 11 insiders made suspiciously timed stock sales **outside of 10b5-1 plans**. *Id*. at 1009–10. *Molycorp* is irrelevant here, where two Defendants sold stock (i) predominantly through 10b5-1 plans and (ii) both during and before the Class Period.

Plaintiff tries to salvage this theory by arguing that two trading plans were adopted during the Class Period. Opp. at 47.[23] But without more—*e.g.*, alleging that Defendants knew of an impending price drop at the time—the adoption of a 10b5-1 plan during the Class Period does not establish scienter. *E.g.*, *Wade v. WellPoint, Inc.*, 892 F. Supp. 2d 1102, 1137–38 (S.D. Ind. 2012).[24] Here, there is nothing "more," especially since the plans on their face were structured to "cover[] successive time periods to ensure seamless coverage," for which Plaintiff has no answer. Br. at 42.

Further, the Opposition fails to address that the stock sales occurred **after** most of the series of alleged corrective disclosures through which Plaintiff claims the truth "gradually" emerged. Br. at 42. Plaintiff's cursory reference to "suspicious timing" cannot save its deficient pleading. *See Johnson v. Tellabs Inc.*, 262 F. Supp. 2d 937, 956 (N.D. Ill. 2003) ("bare-bones stock sale allegations … clearly are insufficient by themselves to create a strong inference of scienter").

Plaintiff's last-ditch argument that four trades by Mr. Howard from September 2023 to March 2024 establish motive fails for similar reasons. To start, Plaintiff's assertion that the trades

---

[23] Plaintiff oddly argues that the 10b5-1 plan documents are not properly before the Court (Opp. at 47) despite referring to them no less than 12 times in the CAC. *See, e.g.*, *Hopson v. MetroPCS Comms., Inc.*, 2011 WL 1119727, at *14 n.14 (N.D. Tex. Mar. 25, 2011) (taking judicial notice because "plaintiff incorporated the 10b5-1 trading plans into his amended complaint by reference"); *Constr. Labors. Pens. Tr. for So. Cal. v. CBS Corp.*, 433 F. Supp. 3d 515, 544 (S.D.N.Y. 2020) (taking notice of 10b5-1 plans filed on Form 4). By contrast, the complaint in *Dang v. Amarin Corp. plc*, 750 F. Supp. 3d 431, 457 (D.N.J. 2024), cited in the Opposition, did not refer to defendants' 10b5-1 plans.

[24] *Freudenberg*, 712 F. Supp. 2d at 200, illustrates that distinction. Plaintiffs "alleged that Defendants were already aware of the Company's mortgage exposure time bombs [when] adopt[ing] their trading plans." *Id*. at 202. Here, the CAC offers no such particularized allegations. *See supra* §I.B.

25

were made "at the exact same time that Defendants decided to 'redraw' their sales motion" (Opp. at 47) is wrong.  The largest of the trades occurred in September 2023 (CAC ¶166)—**before** the alleged decision to update in Q4 2023.  *Id.* ¶151.  Moreover, the Opposition ignores (and thus admits) that (i) Messrs. Howard and Barretto held more stock at the end of the Class Period than at the beginning and (ii) Mr. Howard sold proportionally less stock in the 31-month Class Period than in the 21 months preceding it.[25]  Br. at 43–44.  Nor does it address the CAC's failure to plead net profits from these sales.  Plaintiff's silence confirms the absence of scienter.  *See Garden City Emps.' Ret. Sys. v. Anixter Int'l, Inc.*, 2012 WL 1068761, at \*14 (N.D. Ill. Mar. 29, 2012).[26]

### 4. The Executive Departures Remain Irrelevant to Scienter.

As previously shown, the routine "departures" of four executives—two of whom remained on Sprout's Board and never "departed"—creates no inference of scienter because the CAC pleads nothing unusual, forced, or otherwise suspicious about them.  Br. at 44–45.  Beyond labeling the moves "suspicious" (Opp. at 44–45), the Opposition's sole argument is that certain "former employees" tied the departure of Sprout's CMO to "the failure of the Company's inbound strategy."[27]  Opp. at 45 (citing CAC ¶¶142, 158, 265).  But the CAC paragraphs the Opposition cites make no mention of former employees.  Plaintiff presumably meant to cite CAC ¶138, which refers not to **Plaintiff's** CWs, but to the unnamed witnesses from the **Razor Report**, whose basis

---

[25] As for the fact that Mr. Barretto sold more stock prior to the Class Period than during it (Br. at 43), Plaintiff suggests that pre-Class Period sales made to settle a tax liability do not count.  Opp. at 46–47.  The personal rationale behind the sale is irrelevant. People sell stock for innumerable reasons, all of which distill to freeing up liquidity.

