**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **EMPLOYEES' RETIREMENT SYSTEM OF THE CITY OF BALTMORE, on behalf of itself and all others similarly situated,** | ) | |
| **Plaintiff,** | ) | **No. 24-cv-3867** |
| **v.** | ) | |
| **SPROUT SOCIAL, INC., JUSTYN HOWARD, RYAN BARRETTO, JOE DEL PRETO, and JASON RECHEL,** | ) | **Judge Jeffrey I. Cummings** |
| **Defendants.** | ) | |

**MEMORANDUM OPINION AND ORDER**

The Employees' Retirement System of the City of Baltimore, on behalf of itself and all others similarly situated, brings suit against Sprout Social, Inc. and four current or former company executives, alleging violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§78j(b) and 78t(a), (the "Exchange Act"), and U.S. Securities and Exchange Commission Rule 10b-5, 17 C.F.R. §2401.10b-5. Specifically, plaintiff alleges that defendants made materially false and misleading statements about the adequacy of their product and business model for their enterprise clients. (Dckt. #40).

Defendants have filed an amended motion to dismiss plaintiff's consolidated class action complaint for failure to state a claim. (Dckt. #47). As shown below, defendants' motion is built on a faulty foundation that relies on construing the complaint in the light most favorable to defendants, and not to plaintiff (as is required), and is supported by a slew of factually distinguishable cases. For these reasons and others, defendants' motion to dismiss is denied.

## I. PROCEDURAL HISTORY

On May 13, 2024, plaintiff Richard Munch filed a federal securities class action alleging that defendant Sprout Social, Inc., ("Sprout Social," "Sprout," or the "Company") and certain of its executives—former CEO Justyn Howard, CEO and President Ryan Barretto, and CFO Joe Del Preto—made false and misleading statements regarding Sprout Social's business operations and future prospects. (Dckt. #1). On July 2, 2024, plaintiff City of Hollywood Police Officers' Retirement System filed a separate securities class action suit against the same defendants, bringing substantially similar allegations of defendants' participation in an unlawful and/or fraudulent scheme. (Case No. 24-cv-5582, Dckt. #1). By order dated July 17, 2024, the two actions were consolidated and reassigned to this Court. (Dckt. ##19, 20). Subsequently, by order dated November 12, 2024, the Court appointed the Employees' Retirement System of the City of Baltimore as lead plaintiff and approved its selection of the law firm of Saxena White, P.A. as lead counsel and the law firm of Cohen Milstein Sellers & Toll, PLLC as liaison counsel. (Dckt. ##26, 27).

On January 24, 2025, plaintiff filed its consolidated class action complaint, the operative complaint in this case, against Sprout Social and Howard, Barretto, Del Preto, and Vice President of Investor Relations Jason Rechel (collectively, the "Individual Defendants"). (Dckt. #40).

## II. LEGAL STANDARD

### A. Standard for Motion to Dismiss

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a complaint must "state a claim to relief that is plausible on its face." *Bell. Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Plausibility requires a plaintiff to "go beyond mere speculation or conjecture." *Wertymer v. Walmart, Inc.*, 142 F.4th 491, 495 (7th Cir. 2025). The complaint must plead "factual content that allows the court to draw the reasonable inference that the defendant is

liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "A complaint that satisfies this standard is 'well-pleaded' and may proceed even if it strikes a savvy judge that actual proof of the facts alleged is improbable." *Berk v. Choy*, 607 U.S. 187, 193 (2026) (cleaned up); *Orr v. Shicker*, 147 F.4th 734, 740 (7th Cir. 2025) (recognizing that the "notice-pleading standard is deliberately undemanding") (cleaned up). As such, the Federal Rules require "no more than a statement of the claim" without the pleading of evidence to support it. *Berk*, 607 U.S. at 187.

When considering a motion to dismiss under Rule 12(b)(6), the Court "constru[es] the complaint in the light most favorable to the plaintiffs and accept[s] all well-pleaded factual allegations as true." *Horist v. Sudler & Co.*, 941 F.3d 274, 278 (7th Cir. 2019); *Esco v. City of Chicago*, 107 F.4th 673, 678 (7th Cir. 2024). "[T]he burden of persuasion lies with the moving party . . . to show entitlement to dismissal." *Teva Pharm. USA, Inc. v. Eli Lilly & Co.*, 181 F.4th 756, 767 (7th Cir. 2026) (cleaned up). Moreover, the Court is required to draw all reasonable inferences in favor of plaintiff, and it cannot draw inferences in favor of the moving defendants. *See, e.g.*, *Teva*, 181 F.4th at 767–68 (reversing Rule 12(b)(6) dismissal where the district court improperly drew inferences against the plaintiff and in favor of the defendant). Finally, in opposing a Rule 12(b)(6) motion, a plaintiff is free to "elaborate on his factual allegations so long as the new elaborations are consistent with the pleadings." *Peterson v. Wexford Health Sources, Inc.*, 986 F.3d 746, 752 n.2 (7th Cir. 2021) (cleaned up).

**B. Standard for Section 10(b) and 20(A)**

When a plaintiff alleges fraud, heightened pleading requirements apply. In particular, the plaintiff "must state with particularity the circumstances constituting fraud or mistake," Fed.R.Civ.P. 9(b), and must "provide 'precision and some measure of substantiation' to each fraud allegation." *Menzies v. Seyfarth Shaw LLP*, 943 F.3d 328, 338 (7th Cir. 2019), *quoting*

*U.S. ex rel. Presser v. Acacia Mental Health Clinic, LLC*, 836 F.3d 770, 776 (7th Cir. 2016). This requires describing the "who, what, when, where, and how" of the fraud. *Id.*, *quoting Vanzant v. Hill's Pet Nutrition, Inc.*, 934 F.3d 730, 738 (7th Cir. 2019).

Section 10(b) of the Securities and Exchange Act of 1934 proscribes: (1) the use or employment of any deceptive device; (2) in connection with the purchase or sale of any security; (3) in contravention of Securities and Exchange Commission rules and regulations. 15 U.S.C. §78j(b). SEC Rule 10b-5 implements this statute and forbids the making of any "untrue statement of material fact" or the omission of any material fact "necessary in order to make the statements made . . . not misleading" in connection with sales of securities. 17 C.F.R. §240.10b-5. In order to plead a violation of Section 20(a) of the Securities and Exchange Act, a plaintiff must first adequately plead a violation of Section 10(b) and Rule 10b-5. *Pension Tr. Fund for Operating Eng'rs v. Kohl's Corp.*, 895 F.3d 933, 936 (7th Cir. 2018).

To state a claim under Section 10(b), a plaintiff must allege that the defendant made a statement that was (1) false or misleading; (2) material; (3) made with knowledge of the statement's falsity (scienter); (4) connected to the purchase or sale of a security; (5) on which investors relied; and (6) which caused economic loss. *Hunter v. Elanco Animal Health Inc.*, 187 F.4th 862, 875 (7th Cir. 2026); *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37–38 (2011) (cleaned up). Investors' reliance on an allegedly false statement is presumed in an "impersonal, well-developed market for securities." *Basic Inc. v. Levinson*, 485 U.S. 224, 247 (1988).

Claims alleging securities fraud under the Exchange Act must also meet the "exacting pleading requirements" of the Private Securities Litigation Reform Act ("PSLRA"). *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 313 (2007). In particular, "[a]ny complaint alleging a material misstatement or omission must also 'specify each statement alleged to have been

misleading' and the 'reason or reasons why the statement is misleading.'" *Cornielsen v. Infinium Cap. Mgmt., LLC*, 916 F.3d 589, 599 (7th Cir. 2019), *quoting* 15 U.S.C. §78u-4(b)(1). The PSLRA also dictates that, "if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. §78u-4(b)(1). In short, the complaint must "state with particularity the facts—known to the speaker at the time—that render the statement false or misleading." *Constr. Workers Pension Fund-Lake Cnty. & Vicinity v. Navistar Int'l Corp.*, 114 F.Supp.3d 633, 651 (N.D.Ill. 2015). The Act further requires that "complaints alleging securities fraud 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" *Cornielsen*, 916 F.3d at 598–99, *quoting* 15 U.S.C. §78u-4(b)(2)(A).

## III. RELEVANT FACTS

The Court draws the following facts from plaintiff's amended complaint. (Dckt. #40).

### A. Sprout Social's Business Model

Sprout Social provides a "centralized, subscription-based platform" for businesses to manage their social media marketing. (*Id.* ¶¶1, 33). Prior to the Class Period—the time between September 22, 2021 and May 2, 2024, inclusive—Sprout's business model focused on selling its services via inexpensive-month-to-month subscriptions to small to medium sized businesses, or "SMBs." (*Id.* ¶¶1, 34). Sprout's sales model, or "motion," relied on acquiring SMB customers using an "inbound" sales process: the company drew customers to its website or call center using internet and social media advertising and marketing, at which point those prospective customers were offered a free trial of Sprout's platform. (*Id.* ¶34).

In the months preceding the Class Period, and throughout the Class Period, Sprout Social began to pursue a different market in order to grow its business profitably. (*Id.* ¶¶38–40). From the time of its IPO, Sprout had experienced large annual net losses, to the tune of $15–20 million

annually. (*Id.* ¶39). And profitable growth with SMBs was difficult to achieve because those companies were often: (1) "unsophisticated and unfamiliar with platforms like Sprout's, and thus . . . demanded intensive support"; and (2) "more economically sensitive" and thus less likely to maintain subscriptions long-term. (*Id.* ¶¶38–39). As such, Sprout decided to move "upmarket" to grow its business, targeting larger mid-sized and "enterprise" businesses that could provide the company higher, longer-term annual contract values. (*Id.* ¶40).[1]

As part of its upmarket shift, Sprout announced a new metric for performance during its inaugural Investor Day conference on September 22, 2021: Annual Recurring Revenue ("ARR"), defined as the revenue that Sprout's subscription-based business was projected to report over the next twelve months. (*Id.* ¶¶13, 43). That day, Sprout also announced that it would disclose a new category of customers every quarter: the total number of customers providing Sprout with more than $50,000 in ARR, which represented Sprout's ability to attract upmarket customers. (*Id.* ¶44).

**B. Alleged Misstatements**

Plaintiff alleges that, to assure the market that Sprout could successfully expand with upmarket customers, defendants made materially false or misleading statements "repeatedly tout[ing]" that Sprout's software product and "inbound" sales model were adequate for larger clients. (*Id.* ¶41). These statements are described in further detail below, but the crux of plaintiff's allegations is that defendants "creat[ed] an unrealistically positive assessment of Sprout's business and operational status" through various public statements and filings that caused artificial inflation in Sprout's stock price. (*Id.* ¶172).

---

[1] "Mid-market" in Sprout's SEC filings was defined as organizations with 50 to 999 employees, "Enterprise" as organizations with 1,000 or more employees. (Dckt. #40 at 19 n.1).

Plaintiff alleges that statements made between September 22, 2021 and March 6, 2024 "concerning Sprout's financial and operational condition" included misrepresentations that fell into four categories: (1) the adequacy of the company's inbound sales strategy to attract and retain enterprise clients; (2) the adequacy of the product for enterprise clients; (3) the length of Sprout's sales cycle with mid-market and enterprise clients; and (4) revenue opportunity from Sprout's partnership with Salesforce. (*Id.* ¶172). Plaintiff alleges that individuals purchased Sprout's stock at inflated prices as a result of the company's misrepresentations, and that individuals lost money when the stock price later fell after the truth came out. (*Id.* ¶¶269–78).

The amended complaint alleges that dozens of defendants' statements and omissions were materially false or misleading. (*See id.* ¶¶172–244). These statements, and the alleged basis for their falsity, are categorized below.

**1. Sales Strategy**

The first category of alleged false or misleading statements pertains to the capabilities of the company's sales strategy to capture enterprise customers. Plaintiff identifies various statements made by Barretto, Del Preto, Howard, and Rechel that allegedly gave a false impression about the effectiveness of Sprout's inbound sales strategy for competing in an "enterprise-heavy space." (*Id.* ¶177).

Plaintiff alleges that each Individual Defendant touted the effectiveness of Sprout's sales motion in the enterprise space, calling it the company's "secret sauce" or "secret weapon," a "driver" of growth that was a "significant advantage" and "really effective . . . in the enterprise space." (*Id.* ¶¶48, 57, 59, 61, 175–76, 180, 182, 190, 213, 226) (quoting statements from Barretto, Del Preto, Howard, and Rechel). Defendants stated that Sprout obtained the "majority" of its enterprise clients from the company's inbound model—"90%"—and would not need to change their model as they pursued upmarket customers. (*Id.* ¶¶182, 185, 197, 199) (quoting

statements from Barretto and Del Preto). Indeed, defendants claimed that "the same strategy in SMB is working even better in the enterprise," and that even as Sprout shifted upmarket, "our funnel hasn't slowed down at all." (*Id.* ¶¶197, 199) (quoting statements from Del Preto). Defendants specifically highlighted the comparative benefit of Sprout's sales strategy compared to its competitors', categorizing it as a "powerful differentiator" in the enterprise space. (*Id.* ¶¶174, 176, 182, 190, 193, 206, 213, 226) (quoting statements from Barretto, Del Preto, and Howard). On November 2, 2021, for example, Barretto described Sprout's sales strategy as "highly disruptive to our competitive set," who "typically sell on demos and much longer sales cycles." (*Id.* ¶180).

Defendants continued to highlight the efficacy of Sprout's inbound sales model when fielding questions from analysts about economic downturns or more established competitors. On March 20, 2023, for example, when analysts questioned whether "macroeconomic headwinds" affecting the Software as a Service (SaaS) industry might cause a "slower sales cycle," Rechel asserted that, compared to competitors, Sprout had a "huge strategic advantage" of relying on its trial model to attract customers, even "up through the largest of enterprises." (*Id.* ¶218). On May 2, 2023, in response to questions about upmarket competitors, Barretto repeated that "[O]ur 30-day free trial continues to be the best weapon . . . in the space . . . . We're in more deals than ever before from . . . an enterprise perspective." (*Id.* ¶220). Defendants raised their annual ARR guidance by 25 basis points, translating to "greater than 33% [ARR growth] year over year," and reiterated full-year revenue growth guidance of 30%. (*Id.* ¶128).