[26] *Sinnathurai v. Novavax, Inc.*, 645 F. Supp. 3d 495 (D. Md. 2022), does not say otherwise.  There, two named defendants made large trades days before corrective disclosures after not trading at all in the year prior.  *Id.* at 528.

[27] Plaintiff ignores the other three "departures" entirely and declines to analyze their "suspiciousness" vis-à-vis Sprout's typical hiring and termination practices—the relevant inquiry.  *Phoenix Ins. Co.*, 690 F. Supp. 3d at 893.

of knowledge is never articulated. Such allegations "suffer from all the indicia of unreliability."[28] *DraftKings*, 650 F. Supp. 3d at 155. They create no inference of scienter, let alone a strong one.

### 5. Sprout's Discontinuance of ARR Reporting Is Still Irrelevant.

Finally, Plaintiff largely abandons its claim that Defendants' cessation of ARR reporting supports scienter, feebly arguing that it was "indicative of an intention to obscure" their supposed strategic failures. Opp. at 48. Plaintiff offers no authority, merely citing analysts' reaction to the decision—which was contemporaneously fully explained—in hopes of imputing intent not otherwise alleged. *See Conagra Brands*, 495 F. Supp. 3d at 649. The argument fails. *See United Ass'n Nat'l Pension Fund v. Carvana Co.*, 759 F. Supp. 3d 926, 974 (D. Ariz. 2024) (ceasing to report certain metrics did not support an inference of scienter).

### D. The Opposition Confirms That the CAC Fails to Plead Loss Causation.

As the Opening Brief showed, the CAC connects none of the three purported "corrective" disclosures—(1) the May 2, 2023 Disclosure (Ex. 12); (2) the August 3, 2023 Disclosure (Ex. 15); and (3) the May 2, 2024 Disclosure (Ex. 13)—to a prior alleged misstatement touting Sprout's capabilities and sale model. *See* Br. at 47–49. And stock price declines in response to news that does ***not*** reveal the falsity of prior statements—such as, like here, weak earnings and guidance misses—do not plead loss causation. *See Boca Raton Firefighters' & Police Pension Fund v. DeVry Inc.*, 2012 WL 1030474, at *13 (N.D. Ill. Mar. 27, 2012) (a disclosure accompanied by a contemporaneous stock-price drop does not relieve burden to allege "a plausible link between the disclosures and the alleged fraud") (citing *Tricontinental Indus., Ltd. v. PricewaterhouseCoopers,*

---

[28] The Opposition's cases are distinguishable. In *In re Akorn, Inc. Securities Litigation*, 240 F. Supp. 3d 802 (N.D. Ill. 2017), the CFO defendant's "abrupt" resignation following a financial restatement—and on the eve of SEC and DOJ investigations—contributed to scienter. *Id.* at 811, 820. *See also Phoenix Ins. Co.*, 690 F. Supp. 3d at 893–94 (officer resignation offered "some support" for scienter when (i) announced alongside a corrective disclosure and (ii) followed closely by CEO termination with little explanation). Here, no Defendant left the Company nor was fired—Mr. Howard transitioned to Executive Chairman (*see* Ex. 39 at 2). The two employees who left did so more than four months before the end of the Class Period.

*LLP*, 475 F.3d 824, 843 (7th Cir. 2007)).  Rather, a plaintiff must "identify [a] 'corrective disclosure' that revealed the existence of some prior alleged misrepresentation by Defendants and so caused [the company's] stock price to decline."  *Fort Worth Emps.' Ret. Fund v. Biovail Corp.*, 615 F. Supp. 2d 218, 229 (S.D.N.Y. 2009).  The Opposition offers no persuasive rejoinder.

<u>May 2, 2023 Disclosure</u>.  The Opposition concedes that the disclosure reaffirmed Sprout's sales model, but argues that doing so was consistent with Plaintiff's theory that the three earnings-related disclosures were "partial disclosures" that gradually revealed Sprout's inability to attract and service enterprise clients, causing corresponding stock drops.  But even on a "gradual revelation" theory, Plaintiff must show that each alleged "partial" disclosure corrected a specific alleged misstatement to plead loss causation.  By failing to link ***any*** of the disclosures to alleged misstatements, Plaintiff cannot attribute the stock drops to the "very facts about which the defendant lied," and its claims fail.  *Tricontinental*, 475 F.3d at 842 (quotations omitted).