As late as November 2, 2023, Barretto noted: "[O]ur go-to-market strategy is working . . . these things are all going to be very consistent with what we've done before." (*Id.* ¶229). On November 2, 2023, defendants reported "incredibly strong third quarter results," with revenue up

31% and ARR up 33% compared to the same quarter the previous year. (*Id.* ¶139). Sprout also raised its full-year 2023 ARR guidance from 28–29% to 30%. (*Id.*).

Defendants even noted the efficacy of Sprout's trial motion in a Form 10-K filed on February 23, 2024. Defendants described Sprout's "highly efficient go-to-market strategy" as a "Competitive Strength," "driven by the effectiveness and innovation of our platform and unpaid customer demand," and allowing Sprout to "cost-effectively drive strong lead generation, upgrade free trials to paying customers, . . . and achieve growth of our platform." (*Id.* ¶233).

All along, plaintiff alleges, defendants' statements about Sprout's sales strategy were materially false or misleading. In support of this argument, plaintiff identifies testimony from over a dozen former Sprout employees who served as confidential witnesses ("CWs"). "Multiple high ranking former employees,"[2] plaintiff alleges, explained that "enterprise customers were not purchasing Sprout's services based on free trials, and required a significantly more intensive sales process than Defendants let on." (*Id.* ¶90). Specifically, CWs 1, 2, 3, 4, 7, 9, 10, 11, and 12 described Sprout's inbound strategy as "very ineffective" and "definitely not successful" with enterprise clients, to the extent that some CWs' teams "actively . . . fought against" reliance on that strategy for enterprise clients. (*See id.* ¶¶90–97). They noted that Fortune 500 companies did not use free trials altogether, and enterprise customers were often already locked into long-term contracts with Sprout competitors, making those customers difficult to acquire through free trials. (*Id.* ¶¶92, 96). As a result, these CWs explained, Sprout's inbound enterprise pipeline "was rather weak," began "drying up" toward the end of 2022, and plummeted in early 2023. (*Id.* ¶¶92, 99).

[2] Plaintiff identifies the job title(s), responsibilities, locations, and/or managers of each CW, as well as the years they served in certain roles. (Dckt. #40 at 31 n.3, 32 nn.5–7, 33 n.8, 35 n.10, 36 n.12, 38 n.13, 43 n.15, 44 nn.16–18, 45 n.19, 46 n.20).

Plaintiff also cites the anonymous report of a short seller monikered Akram's Razor (the "Razor Report"), published on April 4, 2023, which stated that Sprout was "struggling to land large corporate clients" and "unable to compete for larger enterprise clients." (*Id.* ¶¶123–24). On October 30, 2023, the author of the Razor Report issued an update asserting that defendants were being "disingenuous" about "underlying growth substantially slowing." (*Id.* ¶138). Quoting former Sprout sales representatives, the report stated that Sprout did not "really have any inbound business." (*Id.*).

In conjunction with a weakening inbound sales pipeline, the CWs whom plaintiff quoted explained that Sprout also lacked necessary infrastructure for a more robust outbound strategy of customer acquisition. (*See id.* ¶¶106–14). CWs 1, 2, 3, 7, and 12 explained that Sprout lacked "verticals, such as representatives who could focus on particular targets . . . something that should have happened as soon as the company started to go upmarket." (*Id.* ¶107). The CWs stated that, although sales representatives complained about the need for verticalization, Sprout did not have "serious" discussion about verticalization until some time in 2023. (*Id.*). And contrary to defendants' assertions that Sprout was continuing to rely primarily on a successful inbound strategy, certain CWs explained that in early 2023, Sprout "restructured its entire go-to-market strategy to focus on the outbound channel," such that sales teams that still had inbound titles were told to focus their efforts on outbound sales instead of insufficient inbound leads. (*Id.* ¶108). Indeed, in Q2 2023, Sprout added outbounding as part of sales representatives' "quota requirements." (*Id.* ¶109). Despite this shift toward prioritizing outbounding in "late 2022 and early 2023," CWs 2, 3, 7, 12, 14, and 15 described an "internal feeling of chaos" with outbound customer acquisition due to a lack of comfort, preparation, tools, or training for handling

outbound sales, let alone the resources necessary to identify good outbound leads. (*Id.* ¶¶110–14).

Indeed, plaintiff alleges that Sprout's "inbound" sales strategy was *so* unsuccessful for enterprise customers that the company began relying on temporary "lifelines" to "stave off deceleration." (*Id.* ¶115). These lifelines included: (1) short-term sales boosts from the Salesforce partnership, (*id.* ¶116); (2) "extreme discounting" for enterprise customers that could be provided at "20% all the time" and occasionally reached "upwards of 90%," with "carte blanche" for sales representatives, especially when trying to hit quarter-end targets, (*id.* ¶¶117–19); both of which were coupled with (3) extreme price increases to inflate sales forecasts, especially in November 2022, (*id.* ¶¶120–22).

Plaintiff further alleges that the falsity of defendants' statements about Sprout's sales strategy was revealed with certain admissions that defendants made on May 2, 2024, when Sprout disclosed that it would be "redrawing our go-to-market model" for enterprise clients, "building vertical sales teams," and "adjusting our account coverage model," and that "the decisions on all this happened in Q4 [2023]." (*Id.* ¶¶8, 150–51) (quoting statements from Barretto).

### 2. Product Adequacy

The second category of allegedly false or misleading statements pertains to the adequacy of the company's product for mid-market and enterprise customers. Plaintiff alleges that defendants connected their success acquiring customers to Sprout's efforts to "lead with the product and specifically with trials." (*Id.* ¶175) (quoting statements from Barretto). They described Sprout as holding a "full suite of products" that allowed the company to "check all of those boxes," specifically "with . . . enterprise clients." (*Id.* ¶¶61, 185) (quoting statements from Rechel and Del Preto). In response to analyst questions, defendants described Sprout as "well

equipped for the deals that are out there," stating "there's not anything that we would . . . put on the board as deficiencies" in product capabilities. (*Id.* ¶188) (quoting statements from Howard). In other words, "in these larger enterprises, we don't have any feature sets or any [gaps] in our feature sets"; Sprout's "products are perfectly positioned for these enterprises." (*Id.* ¶¶199, 227) (quoting statements from Del Preto and Barretto).

In reality, plaintiff alleges, defendants knew "well before the start of the Class Period" that Sprout's product "lacked multiple crucial components" necessary to win enterprise business. (*Id.* ¶66). As numerous CWs explained, Sprout "had no business competing in the enterprise space." (*Id.*). Plaintiff identifies seven "crucial" or "required" capabilities that Sprout lacked for mid-market and enterprise clients, including the following, (*id.* ¶¶66–89):

- **Influencer marketing**, with CWs 1, 2, 3, 4, and 5 describing Sprout's influencer marketing capabilities as "extremely limited" and "not really functional," to the extent that they "substantially hindered Sprout's ability to win large accounts," especially compared to competitors like Sprinklr. (*Id.* ¶¶68–70). CWs 1 and 4 explained that, although influencer marketing had been the "cutting-edge thing" since 2019, Sprout's sales personnel were "pressured to lie and exaggerate" about Sprout's influencer capabilities to compete for clients, and Sprout's lacking influencer capabilities were the reason the company needed to acquire Tagger in 2023. (*Id.* ¶¶71–72). In the words of CW 4, Sprout was "making promises [it] couldn't keep." (*Id.* ¶72);

- **"Social listening" capabilities**, which capture the product's ability to analyze only conversations about a brand or industry to learn more about its audience. (*Id.* ¶73). CWs 1, 2, 3, and 4 noted that social listening was a "crucial" capability and "the big thing in the market." (*Id.* ¶¶72, 74). Nevertheless, plaintiff alleges Sprout had *never* had "the full in-depth granular capabilities and metrics as the competition," specifically Sprinklr, making Sprout a particularly poor fit for enterprise customers. (*Id.* ¶73). While the "vast majority of enterprise customers" wanted a "robust social listening tool," CWs 2 and 6 noted that Sprout's listening capabilities, which were "very basic," lagged behind competitors'. (*Id.* ¶75). "Sprout received a lot of feedback," according to CW 3, that Sprout's capabilities faltered compared to other products'. (*Id.* ¶74);

- **Enterprise-grade application program interfaces ("APIs")**, which were necessary to allow social media networks to integrate with third-party apps. (*Id.* ¶76). CW 7 noted that "Sprout's API's weren't robust," while CW 2 stated outright that "Sprout had bad API." (*Id.*) (cleaned up). CW 1 noted that Sprout was missing APIs that would have helped with enterprise customers, particularly for integrating with apps like Facebook and Instagram, and for a "majority of demonstrations," CW 2 explained that

he had to tell customers that Sprout lacked certain capabilities they wanted due to API limitations. (*Id.*);

- **"Advanced social media analytics or reporting capabilities,"** which CWs 1, 4, and 6 described as inadequate to compete for mid-market and enterprise clients. (*Id.* ¶77). CW 1 noted that Sprout lagged behind competitors because of the "metrics that we were able to display to customers," that other competitors could provide "more targeted and a longer tail of data," and that Sprout "just didn't have the X factor to compete in the full enterprise space." (*Id.*). CW 4 explained that "Sprout Social did not have advanced analytics capabilities that . . . enterprise companies desired," and as a result could not compete on product without "more robust reporting." (*Id.* ¶78). Similarly, CW 6 described Sprout's reporting and analytical capabilities as insufficient for enterprise customers, because Sprout's product did not provide return on investment for larger companies' campaigns: "[W]hen you have a multinational company . . . [those] kind of analytics . . . Sprout can't do that." (*Id.* ¶79);

- **Scalability**, which was "necessary" for Sprout's platform to support "large, globally diverse customers." (*Id.* ¶80). CWs 4 and 8 explained that Sprout "lost out to Sprinklr" because of Sprout's inability "to scale things for large customers like franchises with multiple locations." (*Id.*);

- **Multilingual operational capabilities**, which multiple CWs described as "necessary" to be considered an enterprise grade tool. (*Id.* ¶81). CW 7 noted that Sprout operated in only four languages, and customer support was only provided in English, such that the company might not even be able to provide customer support in the same language in which a customer operated the product. (*Id.*). CW 1 also explained that Sprout lacked "language capabilities" possessed by competitors like Sprinklr. (*Id.*); and

- **"Customer care,"** or the ability to manage social inquiries and respond to positive or negative sentiment directly through Sprout. (*Id.* ¶82). CW 3 stated that "multiple customers within the enterprise space" had voiced their need for this capability, but it was never added. (*Id.*).

As explained by multiple CWs, Sprout was not "fully enterprise-grade" even by 2024 due to the lack of the above-described capabilities, such that Sprout's offerings were "never" competitive with "actual" enterprise solutions. (*Id.* ¶83). In short, as reiterated by CWs 1, 3, 4, 6, and 8, Sprout's product limitations were the reason for their challenges with upmarket customers. (*Id.* ¶¶83–86, 88–89).

Plaintiff also cites the April 2023 Razor Report, which largely attributed Sprout's enterprise difficulties to product inadequacies, explaining that Sprout's product lacked

functionality needed by its upmarket customers, while in fact being "just as expensive" as Sprout's competitor, Sprinklr. (*Id.* ¶124). This report also explained that large business Shopify had recently "decommissioned" Sprout because its analytics couldn't be trusted, and that Sprout's product was "just super, super unreliable." (*Id.*).

Rather than competing on product, plaintiff alleges Sprout primarily generated enterprise business because of competitive pricing. (*Id.* ¶¶98–100). When price increases occurred toward the end of 2022, multiple CWs described sales plummeting as a result, because Sprout "didn't have [competitors'] capability and our prices were not competitive." (*Id.* ¶¶99–100).

Plaintiff further alleges that the falsity of defendants' statements about product adequacy was revealed via certain admissions that defendants made on August 3, 2023, and May 2, 2024. On August 3, 2023, defendants disclosed that they had acquired Tagger, a leading influencer marketing and social intelligence platform used by enterprise customers. (*Id.* ¶189). Plaintiff alleges that this constituted an implicit admission that Sprout "lacked the ability to provide influencer marketing" even though it was a customer "requirement showing up in more than half of [its] enterprise conversations." (*Id.*) (cleaned up). And on May 2, 2024, defendants disclosed that Sprout was making the decision to build out its enterprise teams and "prioritiz[e] Tagger enablement", and that "the decisions on all this happened in Q4 [2023]." (*Id.* ¶¶8, 150–51) (quoting statements from Barretto).

**3. Sales Cycles**

The third category of allegedly false or misleading statements concerns the length of Sprout's sales cycle for mid-market and enterprise customers. Specifically, plaintiff alleges that defendants stated that Sprout's "inbound . . . 30-day trial" model "tend[s] to allow us to keep sales cycles shorter." (*Id.* ¶¶61, 217, 226) (quoting statements from Rechel). Defendants stated that Sprout could acquire upmarket customers "in 30 to 45 days on average." (*Id.* ¶¶175, 210)

(quoting statements from Barretto and Del Preto). They linked the company's sales strategy to the "rapid sales cycles" allowing it to close enterprise deals "every single month," noting that "we . . . see deals in the mid-market and enterprise that hit those timelines." (*Id.* ¶¶190, 197) (quoting statements from Barretto, Rechel, and Del Preto). "We'll close mid-market and enterprise deals within 30 days, within the trial. Not all of them look like that, but for us, it's kept the sales cycle very different for most enterprise companies." (*Id.* ¶239) (quoting statements from Barretto).

Defendants further claimed that enterprise "customers land with similar costs and similar sales cycles as the rest of our customer base." (*Id.* ¶206) (quoting statements from Howard). Sprout, defendants said, was "winning in the enterprise . . . lead[ing] with the product allowed us to land much larger customers faster." (*Id.* ¶222) (quoting statements from Barretto) (cleaned up).

Here, too, plaintiff points to statements by numerous CWs in support of their allegations that defendants' statements were materially false or misleading. CWs 1, 4, 7, 9, 10, 11, and 12 described lengthening sales cycles throughout the Class Period as a result of pursuing enterprise customers. (*Id.* ¶¶93–97). While smaller businesses could close contracts within a month, corporate sales could take sixty to ninety days, or even six months to a year. (*Id.*). In the words of CWs 1 and 4, "it became a total shit show because you couldn't close these people in 30 days"; "enterprise contracts always took longer." (*Id.* ¶¶94–95). Indeed, as CW 9 explained, "it could take up to three years to even get a meeting with the bigger accounts," in part because many of them were already locked into long-term contracts with other competitors. (*Id.* ¶96). Because of the numerous decisionmakers, internal red tape, larger procurement processes,

contract negotiations, and different requests for quotes, enterprise sales cycles were "significantly longer" than for SMB. (*Id.* ¶97).