The Opposition does not alter that outcome.  The fact that "Sprout disclosed its lowest number of large customer adds in two years" (Opp. at 48–49) does not "correct" any alleged misstatement, including prior upbeat statements about Sprout's sales model and product features.  To the contrary, as noted above, Defendants continued to tout their enterprise sales strategy in the disclosure itself—the opposite of revealing a prior misrepresentation.  CAC ¶¶6, 129, 220.[29]  On its face, the disclosure merely announced disappointing results for a finite reporting period, which courts have repeatedly found insufficient to plead loss causation.  *Makor III*, 735 F. Supp. 2d at 908.[30]

---

[29] Even if fewer large customer additions bore on the truth of statements about sales model and capabilities, there is ***no*** basis to infer that a ***Q1 2023*** reduction renders statements made months and years earlier false when made.

[30] *Groupon* does not mean that loss causation must await summary judgment.  Opp. at 49.  Defendants there offered an alternative explanation for a price decline.  *Groupon*, 553 F. Supp. 3d at 490.  Defendants here argue that Plaintiff pled ***no*** causal nexus between the alleged misstatements and the stock drops.  That is a legal question.  *See Tricontinental*, 475 F.3d at 844.

August 3, 2023 Disclosure.  The Tagger deal announcement likewise "corrects" nothing. Plaintiff points to no prior statement—let alone a misstatement—about influencer marketing.  It simply theorizes that August 2022 statements that Sprout did not lack "any functionality" and "check[ed] all the boxes" for enterprise clients were rendered false by Defendants' acknowledgment on August 3, 2023 that the Tagger deal was driven by influencer marketing being a "customer requirement showing up in more than half of our enterprise conversations."  Opp. at 50.  Plaintiff's contrived connection collapses on inspection.  In the same earnings call from which Plaintiff excised this acknowledgment, Mr. Howard explained that Sprout was responding to a recent *shift* in influencer marketing dynamics:

> *Influencer and creator marketing has quickly increased in customer demand given how critical this category has become* to a brand's awareness and brand strategy.  In fact, we *currently* see influencer marketing in more than half of our enterprise RFPs.

(Ex. 15 at 6 (emphasis added).)  Thus, Sprout chose to acquire Tagger *in August 2023* because influencer marketing had "quickly increased in customer demand" and become a frequent ask for enterprise clients.  That is a responsible response to evolving market dynamics.  It in no way suggests that statements from *a year earlier* about Sprout's then-current product features were false *when made* or reveals the "truth."[31]

May 2, 2024 Disclosure.  Plaintiff likewise cannot draw a line from any alleged misstatement about Sprout's then-existing sales strategy to its modification of that strategy in May 2024.  Two propositions can coexist: (1) Sprout's historical go-to-market model spawned rapid enterprise growth and (2) Sprout later refined that model to maintain momentum, as would any competently managed business.  Indeed, Plaintiff admits that Sprout's enterprise base grew by

---

[31] In *Phoenix Insurance Company*, the court found disclosures that a company had "implemented targeted measures that reduced clinical staff attrition" corrective where (i) the fraud concerned attrition rates and (ii) the attrition issues allegedly *preceded* the challenged statements.  690 F. Supp. 3d at 875.

59% and 44% in the two years before the disclosure.  Br. at 12; (Exs. 12–13).  Neither a single

quarter's results nor ensuing analyst reactions acknowledge the contemporaneous falsity of a prior

statement.[32]  Since that is all Plaintiff plausibly alleges, the CAC fails to plead loss causation.[33]

## **CONCLUSION**

The CAC should be dismissed with prejudice for the reasons here and in the Opening Brief.

Dated: July 17, 2025

WINSTON & STRAWN LLP

By: */s/ Dane Drobny*
Dane Drobny
35 West Wacker Drive
Chicago, IL 60601-9703
Telephone: (312) 558-5600
Email: ddrobny@winston.com

Matthew L. DiRisio (*pro hac vice*)
WINSTON & STRAWN LLP
200 Park Avenue
New York, NY 10166
Telephone: (212) 294-4686
Email: mdirisio@winston.com

*Counsel for Defendants*

---

[32] Plaintiff's own case law shows that analyst reaction is not "independently sufficient" (Opp. at 50) to plead loss causation; it can only bolster it where (unlike here) a causal nexus is already pled.  *Washtenaw Cnty. Emps.' Ret. Sys. v. Walgreen Co.*, 2019 WL 4597518, at *8 (N.D. Ill. Sept. 23, 2019).

[33] Plaintiff's failure to cure its deficient §10(b) pleading necessarily defeats its §20(a) claim as well.  *See* Opp. at 50.

## <u>CERTIFICATE OF SERVICE</u>

The undersigned attorney hereby certifies that a true and correct copy of the foregoing Defendants' Motion to Dismiss Reply Brief was filed electronically with the Clerk of the Court and served on all counsel of record via CM/ECF system on July 17, 2025.


By: */s/ Dane Drobny*
Dane Drobny