### 4. Salesforce Partnership

The fourth and final category of alleged false or misleading statements concerns the nature of Sprout's partnership with Salesforce, a cloud-based software company providing customer relations management, sales, marketing, and other products. (*Id.* ¶51). On March 7, 2022, Sprout announced a partnership with Salesforce that would purportedly fuel the company's growth because Salesforce was retiring "Social Studio," a Sprout competitor, and Sprout could pursue Social Studio's former customers. (*Id.*). Defendants noted "excite[ment] about the customers in our Social Studio that are going to migrate over the next couple years . . . 4,000ish of them." (*Id.* ¶195) (quoting statements from Barretto). During a Q4 2022 earnings call that took place on February 21, 2023, Barretto claimed that the Social Studio "pipeline" that year was "bigger than it had been," and that "[t]here's still a decent amount of time left on the process . . . for Social Studio . . . [w]e think that there's plenty of upside." (*Id.* ¶215).

In September 2023, defendants continued to describe the Salesforce opportunity as "absolutely massive," and noted that the company would be leading with the same go-to-market strategy to acquire Social Studio customers. (*Id.* ¶223) (quoting statements from Barretto). Defendants said Sprout "continued to see great success there . . . [and] expected another record ARR contribution in Q4, as complex deployments begin their migration to Sprout." (*Id.* ¶231) (quoting statements from Barretto) (cleaned up). And at a session of the KeyBanc Emerging Technology Summit that took place on March 6, 2024, defendants noted that "we've been building pipeline across the rest of the [Salesforce] ecosystem whether they're Social Studio customer or not." (*Id.* ¶241) (quoting statements from Barretto).

Plaintiff alleges that these statements were false or misleading because the Salesforce partnership was, at most, "a short-term boost to sales." (*Id.* ¶116). CW 1 explained that the Salesforce partnership "was a total flop" and that there was "an overwhelming sentiment" that former Social Studio customers, who had been using the product for free, did not want to start paying for social media management. (*Id.*). Plaintiff also cites the Razor Report, which stated that the majority of the customers from Salesforce's Social Studio had already migrated to other platforms as early as May 2021, "nearly a year before Sprout announced the Salesforce partnership" in March 2022, such that Sprout would hit a "growth wall" by the beginning of 2024. (*Id.* ¶¶123–26).

Plaintiff further alleges that the falsity of defendants' statements about the Salesforce Opportunity was revealed with certain admissions that defendants made on May 2, 2024, when Sprout disclosed that "both Social Studio and non-Social Studio business [from Salesforce clients] accounted for slightly less than 15% of our new business in 2023 and less in 2022 . . . significantly less [business] than many may have previously assumed." (*Id.* ¶155) (quoting statements from Barretto).

**C. Additional Scienter Allegations**

Plaintiff includes other allegations about senior officers at Sprout that it claims are supportive of scienter.

**1. Involvement**

First, plaintiff alleges that Individual Defendants were closely involved in Sprout's efforts to target enterprise clients. At an August 11, 2021 conference, Del Preto described how management "have so much data" and "information [to] understand what parts of the organization are working better than others." (*Id.* ¶253). Indeed, he said that "every month, we spend time with Ryan Barretto's team and all his leaders and we go by segment, we go by new

business. . . . We are very data focus[ed]. Everything's based on all that internal unit economics we're looking at." (*Id.*) (cleaned up).

Plaintiff alleges that defendants "made similar representations throughout the Class Period." (*Id.* ¶254). On December 7, 2021, Del Preto stated that Sprout was "heavily data-driven because of the inbound model," providing "really good visibility into where demand was coming from." (*Id.*). At an August 11, 2022 conference, Del Preto highlighted Sprout's ability to "drive the growth numbers we've given out" because of "such good data on the sales and marketing side." (*Id.*). At a December 7, 2022 conference, defendants explained that "the finance team . . . meets on a monthly basis with each of the sales leaders and each of the business unit leaders . . . to, on a real-time basis, understand what's working in the business, what's not working." (*Id.* ¶255). And at Sprout's September 27, 2023 Investor Day, Barretto stated that he and Del Preto personally spent a lot of time with Sprout's "leadership team to make sure that we've got a great handle on . . . mid-market and enterprise solution engineering." (*Id.*) (cleaned up). He stated that he and Del Preto were "constantly meeting to look at this data, to look at the success and figure out the right places to optimize and invest in growth." (*Id.*).

In addition to defendants' own representations, plaintiff identifies numerous statements from CWs about Individual Defendants' awareness of poor enterprise growth. According to CW 1, "management was definitely aware" of longer sales cycles; Howard and Barretto would offer their personal help to land larger deals and were thus "undeniably" aware of lengthening sales cycles. (*Id.* ¶¶94, 250). CW 1 also stated that sales pressure came directly from Barretto and VP of Sales Dan Summers. (*Id.* ¶94). CW 8 recalled one sales call Barretto was on that "did not close because Sprout lacked the technical capabilities" the customer needed. (*Id.* ¶86).

CW 7 explained that successful and unsuccessful attempts to "win" a customer contract were all described in Salesforce, including "sometimes lengthy" reasons why a contract might have been lost. (*Id.* ¶87). He noted that "the entire sales organization, including executives, had access to sales information in Salesforce," including data showing "dwindling sales." (*Id.* ¶102). He also stated that "the entire sales team" would view the Salesforce dashboard "on a daily basis to look for leads and see what was in the pipeline." (*Id.*). Similarly, CW 1 stated that management checked the Salesforce pipeline "all the time. . . . They live inside of it. . . . They're very involved. They are always . . . telling salespeople to 'pull us in where we can help to bring deals forward.'" (*Id.* ¶103). CW 14 stated that "[t]he C-Suite were always tracking upcoming sales closely in order to forecast pending revenue." (*Id.* ¶104). And CW 9 stated that [p]eople like Barretto certainly got reports and overviews . . . He was the – be in the trenches with you type." (*Id.* ¶105).

After price increases were announced, CW 7 said, "leadership asked for an analysis of the effects." (*Id.* ¶101). He noted that "his team was telling management in Q4 2022 that Sprout was losing [even] SMB contracts . . . [and] that this deficiency was broadcast to the Company from November 2022 through May 2023." (*Id.*).

**2. Resignations**

Second, plaintiff alleges there was "abrupt[]" changeover of senior officers at Sprout that occurred "[a]s Sprout's long-term growth prospects were collapsing, and at the same time as Defendants were secretly revamping their entire go-to-market strategy." (*Id.* ¶142). On September 7, 2023, Chief Marketing Officer Jamie Gilpin, who "led the company's marketing and GTM strategy," "abruptly announced her resignation." (*Id.* ¶¶138, 142, 265) (cleaned up). The Razor Report asserted that Gilpin had resigned due to "collapse" in the company's inbound sales pipeline. (*Id.* ¶138). In November 2023, Chief Revenue Officer John Schoenstein, who

was responsible for "world-wide Sales, Demand Generation, Revenue Operations, Customer Success and Professional Services organizations," "quietly departed the Company . . . after just over a year on the job." (*Id.* ¶¶142, 265). On December 14, 2023, Sprout announced that Chief Technology Officer Aaron Rankin would resign, "effective immediately." (*Id.*). And on April 15, 2024, Sprout announced that Howard would no longer be CEO at Sprout. (*Id.* ¶265).

**3. Stock Sales**

Third, plaintiff points to a series of "suspicious" stock sales by Barretto and Howard. (*Id.* ¶266). Plaintiff alleges that Barretto sold $19.6 million in Sprout stock during the Class Period at prices inflated by the alleged fraud—"more than three times as many shares" during the Class Period as he sold before it, for proceeds "nearly three times the stock sale proceeds" he obtained for a period prior to the start of the Class Period. (*Id.* ¶¶166, 266). Barretto sold 45% of his total vested Sprout shares held and acquired during the Class Period. (*Id.*). Similarly, Howard sold "significantly more shares" of Sprout stock during the Class Period than before, for proceeds of more than $43 million, which were roughly 45% larger than Howard's pre-Class Period proceeds. (*Id.* ¶¶168, 266).

While both Barretto and Howard made many of their sales pursuant to 10b5-1 trading plans, plaintiff alleges that those plans were adopted "during the Class Period under suspicious circumstances." (*Id.* ¶267). Barretto, for example, entered two such plans on November 8, 2022—"just after Defendants announced on November 3, 2022 that Sprout was dramatically increasing its pricing," a move allegedly made to "inflate [Sprout's] numbers"—and on August 31, 2023, when the Company was "discount[ing] like crazy" to stave off growth decline. (*Id.* ¶¶167, 267). Howard, for his part, entered plans on July 7, 2022, before defendants' November 2022 price increases, and on August 10, 2023, at the same time as mass discounts at Sprout. (*Id.* ¶170). Furthermore, plaintiff alleges that Howard made "several outsized, suspiciously timed

sales *outside* of his 10b5-1 plan" during the Class Period, for a total of $8.3 million in proceeds, "just before the full truth was ultimately revealed" in May 2024. (*Id.* ¶¶169, 267) (emphasis in original).

### 4. Denying the Razor Report

Fourth, plaintiff alleges that defendants made statements on their May 2, 2023 call specifically to "contradict[] the short seller's assertions" about poor enterprise preparedness in the Razor Report. (*Id.* ¶128). While the Razor Report stated that the Salesforce partnership had "inflated ARR growth . . . obfuscat[ing] the organic realities of [Sprout's] business," and that Sprout's model "for 30% growth in 2024/2025 . . . is absurd and definitely unsustainable," (*id.* ¶127), in May, defendants raised their annual ARR guidance by 25 basis points, translating to "greater than 33% [ARR growth] year over year," and "reiterat[ing] full year revenue growth guidance of 30%," (*id.* ¶128). Plaintiff also alleges that defendants "took pains to refute the specific concerns that were raised in the Razor Report with respect to the Salesforce partnership." (*Id.* ¶129). When an analyst asked about changes Sprout was seeing in the enterprise space, for example, Barretto repeated his confidence in Sprout's enterprise growth, inbound sales model, and Social Studio migrations. (*Id.*). He refuted the "narrative out there that it's been the larger customers that have moved first," instead claiming "it [was] likely the opposite," and that there was in fact a "tremendous amount of opportunity" within Social Studio, which was an opportunity "still pretty early . . . with a lot ahead of us." (*Id.* ¶130).

### 5. Abandoning ARR

Fifth, plaintiff alleges that defendants' abandonment of ARR also supports defendants' scienter about Sprout's lack of preparedness for enterprise growth. Despite having touted ARR as Sprout's "key business metric" throughout the Class Period, (*see id.* ¶37) ("[E]very one of Sprout's quarterly and annual filings until the end of the Class Period referred to ARR as the

Company's 'key business metric.'"), in May 2, 2024, defendants announced that they "no longer believe[ed] that ARR and total number of customers are key performance indicators of Sprout Social's business," and that the company would no longer report those metrics, (*id.* ¶153). In response to analyst concerns about this shift, Howard claimed that ARR had been an inapt measure of Sprout's performance "for at least the previous two years." (*Id.* ¶154).

**D. Alleged Admissions**

Plaintiff alleges that defendants made two "partial corrective disclosure(s)" and one "corrective disclosure" that brought Sprout's struggles with upmarket growth to light. (*Id.* ¶¶269–78).

First, after the close of markets on May 2, 2023, Sprout "announced ARR growth dipping below 30% for the first time since 3Q20" and the addition of only 36 customers with ARR above $50k. (*Id.* ¶269). Sprout also announced that the company was "forced to 'shift customer success resources away from [its] lowest value customers' and instead focus 'product and go-to-market strategies around mid-market and enterprise.'" (*Id.*). Plaintiff alleges that this caused stock prices to decline "over 20%." (*Id.* ¶270).

Second, after the close of markets on August 3, 2023, Sprout issued a press release "announcing poor Q2 2023 results, with both ARR and customer adds again falling below expectations." (*Id.* ¶272). During an accompanying conference call with analysts, defendants disclosed that they had acquired Tagger, a leading influencer marketing and social intelligence platform used by enterprise customers. (*Id.*). To do so, Sprout took on debt "for the first time in its history as a public company," in an amount equal to "more than half of the Company's entire revenue for 2022," because Sprout allegedly "lacked the ability to provide influencer marketing even though [it was] a customer requirement showing up in more than half of [its] enterprise

conversations." (*Id.* ¶¶133, 272) (cleaned up). Plaintiff alleges that this caused stock prices to fall 12.3%. (*Id.* ¶273).

Third, after the close of markets on May 2, 2024, Sprout reported "extraordinarily poor results for Q1 2024." (*Id.* ¶148). Sprout announced a decline of nearly 80% in mid-market growth compared to the prior quarter, with the lowest number of mid-market customer additions since 2019, and a decline of nearly 70% in enterprise growth compared to the prior quarter. (*Id.* ¶149). Defendants also announced that Sprout was "redrawing our go-to-market model," "building new vertical sales teams," and "prioritizing Tagger enablement" to achieve its desired upmarket growth—all steps that plaintiff alleges contradict defendants' prior insistence about enterprise readiness—and all changes that defendants stated had been in progress "for eight months," since Q4 of 2023. (*Id.* ¶¶150–51). Defendants disclosed that they were "seeing lengthening of our sales cycles as the composition of the customer base . . . is changing," (*id.* ¶152); that Sprout would no longer disclose ARR and total number of customers, which defendants alleged were "no longer . . . key performance indicators of Sprout Social's business due to our evolving customer mix," (*id.* ¶153); and that the Salesforce partnership was contributing to growth, in Barretto's words, "significantly less than many may have previously assumed," and that Sprout would no longer report customer numbers and contributions from Salesforce, (*id.* ¶155). In response to Sprout's "slashed 2024 guidance due to 'self-induc[ed] sales execution headwinds,'" stock prices plummeted 40.1%. (*Id.* ¶¶275–77).

Less than a month after Sprout's May 2 disclosure, plaintiff filed this suit. (*See* Dckt. #1). Plaintiff later filed an amended complaint, (Dckt. #40), which defendants now move to dismiss under Rule 12(b)(6), (Dckt. #47).

## IV. ANALYSIS

Defendants argue that plaintiff's claims should be dismissed because: (1) the complaint fails to allege any actionable misstatement; (2) any alleged misstatements are inactionable as a matter of law; (3) the complaint fails to plead scienter; (4) the complaint fails to plead loss causation; and (5) plaintiff's Section 20(a) claim should fall with his Section 10(b) claim. (Dckt. #51). For the following reasons, the Court disagrees.

### A. Material Misstatements

First, defendants argue that the complaint "fails to adequately plead that any" statements were "false at the time they were made (or ever)." (Dckt. #51 at 22).

In securities fraud actions, "[m]ere silence about even material information is not fraudulent absent a duty to speak," but "if one speaks, he must speak the whole truth." *Stransky v. Cummins Engine Co., Inc.*, 51 F.3d 1329, 1331 (7th Cir. 1995) (cleaned up). An omission is material when there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having altered the total mix of information made available." *Levinson*, 485 U.S. at 231–32 (cleaned up).

In determining whether a statement is misleading, the Court considers "the context in which the statement was made" and determines whether the facts alleged support a "reasonable belief" as to the misleading nature of the statement or omission. *Seeks v. Boeing Co.*, 752 F.Supp.3d 992, 1016 (N.D.Ill. 2024) (cleaned up). The Court also considers "the significance the reasonable investor would place on the withheld or misrepresented information." *Seeks*, 752 F.Supp.3d at 1016; *Macovski v. Groupon, Inc.*, 553 F.Supp.3d 460, 476 (N.D.Ill. 2021). Statements that are vague, "puffery," or opinion are generally not actionable under Rule 10b-5. *See City of Taylor Police & Fire Ret. Sys. v. Zebra Techs. Corp.*, 8 F.4th 592, 595 (7th Cir. 2021); *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 186 (2015).

But "a reasonable investor may, depending on the circumstances, understand an opinion statement to convey facts about how the speaker has formed the opinion—or, otherwise put, about the speaker's basis for holding that view." *Omnicare*, 575 U.S. at 188. Where that is the case, even an opinion statement can be materially misleading. *Id.* Ultimately, whether a statement is misleading "depends on the perspective of a reasonable investor: The inquiry . . . is objective." *Id.* at 186–87.

Moreover, even if a statement is false or misleading, it will give rise to liability only if it is false or misleading as to a "*material*" fact. *Matrixx*, 563 U.S. at 38. A statement is material if "there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote." *Smykla v. Molinaroli*, 85 F.4th 1228, 1235–36 (7th Cir. 2023), *quoting TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976). In other words, "there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Smykla*, 85 F.4th at 1236, *quoting TSC Indus.*, 426 U.S. at 449. This standard is objective. *See Omnicare*, 575 U.S. at 186–87.

Defendants raise several arguments in support of their contention that plaintiff fails to allege material misstatements. (*See* Dckt. #51 at 22–35). For each category of alleged misstatement, defendants' arguments are insufficient to compel dismissal of the complaint for this reason.

**1. Sales Strategy**

Defendants argue that neither the statements from confidential witnesses nor the "admissions" made by Barretto demonstrate the falsity of defendants' statements about Sprout's sales strategy. (Dckt. #51 at 22–25). For the following reasons, the Court disagrees.

With respect to statements from confidential witnesses, defendants argue that plaintiff fails to identify evidence of the statements' falsity with the requisite level of particularity. Defendants list various facts—the number of enterprise customers lost or acquired, or other statistics about Sprout's inbound performance—that plaintiff could have pleaded, but did not. (*Id.*). But as plaintiff correctly points out, (*see* Dckt. #53 at 34 n.6), that level of specificity is not required at the pleading stage. *See Lucid Alt. Fund, LP v. Five9, Inc.*, 821 F.Supp.3d 1073, 1092–93 (N.D.Cal. 2026) ("[D]etailed quantification [is] unnecessary to [allege falsity] at the pleadings stage.") (cleaned up); *In re HD Supply Holdings, Inc. Sec. Litig.*, 341 F.Supp.3d 1342, 1356 (N.D.Ga. 2018) ("Plaintiffs have pleaded sufficient details . . . based on the CWs' beliefs and information at the time, without having to specifically quantify *how* false the statements were when made. This will be made clear through discovery.") (emphasis added); *In re Faro Techs. Sec. Litig.*, 534 F.Supp.2d 1248, 1260 (M.D.Fla. 2007) (rejecting defendants' argument that plaintiff needed to "quantify the falsity to the penny").[3] Here, as in *Lucid*, defendants represented that Sprout's upmarket shift required no change in the company's sales strategy; accordingly, as in that case, plaintiff here only need allege with particularity that enterprise business "did in fact have an impact" on Sprout's sales strategy. *Lucid*, 821 F.Supp.3d at 1093.

Moreover, in arguing that the pleadings are insufficiently particular, defendants implicitly urge the Court to view the factual allegations in the light most favorable to them rather than plaintiff. When the allegations are viewed in the light most favorable to plaintiff, plaintiff (as required by the PSLRA) has adequately alleged the reasons why it believes defendants' statements about the success of Sprout's sales strategy to be false. In particular, defendants

---

[3] Defendants' efforts to distinguish *In re HD*, in particular, are unavailing, because here, as in that case, plaintiff alleges that statements were false "based on multiple CWs with access to data." (Dckt. #57 at 13 n.4).

admitted in May 2024 that they had actually abandoned their inbound sales strategy months prior, (*see* Dckt. #40 ¶¶150–52); and numerous former employees with firsthand experience in product sales described, over the course of the Class Period, (1) the failure of inbound sales for enterprise customers, (2) the lack of outbound sales infrastructure, and (3) Sprout's efforts to compensate for the inadequacy of their inbound sales strategy with extreme discounts and price increases, *see supra* Section III.B.1. These admissions by defendants and statements from CWs constitute "fact-based connections between a speaker, a statement, and specific, contradictory information" that are sufficient to allege the misstatements' falsity. *In re Harley-Davidson, Inc. Sec. Litig.*, 660 F.Supp.2d 969, 1000 (E.D.Wis. 2009).

The fact that plaintiff could have pleaded *additional* facts about the shortcomings of Sprout's sales strategy is of no moment, because, as with any motion to dismiss, the Court construes all pleadings in plaintiff's favor, *Lax v. Mayorkas*, 20 F.4th 1178, 1181 (7th Cir. 2021), and the absence of certain quantitative data about Sprout's sales performance does not make implausible the inference that defendants' statements about the adequacy of Sprout's sales strategy for enterprise customers were false at the time they were made. The facts alleged here are therefore "sufficient to support a reasonable belief as to the misleading nature" of defendants' statements, *Makor Issues & Rts., Ltd. v. Tellabs*, 437 F.3d 588, 596 (7th Cir. 2006), and the cases defendants cite to the contrary are inapposite.[4]

---

[4] In *Pierrelouis v. Gogo, Inc.*, for example, plaintiffs failed to allege that data about damage to defendants' systems was available at the time the alleged misstatements were made; here, on the other hand, plaintiff alleges pervasive and widely known challenges to Sprout's upmarket growth throughout the Class Period. 414 F.Supp.3d 1164, 1174 (N.D.Ill. 2019). In *Premier Capital Management, LLC v. Cohen* and *Babin v. Shchekin*, unlike here, plaintiffs failed to allege *any* "facts showing why" certain statements were untrue. No. 02 C 5368, 2003 WL 21960357, at *5 (N.D.Ill. Aug. 15, 2003); No. 16 C 5722, 2017 WL 403568, at *8 (N.D.Ill. Jan. 30, 2017). And in *Chew v. Moneygram International, Inc.*, the Court granted defendants' motion to dismiss because plaintiffs failed to allege "actionable" misstatements upon which a reasonable investor would rely. No. 18-cv-7537, 2024 WL 4346522, at *12 (N.D.Ill. Sept. 30, 2024).

Defendants further argue that Barretto's alleged "admissions" from May 2, 2024 in fact admit nothing. (Dckt. #51 at 25–26). They emphasize that, read in full context, Barretto's statements actually describe Sprout's *success* in acquiring enterprise customers, and they posit different ways of interpreting Barretto' statements. (Dckt. ##51 at 25–27; 57 at 13–14). But defendants' arguments are unavailing because, once again, they ask the Court to construe Barretto's statements in the light most favorable to defendants, not plaintiff. As plaintiff points to—and defendants ignore altogether—Barretto expressly stated on May 2, 2024 that "the decisions on all this happened in Q4 [2023]." (Dckt. #40 ¶151). And the additional context that defendants provide—in which Barretto describes "2023 model changes" and "important strategic decisions heading into Q1 [2024]," (Dckt. #51 at 25–26)—further supports a plausible inference that, as early as Q4 2023, Sprout was "redrawing [its] go-to-market model," "building new vertical sales teams, accelerating promotions in our mid-market and enterprise teams, [and] adjusting [its] account coverage model." (Dckt. #40 ¶150). These admissions support a reasonable inference that Sprout's former sales strategy—the inbound motion touted as Sprout's crown jewel—was not, in fact, wholly adequate for enterprise clients at the time Barretto described it as such. (*Id.* ¶208).[5]

Therefore, plaintiff adequately alleges the falsity of statements made by defendants about the adequacy of Sprout's inbound sales strategy.

**2. Sales Cycles**

Defendants raise similar arguments with respect to misstatements about the length of Sprout's sales cycles. (*See* Dckt. #51 at 27–30). First, defendants argue that plaintiff pleads no

[5] The fact that Barretto described changes made *prior* to his May 2024 admissions distinguishes the situation before the Court with other cases in which plaintiffs failed to allege falsity. *See, e.g.*, *Williams v. Globus Med., Inc.*, 869 F.3d 235, 244 (3d Cir. 2017) (finding that allegations about subsequent performance did not demonstrate the falsity of earlier-in-time revenue projections).

particularized facts supporting defendants' statements' falsity, but alleges only "non-particularized CW statements . . . [that] ***corroborate*** the representations." (*Id.* at 28) (emphasis in original). Second, defendants argue that defendants' "admissions" at the end of the Class Period are inadequate to allege falsity. (*Id.* at 30). The Court disagrees on both counts.

"Even statements that are literally true can still be actionable . . . if they are susceptible to another interpretation by a reasonable investor." *Macovski*, 553 F.Supp.3d at 474. Here, plaintiff need only allege that defendants' statements could reasonably have been interpreted as indicating that Sprout had short sales cycles, even for enterprise customers. The Court finds that plaintiff has done so. As plaintiff correctly points out, (*see* Dckt. #53 at 39), the complaint highlights statements specifically repeating the time frame of 30 to 45-day sales cycles in the context of enterprise customers. (*See, e.g.*, Dckt. #40 ¶¶175 ("[E]ven . . . for sophisticated customers in the mid-market and enterprise . . . that has enabled us to win customers in 30 to 45 days on average."); 190 ("[W]e're still running at a sales cycle that runs between 30 to 45 days on average . . . we will see deals in the mid-market and enterprise that hit those timelines."); 190 ("[W]e still get a significant amount of pipeline in the enterprise every single month."); 239 ("We'll close mid-market and enterprise deals within 30 days.")). These statements give the impression that Sprout's average 30 to 45-day sales cycles were unaffected by the addition of enterprise customers. Plaintiff adequately identifies statements from CWs indicating a contrary truth: that enterprise sales cycles took months, even years, but "*always* . . . longer," than sales cycles for smaller businesses. (*Id.* ¶¶93–97) (emphasis added).[6]

[6] Defendants argue that these statements by CW 4 are unreliable because he "is only alleged to have worked at Sprout for about one-third of the Class Period . . . and thus lacks knowledge and reliability about enterprise sales cycles at most relevant times." (Dckt. #57 at 17). But while courts "have discounted confidential witnesses who were not employed during the time period in question . . . there is no rule that confidential witnesses must have been employed during the class period at all, let alone for the whole time." *Cullen v. Ryvyl Inc.*, No. 3:23-cv-0185-GPC-SBC, 2024 WL 4536471, at *9 n.6

Defendants argue, to the contrary, that the alleged misstatements were not false because they concerned only the "*average* length of sales cycles for *all* its customers"—that, "as the [complaint] acknowledges, [defendants] specifically disclosed that 'not all' of its Enterprise customers have short sales cycle lengths," and the fact that enterprise customers had longer sales cycles did not make false the alleged misstatements about Sprout having short sales cycle lengths "on average." (*Id.* at 28 & n. 12, 29) (emphasis in original). Defendants also assert that the alleged misstatements described Sprout's comparative advantage over competitors, not the brevity of Sprout's sales cycles for enterprise compared to SMB customers. (Dckt. #57 at 16). Defendants' arguments are unavailing, however, because they again ask the Court to improperly draw inferences in favor of defendants, not plaintiff, which the Court cannot do on a motion to dismiss. *See Teva*, 181 F.4th at 767–68.[7]

With respect to Barretto's May 2, 2024 admission that Sprout was "definitely seeing lengthening of sales cycles," defendants argue that "the mere proximity" of Barretto's statements to alleged misstatements made months or years earlier could not bear on the falsity of those earlier statements. (Dckt. #53 at 30). But agreeing with defendants would require drawing inferences in their favor. Plaintiff highlights statements that Barretto made as recently as March 6, 2024, when he explained that Sprout "close[s] mid-market and enterprise deals within 30

(S.D.Cal. Oct. 21, 2024). Moreover, CW 4's statements are corroborated by statements from other CWs who were employed at other points throughout the Class Period, which bolsters their reliability. *See Institutional Invs. Grp. v. Avaya, Inc.*, 564 F.3d 242, 261 (3d Cir. 2009) (describing how confidential witness statements can corroborate each other).

[7] Defendants also repeat certain arguments that they raised when discussing misstatements about Sprout's sales strategy. Namely, they identify numerous details that plaintiff could have pleaded, but did not, (see Dckt. #51 at 29 & n.13), and cite the same cases that the Court already determined were inapposite, *see supra* Section IV.A.1 (distinguishing *Pierrelouis*, *Premier Capital Management*, *Babin*, and *Chew*). Once more, however, the details defendants list are not necessary for plaintiff to allege, *Lucid*, 821 F.Supp.3d at 1093, nor do they make plaintiff's existing allegations implausible.

days," (Dckt. #40 ¶239), and contends that it is reasonable to infer that sales cycles lengthened not only in April and May 2024, but also as early as March 2024. Particularly in light of CW allegations that enterprise sales cycles were "always" longer, (*see id.* ¶95), the Court agrees. Indeed, "[a] later statement may suggest that a defendant had a contemporaneous knowledge of the falsity of his statement, if the later statement directly contradicts or is inconsistent with the earlier statement." *In re Rackable Sys., Inc. Sec. Litig.*, No. C 09-0222 CW, 2010 WL 3447857, at *10 (N.D.Cal. Aug. 27, 2010) (cleaned up); *see also Indiana Pub. Ret. Sys. v. Pluralsight, Inc.*, 45 F.4th 1236, 1262–63 (10th Cir. 2022) (finding that a contradictory subsequent statement supported the inference that an earlier statement was a knowing material misrepresentation). The Court finds plausible plaintiff's inference about the falsity of defendants' statements—that, if enterprise sales cycles were longer than 30 to 45 days in May 2024, the same was true by March 2024. As such, the Court finds that Barretto's May 2024 admissions support a finding of falsity.[8]

Finally, defendants argue that the risk warnings in Sprout's Form 10-K documents about "increasing variability in our sales cycles" demonstrate that Barretto's "supposed corrective disclosure [was] not an admission, but an update on a dynamic operational metric." (Dckt. #51 at 30). The Court disagrees. As plaintiff asserts, defendants' cautionary language was insufficient where, as plaintiff alleges, sales cycles were allegedly *always* longer for enterprise customers, even at the time forward-looking cautionary language was being issued. *See Rombach v. Chang*, 355 F.3d 164, 173 (2d Cir. 2004) ("Cautionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired."); *Hedick v. Kraft*

[8] Defendants are correct that "temporal proximity" alone "does not create an inference that earlier statements were fraudulent." (Dckt. #51 at 30). But in the case they cite for that proposition, *Arazie v. Mullane*, the alleged misstatements were "predictions of its future performance," not, as here, statements of present fact about Sprout's sales cycles for enterprise customers. 2 F.3d 1456, 1465 (7th Cir. 1993).

*Heinz Co.*, No. 19-CV-1339, 2021 WL 3566602, at *15–16 (N.D.Ill. Aug. 11, 2021) (collecting cases).

Construing the facts alleged in the light most favorable to plaintiff—in particular, the unanimity of the CWs' testimony about longer enterprise sales cycles, combined with Barretto's own admission in May 2024 that the greater number of enterprise customers resulted in longer sales cycles—the facts alleged reasonably support the inference that defendants made false statements about the length of Sprout's enterprise sales cycles.

**3. Product Adequacy**

Defendants next argue that plaintiff fails to allege the falsity of statements about the adequacy of Sprout's product. (Dckt. #51 at 31–33). They contend that (1) the CWs' criticisms identify specific product shortcomings, while defendants' statements are merely generalized statements that do not discuss specific product capabilities, (*id.*at 31); (2) Sprout's lack of influencer marketing capabilities could not constitute an inability to serve all enterprise customers, (*id.* at 33); and (3) Sprout could not have had an inadequate product because the company won numerous enterprise customers and awards for its enterprise service, (*id.* at 31–33).[9] Each of these arguments falls short.

First, the statements from confidential witnesses about specific inadequacies in Sprout's product do, in fact, undermine defendants' statements about Sprout's "full suite of products," "perfect[] position[ing]," and utter lack of "deficiencies" for enterprise clients. (Dckt. #40 ¶¶50, 188, 227). This is so because the seven shortcomings that plaintiff highlights demonstrate the numerous ways in which defendants' product was not, in fact, "perfectly positioned" to service

[9] Defendants also assert that plaintiff identifies only two alleged misstatements pertaining to the adequacy of Sprout's product for enterprise customers. (*See* Dckt. #51 at 31). As described above, *see supra* Section III.B.2, that contention is inaccurate.

enterprise clients.[10] The same is true of Sprout's acquisition of Tagger and CWs' discussion about Sprout's influencer marketing capabilities: defendants' need to acquire a company that could boost its influencer marketing, combined with multiple CWs' statements that Sprout lacked this "crucial" feature for enterprise customers, supports a plausible inference that defendants' statements about their enterprise readiness were false or misleading. Defendants' argument that plaintiff's specific allegations of shortcomings cannot demonstrate the falsity of more general statements about the product defies logic.[11] *See In re Inotiv, Inc. Sec. Litig.*, No. 4:22-CV-045-PPS-JEM, 2024 WL 1344784, at *20 (N.D.Ind. Mar. 29, 2024) ("To have a securities fraud claim, plaintiff must plead with particularity the falsity of a statement of fact or omission.").

Furthermore, defendants' claim that Sprout won "awards" for its service to enterprise customers improperly relies on information outside the four corners of the complaint to argue that plaintiff fails to state a claim. Indeed, it is well-settled that a defendant cannot introduce evidence to contradict a plaintiff's well-pleaded actual allegations on a Rule 12(b)(6) motion. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007); *Wilson v. Price*, 624 F.3d 389, 391 n.1 (7th Cir. 2010); *Tierney v. Vahle*, 304 F.3d 734, 738 (7th Cir. 2002). Plaintiff does not mention any "awards" Sprout won for its customer service in its complaint, (*see generally* Dckt. #40), and the Court will not take judicial notice of the G2 website defendants cite because it is neither a "universal truth," nor something "generally known within the territorial jurisdiction of the trial

---

[10] For the same reason, defendants' argument that product inadequacies only described "[m]issed growth targets" is unavailing. (Dckt. #57 at 19). The alleged misstatements were not predictive growth targets, but descriptions of Sprout's present-day enterprise readiness.

[11] Moreover, as defendants acknowledge, (*see* Dckt. #51 at 31 n.14), their argument that the alleged misstatements are merely "generalized statements" goes to the question of materiality, addressed *infra*, not falsity.

court," nor something "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned," *Gen. Elec. Capital Corp. v. Lease Resolution Corp.*, 128 F.3d 1074, 1081 (7th Cir. 1997); Fed.R.Evid. 201(b); *United States v. Kmart Corp.*, No. 12-CV-881-NJR-PMF, 2014 WL 11696711, at *2 (S.D.Ill. Sept. 26, 2014) ("The Internet contains a wide variety of information with varying levels of reliability, and a court is not required to take judicial notice of a website's content."). Accordingly, the Court cannot, and will not, consider the fact of any of defendants' awards when evaluating their motion to dismiss.

Moreover, defendants' arguments again urge the Court to construe facts in the light most favorable to defendants, and not plaintiff. The fact that Sprout won some enterprise customers, or even that the company was recognized for its enterprise service, does not make implausible the inference that Sprout's products lacked requirements "crucial" for achieving the upmarket growth defendants advertised, and that defendants' statements about being able to rely on product trials to acquire enterprise customers were materially false or misleading. *Cf. Coll. Ret. Equities Fund v. Boeing Co.*, No. 22 CV 3845, 2023 WL 6065260, at *20 (N.D.Ill. Sept. 18, 2023) ("[E]ven slow and inadequate progress would not render [statements about making steady progress] false."); *Castaneda v. Amazon.com, Inc.*, 679 F.Supp.3d 739, 749 (N.D.Ill. 2023) ("The fact that the machine broke cannot give rise to a misrepresentation claim unless Amazon made a false statement that the machine would not break. . . . Describing an attribute of a product is not the same thing as guaranteeing that the product will always work properly.").

As such, plaintiff adequately alleges the falsity of defendants' statements about the adequacy of Sprout's product for enterprise customers.

#### 4. Salesforce Partnership

Finally, defendants argue that plaintiff fails to allege the falsity of statements about the company's March 2022 Salesforce partnership. (Dckt. #51 at 33–35). Defendants contend that

allegations emerging from the Razor Report should be "discarded in their entirety" because a short-seller report relying on anonymous sources is too vague and unreliable to satisfy the PSLRA. (*Id.* at 34). Furthermore, defendants argue that plaintiff lacks corroborating allegations for the Razor Report because CW 1's statements about the Salesforce partnership constitute merely vague, conclusory, non-particularized allegations about Sprout's motives for partnering with Salesforce. (*Id.* at 34–35).

The Court disagrees. While short-seller reports "have an obvious motive to exaggerate the infirmities of the securities in which they speculate," *Ho v. Duoyuan Glob. Water, Inc.*, 887 F.Supp.2d 547, 564 (S.D.N.Y. 2012), "[i]t is permissible for Plaintiffs to rely on a short seller report to allege falsity at the pleading stage," especially where the report contains sufficient indicia of reliability, *Snellink v. Gulf Res., Inc.*, 870 F.Supp.2d 930, 939 (C.D.Cal. 2012) (collecting cases). These indicia of reliability include "facts . . . cited that tend to substantiate [a report's] allegations or reveal the basis for [its] factual assertions," *In re EHang Holdings Ltd. Sec. Litig.*, 646 F.Supp.3d 443, 459 (S.D.N.Y. 2022) (cleaned up), such as "evaluation of the Company's data" and "conversations with individuals who worked [for the company]," *Saskatchewan Healthcare Emp.'s Pension Plan v. KE Holdings Inc.*, 718 F.Supp.3d 344, 383 (S.D.N.Y. 2024). Moreover, "courts have generally sustained pleadings where 'independent factual allegations corroborated the factual allegation in the complaint drawn from short-sellers.'" *zCap Equity Fund LLC v. LuxUrban Hotels Inc.*, 792 F.Supp.3d 407, 436 (S.D.N.Y. 2025), *quoting Long Miao v. Fanhua, Inc.*, 442 F.Supp.3d 774, 801 (S.D.N.Y. 2020); *cf. In re DraftKings Inc. Sec. Litig.*, 650 F.Supp.3d 120, 155 (S.D.N.Y. 2023) (dismissing complaint that relied on a short-seller report "for almost all of its factual allegations").

Here, the Razor Report is both sufficiently reliable and corroborated by CW 1's statements. The report itself extensively describes and even quotes expert calls with employees at various Sprout customers, including Nestlé, (*see* Dckt. #35 at 16); JNJ, (*see id.* at 17); Shopify, (*see id.* at 48–51); and another private company, (*see id.* at 51–54). As plaintiff points out, (*see* Dckt. #53 at 42 n.15), the Razor Report also supports its conclusions with numerical analyses, (*see, e.g.*, Dckt. #35 at 21–23). These are both factors that courts have concluded contribute to the reliability of anonymous short-seller reports. *See Manchin v. PACS Grp., Inc., et al.*, No. 24-CV-8636 (LJL), 2026 WL 2621029, at *17 (S.D.N.Y. Sept. 4, 2026) ("[T]here is a category of short-seller reports that . . . provide economic analysis of publicly available information.") (collecting cases); *zCap*, 792 F.Supp.3d at 436 (crediting allegations where the source in a short-seller report "was in a position . . . to know the facts attributed to him") (cleaned up); *Saskatchewan*, 718 F.Supp.3d at 383; *Lewy v. SkyPeople Fruit Juice, Inc.*, No. 11 CIV. 2700 PKC, 2012 WL 3957916, at *14 (S.D.N.Y. Sept. 10, 2012) (finding anonymous short-seller reports reliable because they were "corroborated by other facts" than their anonymous sources, including "revenue and income figures").

Moreover, plaintiff alleges other facts that further corroborate the contents of the Razor Report. CW 1 describes an "overwhelming sentiment" that former Social Studio customers did not want to start paying for Sprout's social media management. (Dckt. #40 ¶196). Barretto allegedly made an admission about Salesforce acquisitions being "significantly less than many may have previously assumed." (*Id.* ¶155). And numerous CWs describe Sprout's "extreme discounting" and "revenue manipulations" at the same time defendants were asserting that Social Studio remained a viable source of customers. (*Id.* ¶¶117–22). Unlike allegations in the cases defendants cite, (*see* Dckt. #51 at 35), these pleadings constitute more than bare and conclusory

allegations about statements' falsity. Accordingly, the Court finds the Razor Report adequately corroborated where, as here, "well-pled independent and particularized facts corroborate[d]" statements in the short-seller report about the size and viability of the Salesforce opportunity. *zCap*, 792 F.Supp.3d at 436.

As such, the Court concludes that plaintiff has adequately alleged the falsity of defendants' statements about the Salesforce opportunity.

**B. Actionable Misstatements**

Next, defendants argue that the alleged misstatements are inactionable because many of them were, at most, "corporate puffery or optimism," (Dckt. #51 at 36–38); "inactionable statements of opinion or belief," (*id.* at 38–40); or forward-looking statements protected by the PSLRA's safe harbor, (*id.* at 41–42). For the following reasons, the Court disagrees.

Statements that are vague or non-specific "puffery"—"rosy affirmation heard from corporate managers and numbingly familiar to the marketplace," something "so lacking in specificity . . . that no reasonable investor could find [it] important to the total mix of information available"—are generally not actionable under Rule 10b-5. *City of Monroe Emps.' Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 669–70 (6th Cir. 2005) (cleaned up); *City of Taylor*, 8 F.4th at 595. The nature of puffery stems from the "generic, indefinite nature" of the statements at issue. *Boca Raton Firefighters & Police Pension Fund v. Bahash*, 506 Fed.App'x 32, 37 (2d Cir. 2012). A statement is not puffery where it constitutes a falsifiable, concrete assertion that a "reasonable investor, exercising due care, would view as moving the investment-decision needle." *Kuebler v. Vectren Corp.*¸13 F.4th 631, 638 (7th Cir. 2021). Similarly, statements of opinion are generally not actionable in a securities fraud case, although "a reasonable investor may, depending on the circumstances, understand an opinion statement to convey facts about how the speaker has formed the opinion—or, otherwise put, about the speaker's basis for holding that view." *See*

*Omnicare*, 575 U.S. at 186, 188. Finally, the PSLRA safe harbor applies to forward-looking statements "if and to the extent that" such a statement is "(i) identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement; or (ii) immaterial." 15 U.S.C. §78u-5(c)(1)(A).

Defendants' arguments about the immateriality of their alleged misstatements are unavailing. As a preliminary matter, "materiality," which includes considerations of whether a statement constitutes puffery or opinion, "is normally a question of fact reserved for the trier of fact." *Smykla*, 85 F.4th at 1236. That is so because the materiality determination "requires delicate assessments of the inferences a reasonable shareholder would draw from a given set of facts . . . and these assessments are peculiarly ones for the trier of fact." *SEC v. Bauer*, 723 F.3d 758, 772 (7th Cir. 2013). A court can decide materiality as a matter of law only if "reasonable minds cannot differ on the question of materiality." *TSC Indus.*, 426 U.S. at 450.

Here, the Court does not find that to be the case. First as plaintiff points out, many of the alleged misstatements were made in response to analyst questions. (*See* Dckt. #53 at 31, 35, 38, 44). "Direct responses to analysts' specific inquiries go well beyond immaterial puffery." *Hunter*, 2026 WL 2357739, at *7, *quoting Tellabs*, 437 F.3d at 597 (cleaned up). Contrary to defendants' contention, (*see* Dckt. #57 at 24 & n.13), plaintiff adequately alleges that numerous misstatements were made in response to analysts' direct questions about "whether changes to Sprout's sales model were needed," "how Sprout was 'planning to attack that Salesforce customer base,'" and "whether Sprout required 'any changes around the go-to-market or sales motion.'" (Dckt. #40 ¶¶49, 52, 58). "[B]ecause of the fact-intensive nature of the materiality inquiry, the Court may not dismiss a complaint" for materiality unless the alleged misstatements

are "obviously unimportant to a reasonable investor," *In re DraftKings*, 6650 F.Supp.3d at 150, which is plausibly not the case where a statement is made in direct response to an analyst's question.

Furthermore, upon analysis of the misstatements themselves, many of them were specific representations of fact for which truth or falsity could be demonstrated. These include defendants' alleged statements that Sprout's sales strategy was working better in the enterprise space than in SMB; that Sprout's product had no gaps in its feature set; that Sprout was acquiring enterprise customers in "30 to 45" days; and that the Salesforce opportunity comprised "4,000ish" customers. (Dckt. #40 ¶¶146, 174, 197, 199, 195). Rather than being "general," "aspirational," or "forward-looking," these statements were pronounced with present-tense certainty about a sales strategy that defendants themselves described as *the* "driver" of Sprout's enterprise growth. *Cf. Pembroke Pines Firefighters & Police Officers Pension Fund v. Abbott Labs., et al.*, No. 22-cv-4661, 2026 WL 2137943, at *23 (N.D.Ill. July 24, 2026) ("Hopes, dreams, goals, aspirations, visions, values, and principles rarely provide material information to reasonable investors."); *Chandler v. Ulta Beauty, Inc.*, No. 18-CV-1577, 2022 WL 952441, at *11 (N.D.Ill. Mar. 30, 2022) (finding statements immaterial where they described "two of a lot of factors that drove Ulta's sales and earnings") (cleaned up).

Indeed, Del Preto stated that Sprout's sales strategy "*is workin*g even better in the enterprise" space than for SMBs, (*id.* ¶197); Howard stated that enterprise "customers land with similar costs and similar sales cycles as the rest of our customer base, bearing an LTV many multiples higher and net dollar retention north of 120%," (*id.* ¶57); Rechel stated that Sprout's strategy "allows us to keep sales cycles shorter," (*id.* ¶61) (cleaned up); and Barretto stated that he was "excited about the [4,000ish] customers in our Social Studio that *are going to migrate*

over the next couple years," (*id.* ¶195). *Cf. Chandler*, 2022 WL 952441, at *9 (finding statements "inherently aspirational" where they were conditioned by words such as "expects," "should," and "seeks"); *In re Walgreens Boots Alliance Sec. Litig.*, No. 24-cv-5907, 2026 WL 25948, at *12 (N.D.Ill. Jan. 5, 2026) (finding statements inactionable puffery where they described a strategy that was "highly scalable" or had met "key milestones"). For similar reasons, defendants' argument that forward-looking statements are protected by the PSLRA safe harbor falls short: plaintiff adequately alleges numerous misstatements that are not forward-looking and, as such, are not protected by the statute's safe harbor.

Moreover, plaintiff adequately alleges specific, measurable metrics of success in defendants' misstatements, including the 30 to 45-day timeline of their enterprise sales cycles, (Dckt. #40 ¶146); the number of customers available related to the Salesforce Social Studio migration, (*id.* ¶195); and Sprout's "30% growth target," (*id.* ¶58). In short, many of defendants' alleged misstatements were concrete, measurable, and verifiable, and they communicated to the market that "a core metric of business performance"—namely, Sprout's positioning for upmarket growth—was strong. *See Gallagher v. Abbott Labs.*, 269 F.3d 806, 811 (7th Cir. 2001).

In support of their contention that the alleged misstatements were mere puffery, defendants once more rely on inapposite cases in which the statements at issue were far more general and conditioned with language about what defendant "believe[d]," what results "will be," that a defendant was "confident in its ability," or that defendants "fe[lt] very, very good" about growth. *See In re Midway Games, Inc. Sec. Litig.*, 332 F.Supp.2d 1152, 1165 (N.D.Ill. 2004); *Roth v. OfficeMax, Inc.*, No. 05 C 236, 2006 WL 2661009, at *4 (N.D.Ill. Sept. 13, 2006); *Plumbers & Pipefitters Loc. Union No. 630 Pension-Annuity Tr. Fund v. Allscripts-Misys*

*Healthcare Sols., Inc.*, 778 F.Supp.2d 858, 872 (N.D.Ill. 2011) (cleaned up); *Tellabs*, 437 F.3d at 597.

Similarly, in support of their contention that the alleged misstatements were pure opinion, defendants cite inapposite cases in which the statements at issue contained qualifiers, *Fryman v. Atlas Fin. Holdings, Inc.*, No. 18-cv-01640, 2022 WL 1136577, at *14 (N.D.Ill. Apr. 18, 2022) ("Wollney's March 14, 2017 assurance that '[w]e feel very strongly that we've isolated the issue . . .' is couched in opinion language."), or forward-looking language, *Chew*, 2024 WL 4346522, at *12 (describing "merely vague, aspirational puffery regarding [defendant's] progress and future outlook"); *W. Palm Beach Firefighters' Pension Fund v. Conagra Brands, Inc.*, 495 F.Supp.3d 622, 649 (N.D.Ill. 2020) ("[E]ven without qualifiers, the content of future predictions makes the distinction clear: . . . Defendants' pre-merger predictions were expressions of opinion."), *aff'd sub nom. Nat'l Elevator Indus. Pension Fund v. Conagra Brands, Inc.*, No. 21-1155, 2022 WL 1449184 (7th Cir. May 9, 2022).

Finally, in support of their contention that the PSLRA safe harbor applied to the alleged misstatements, defendants cite inapposite cases in which (1) the safe harbor language was specific to the business integration that defendants said would impact revenues, *see In re Tibco Software, Inc.*, No. C 05-2146 SBA, 2006 WL 1469654, at *27 (N.D.Cal. May 25, 2006); and (2) the alleged misstatements were forward-looking revenue projections that differed from the present-tense language about Sprout's enterprise readiness at issue here, *see id.*; *Johnson v. Tellabs, Inc.*, 262 F.Supp.2d 937, 954 (N.D.Ill. 2003).

In their reply, defendants also identify portions of numerous misstatements for which they argue that plaintiff either conceded or failed to establish materiality. (Dckt. #57 at 21–27). But while defendants may be correct that certain portions of the alleged misstatements "contain

an element of generic optimism"—for example, Barretto's statement that "we are incredibly excited about [our] trial motion," (*see* Dckt. #40 ¶213)—"that is not enough to get the alleged statement (much less any claim in the complaint) thrown out." *Hedick*, 2021 WL 3566602, at *10. Indeed, "[o]n a motion to dismiss, the question is not whether *every* misstatement, in isolation, is material. Rather, the Court must only determine if *a* material misstatement has been pled with particularity." *Kumaran v. Northland Energy Trading, LLC*, No. 19-CV-8345 (MKV) (RWL), 2025 WL 1982945, at *7 (S.D.N.Y. July 9, 2025) (emphasis in original); *KDH Consulting Grp. LLC v. Iterative Cap. Mgmt. L.P.*, 528 F.Supp.3d 192, 203 n.6 (S.D.N.Y. 2021) (noting that a securities fraud plaintiff "need only allege at least one actionable misstatement to survive a motion to dismiss"). As such, plaintiff's claims survive even if certain portions of alleged misstatements are not actionable. *See BBL, Inc. v. City of Angola*, 809 F.3d 317, 325 (7th Cir. 2025) ("A motion to dismiss under Rule 12(b)(6) doesn't permit piecemeal dismissals of *parts* of claims.").

Accordingly, because plaintiff plausibly points to "statements on which an investor would reasonably rely as reflecting consequential facts about [Sprout], namely, its financial health," the Court finds that plaintiff has plausibly alleged the existence of material misstatements. *Roth*, 2006 WL 2661009, at *4.

**C. Scienter**

Next, defendants argue that plaintiff fails to adequately plead "a strong inference of scienter with respect to each" defendant. (Dckt. #51 at 43–54). They argue that statements from confidential witnesses, allegations about defendants' motives, the departures of various executives, and plaintiff's remaining allegations are all insufficient to allege scienter. (*Id.*). Once again, the Court disagrees.

Scienter is an essential element of a securities fraud claim under Rule 10b-6. Scienter means acting with an "intent to deceive, demonstrated by knowledge of the statement's falsity or reckless disregard of a substantial risk that the statement is false." *Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d 753, 756 (7th Cir. 2007); *see also Appvion, Inc. Retirement Savings and Emp. Stock Ownership Plan by and through Lyon v. Buth*, 99 F.4th 928, 951 (7th Cir. 2024). A "reckless" state of mind means "an extreme departure from the standards of ordinary care . . . to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *City of Livonia v. Boeing Co.*, 711 F.3d 754, 756 (7th Cir. 2013) (cleaned up). "When the facts known to a person place him on notice of a risk, he cannot ignore the facts and plead ignorance of the risk." *Makor Issues & Rts., Ltd. v. Tellabs Inc.*, 513 F.3d 702, 704 (7th Cir. 2008).

Ordinarily, "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed.R.Civ.P. 9(b). But securities fraud complaints under the PSLRA must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. §78u–4(b)(2)(A).

Thus, to establish the "required state of mind," "the plaintiffs must create a strong inference of scienter with respect to each individual defendant." *Pugh v. Tribune Co.*, 521 F.3d 686, 693–94 (7th Cir. 2008) (*citing Tellabs*, 513 F.3d at 710). A "strong inference" that a defendant acted with scienter is "more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Hunter*, 2026 WL 2357739, at *6, *quoting Tellabs*, 551 U.S. at 314. !In evaluating competing inferences at the pleading stage, the Court scrutinizes the facts collectively, not in isolation, "accept[ing] all factual allegations . . . as true," including those in the complaint and documents incorporated by

reference. *Tellabs*, 551 U.S. at 322–23; *Hunter*, 2026 WL 2357739, at *6. After reviewing the complaint holistically, and recognizing that the "inquiry is inherently comparative," the Court asks whether "the inference of scienter [is] cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 323–24; *Hunter*, 2026 WL 2357739, at *6.

If the scienter requirement is met as to any of the Individual Defendants, it is also met as to Sprout, because defendants do not argue that the individual defendants were acting outside the scope of their apparent authority. *See Tellabs*, 437 F.3d at 603 (vacated and remanded on other grounds).

Plaintiff's response highlights several sets of allegations which, taken together, support scienter, (*see* Dckt. #53 at 40–49):

- First, the complaint alleges that Sprout's sales strategy and upmarket success, mentioned in "every single investor call during the Class Period," were critical to Sprout and investors, and officers "can be assumed to know of facts critical to a business's core operations." *Jones v. Corus Bankshares, Inc.*, 701 F.Supp.2d 1014, 1028 (N.D.Ill. 2010); *Shenwick v. Twitter, Inc.*, 282 F.Supp.3d 1115, 1145 (N.D.Cal. 2017) (finding the core operations theory applied when the alleged misstatements concerned what defendants described as one of the company's "major growth drivers"); (*see* Dckt. #40 ¶¶48, 57, 59, 61, 175–76, 180, 182, 190, 213, 226) (describing Sprout's sales strategy as the primary driver of the company's enterprise success).

- Second, by making repeated statements (often in response to analyst questions) about Sprout's sales strategy, enterprise-readiness, sales cycle, and Salesforce opportunity, and touting their own access to "so much data" "in real time" in large part "because of the inbound model," (*see* Dckt. #40 ¶¶253–55), defendants allegedly "held themselves out to investors as having personal knowledge about" those topics. *Alghazwi v. Beauty Health Co.*, 801 F.Supp.3d 982, 1003 (C.D.Cal. 2025); *see also In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1145 (9th Cir. 2016) (finding scienter adequately pleaded where executives "told investors they had real-time access to, and knowledge of, sales information").

- Third, defendants made representations admitting that they needed to entirely "redraw" the same go-to-market strategy they'd insisted was adequate throughout the Class Period, and that they had known about the inadequacy of their product or sales strategy at the same time they had issued statements about their preparedness for enterprise

business. *See Rehm v. Eagle Fin. Corp.*, 954 F.Supp. 1246, 1256 (N.D.Ill. 1997) ("The more serious the error, the less believable are defendants' protests that they were completely unaware . . . and the stronger is the inference that defendants must have known.") (cleaned up).

- Fourth, statements from fourteen former Sprout employees and confidential witnesses provided corroborating stories about pervasive issues that Sprout had landing enterprise clients, as well as other descriptions of CWs' interactions with management supportive of scienter. *See Tellabs*, 513 F.3d at 712 (finding confidential informants' statements supportive of scienter where numerous informants set forth information in "convincing detail" that was "corroborated by multiple sources").

- Fifth, defendants' denial of the claims made in the Razor Report allegedly indicated their awareness of the company's shortcomings. *See Karimi v. Deutsche Bank Aktiengesellschaft*, 607 F.Supp.3d 381, 398 (S.D.N.Y. 2022) ("Public denials . . . are also recognized to support an inference of scienter.").

- And sixth, the complaint alleges that defendants had motive to inflate Sprout's stock, including so that they could sell their own stock at inflated prices, which plaintiff alleges Howard and Barretto did at "suspicious" times. *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 277 (3d Cir. 2006) ("Sales of company stock by insiders that are unusual in scope or timing . . . may support an inference of scienter.") (cleaned up).

Defendants argue that none of plaintiff's allegations raises any inference of scienter, and that the strongest inference to draw from the complaint is that defendants "believed, at all relevant times, that Sprout was well-positioned to expand its Enterprise client base, while disclosing the potential risks attendant to a considerably different customer composition." (Dckt. #51 at 44 n.26). But in doing so, defendants attack each of plaintiff's allegations in isolation, even though the Court must consider the complaint "holistically" and "in its entirety." *Tellabs*, 551 U.S. at 323–24; *Hunter*, 2026 WL 2357739, at *6. As such, defendants' arguments ultimately fall short, for the reasons described below.[12]

[12] Defendants also contend in a footnote that the Court should dismiss Rechel in his entirety because he is only alleged to have made a "handful of the alleged misrepresentations," all of which were neither false nor actionable. (Dckt. #51 at 44 n.27). Skeletal arguments presented in a footnote are waived. *See, e.g.*, *Harmon v. Gordon*, 712 F.3d 1044, 1053 (7th Cir. 2013). Nonetheless, even if the Court were to consider this argument, it finds for the reasons described herein that plaintiff has, in fact, adequately alleged material and actionable misstatements by Rechel.

### 1. Core Operations Theory

Under the "core operations" theory, officers of a company "can be assumed to know of facts critical to a business's core operations . . . that would affect a company's performance." *Jones*, 701 F.Supp.2d at 1028 (cleaned up); *see also Chow v. Archer-Daniels-Midland Co.*, No. 24 C 634, 2025 WL 790854, at *4 (N.D.Ill. Mar. 12, 2025); *Azar v. Grubhub, Inc.*, No. 1:19-cv-07665, 2021 WL 4077327, at *6 (N.D.Ill. Sept. 7, 2021); *In re Sears, Roebuck & Co. Sec. Litig.*, 291 F.Supp.2d 722, 727 (N.D.Ill. 2003). Plaintiff argues that Sprout's enterprise readiness was part of the company's "core operations," and that this fact supports a strong inference of scienter. (Dckt. #53 at 47–48). Defendants, to the contrary, argue that plaintiff cannot rely on the "core operations" doctrine because plaintiff "offers no particularized facts from which to infer knowledge of falsity." (Dckt. #51 at 53–54).

The Court disagrees that plaintiff fails to allege falsity. *See supra* Section IV.A.[13] In particular, plaintiff alleges facts about both (1) the centrality of Sprout's enterprise growth to the company's business and (2) the Individual Defendants' access to information that belied their allegedly misleading statements. For example, the complaint includes numerous allegations about the importance of Sprout's upmarket shift, the importance of Sprout's sales strategy for that shift, and the value that defendants claimed to place on Sprout's product in order to support that strategy. (Dckt. #40 ¶¶37–50). And plaintiff includes other allegations about defendants answering analyst questions about Sprout's upmarket shift, (*see, e.g.*, *id.* ¶¶3, 48–49, 52, 58, 60–61); touting their own awareness of internal data, (*see id.* ¶¶253–55); and being able to access

---

[13] The cases defendants cite are inapposite because plaintiffs in those cases failed to allege that defendants knew of the facts that would demonstrate the falsity of their own misstatements. *See Kohl's*, 895 F.3d at 939; *Societe Generale Sec. Servs., GbmH v. Caterpillar, Inc.*, No. 17 cv 1713, 2018 WL 4616356, at *8 (N.D.Ill. Sept. 26, 2018); *In re Fifth Third Bancorp Deriv. Litig.*, No. 20 C 4115, 2023 WL 2429009, at *19 (N.D.Ill. Mar. 8, 2023). Here, in contrast, plaintiff alleges that the facts about Sprout's business are the same facts that demonstrate the falsity of defendants' statements.

internal data, (*see id.* ¶¶85–89, 101–05). Plaintiff also identifies CW statements about Howard and Barretto's attendance at meetings where Sprout's enterprise inadequacy was discussed, as well as Barretto's hands-on management style more generally. (*Id.* ¶¶86, 105, 252).

These facts are sufficient to allege that the Individual Defendants had actual access to the information related to the alleged misstatements. *See United Ass'n Nat'l Pension Fund v. Carvana Co.*, 759 F.Supp.3d 926, 977 (D.Ariz. 2024) (finding scienter for core operations theory adequately pleaded after considering defendants' positions as CEO and CFO, their repeated discussion of the subject of certain misstatements, and attendance at meetings where those subjects were discussed); *In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 710 (9th Cir. 2012) (same, considering allegations about defendants being "hands-on managers"); *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 785 (9th Cir. 2008) (noting that allegations regarding management's role in a company are relevant to scienter).

Considering all the above, the Court finds that plaintiff has clearly and plausibly alleged that the viability of Sprout's upmarket sales strategy and product "are a significant part of [the company's] financial picture that cannot be expected to evade executive knowledge altogether." *Kohl's*, 895 F.3d at 936–37. As such, and considering the complaint in its totality, the "core operations" theory supports a strong inference of scienter.

**2. CW Statements**

Defendants also attack plaintiff's reliance on statements from confidential witnesses, which they argue are insufficient to support scienter because the statements (1) are unreliable, due to lack of information about the CWs, their relationship to defendants, or the time frame of the CW statements; and (2) fail to indicate the falsity of any alleged misstatements. (Dckt. #51 at 44–47). Again, the Court disagrees.

Contrary to defendants' assertions, "[t]here is no categorical discount of confidential witness allegations where, as here, Plaintiff has described the witnesses with enough detail that this Court can determine that the confidential witnesses have a foundation for their allegations." *Van Noppen v. InnerWorkings, Inc.*, 136 F.Supp.3d 922, 934 (N.D.Ill. 2015). Instead, "the degree to which confidential witness testimony needs to be discounted is contextual. When numerous confidential sources tell an overlapping, corroborated story and we are able to assess those sources' access to the knowledge they claim to have, we can still draw a strong inference from the informants' assertions." *Hunter*, 2026 WL 2357739, at *8, *quoting Tellabs*, 513 F.3d at 711–12 (cleaned up). In evaluating the reliability of a confidential witness's statements, courts consider "the detail provided by the confidential sources, the sources' basis of knowledge, the reliability of the sources, the corroborative nature of other facts alleged, including from other sources, the coherence and plausibility of the allegations, and similar indicia." *Levon v. CorMedix Inc.*, 797 F.Supp.3d 381, 419 (D.N.J. 2025), *quoting Cal. Pub. Empls.' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 147 (3d Cir. 2004).

Plaintiff has pleaded the CW statements in sufficient detail to be reliable at this stage of litigation. As defendants concede, plaintiff provided information about the positions, periods of employment, and job responsibilities of nine out of the fourteen former employee confidential witnesses they cite. (*See* Dckt. #40 at 31–46). For the remaining five former employees, plaintiff describes at least their job titles and periods of employment. (*Id.*). All of those CWs corroborated each other's stories about the longstanding and widely known shortcomings of Sprout's sales strategy and product for enterprise clients, which they described as central to Sprout's business performance throughout the Class Period. (*Id.*).

Defendants argue that the complaint provides few allegations of CWs' direct interactions with the Individual Defendants, and that the CWs were "all low-level employees who would not have . . . been privy to overarching Company strategy or results." (*See* Dckt. #51 at 45–46; *but see* Dckt. #40 ¶¶86, 94, 250 (describing CWs 1 and 8 working with Sprout executives)). But "direct contact with the [Individual] Defendants themselves . . . is not required." *Carvana*, 759 F.Supp.3d at 976; *Glazer Cap. Mgmt., L.P., et al. v. Forescout Techs., Inc., et al.*, 63 F.4th 747, 772–73 (9th Cir. 2023). And, as plaintiff points out, (*see* Dckt. #53 at 51), the complaint includes numerous allegations about the CWs' interactions with management, including the CWs' complaints to management about product deficiencies, and their description of management as uniquely involved in business pertaining to enterprise growth. (Dckt. #40 ¶¶71–72, 81, 84–86, 89, 91, 107). Contrary to defendants' arguments, the overlapping CW statements constitute "corroboration from multiple sources" about Barretto, Del Preto, and Howard's involvement in and awareness of sales performance, which supports an inference of scienter. *Freudenberg v. E*Trade Fin. Corp.*, 712 F.Supp.2d 171, 197 (S.D.N.Y. 2010) (cleaned up).[14]

Moreover, "[e]ven if the CWs' statements are unreliable as to the [I]ndividual Defendants' state of mind, they reliably bolster" Sprout's "core operations" theory: that Sprout's product and sales strategy were so crucial to the company's success that a strong inference exists

[14] Defendants' citations to inapposite cases are unavailing. (*See* Dckt. #51 at 44–46). In particular, these cases are distinguishable because: (a) the CWs' statements were based on secondhand information, (*Davis v. SPSS, Inc.*, 431 F.Supp.2d 823, 828 (N.D.Ill. 2006); *In re Coty Inc. Sec. Litig.*, No. 14-cv-919 (RJS), 2016 WL 1271065, at *10 (S.D.N.Y. Mar. 29, 2016)); (b) plaintiffs failed to allege that the CWs' opinions were competently formed, (*Fulton Cnty. Emps.' Ret. Sys. v. MGIC Inv. Corp.*, No. 08-C-0458, 2010 WL 5095294, at *8 (E.D.Wis. Dec. 8, 2010)); (c) services like Slack and Microsoft Teams did not exist, making allegations about, *e.g.*, employees' office location more relevant to establishing the reliability of CWs' knowledge, (*In re Career Educ. Corp. Sec. Litig.*, No. 03 C 8884, 2006 WL 999988, at *4 (N.D.Ill. Mar. 28, 2006)); (d) the information provided by CWs was "not inconsistent" with defendants' disclosures, *Garden City Emps.' Ret. Sys. v. Anixter Int'l, Inc.*, No. 09-CV-5641, 2012 WL 1068761, at *13 (N.D.Ill. Mar. 29, 2012)); and (e) plaintiffs' complaints were dismissed due to impermissible group pleading, (*City of New Orleans Emps.' Ret. Sys. v. PrivateBankcorp, Inc.*, No. 10 C 6826, 2011 WL 5374095, at *8 (N.D.Ill. Nov. 3, 2011); *Pugh*, 521 F.3d at 697).

that they knew about the alleged truth of Sprout's enterprise readiness. *Shenwick*, 282 F.Supp.3d at 1146; *cf. Hunter*, 2026 WL 2357739, at *8 (discounting CW statements where "there is no reason to think they have first-hand information about the defendants' mental states"). For example, CWs spoke at length about the company's efforts to maintain short sales cycles, wildly increase pricing, and steeply discount the product in order to acquire enterprise customers. (*See, e.g.*, Dckt. #40 ¶¶115–22). And the CW statements are sufficiently reliable for this purpose, because the CWs listed are "numerous and consist of persons who from the description of their jobs were in a position to know at first hand the facts to which they are prepared to testify," including low sales of product to enterprise customers, product complaints from enterprise customers, and long sales cycles for enterprise customers. *Tellabs*, 513 F.3d at 712.

As such, the CW statements support a strong inference of scienter where, as here, "it is almost inconceivable that an individual defendant would be unaware of the matters at issue." *Jones*, 701 F.Supp.2d at 1029.

**3. Motive Allegations**

Plaintiff points to "suspicious" stock trading activity by Howard and Barretto that it alleges establishes motive, and thus supports a strong inference of scienter. (Dckt. #53 at 53–54). Defendants argue that plaintiff's motive allegations fail to plead scienter. (Dckt. #51 at 48–51). The Court agrees that plaintiff's allegations about Barretto and Howard's "suspicious" stock trading only supports scienter for those two Individual Defendants (and, as imputed, to the company). (*Id.* at 48). But, contrary to defendants' assertions, the fact that these motive allegations only apply to two Individual Defendants does not undermine their import altogether.[15]

[15] In *Johnson v. Tellabs, Inc.*, the case defendants cite for this proposition, plaintiffs alleged that ten individual defendants were part of a scheme to defraud, but that only five of those defendants sold stock

Allegations of motive are not required to plead scienter. *Tellabs*, 551 U.S. at 325. Where alleged, however, "stock sales must generally be unusual or suspicious to constitute circumstantial evidence of scienter." *Kohl's*, 895 F.3d at 940 (cleaned up). An "unusual or suspicious" sale is one that is "dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information." *Fryman v. Atlas Fin. Holdings, Inc.*, 462 F.Supp.3d 888, 903–04 (N.D.Ill. 2020) (cleaned up). Relevant considerations include "the amount and percentage of overall shares sold, the profit made, the timing of the stock sales and the consistency of the sales with the insider's prior trading history." *Id.* at 904 (cleaned up).

Defendants contend that the stock sales: (1) lacked suspicious timing; (2) were largely made pursuant to 10b5-1 trading plans, precluding an inference of scienter; (3) are not described in sufficient detail to support an inference of scienter; and (4) were otherwise routine. (Dckt. #51 at 49–51). But plaintiff alleges numerous facts demonstrating the unusual timing and volume of Howard and Barretto's trades, highlighting in particular the ways that their trades during the Class Period were starkly out of line with their trading history in the months and years prior. (*See* Dckt. ##40 ¶¶166–70, 266–68; 53 at 53).[16] Moreover, plaintiff alleges that both Barretto and Howard entered at least two 10b5-1 trading plans *during* the Class Period, allegedly at "suspicious times," and "[t]rading plans are not a cognizable defense to scienter allegations on a

---

during the purported class period. *See* 262 F.Supp.2d at 956. Plaintiffs in that case also included no detail about the stock sales other than the number of shares of stock sold and the related proceeds. *Id.* Here, on the other hand, plaintiff highlights a stark comparison between Howard and Barretto's sales before and during the Class Period, and the number of Individual Defendants who are not alleged to have made suspicious stock sales (two) is far fewer than the five at issue in *Johnson*.

[16] In contrast, in the cases defendants cite, plaintiffs pleaded only "the number of shares . . . sold and the amount of trading proceeds each person received, *Johnson*, 262 F.Supp.2d at 956; or "only gross proceeds." *Garden City*, 2012 WL 1068761, at *14.

motion to dismiss where, as here, they were adopted during the Class Period," especially because the Court must accept all of plaintiff's well-pleaded allegations as true at the motion to dismiss stage. *Freudenberg*, 712 F.Supp.2d at 201 (collecting cases).[17]

Plaintiff's motive theory—that defendants sold stock when Sprout was still making efforts to inflate company metrics, and before the truth about the state of the company's enterprise business was fully revealed in May 2024—is at least as compelling as any other inference. Defendants' assertions that Howard and Barretto held more stock at the end of the Class Period than at the beginning, and that Howard sold *proportionally* less stock during the Class Period than in the 21 months preceding it, do not hold together in a more compelling inference, especially because the Court construes all facts in plaintiff's favor at the motion to dismiss stage.

As such, plaintiff's motive allegations support a strong inference of scienter when considered alongside the complaint in its totality.

**4. Other Allegations of Scienter**

Defendants argue that certain of plaintiff's remaining allegations of scienter constitute "must have known" allegations that amount merely to allegations of "fraud by hindsight." (Dckt. #51 at 52–53). In combination with the remainder of plaintiff's complaint, however, their allegations about defendants' admissions are adequate to allege scienter.

First, defendants contend that the August 3, 2023 and May 2, 2024 "disclosures" did not constitute "admissions" about the inadequacy of the company's prior product or sales strategy, and that plaintiff fails to allege that defendants' statements were false *at the time they were made*.

[17] The cases defendants cite to the contrary are, once again, inapt. In *Chew*, defendants made stock sales pursuant to trade plans that were in place before the Class Period. 2024 WL 4346522, at *22. And in *Wade v. WellPoint, Inc.*, plaintiff included no allegations about the unusual nature of defendants' trading inside the class period compared to outside it. 892 F.Supp.2d 1102, 1137–38 (S.D.Ind. 2012).

(Dckt. ##51 at 52–53; 57 at 29–30). The Court disagrees. With respect to the August announcement of Sprout's Tagger acquisition, plaintiff alleged that defendants described influencer marketing as a "customer requirement" seen "in more than half of our enterprise RFPs," and that various CWs described that capability as a well-known feature gap throughout the Class Period. (Dckt. #40 ¶¶66–89, 133). And on June 5, 2024, Rechel himself stated that Sprout recognized the need for influencer capabilities in "the back half of 2022"—i.e., before various misstatements were made during the Class Period. (*Id.* ¶246).

Defendants' May 2024 disclosure also supports scienter because, at that time, defendants disclosed that efforts to "redraw[] [Sprout's] go-to-market model" had been underway since Q4 of 2023. (Dckt. #40 ¶151). Defendants attempt to distinguish *In re Apple Inc. Securities Litigation* because, in that case, the Apple CEO's statements made clear, "[b]y process of elimination" of the months in a financial quarter, that he had seen signs of financial difficulty at a time when he made allegedly misleading statements about Apple's wellbeing. No. 19-cv-02033-YGR, 2020 WL 6482014, at *9 (N.D.Cal. Nov. 4, 2020).

While the inferences in *In re Apple*, the court noted, were "not hard," here they are only slightly more difficult. *Id.* On November 2, 2023, when analysts asked whether Sprout needed to change its go-to-market strategy, Barretto answered there were "no major changes to call out" because Sprout's "go-to-market strategy is working." (Dckt. #40 ¶¶139, 151). But on May 2, 2024, Barretto admitted that "the decisions on all this"—referring to Sprout's changed sales strategy, among other things—happened in Q4" of 2023. (*Id.* ¶151). This statement "plausibly suggests that defendants saw troubling signs" throughout Q4 of 2023, and not solely (and abruptly) in the two months following Barretto's November 2, 2023 statement. *In re Apple*, 2020

WL 6482014, at *9. As such, defendants' alleged admissions support a strong inference of scienter.

Defendants also contend that any "repudiation" of the Razor Report does not support an inference of scienter, because plaintiff fails to allege that defendants "even reviewed the report." (Dckt. ##51 at 53 n.35; 57 at 30–31). But defendants misconstrue the way that the alleged denials support scienter. It is certainly true that explicit denials of a *particular report* support a strong inference of scienter. *See Karimi*, 607 F.Supp.3d at 388 (alleging a public denial that expressly refuted another source); *In re Cassava Scis., Inc. Sec. Litig.*, No. 1:21-CV-751-DAE, 2023 WL 3442087, at *9 (W.D.Tex. May 11, 2013) (same); *In re EQT Corp. Sec. Litig.*, 504 F.Supp.3d 474, 481, 497–98 (W.D.Pa. 2020) (same). But defendants' response to analyst questions (allegedly about the Razor Report) separately support scienter because defendants were "specifically asked, directly and repeatedly, whether the company's" strategy needed to change despite Sprout's upmarket shift. *Avaya*, 564 F.3d at 270. Analysts' "focused questions," and defendants' responses thereto, "mark an important distinction between this case and those in which . . . defendants were most likely simply ignorant of the facts that made their statements false." *Id.* Accordingly, defendants' admissions and response to questions about the Razor Report support a strong inference of scienter.

**5. Facts That Do Not Support Scienter**

Two sets of facts alleged by plaintiff do not ultimately support an otherwise strong inference of scienter. The first concerns executive resignations. In support of scienter, plaintiff contends that several C-suite officers—Chief Marketing Officer Jamie Gilpin, Chief Revenue Officer John Schoenstein, Chief Technology Officer Aaron Rankin, and CEO Justyn Howard—allegedly resigned with "suspicious" timing after defendants' first admissions, between September 2023 and April 2024. Defendants argue that the departures of non-defendant

executives do not support a strong inference of scienter. (Dckt. #51 at 51–52). In this case, the Court agrees.

"[T]iming of terminations and resignations . . . can [support] a strong inference of scienter." *In re Pareteum*, 19 Civ. 9767 (AKH), 2021 WL 3540779, at *17 (S.D.N.Y. Aug. 11, 2021) (collecting cases). "For corporate departures to strengthen an inference of scienter, there must be particularized allegations connecting the departures to the alleged fraud." *In re Hertz Glob. Holdings Inc.*, 905 F.3d 106, 118 (3d Cir. 2018). Here, however, the most plaintiff does is allege a link between Gilpin and Schoenstein's abrupt and unexplained resignations in late 2023—three to four months after defendants' alleged disclosures in May and August 2023—to "Sprout's long-term growth prospects . . . collapsing" and defendants' strategic "revamp[]." (Dckt. #40 ¶142). Plaintiff concedes that Rankin and Howard did not actually resign, but contends that "it is unsurprising they remained on the Board in light of their roles as Sprout co-founders." (Dckt. #53 at 52 n.21). Without more facts linking the highlighted corporate resignations to the alleged fraud—or, indeed, more than two cursory case cites in plaintiff's opposition brief—plaintiff fails to allege that the departures of Gilpin and Schoenstein, or the changed titles of Rankin and Howard, support an inference of scienter.

Second, defendants contend that "Sprout's decision to shift away from ARR as a reporting metric" cannot, without more, support an inference of scienter. (Dckt. #51 at 52 n.34). They emphasize that ARR is not a required disclosure, and that defendants explained their decision to stop reporting ARR because they "no longer believ[ed]" it was a key performance indicator. (Dckt. #40 ¶145). Where, as here, plaintiff failed to develop this argument of scienter with citation to any legal authority, (*see* Dckt. #53 at 55), the Court agrees with defendant that the change in reporting metrics alleged here does not support an inference of scienter. *See Cupat*

*v. Palantir Techs., Inc.*, No. 1:22-CV-02805-GPG-SBP, 2025 WL 1141534, at *12 (D.Colo. Apr. 4, 2025) (finding allegations of abandoned reporting metrics inadequate to support scienter); *Fischer v. Magyar Allamvasutak Zrt.*, No. 1:10-cv-00868, 2025 WL 2654161, at *3 (N.D.Ill. Sept. 16, 2025) ("The Seventh Circuit has unequivocally held that a party's failure to develop an argument with citation to legal authority constitutes . . . waiver.").

Nonetheless, because plaintiff otherwise adequately alleges other facts such that, in totality, "a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference," *Tellabs*, 551 U.S. at 324, the Court finds that plaintiff has adequately alleged scienter.

**D. Loss Causation**

Next, defendants argue that the complaint fails to plead loss causation because Sprout's purported "corrective disclosures" did not plausibly cause the company's stock prices to decline. (Dckt. #51 at 54–57). Plaintiff argues that it adequately alleges loss causation because it alleges that Sprout's disclosures from May 2, 2023, August 3, 2023, and May 2, 2024 each revealed, at least partially, the falsity of prior statements in a way that plausibly caused loss. (Dckt. #53 at 55–57). For the following reasons, the Court agrees.

The notice pleading standard of Rule 8 governs allegations of loss causation. *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 338 (2005); *Coll. Ret. Equities Fund*, 2026 WL 891657, at *7. "[L]oss causation allegations need only 'provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind.'" *Ray v. Citigroup Global Markets, Inc.*, 482 F.3d 991, 995 (7th Cir. 2007), *quoting Dura*, 544 U.S. at 347. A plaintiff can satisfy this element by plausibly alleging that when the truth regarding an alleged misstatement emerged—referred to as corrective disclosure—the price of the company's shares declined as a result. *In re Allstate Corp. Sec. Litig.*, 966 F.3d 595, 612 n.5 (7th Cir. 2020); *Dura*, 544 U.S. at

346–47. These corrective disclosures need not be a mirror image of previous misstatements, and "loss causation may be plead on a theory of partial disclosures." *Hedick*, 2021 WL 3566602, at *16; *see Coll. Ret.*, 2026 WL 891657, at *1; *In re Williams Sec. Litig.-WCG Subclass*, 558 F.3d 1130, 1140 (10th Cir. 2009); *Alaska Elec. Pension Fund v. Flowserve Corp.*, 572 F.3d 221, 230 (5th Cir. 2009). A plaintiff need only plead that defendants' misstatements were "at least one plausible cause of the economic loss." *AnchorBank, FSB v. Hofer*, 649 F.3d 610, 618 (7th Cir. 2011).

Plaintiff has adequately pleaded loss causation for the corrective disclosures it identifies on May 2, 2023; August 3, 2023; and May 2, 2024. For each disclosure, plaintiff identifies statements that it alleges revealed at least the partial truth about defendants' previous false statements. On May 2, 2023, for example, defendants announced Sprout's need to shift resources and go-to-market strategies toward "mid-market and enterprise," contrary to prior statements about the company's enterprise readiness, and Sprout's stock price dropped 12.1%. (Dckt. #40 ¶¶269–70). On August 3, 2023, defendants announced poor Q2 2023 results and admitted the need to acquire Tagger to fill gaps in Sprout's social media marketing capabilities, contrary to prior statements about there being no "gaps" in Sprout's feature set for enterprise customers, and Sprout's stock price dropped 12.3%. (*Id.* ¶¶272–73). And on May 2, 2024, defendants announced poor Q1 2024 results and disclosed that for months Sprout had been "building new vertical sales teams, accelerating promotions in [enterprise]," and "prioritizing Tagger enablement" to facilitate its shift upmarket, despite prior statements that the strategy and product that had worked for SMB were also working for enterprise, and Sprout's stock price dropped 40.1%. (*Id.* ¶¶276–77).

In short, each of the alleged corrective disclosures plausibly: (1) corrected a previous false statement and (2) caused the price of Sprout's shares to decline. Other than repeat their arguments that plaintiff fails to allege falsity and insist, incorrectly, that partial disclosures are insufficient to establish loss causation, defendants fail to make any arguments to the contrary. (*See* Dckt. ##51 at 55–57; 57 at 35–38).[18] Accordingly, the Court finds that plaintiff has adequately pleaded loss causation for defendants' 2023 and 2024 corrective disclosures.

The Court thus finds that plaintiff has adequately stated a claim for violation of Section 10(b) of the Securities Exchange Act, and therefore denies defendants' motion to dismiss plaintiff's Section 10(b) claim.

**E. Section 20(A) Claim**

"Section 20(a) creates vicarious liability for a person who actually or potentially controlled the primary violator's acts." *Foss v. Bear, Stearns & Co.*, 394 F.3d 540, 543 (7th Cir. 2005). In addition to a primary securities violation, plaintiff must also allege that (1) each of the defendant officers exercised general control over Sprout's operations, and (2) each of the defendant officers "possessed the power or ability to control the specific transaction or activity upon which the primary violation was predicated, whether or not that power was exercised." *Harrison v. Dean Witter Reynolds, Inc.*, 974 F.2d 873, 880–81 (7th Cir. 1992). Because defendants argue that plaintiff's Section 20(a) claim should fail with its Section 10(b) claim, but

---

[18] *Cf. Coronel v. Quanta Cap. Holdings Ltd.*, No. 07 CIV. 1405 (RPP), 2009 WL 174656, at *30–31 (S.D.N.Y. Jan. 26, 2009) (finding no loss causation pleaded where stock prices declined prior to the public disclosure of an omission, or where there were multiple causes of a potential stock price drop); *Tricontinental Indus., Ltd. v. PricewaterhouseCoopers, LLP*, 475 F.3d 824, 843–44 (7th Cir. 2007) (same, where plaintiff did not link corrective disclosure and alleged misstatement); *Boca Raton Firefighters' & Police Pension Fund v. DeVry Inc.*, No. 10 C 7031, 2012 WL 1030474, at *18 (N.D.Ill. Mar. 27, 2012) (same, where plaintiff failed to allege any corrective disclosure); *Fort Worth Employers' Ret. Fund v. Biovail Corp.*, 615 F.Supp.2d 218, 229 (S.D.N.Y. 2009) (same); *Makor Issues & Rts., Ltd. v. Tellabs, Inc.*, 735 F.Supp.2d 856, 908 (N.D.Ill. 2010) (at summary judgment, finding no loss causation shown where the only fact disclosed was an earnings miss).

plaintiff has adequately pled a Section 10(b) violation, the Court denies defendants' motion to dismiss as to plaintiff's Section 20(a) claim.

## CONCLUSION

For the reasons set forth above, the Court denies defendants' motion to dismiss. (Dckt. #47). Defendants are ordered to answer by October 27, 2026. The stay on discovery is lifted. By November 10, 2026, the parties shall file a joint status report setting forth a proposed schedule for the completion of fact and expert discovery and providing an update on the status of their settlement negotiations. An in-person status hearing is set for November 19, 2026 at 11:00 a.m.

**DATE:** **October 6, 2026**

**Jeffrey I. Cummings**
**United States District Court Judge**